**EXHIBIT 2**

**INDEX OF STATE COURT DOCUMENTS**

| Exhibit No. | Date | Description |
|---|---|---|
| 3 | N/A | State Court Docket (accessed November 25, 2025) |
| 4 | 10/20/2025 | *Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief* |
| 5 | 10/22/2025 | Letter to Court re: Fees for Citations |
| 6 | 10/22/2025 | Citation – Aaron Shimek |
| 7 | 10/22/2025 | Citation – 84 Energy, LLC |
| 8 | 10/22/2025 | Citation – 84 Energy Holdings, LLC |
| 9 | 10/24/2025 | Return of Service – Aaron Shimek |
| 10 | 10/24/2025 | Return of Service – 84 Energy, LLC |
| 11 | 10/24/2025 | Return of Service – 84 Energy Holdings, LLC |
| 12 | 11/11/2025 | *Defendants' Original Answer to Plaintiff's Original Petition for Declaratory Relief and Counterclaims* |
| 13 | 11/21/2025 | Assignment Order |
| 14 | 11/24/2025 | *Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC's First Amended Petition For Declaratory Relief and Verified Application for Injunctive Relief* |
| 15 | 11/24/2025 | Proposed Order Granting Plaintiffs' Verified Application for Temporary Restraining Order |
| 16 | 11/24/2025 | Notice of Hearing |
| 17 | 11/25/2025 | Suggestion of Bankruptcy |

11/25/25, 5:26 PM                          re:SearchTX - Andrew Kollaer vs. 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek 25-BC11B-0074

https://research.txcourts.gov/CourtRecordsSearch/ViewCasePrint/0772b5c45f2d45c19386a18a81d47699

## Case Information

### Andrew Kollaer vs. 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek

25-BC11B-0074

Location
Business Court 11b

Case Category
Civil - Other Civil

Case Type
Debt/Contract - Other

Case Filed Date
10/20/2025

Judge
Marialyn Barnard

Case Status
Active

**EXHIBIT 3**

## Parties [4]

| Type | Name | Nickname/Alias | Attorneys |
|------|------|----------------|-----------|
| Plaintiff | Kollaer, Andrew | | Leonard, David, JR |
| Defendant | 84 Energy, LLC | | Hendershot, Simon W., III, Spears, Lacey |
| Defendant | 84 Energy Holdings, LLC | | Hendershot, Simon W., III, Spears, Lacey |
| Defendant | Shimek, Aaron | | Hendershot, Simon W., III, Spears, Lacey |

## Hearings [1]

| Date/Time | Hearing Type | Judge | Location | Result |
|-----------|--------------|-------|----------|--------|
| 11/25/2025 03:00 PM | Temporary Restraining Order | Barnard, Marialyn | Virtual/Video Hearing | |

## Events [18]

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 10/20/2025 | Filing | OP | Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief | Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief.pdf |
| 10/20/2025 | Filing | O | No Documents (i) | |
| 10/22/2025 | Service | Citation | - | - |
| 10/22/2025 | Service | Citation | - | - |
| 10/22/2025 | Service | Citation | - | - |
| 10/22/2025 | Filing | REQ | Letter to Court regarding fees for citation | Letter to court re fees for citation.pdf |
| 10/22/2025 | Filing | CITISS | Citation - 84 Energy, LLC | Citation - 84 Energy, LLC.pdf |
| 10/22/2025 | Filing | CITISS | Citation - 84 Energy Holdings, LLC | Citation - 84 Energy Holdings, LLC.pdf |
| 10/22/2025 | Filing | CITISS | Citation - Aaron Shimek | Citation - Aaron Shimek.pdf |
| 10/24/2025 | Filing | RETS | Return of Service 84 Energy, LLC | Return of Service 84 Energy, LLC.pdf |
| 10/24/2025 | Filing | RETS | Return of Service 84 Energy Holdings, LLC | Return of Service 84 Energy Holdings, LLC.pdf |
| 10/24/2025 | Filing | RETS | Return of Service Aaron Schimek | Return of Service Aaron Shimek.pdf |
| 11/12/2025 | Filing | CCINT3RD | Defendants' Original Answer and Counterclaims | Defendants' Original Answer and Counterclaims.pdf |
| 11/21/2025 | Filing | OAPJ | Assignment Order | Assignment Order.pdf |

11/25/25, 5:26 PM                    re:SearchTX - Andrew Kollaer vs. 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek 25-BC11B-0074

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 11/24/2025 | Filing | AMPET | Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC's First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief | Plaintiffs' First Amended Petition and Application for TRO.pdf |
| 11/24/2025 | Filing | PO | Proposed Order Granting Plaintiffs' Verified Application for Temporary Restraining Order | Proposed Order Granting Plaintiffs' Verified Application for Temporary Restraining Order.pdf |
| 11/24/2025 | Filing | NOH | Notice of TRO Hearing | 25-BC11B-0074 Notice of TRO Hearing.pdf.pdf |
| 11/25/2025 | Hearing | Temporary Restraining Order | - | - |

© 2025 Tyler Technologies, Inc. | All Rights Reserved

Version: 2025.9.2.1644



E-filed in the Office of the Clerk
for the Business Court of Texas
10/20/2025 8:37 PM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

**THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION**

**EXHIBIT
4**

25-BC11B-0074

| | |
|---|---|
| **ANDREW KOLLAER,** | § |
| | § |
| *Plaintiff*, | § |
| | § |
| **v.** | § |
| | § |
| **84 ENERGY, LLC, 84 ENERGY** | § |
| **HOLDINGS, LLC,** | § |
| **AND AARON SHIMEK,** | § |
| | § |
| *Defendants*. | § |

**CAUSE NO._____**

**PLAINTIFF ANDREW KOLLAER'S
ORIGINAL PETITION FOR DECLARATORY RELIEF**

Plaintiff Andrew Kollaer ("*Plaintiff*") files this Original Petition for Declaratory Relief against Defendants 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek.

**DEFENDANTS' UNILATERAL AND RECKLESS CONDUCT**

1.     On October 8, 2025, Defendant Aaron Shimek ("*Shimek*") unilaterally began shutting-in oil and gas wells owned by 84 Resources Holdings, LLC and 84 Energy Resources I, LLC (the "*Companies*"). In so doing, Shimek acted on behalf of Defendant 84 Energy, LLC (the "*Operator*"), the operator of record of the wells. Shimek owns and controls the Operator.

2.     Shimek shut-in the wells without any prior notice or plans to resume production. The investors of the Companies, the parties who actually own the wells, have offered to take over the operatorship, but Shimek refuses to cooperate. Instead, Shimek insists the wells remain shut-in while he attempts to negotiate a cash buyout from the investors.

3.     Shimek's bad-faith gamesmanship is extraordinarily reckless and threatens to damage the oil and gas reservoirs and their future productivity. These matters worsen every day that passes and threaten to completely wipe out a $28 million investment in over 1,000 oil and gas

4927-6117-4899.4

Copy from re:SearchTX

wells owned by the Companies.

4.      This destructive result is at odds with Shimek's duties and responsibilities to the Companies as member and/or manager.  Shimek cannot acknowledge this reality because he is so immersed in conflicts of interest associated with him favoring his role as operator over his role as member and/or manager of the Companies.

5.      Meanwhile, Plaintiff—who is co-manager of the Companies with Shimek—is picking up the pieces and trying to stop the bleeding in order to mitigate liability and preserve value.  Unfortunately, Shimek refuses to cooperate, and Plaintiff therefore had no choice but to sever the Companies' ties with Shimek by written notice dated October 20, 2025.

6.      Shimek still refuses to voluntarily step down so Plaintiff must file this lawsuit to confirm the effect of the October 20 correspondence.  Obtaining such a declaration will, among other things, enable the Companies to petition the Railroad Commission of Texas to remove the derelict operator—Defendant 84 Energy, LLC—and replace it with a solvent and competent one.

### DISCOVERY (LEVEL 2)

7.      Discovery in this case should be conducted in accordance with Level 2, TEX. R. CIV. P. 190.3.

### PARTIES

8.      Plaintiff Andrew Kollaer is an individual residing in Harris County, Texas. Plaintiff has standing in this case pursuant to TEX. CIV. PRAC. REM. CODE § 37.004(a) on at least the following grounds:

   a.  Plaintiff is authorized to act on behalf of non-party 84 Resources Holdings, LLC ("***Resources Holdings***") as manager of non-party 84 Resources Management, LLC ("***Resources Management***"), the manager of 84 Resources Holdings.

   b.  Plaintiff is authorized to act on behalf of Resources Management as its manager and member.

4927-6117-4899.4

Copy from re:SearchTX

c. Plaintiff is authorized to act on behalf of non-party 84 Energy Resources I, LLC ("***Energy Resources***") as manager of Magnolia Texas Management, LLC who is the co-manager of MPC Conventional Management, LLC, the manager of Energy Resources.  MPC Conventional Management, LLC is also manager of MPC 84 I, LLC, the member of Energy Resources.

9.      Defendant 84 Energy, LLC is a Texas limited liability company.  It may be served through its registered agent, Aaron Shimek, 1902 Winners Cir., Richmond, Texas, 77406, or wherever he may be found.

10.      Defendant Aaron Shimek is an individual residing in Fort Bend County, Texas and may be served at 1902 Winners Cir., Richmond, Texas, 77406, or wherever he may be found.

11.      Defendant 84 Energy Holdings, LLC is a Texas limited liability company.  It may be served through its registered agent, Aaron Shimek, 1902 Winners Cir., Richmond, Texas, 77406, or wherever he may be found.

<div align="center">

**VENUE AND JURISDICTION**

</div>

12.      The relief sought is within the jurisdictional limits of this Court.  This Court has jurisdiction over Plaintiff's claims pursuant to Sections 25A.004(b), (e) of the Texas Government Code.  The value of the rights at issue in this case, and the harm to the Companies if those rights are not enforced, exceeds $5 million and thus the amount-in-controversy exceeds $5 million. *SafeLease Ins. Servs. LLC v. Storable, Inc.*, 707 S.W.3d 130, 134 (Tex. Bus. Ct. 2025); *Tex. Dep't of Pub. Safety v. Barlow*, 48 S.W.3d 174, 176 (Tex. 2001).

13.      In accordance with TEX. R. CIV. P. 47(c), Plaintiff states that he seeks nonmonetary relief along with an award of costs and his reasonable and necessary attorneys' fees.

14.      Venue is proper in Harris County because all or a substantial part of the events or omissions riving rise to Plaintiff's claim occurred in Harris County.  TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).

Copy from re:SearchTX

FACTUAL BACKGROUND

A.    **The Company Agreements**

*Energy Resources*

15.    As mentioned above, Plaintiff is an authorized representative of Energy Resources. Energy Resources owns approximately 113 oil and gas wells located in Polk and Newton Counties, Texas.  It is largely owned by a group of outside investors who are vested with minimal direct operational control.

16.    Energy Resources is governed by a Company Agreement dated September 11, 2023 (the "***Energy Resources Company Agreement***").  Prior to October 20, 2025, Operator was a co-manager of Energy Resources.  Operator was also named as contract operator of the oil and gas wells owned by Energy Resources.  Again, Shimek is the sole owner and operator of Operator.

17.    Article 5.11 of the Energy Resources Company Agreement vests the member (MPC 84 I, LLC) with the ability to remove a manager (such as Operator) for "Cause."  Article 1.12(i) broadly defines "Cause" to include, among other things, breach of contract, breach of operational standards, and breach of fiduciary duties.

18.    Article 1 indicates Operator is the contract operator of the oil and gas wells owned by Energy Resources.  There is not a separate operating agreement and Operator's duties and responsibilities are not otherwise specifically enumerated in the Energy Resources Company Agreement.  However, Article 5.14 expressly gives Plaintiff, by and through MPC 84 I, LLC, the right to remove Operator as the operator of record.

*Resources Holdings*

19.    Plaintiff is also an authorized representative of a different company, Resources Holdings, by virtue of his position with the company's manager, Resources Management. Resources Holdings owns approximately 926 oil and gas wells located in twelve different counties

4

Copy from re:SearchTX

in Texas.  It is largely owned by the same group of outside investors who own Energy Resources.  Similar to Energy Resources, the investors are vested with minimal direct operational control.

20.     Resources Holdings is governed by a Company Agreement dated March 15, 2024 (the "***Resources Holdings Company Agreement***").  Prior to October 20, 2025, Operator was a co-manager of Resources Management.  It was also named as contract operator of the oil and gas wells owned by Resources Holdings.  Similar to Energy Resources, the Resources Holdings Company Agreement indicates Operator is the contract operator of the oil and gas wells owned by Resources Holdings, but there is no separate operating agreement.

21.     Article 10.1(b) of the Resources Holdings Company Agreement vests its members with the right to remove a manager with "Cause."  Article I broadly defines "Cause" in terms of the entry of a final judgment entered in connection with the performance of a manager's duties broadly relating to events that have a material adverse effect on the business of the company such as material breaches, willful misconduct, and bad faith.

**B.      Shimek's Reckless and Erratic Self-Dealing**

22.     Against this backdrop, it is evident that *ownership* and *operational control* of the Companies is largely separate.  This unique divide between ownership (investors), control (Plaintiff and Defendants as co-managers), and status as the operator of record with the Railroad Commission of Texas (Operator) presented Shimek with an opportunity to engage in self-dealing transactions whereby he has abused his operational control of the Companies to favor his status as operator of record.

23.     For example, Operator lacks financial wherewithal to serve as contract operator of over 1,000 oil and gas wells.  Operator is unable to fund routine operational expenses in the ordinary course of business and relies on cash advances from the investors.  This design was never intended and falls short of the industry standard.  Operator's solvency has further come into

4927-6117-4899.4

Copy from re:SearchTX

question when an *Agreed Judgment* in favor of Prosperity Bank was entered against it (along with Shimek) in the amount of $1,449,113.30.

24.     Having an insolvent operator is intolerable.   Under these circumstances, an impartial manager acting in the interest of Energy Resources and Resources Holdings would seek to hold Operator accountable as the contract operator.   But that is not possible here because Defendant refuses to act, as that would adversely impact him in his role as contract operator.

25.     Operator's insolvency also reflects its operational incompetence.   Operator's performance as operator has been a complete failure, and it therefore comes as no surprise that the financial returns have been far lower than projected.

26.     Plaintiff and the Companies' investors have complained to Shimek about these issues for months.  And, on behalf of the Companies, Plaintiff has attempted to investigate them. But Plaintiff has had little success because his 50/50 partner, Shimek, refuses to cooperate and share information.  As the operator of record, Shimek is in exclusive control and possession of many business records of Operator, and he hides them from others to protect himself from liability. Shimek otherwise refuses to give up his role as operator in favor of someone else with more financial and operational wherewithal, even though doing so would clearly be in the best interests of the Companies.   There is simply no justification to allow Operator to continue serving as operator of record of the oil and gas wells owned by the Companies.

27.     This issue came to a head on October 1, 2025, when the investors sent a letter to Plaintiff and Shimek, as representatives of the managers of Energy Resources and Resources Holdings, demanding accountability for the poor results of the Companies' operations (the "***Investor Letter***").  The Investor Letter provides six examples of "severe mismanagement" by the manager, all directly attributable to Shimek:

   i.       Allegations of nonpayment of royalties.

<div align="center">6</div>

Copy from re:SearchTX

ii.     A recent lawsuit filed by Prosperity Bank against Defendant pertaining to a loan default exceeding $1 million.

iii.    Allegations of nonpayment of oilfield vendors.

iv.     Unanswered questions regarding conflict-of-interest transactions including Defendant's business with family members and related party transactions.

v.      Operator's regulatory history with the Railroad Commission of Texas.

vi.     Major deviations between "projected" and "actual" oil and gas production.

*See* Investor Letter at pp. 1–2.

28.     The Investor Letter also threatened to cut funding for the underlying oil and gas operations if these issues were not promptly resolved.  Needless to say, Plaintiff was displeased to receive such a letter from the investors.  But none of these allegations came as a surprise because most of these issues had already been discussed for several months; indeed, Plaintiff has attempted to investigate many of these issues but has been stonewalled by Shimek.

29.     Upon receipt of the Investor Letter, Plaintiff again attempted to engage with Shimek to investigate the allegations, but Shimek refused to reconsider his position or substantively engage.

30.     The Investor Letter set a response deadline of October 8.  On October 7, Plaintiff notified Shimek that he agreed with the investors' position and recommended cooperating with them.

31.     Shockingly, also on October 7, Shimek sent a letter to the investors threatening to shut-in the Companies' oil and gas wells and declare bankruptcy.  Ironically, and inexplicably, Shimek declared this proposed course to be in the Companies' best interest: "**I will consult with counsel to determine the best way to shut-in the properties and conclude operations including**

4927-6117-4899.4

Copy from re:SearchTX

**but not limited to filing a bankruptcy proceeding to attempt to preserve the value of the properties and any and all claims owned by the company**."

32.     Further reflecting his bad faith, Shimek acted as if he had the unilateral right to take these actions.  At no time prior to October 7 had Plaintiff and Shimek ever discussed shutting-in the wells or declaring bankruptcy, and it was appalling when Shimek took it upon itself to threaten the investors, acting as if he was authorized to act on behalf of the Companies.  Needless to say, Shimek's proposed course of action is wasteful of oil and gas resources, destructive of value, and not in the Companies' best interest.

33.     Shimek's October 7 letter largely brushed aside the substantive issues at hand, namely, the allegations of "severe mismanagement."  Shimek's dismissive attitude towards the investors is consistent with Plaintiff's dealings with Shimek.

34.     It was even more shocking when Shimek made good on his threat to shut-in the wells and, on about October 9, began contacting field personnel and instructing them to shut in wells.

35.     The Companies' investors immediately responded by letter dated October 9 notifying Shimek they did not approve shutting-in the wells and considered Shimek to have abandoned them.  The investors also stated they would take over the wells and begin operating them.

36.     By this point, to the extent there was any doubt, the investors concluded it was not prudent to continue advancing funds to keep Shimek's failing operation afloat.  The investors had no duty to advance such funds and only did so in good faith because Shimek had already materially breached his duties and obligations to the Companies.  Shimek, as operator, was living paycheck-to-paycheck—a far cry from the operative standard.

4927-6117-4899.4

Copy from re:SearchTX

37.     Shimek responded by letter dated October 13 and, recognizing his mistake, clarified that he was *not* abandoning the wells.  The purpose of Shimek's strategic reversal was to support his ongoing effort to leverage a cash buyout from the investors.  By taking inconsistent action— abandoning the wells, yet refusing to step down as operator of record—Shimek is holding the oil and gas wells hostage in order to extort more money from the investors.

38.     As of the filing of this lawsuit, Shimek is so entrenched in conflicts of interest he is incapable of acting lawfully and refuses to cooperate.  Plaintiff therefore has no choice but to file this lawsuit seeking to confirm the legal effect of his October 20 termination letter vis a vis the operative Company Agreements and other applicable law.

### CAUSE OF ACTION – DECLARATORY RELIEF

39.     As set forth herein, various disputes have arisen regarding the rights, status, and obligations of the parties under the Resources Holdings Company Agreement and the Energy Resources Company Agreement.  Therefore, pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Plaintiff seeks declarations that:

(a)     Due to unlawful acts and omissions by Aaron Shimek, 84 Resources Management, LLC has been removed as manager of Resources Holdings pursuant to the Resources Holdings Company Agreement;

(b)     The members of 84 Resources Management, LLC may appoint a new Manager of the company;

(c)     Due to unlawful acts and omissions by Aaron Shimek, 84 Resources Management, LLC has materially breached the Resources Holdings Company Agreement such that it has been removed and/or terminated as its manager;

(d)     84 Energy, LLC has materially breached the Resources Holdings Company Agreement such that it has been removed and/or terminated as its contract operator;

(e)     84 Energy, LLC has been terminated as contract operator of all wells owned by Resources Holdings;

9

Copy from re:SearchTX

(f)     84 Energy, LLC has been removed as manager of Energy Resources pursuant to the Energy Resources Company Agreement;

(g)     84 Energy, LLC has materially breached the Energy Resources Company Agreement such that it has been removed and/or terminated as manager;

(h)     84 Energy, LLC has materially breached the Energy Resources Company Agreement such that it has been removed and/or terminated as its contract operator;

(i)     84 Energy, LLC has forfeited its B share Member Percentage Interest in MPC 84 I, LLC pursuant to Article 5.11 of the Energy Resources Company Agreement;

(j)     84 Energy, LLC has been terminated as contract operator of all wells owned by Energy Resources; and,

(k)     Aaron Shimek has been removed for cause as manager of Resources Management.

### ATTORNEYS' FEES

40.    Plaintiff requests an award of costs and his reasonable and necessary attorneys' fees incurred in this case and any appeals.  TEX. CIV. PRAC. & REM. CODE § 37.009.

### PRAYER

Plaintiff Andrew Kollaer respectfully requests that Defendants be cited to appear and answer, and that upon final trial hereof, judgment be entered in favor of Plaintiff and against Defendants for:

a.     all declaratory relief set forth herein;

b.     reasonable attorneys' fees, expenses, court fees, and associated costs; and,

c.     for such other and further relief, both general and special, legal or equitable, to which Plaintiff may show himself to be justly entitled.

10

Copy from re:SearchTX

Respectfully submitted,

**GRAY REED**

By: _____/s/_____ *David Leonard*_____
    David Leonard
    dleonard@grayreed.com
    Texas Bar No. 24078847
    Jeremy Walter
    jwalter@grayreed.com
    Texas Bar No. 24098572
    Daniel B. Howry
    dhowry@grayreed.com
    Texas Bar No. 24130877
    1300 Post Oak Blvd. Suite 2000
    Houston, Texas 77056
    T: (713) 986-7180
    F: (713) 986-7100

**ATTORNEYS FOR PLAINTIFF ANDREW KOLLAER**

11

4927-6117-4899.4

Copy from re:SearchTX

### Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Leonard
Bar No. 24078847
dleonard@grayreed.com
Envelope ID: 107072513
Filing Code Description: Petition
Filing Description: Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief
Status as of 10/21/2025 9:01 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Daniel B.Howry | | dhowry@grayreed.com | 10/20/2025 8:37:41 PM | NOT SENT |
| Jeremy Walter | | jwalter@grayreed.com | 10/20/2025 8:37:41 PM | NOT SENT |
| David Leonard | | dleonard@grayreed.com | 10/20/2025 8:37:41 PM | NOT SENT |

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
10/22/2025 3:34 PM
Accepted by: Beverly Crumley
Case Number: 25-BC11B-0074



**EXHIBIT**

**5**

**DAVID LEONARD**
ATTORNEY
D: 713.986.7198
Dleonard@grayreed.com

October 22, 2025

*Via E-file*
The Business Court of Texas
Eleventh Division
Attention: Civil Intake
300 W. 15th Street, Suite 606
Austin, Texas 78701

   Re:  Cause No. 25-BC11B-0074; *Andrew Kollaer v. 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek,* In the Eleventh Division Business Court of Texas.

Dear Sir or Madam:

   We filed Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief on October 20, 2025. The purpose of this letter is to pay the three citation fees of $24.00 for the Petition.

   Thank you for your assistance in this matter. Should you have any questions or need anything further, please do not hesitate to contact us.

   Respectfully yours,

   */s/ David Leonard*

   David Leonard

4919-3166-7308.1

Copy from re:SearchTX

**Business Court of Texas**
**Court Clerk's Office**
**300 W. 15th Street, Suite 606**
**Austin, Texas 78701**
**512-463-1616**

## *ISSUANCE REQUEST FORM*

**Cause #** ___25-BC11B-0074___                **Date requested:** ___10/22/2025___

**Document to include with issuance :** _Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief_

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**
**Issue Service To:** ___Aaron Shimek_____

**Address of Service:** ___1902 Winners Cir._____

**City, State, Zip:** ___Richmond, Texas, 77406_____

**Agent (if applicable** _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED: (Select the proper type)**

___X___ **CITATION** _____**CITATION BY POSTING** _____ **CITATION BY PUBLICATION**

_____ **SECRETARY OF STATE CITATION**        **Newspaper** _____

_____ **TEMPORARY RESTRAINING ORDER** _____ **PRECEPT** _____**NOTICE**

_____ **PROTECTIVE ORDER** _____**ATTACHMENT** _____ **GARNISHMENT**

_____ **SEQUESTRATION** _____ **INJUCTION** _____

_____**OTHER:**_____

Name of person requesting issuance:   David Leonard

Mailing Address:  ___1300 Post Oak Blvd., Suite 2000, Houston, Texas 77056___

Email address to return prepared issuance to:  ___dleonard@grayreed.com and creyes@grayreed.com___

**ALL PREPARED ISSUANCE WILL BE EMAILED TO ATTORNEY OF RECORD/SELF REPRESENTED LITIGANT UPON COMPLETION**

Copy from re:SearchTX
4906-1298-3157.1

**Business Court of Texas**
**Court Clerk's Office**
**300 W. 15th Street, Suite 606**
**Austin, Texas 78701**
**512-463-1616**

## _ISSUANCE REQUEST FORM_

**Cause #** _25-BC11B-0074_          **Date requested:** _10/22/2025_

**Document to include with issuance :** Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**
**Issue Service To:** _84 Energy Holdings, LLC_

**Address of Service:** _1902 Winners Cir._

**City, State, Zip:** _Richmond, Texas, 77406_

**Agent (if applicable** _Aaron Shimek_

**TYPE OF SERVICE/PROCESS TO BE ISSUED: (Select the proper type)**

__x__ **CITATION** _____**CITATION BY POSTING** _____ **CITATION BY PUBLICATION**

_____ **SECRETARY OF STATE CITATION**      **Newspaper** _____

_____ **TEMPORARY RESTRAINING ORDER** _____ **PRECEPT** _____**NOTICE**

_____ **PROTECTIVE ORDER** _____**ATTACHMENT** _____ **GARNISHMENT**

_____ **SEQUESTRATION** _____ **INJUCTION** _____

_____**OTHER:**_____

Name of person requesting issuance: _David Leonard_

Mailing Address: _1300 Post Oak Blvd., Suite 2000, Houston, Texas 77056_

Email address to return prepared issuance to: _dleonard@grayreed.com and creyes@grayreed.com_

**ALL PREPARED ISSUANCE WILL BE EMAILED TO ATTORNEY OF RECORD/SELF REPRESENTED LITIGANT UPON COMPLETION**

Copy from re:SearchTX
4906-1298-3157.1

**Business Court of Texas**
**Court Clerk's Office**
**300 W. 15th Street, Suite 606**
**Austin, Texas 78701**
**512-463-1616**

### *ISSUANCE REQUEST FORM*

**Cause #**    25-BC11B-0074      **Date requested:** 10/22/2025

**Document to include with issuance :** Plaintiff Andrew Kollaer's Original Petition for Declaratory Relief

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**
**Issue Service To:**    84 Energy, LLC

**Address of Service:**   1902 Winners Cir.

**City, State, Zip:**   Richmond, Texas, 77406

**Agent (if applicable**   Aaron Shimek

**TYPE OF SERVICE/PROCESS TO BE ISSUED: (Select the proper type)**

__x__ **CITATION** _____**CITATION BY POSTING** _____ **CITATION BY PUBLICATION**

_____ **SECRETARY OF STATE CITATION**    Newspaper _____

_____ **TEMPORARY RESTRAINING ORDER** _____ **PRECEPT** _____**NOTICE**

_____ **PROTECTIVE ORDER** _____**ATTACHMENT** _____ **GARNISHMENT**

_____ **SEQUESTRATION** _____ **INJUCTION** _____

_____**OTHER:**_____

Name of person requesting issuance:   David Leonard

Mailing Address:   1300 Post Oak Blvd., Suite 2000, Houston, Texas 77056

Email address to return prepared issuance to:   dleonard@grayreed and creyes@grayreed.com

**ALL PREPARED ISSUANCE WILL BE EMAILED TO ATTORNEY OF RECORD/SELF REPRESENTED LITIGANT UPON COMPLETION**

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Celeste Reyes on behalf of David Leonard
Bar No. 24078847
creyes@grayreed.com
Envelope ID: 107172537
Filing Code Description: Notice
Filing Description: Letter to Court regarding fees for citation
Status as of 10/22/2025 3:59 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Leonard | | dleonard@grayreed.com | 10/22/2025 3:34:18 PM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 10/22/2025 3:34:18 PM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 10/22/2025 3:34:18 PM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 10/22/2025 3:34:18 PM | SENT |

Copy from re:SearchTX

**CITATION**

**THE STATE OF TEXAS, Business Court Division 11B**

**NO. 25-BC11B-0074**

**EXHIBIT 6**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

TO:     **Aaron Shimek**
        **1902 Winners Cir.**
        **Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _Beverly Crumley_

---

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____o'clock __M. and executed at _____, within the County of _____, Texas, at _____o'clock ____M. on the ____ day of _____ , 20 __, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the date of delivery.

*NOT EXECUTED, the diligence used to execute being (show manner of delivery) _____

_____; for the following reason _____

The defendant may be found at _____.

*Strike if not applicable.

**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS

_____ SHERIFF/CONSTABLE    BY: _____ DEPUTY

**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
_____ (Street, City, Zip).
      Please print.      (First, Middle, Last)
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____day of _____ , 20____

_____                        _____
Declarant/Authorized Process Server                ID # & expiration of certification

Copy from re:SearchTX

**CITATION**
**THE STATE OF TEXAS, Business Court Division 11B**
**NO. 25-BC11B-0074**

**EXHIBIT**
**7**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

TO:  **84 Energy, LLC, by serving Registered Agent, Aaron Shimek**
**1902 Winners Cir.**
**Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _Beverley Crumley_

---

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____o'clock ___M. and executed at _____, within the County of _____, Texas, at _____o'clock ____M. on the ____ day of _____ , 20 ___, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the date of delivery.
*NOT EXECUTED*, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE     BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
_____ (Street, City, Zip).
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____ , 20_____

       Declarant/Authorized Process Server          ID # & expiration of certification

Copy from re:SearchTX

**CITATION**
**THE STATE OF TEXAS, Business Court Division 11B**
**NO. 25-BC11B-0074**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

**EXHIBIT**
**8**

TO:   **84 Energy Holdings, LLC, by serving Registered Agent, Aaron Shimek**
        **1902 Winners Cir.**
        **Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _Beverly Crumley_

---

**RETURN OF SERVICE**
Came to hand on the _____ day of _____, 20_____, at _____o'clock ___M. and executed at _____, within the County of _____, Texas, at _____o'clock ____M. on the ____ day of _____ , 20 ___, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the date of delivery.
*NOT EXECUTED*, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE     BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
_____ (Street, City, Zip).
      Please print.     (First, Middle, Last)
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____, 20____
      Declarant/Authorized Process Server              ID # & expiration of certification

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
10/24/2025 11:33 AM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

**CITATION**
**THE STATE OF TEXAS, Business Court Division 11B**
**NO. 25-BC11B-0074**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

**EXHIBIT**
**9**

TO:    **Aaron Shimek**
       **1902 Winners Cir.**
       **Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616
By: *Beverly Crumley*

---

**RETURN OF SERVICE**
Came to hand on the _____ day of _____, 20____, at _____o'clock __M. and executed at _____, within the County of _____, Texas, at _____o'clock ____M. on the ____ day of _____ , 20 __, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the date of service.
*NOT EXECUTED, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____.
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE    BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
          Please print.      (First, Middle, Last)
_____ (Street, City, Zip).
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____ , 20_____.

_____        _____
Declarant/Authorized Process Server                ID # & expiration of certification

Copy from re:SearchTX

## CAUSE NUMBER: 25-BC11B-0074

**ANDREW KOLLAER**
**PLAINTIFF**

**VS.**

**IN THE BUSINESS COURT OF TEXAS,**
**ELEVENTH DIVISION**

**84 ENERGY, LLC, ET AL**
**DEFENDANT**

### RETURN OF SERVICE

My name is **SHARON MOTEN YOUNG**. I am over the age of eighteen (18), I am not a party to this case and, as a disinterested person, I have no interest in the outcome of this case. I am in all ways competent to make this affidavit and this affidavit is based on personal knowledge. The facts stated herein are true and correct. My business address is: 1320 QUITMAN ST. STE 100, HOUSTON, HARRIS COUNTY, TX 77009, U.S.A.

ON **Thursday October 23, 2025 AT 8:43 AM - CITATION, PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF** came to hand for service upon **AARON SHIMEK**.

On **Friday October 24, 2025** at **7:38 AM** - The above named documents were hand delivered to: **AARON SHIMEK @ 1902 WINNERS CIRCLE**, **RICHMOND**, **TX 77406**, **in Person.**

**FURTHER AFFIANT SAYETH NOT.**

STATE OF TEXAS                                    DECLARATION

"My name is **SHARON MOTEN YOUNG**, I am over the age of Eighteen**, my business address is 1320 QUITMAN STREET, HOUSTON, TX 77009,** and I declare under penalty of perjury that this affidavit is true and correct."

Executed in **Harris County, State of Texas on Friday October 24, 2025**

**PSC#12710 EXP. 06/30/26**
Declarant; Appointed in accordance with State Statutes.

2025.10.1090086

efile@courtrecords.com

E-filed in the Office of the Clerk
for the Business Court of Texas
10/24/2025 11:22 AM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

**CITATION**
**THE STATE OF TEXAS, Business Court Division 11B**
**NO. 25-BC11B-0074**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

> **EXHIBIT**
> **10**

TO:   **84 Energy, LLC, by serving Registered Agent, Aaron Shimek**
      **1902 Winners Cir.**
      **Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _Beverly Crumley_

---

**RETURN OF SERVICE**

Came to hand on the _____ day of _____, 20____, at _____o'clock ___M. and executed at _____, within the County of _____, Texas, at _____o'clock _____M. on the _____ day of _____ , 20 __, by delivering to the within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the date of delivery.
*NOT EXECUTED, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE     BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.
My name is _____, my date of birth is _____, and my address is
_____ Please print.      (First, Middle, Last)
_____ (Street, City, Zip).
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____ , 20_____

Declarant/Authorized Process Server          ID # & expiration of certification

## CAUSE NUMBER: 25-BC11B-0074

**ANDREW KOLLAER**
**PLAINTIFF**

**VS.**
      **IN THE BUSINESS COURT OF TEXAS,**
      **ELEVENTH DIVISION**

**84 ENERGY, LLC, ET AL**
**DEFENDANT**

### RETURN OF SERVICE

My name is **SHARON MOTEN YOUNG**. I am over the age of eighteen (18), I am not a party to this case and, as a disinterested person, I have no interest in the outcome of this case. I am in all ways competent to make this affidavit and this affidavit is based on personal knowledge. The facts stated herein are true and correct. My business address is: 1320 QUITMAN ST. STE 100, HOUSTON, HARRIS COUNTY, TX 77009, U.S.A.

ON **Thursday October 23, 2025 AT 8:43 AM - CITATION, PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF** came to hand for service upon **84 ENERGY LLC, BY SERVING REGISTERED AGENT, AARON SHIMEK**.

On **Friday October 24, 2025** at **7:38 AM** - The above named documents were hand delivered to: **84 ENERGY LLC, BY DELIVERING TO ITS REGISTERED AGENT, AARON SHIMEK @ 1902 WINNERS CIRCLE, RICHMOND, TX 77406, in Person.**

**FURTHER AFFIANT SAYETH NOT.**

STATE OF TEXAS                 DECLARATION

"My name is **SHARON MOTEN YOUNG,** I am over the age of Eighteen, my business address is **1320 QUITMAN STREET, HOUSTON, TX 77009,** and I declare under penalty of perjury that this affidavit is true and correct."

Executed in **Harris County, State of Texas on Friday October 24, 2025**

**PSC#12710 EXP. 06/30/26**
Declarant; Appointed in accordance with State Statutes.

                        2025.10.1090092

efile@courtrecords.com

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
10/24/2025 11:41 AM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

**CITATION**
**THE STATE OF TEXAS, Business Court Division 11B**
**NO. 25-BC11B-0074**

**EXHIBIT**
**11**

**ANDREW KOLLAER VS. 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK**

TO:    **84 Energy Holdings, LLC, by serving Registered Agent, Aaron Shimek**
       **1902 Winners Cir.**
       **Richmond, TX  77406**

DEFENDANT in the above styled and numbered cause:

YOU HAVE BEEN SUED.  You may employ an attorney. If you or your attorney do not file a written answer with the clerk
who issued this citation by 10:00 a.m. on the Monday following the expiration of twenty days after you were served this
citation and petition, a default judgment for the relief demanded in the petition may be taken against you.  In addition to
filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These
disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at
TexasLawHelp.org

Attached is a copy of the PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF in the above styled
and numbered cause, which was filed on the 20th day of October, 2025 in the Texas Business Court Division 11B. This
instrument describes the claim against you.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office on this on this the 22nd day of October, 2025.

ADDRESS OF LEAD ATTORNEY FOR
PLAINTIFF:
David Leonard, Jr.
1300 Post Oak Blvd Ste 2000
Houston TX  77056-8000
(713) 986-7198



**Beverly Crumley, Business Court Clerk**
300 W. 15th Street, Suite 606
Austin, Texas 78701
(512) 463-1616

By: _Beverley Crumley_

---

**RETURN OF SERVICE**
Came to hand on the _____ day of _____, 20_____, at _____o'clock ___M. and executed at _____, within the
County of _____, Texas, at _____o'clock _____M. on the _____ day of _____ , 20 ___, by delivering to the
within named _____, in person a true copy of this citation, with a true and correct copy of PLAINTIFF
ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF attached thereto, having first endorsed on such copy of citation the
date of delivery.
*NOT EXECUTED*, the diligence used to execute being (show manner of delivery) _____
_____; for the following reason _____
The defendant may be found at _____.
*Strike if not applicable.
**TO CERTIFY WHICH WITNESS MY HAND OFFICIALLY** _____ COUNTY, TEXAS
_____ SHERIFF/CONSTABLE     BY: _____ DEPUTY
**FEE FOR SERVICE OF CITATION: $ _____**

| **COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.** |
| --- |
| In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return. |

My name is _____, my date of birth is _____, and my address is
_____ (Street, City, Zip).
          Please print.       (First, Middle, Last)
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____ , on the _____day of _____ , 20_____

Declarant/Authorized Process Server              ID # & expiration of certification

Copy from re:SearchTX

**CAUSE NUMBER: 25-BC11B-0074**

**ANDREW KOLLAER**
**PLAINTIFF**

**VS.**                                                    **IN THE BUSINESS COURT OF TEXAS,**
                                                           **ELEVENTH DIVISION**

**84 ENERGY, LLC, ET AL**
**DEFENDANT**

**RETURN OF SERVICE**

My name is **SHARON MOTEN YOUNG**. I am over the age of eighteen (18), I am not a party to this case and, as a disinterested person, I have no interest in the outcome of this case. I am in all ways competent to make this affidavit and this affidavit is based on personal knowledge. The facts stated herein are true and correct. My business address is: 1320 QUITMAN ST. STE 100, HOUSTON, HARRIS COUNTY, TX 77009, U.S.A.

ON **Thursday October 23, 2025 AT 8:43 AM - CITATION, PLAINTIFF ANDREW KOLLAER'S ORIGINAL PETITION FOR DECLARATORY RELIEF** came to hand for service upon **84 ENERGY HOLDINGS, LLC, BY SERVING REGISTERED AGENT, AARON SHIMEK**.

On **Friday October 24, 2025** at **7:38 AM** - The above named documents were hand delivered to: **84 ENERGY HOLDINGS, LLC, BY DELIVERING TO ITS REGISTERED AGENT, AARON SHIMEK @ 1902 WINNERS CIRCLE, RICHMOND, TX 77406, in Person.**

**FURTHER AFFIANT SAYETH NOT.**

STATE OF TEXAS                          DECLARATION

"My name is **SHARON MOTEN YOUNG,** I am over the age of Eighteen, my business address is **1320 QUITMAN STREET, HOUSTON, TX 77009,** and I declare under penalty of perjury that this affidavit is true and correct."

Executed in **Harris County, State of Texas on Friday October 24, 2025**

_____

**PSC#12710 EXP. 06/30/26**
Declarant; Appointed in accordance with State Statutes.

2025.10.1090089

efile@courtrecords.com

E-filed in the Office of the Clerk
for the Business Court of Texas
11/11/2025 4:47 PM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

**THE BUSINESS COURT OF TEXAS**
**ELEVENTH DIVISION**

**EXHIBIT**
**12**

| | | |
|---|---|---|
| **ANDREW KOLLAER** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 25-BC11B-0074** |
| | § | |
| **84 ENERGY, LLC, 84 ENERGY** | § | |
| **HOLDINGS, LLC, AND AARON** | § | |
| **SHIMEK** | § | |
| **Defendant.** | § | |

**DEFENDANTS' ORIGINAL ANSWER TO PLAINTIFF'S ORIGNAL PETITION FOR**
**DECLARATORY RELIEF AND COUNTERCLAIMS**

Defendants/Counter-Plaintiffs, 84 Energy, LLC ("84 Energy"), 84 Energy Holdings, LLC ("Energy Holdings"), and Aaron Shimek ("Shimek") (collectively "Defendants"), file this Original Answer to Plaintiff/Counter-Defendant Andrew Kollaer's ("Kollaer") Original Petition for Declaratory Judgment and Counterclaims. In support, Defendants respectfully show the Court the following:

**DEFENDANTS' ORIGINAL ANSWER**

**I.     GENERAL DENIAL**

1.     As authorized by Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny all allegations contained in Kollaer's pleading and respectfully request that Kollaer be required to prove the charges and allegations against Defendants by a preponderance of the evidence as is required by the Constitution and laws of the State of Texas.

**II.     ADDITIONAL DENIALS AND DEFENSES**

2.     Defendants deny that Shimek or 84 Energy abandoned wells, acted in bad faith, or attempted to coerce a buyout. Any temporary shut-ins or operational changes were undertaken in

1

Copy from re:SearchTX

good faith, consistent with prudent-operator standards, and were necessitated by Plaintiff and the investor group's refusal to authorize or provide funding required for operations.

      3.    The individuals—including Kollaer—who signed the October 20, 2025 removal letter lacked authority to remove 84 Energy or Shimek as managers of any entity.

     a.    **84 Energy Resources I, LLC ("Energy Resources")—Removal of 84 Energy as Manager**—Only MPC 84 I, LLC ("MPC 84 I"), as the sole Member of Energy Resources, is contractually authorized to remove 84 Energy as Manager. None of the signatories expressly or even purported to act on behalf of MPC 84 I, and no written consent, meeting, or Member approval occurred.

     b.    **Energy Resources—Removal of 84 Energy as Operator**—Under the governing agreement, 84 Energy serves both as Manager and as Operator of Energy Resources. The agreement expressly provides that the Operator, and not the Manager, is solely responsible for oil and gas operations, and that if the Operator "resigns or is removed as Manager," the Operator shall no longer serve the Company effective as of that date. Accordingly, 84 Energy can only be removed as Operator if it has first been properly removed as Manager. As discussed above, no such removal has occurred.

     c.    **84 Resources Management, LLC ("Resources Management")—Removal of Aaron Shimek as Manager**—Resources Management is owned 50/50 by Shimek and Kollaer, who are both expressly designated as Managers and Members. The Company Agreement provides no mechanism for unilateral removal and is silent regarding the removal of Managers. Under the default provisions of the Texas Business Organizations Code, when the Company Agreement is silent, the authority to remove a manager lies with the members and requires approval by a majority-in-interest of the members. See Tex. Bus. Orgs. Code §§ 101.253, 101.356. No such member vote occurred here. In addition, the Company Agreement provides a specific mechanism for resolving any issue resulting in a "deadlock," which incorporates a mandatory dispute-resolution procedure, including mediation and, if unresolved, arbitration.

     d.    **84 Resources Holdings, LLC ("Resources Holdings")—Removal of Resources Management as Manager**—Resources Holdings' Company Agreement allows removal of a Manager only for cause and only with approval of at least 80% of the non-affiliated Members. A "Cause Event" requires a final, non-appealable judgment finding fraud, gross negligence, willful misconduct, bad faith, or intentional and material breach causing material harm to the Company. No such judgment exists, no cause was shown, and no meeting or vote occurred. Any alleged removal is therefore void and without effect.

2

e.    **Resource Holdings—Removal of 84 Energy as Operator**— The Company Agreement for Resources Holdings designates 84 Energy as the Operator and references a separate "Operating Agreement" to govern the Operator's duties and rights. No such written Operating Agreement was ever executed. Nevertheless, through the parties' course of conduct, an implied-in-fact agreement arose under Texas law whereby 84 Energy provided, and the Companies and their investors accepted, operator services in exchange for payment of Operator and Management Fees. Accordingly, the relationship between 84 Resources Holdings and 84 Energy is governed by the Company Agreement, that implied-in-fact agreement, and the default principles of Texas law.

Under the governing structure, Resources Holdings is managed by 84 Resources Management, which is jointly owned and managed 50/50 by Shimek and Kollaer. Any decision to remove or replace the Operator must therefore be made by that governing authority, acting collectively and in accordance with the Company Agreement and the Texas Business Organizations Code. Because 84 Energy has not been removed as Manager, no valid company action exists to remove it as Operator.

To the extent Shimek and Kollaer disagree on that issue, such disagreement constitutes a "deadlock" under the 84 Resources Management Company Agreement. That agreement requires any deadlock to be resolved through the specified process—first by referral to the Members, and if unresolved, by mediation and binding arbitration. Plaintiffs' attempt to achieve through this lawsuit what the agreements require to be resolved through contractual dispute-resolution procedures disregards those binding provisions.

Accordingly, any purported removal of 84 Energy as Operator—whether unilaterally by Kollaer or by investors or affiliated entities lacking managerial authority—is unauthorized and without legal effect.

4.    Kollaer's claims for declaratory relief are improper because they seek determinations affecting entities that are not parties, including Energy Resources, Resources Management, and Resources Holdings. Under Texas Civil Practice and Remedies Code § 37.006(a), all entities whose rights would be affected by a declaration must be joined. Any judgment issued in their absence would be nonbinding, incomplete, and subject to collateral attack.

5.    The Company Agreement of Resources Management contains a mandatory dispute-resolution clause requiring (a) pre-suit mediation as a condition precedent to litigation, and

Copy from re:SearchTX

(b) binding arbitration for any dispute arising out of or relating to the agreement, the governance of Resources Management, or the rights and duties of its Members or Managers. Plaintiff failed to comply with these mandatory procedures. Accordingly, to the extent Plaintiff seeks declaratory or other relief relating to the governance of Resources Management, the removal of a Manager, or any rights arising under that agreement, such claims must be resolved through mediation and, if unresolved, arbitration—not by this Court. Defendants assert and preserve their right to compel arbitration and object to this Court's exercise of jurisdiction over such disputes.

6.      Kollaer's petition alleges removal "for cause," yet fails to plead compliance with required notice, cause definition, voting procedures, or consent requirements under the applicable Company Agreements and the Texas Business Organizations Code. Defendants deny any valid removal occurred and specially except to Plaintiff's failure to plead a specific contractual basis.

7.      Kollaer's claims are barred by the doctrine of unclean hands because he seeks equitable relief despite refusing to authorize payment of contractual Operator and Management Fees, withholding funding for operations, and then using the resulting operational constraints as a pretext for removal.

8.      Pleading further and in the alternative, Defendants assert comparative responsibility, as any harm or alleged mismanagement was caused or contributed to by Kollaer's own conduct, including withholding funding, rejecting operational budgets, and disrupting management.

9.      Kollaer fails to state a claim against Defendant 84 Energy Holdings, LLC, as the petition alleges no wrongful conduct, breach, or actionable relief against that entity.

4

Copy from re:SearchTX

## COUNTER-PLAINTIFFS' COUNTERCLAIMS AGAINST KOLLAER AND ADDITIONAL COUNTER-DEFENDANTS

### I.    PARTIES

10.    Counter-Defendant Andrew Kollaer is an individual residing in Harris County, Texas. Counter-Defendant has appeared in this lawsuit.

11.    Counter-Plaintiff, 84 Energy, LLC is a Texas limited liability company appearing in this lawsuit through the undersigned counsel.

12.    Counter-Plaintiff Aaron Shimek is an individual residing in Harris County, Texas and appearing in the lawsuit through the undersigned counsel.

13.    Counter-Plaintiff 84 Energy Holdings, LLC is a Texas limited liability company appearing in this lawsuit through the undersigned counsel.

14.    Additional Counter-Defendant MPC Conventional Management, LLC ("MPC CM")  is a Texas limited liability company and can be served through its registered agent Andrew Kollaer at 675 Bering, Suite 140, Houston, Texas 77057.

15.    Additional Counter-Defendant MPC 84 I, LLC ("MPC 84 I") is a Texas limited liability company and can be served through its registered agent Andrew Kollaer at 675 Bering, Suite 140, Houston, Texas 77057.

16.    Additional Counter-Defendant The Karen Hanks 2015 Descendants Trust, LLC (the "Hanks Trust") is a Texas limited liability company and can be served through its trustee Thomas O. Hanks at Route 1, Box 44A, Leesburg, Texas 75451.

17.    Additional Counter-Defendant 84 Basa 0224, LLC ("84 Basa") is a Texas limited liability company and can be served through its registered agent TK Capitol Services LLC at 675 Bering Drive, Suite 110, Houston, Texas 77057.

5

Copy from re:SearchTX

18.     Additional Counter-Defendant Thomas O. Hanks is an individual residing in Camp County and can be served at Route 1, Box 44A, Leesburg, Texas 75451 or wherever he may be found.

## II.      JURISDICTION AND VENUE

19.     This Court has jurisdiction over Counter-Plaintiffs' counterclaims pursuant to Sections 25A.004(b) and (e) of the Texas Government Code. The relief sought herein falls within the jurisdictional authority of this Court. The value of the contractual, managerial, and ownership rights at issue—together with the harm that will result to Defendants and the Companies if such rights are not protected—exceeds $5 million. Accordingly, the amount in controversy with respect to these counterclaims is greater than $5 million.

20.     Pursuant to Texas Rule of Civil Procedure 47, Counter-Plaintiffs seek monetary relief in excess of $5 million as well as reimbursement of costs and attorneys' fees as allowed by law.

21.     Venue is proper in Harris County because all or a substantial part of the events or omissions riving rise to Counter-Plaintiffs' claims occurred in Harris County. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).

22.     The counterclaims asserted herein include both compulsory and permissive counterclaims under Texas Rule of Civil Procedure 97, as they arise out of the same transactions, occurrences, and course of conduct that form the basis of the claims asserted in the Original Petition.

## III.     DISCOVERY CONTROL PLAN

23.     Counter-Plaintiffs intend to conduct discovery under Level 2 of the Texas Rule of Civil Procedure 190.4.

6

Copy from re:SearchTX

## IV.     FACTUAL BACKGROUND AND BASIS FOR COUNTERCLAIMS

24.     This dispute does not arise from any misconduct by Counter-Plaintiffs, but rather from Kollaer—together with Additional Counter-Defendants MPC CM, MPC 84 I, the Hanks Trust, 84 BASA, and Hanks (collectively, "Counter-Defendants")—and other non-party investors, who refused to cause the Companies to honor their contractual obligations to fund operations and to pay the Operator and Management fees and expenses required under the governing Company Agreements, as well as under the implied-in-fact agreement between 84 Energy and 84 Resources Holdings.

### A.     BUSINESS STRUCTURE

25.     Energy Resources was formed to acquire and operate oil-and-gas assets. Its sole Member is MPC 84 I, which is managed by MPC CM—an entity controlled in part by Kollaer. The members of MPC 84 I include Kollaer, the Hanks Trust (controlled by Tom Hanks), and non-party JJ2N DC, LLC (controlled by non-party J.J. Oshins). Under the Energy Resources Company Agreement, 84 Energy was duly appointed as both Manager and Operator.

26.     Approximately six months later, Resources Holdings was formed to acquire and operate additional oil-and-gas assets. Its members consisted of the same entities—or entities controlled by the same individuals—as 84 MPC I, together with a few additional investors. Resources Holdings is Managed by Resources Management, an entity owned 50/50 and jointly controlled by Kollaer and Shimek. 84 Energy was designated as the Operator in the Resources Holdings Company Agreement. Through the parties' consistent course of performance, 84 Energy provided, and Resources Holdings and its investors accepted, operator services in exchange for payment of Operator and Management fees, thereby establishing a binding implied-in-fact contract under Texas law recognizing 84 Energy's role as Operator for Resources Holdings.

7

Copy from re:SearchTX

27.     Under the governing Company Agreement of Energy Resources, the Company is contractually obligated to pay (i) an Operator Fee to 84 Energy for oil-and-gas operational services and (ii) a Management Fee for management services. These fees are Company obligations and are paid through Company funds pursuant to the Annual Business Plan. However, Kollaer, Hanks, and Oshins—both individually and through the entities they control—refused to approve the funding and budgets necessary to pay these contractual fees, despite continuing to benefit from 84 Energy's performance of its operating duties. Their obstruction of payments caused cash flow shortages and forced Shimek and 84 Energy to personally advance operational expenses to preserve Company assets.

28.     Under the Resources Holdings Company Agreement, and through the parties established course of conduct, Management Fees and Operator Fees are likewise Company-level obligations payable through approved budgets or business plans—not optional or subject to individual investor discretion.

**B.     COUNTER-DEFENDANTS CONDUCT**

29.     Beginning in mid-2025, Counter-Defendants withheld approval of budgets and payments for operating expenses, vendor invoices, and regulatory requirements. Over the ensuing months, Counter-Plaintiffs repeatedly communicated with Counter-Defendants requesting approval and payment of these necessary expenditures. Through a series of conversations and correspondence, Counter-Plaintiffs made clear that continued nonpayment jeopardized ongoing operations and regulatory compliance. Counter-Defendants nevertheless refused to authorize or fund these obligations unless Counter-Plaintiffs agreed to execute an amendment to the Resources Holdings Company Agreement that would, among other changes, grant them the ability to remove 84 Energy as Operator.

8

Copy from re:SearchTX

30.     In response to this coercive effort to force acceptance of unfavorable contractual amendments, Counter-Plaintiffs warned Counter-Defendants that, in order to protect Company assets, avoid regulatory violations, and operate as a prudent operator, they would be forced to temporarily shut in certain wells until adequate funding could be restored. Counter-Plaintiffs further advised that if Counter-Defendants persisted in withholding operational funding required under the governing agreements, 84 Resources Management, as the Manager of 84 Resources Holdings, would have to consult legal counsel regarding potential wind-up or bankruptcy proceedings for 84 Resources Holdings. These options were presented only after repeated refusals by Counter-Defendants to provide the operational funding required under the parties' agreements.

31.     Instead of curing the funding failure, Counter-Defendants attempted to manufacture "cause" and circulated a letter on October 20, 2025, purporting to remove 84 Energy and Shimek as Managers of multiple Companies. The signatories acted only in their "various capacities" and not through any formal vote of MPC 84 I, or any 80% non-affiliated Member approval in Holdings, or any majority vote in Resources Management.

32.     The October 20 letter was procedurally and substantively defective. No cause was specified, no meeting was called, no vote occurred, and the governing Company Agreements provide no authority for unilateral action. Accordingly, any alleged removal is void and without effect.

33.     Notwithstanding this lack of authority, Plaintiff filed this lawsuit seeking declaratory relief to validate an improper removal, while also claiming to act on behalf of Companies he refused to join—as required under Texas Civil Practice & Remedies Code § 37.006(a).

9

34.     Defendants bring these counterclaims to confirm the invalidity of the October 20 letter, to enforce their rights as valid Managers and Operator, and to seek relief for Plaintiff's breaches of contract, fiduciary duties, and interference with Company operations and contracts.

## C.     KOLLAER'S FRAUDULENT CONDUCT

35.     In addition to the foregoing conduct, Kollaer has engaged in multiple acts of fraud and misrepresentation for his own personal benefit and to the detriment of Shimek, 84 Energy, and the Companies.

36.     Without authorization, Kollaer executed and recorded an assignment of a commercial office lease held in the name of 84 Energy to a separate company that he owns and controls—Blackfin Interests, LLC. In doing so, Kollaer falsely represented himself as a "partner" of 84 Energy and signed the assignment on behalf of 84 Energy in that purported capacity, despite knowing that he held no ownership interest, partnership status, or agency authority to act for 84 Energy. Kollaer's execution of the assignment was intentionally deceptive and made with the intent to mislead the landlord and third parties into believing he possessed authority to act on behalf of 84 Energy, thereby wrongfully transferring a valuable leasehold interest for his personal benefit and to 84 Energy's detriment.

37.     Kollaer further acted fraudulently in entering into a Production Agreement on behalf of 84 Resources Holdings—without Shimek's knowledge, consent, or approval—through which he caused the Company to incur debt to a lending entity owned and controlled by Tom Hanks. In doing so, Kollaer bound 84 Resources Holdings to operational and financial obligations without consulting or obtaining authorization from its Operator or co-Manager, and without even disclosing those obligations to them. Moreover, Kollaer included, as collateral and in the conveyance of production payments, oil-and-gas leases and production interests owned solely by

10

Counter-Plaintiff 84 Energy Holdings—again without their knowledge, authorization, or consent. By doing so, Kollaer knowingly misrepresented his authority to encumber those assets and concealed his actions from Counter-Plaintiffs, thereby intentionally misappropriating and burdening property belonging exclusively to them for his and his affiliates' benefit.

38.     Kollaer also used Company resources and authority for his personal benefit in other unauthorized ways. He unilaterally added his separate company, Blackfin Interests, LLC, to the insurance policy of 84 Resources Holdings, and paid the associated legal expenses for forming Blackfin Interests from Resources Holdings' account.

39.     Additionally, without 84 Energy's knowledge or consent, Kollaer entered into a contract with an employment agency to hire personnel purportedly "for 84 Energy," again falsely representing that he had authority to act on its behalf. These actions were taken outside his authority, constituted misuse of Company assets, and further evidence his ongoing pattern of self-dealing and fraudulent conduct.

## V.     SUIT FOR DECLARATORY RELIEF

40.     This counterclaim is brought pursuant to the Texas Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code.

41.     An actual, justiciable controversy exists between the parties. Counter-Plaintiffs seek declarations opposite to those requested by Plaintiff Kollaer, including that:

(a) Kollaer lacked legal or contractual authority to issue or enforce the October 20, 2025 removal or termination letter against 84 Energy or Shimek;

(b) no "Cause," as defined in the governing Company Agreements, exists or was properly asserted to remove 84 Energy or Shimek from any management or operator position; and

(c) the contractual and statutory prerequisites to any removal—including notice, opportunity to cure, and approval by the proper Members holding the required voting interest—were not satisfied.

11

Copy from re:SearchTX

42.     Counter-Plaintiffs further request recovery of their reasonable and necessary attorneys' fees and costs pursuant to § 37.009 of the Texas Civil Practice and Remedies Code.

## VI.     CAUSES OF ACTION
### A.  BREACH OF CONTRACT (AGAINST MPC 84 I, MPC CM, 84 BASA, AND JJN2)

43.     Valid, enforceable Company Agreements govern the relationships among the parties, including the Company Agreement of 84 Energy Resources I, LLC, the Company Agreement of 84 Resources Management, LLC, and the Company Agreement of 84 Resources Holdings, LLC. These agreements expressly appoint 84 Energy, LLC and/or Shimek as Manager and Operator, grant them management and operational authority, entitle them to Operator and Management Fees, and set forth the exclusive procedures for removal, including requirements for notice, cause, and approval by the requisite Members or interest holders.

44.     84 Energy and Shimek substantially performed their contractual and managerial obligations under the Agreements. To the extent any performance was delayed or altered—such as temporary shut-in of wells or suspension of certain operations—such performance was either (a) in full conformity with prudent-operator standards and the duty to preserve company assets, or (b) excused under Texas law due to Plaintiff's and his investor group's prior material breaches, including their refusal to authorize funding and their failure to cause the Company to pay contractually required Operator Fees, Management Fees, or budgeted operational expenses.

45.     Counter-Defendants materially breached the governing Agreements by, among other things:

(a) purporting to remove or terminate 84 Energy and Shimek "for cause" without complying with the contractual prerequisites for removal, including failing to provide specific notice of alleged cause, failing to afford any opportunity to cure, failing to call or notice a Member meeting, and failing to obtain the required percentage vote or written consent from Members entitled to vote;

12

Copy from re:SearchTX

(b) interfering with and obstructing 84 Energy's exclusive contractual rights to manage and operate the assets of the Companies, including directing third parties, vendors, and field personnel to disregard 84 Energy's instructions and falsely claiming that 84 Energy and Shimek no longer had authority to act; and

(c) causing or encouraging Members, Managers, and affiliated investors to withhold approval of budgets, capital contributions, and payments necessary to fund ongoing operations—including Operator and Management Fees—and then using the resulting financial distress and operational limitations, which they themselves created, as a pretextual basis to assert "cause" for removal.

46.     These breaches were substantial, material, and went to the heart of the parties' contractual relationships. Counter-Plaintiffs' performance was rendered impossible, impracticable, or excused by Counter-Defendants' prior repudiation and material breaches. Counter-Defendants cannot rely on their own obstruction, refusal to fund, and procedural non-compliance to justify removing Counter-Plaintiffs from the roles expressly granted under the Agreements.

47.     As a direct and proximate result of Counter-Defendants' breaches, Counter-Plaintiffs suffered damages, including but not limited to lost management and operator fees, unreimbursed out-of-pocket expenses advanced to preserve operations and protect Company assets, reputational harm, disruption of business relationships, legal fees and costs incurred in responding to Counter-Defendants' improper actions, and other consequential damages.

**B. BREACH OF FIDUCIARY DUTY**

48.     Counter-Defendant Kollaer, through his roles as Manager, co-Manager, and managing Member of MPC 84 I LLC, 84 Resources Management LLC, and related entities, owed fiduciary duties of loyalty, care, good faith, and full disclosure to the Companies and, in certain instances, to Counter-Plaintiffs as co-managers and co-members. These duties required him to (a) act in the Companies' best interests, (b) refrain from self-dealing or using control for personal advantage, (c) avoid oppression of fellow members or managers, (d) disclose material information

13

Copy from re:SearchTX

affecting Company decisions, and (e) comply with the governance procedures set forth in the Company Agreements.

49.     Kollaer breached these fiduciary duties in multiple respects. Rather than acting to advance the Companies' operational interests, Kollaer intentionally aligned with select investors to obstruct or withhold approval of Company funding, capital contributions, and payment of contractual Operator and Management Fees. This deliberate obstruction deprived the Companies of the liquidity necessary to sustain operations, pay vendors, meet regulatory obligations, and honor contractual commitments to 84 Energy and Resources Management. Kollaer's conduct was not undertaken to protect the Companies but to manufacture financial distress and operational paralysis, thereby creating a pretext to remove Shimek and 84 Energy from their management and operatorship roles and ultimately replace them—first with an entity controlled by Kollaer and now with one controlled by Hanks.

50.     Second, Kollaer violated his duties of loyalty and candor by withholding material information, refusing to collaborate on operational needs, and orchestrating a removal campaign. Instead of following the agreed governance process, Kollaer secretly coordinated with aligned investors, then circulated a removal letter that ignored the required procedures, failed to identify any legitimate "cause," and lacked the Member approvals mandated by the Company Agreements.

51.     Third, Kollaer abused his managerial authority for personal benefit and to advance the interests of his investor allies, including discouraging other Members from approving funding, directing vendors and working-interest owners to disregard 84 Energy's instructions, and attempting to install replacement managers and operators favorable to his group. Such conduct placed personal and investor interests above Company interests and constitutes classic breaches of fiduciary loyalty under Texas law.

14

52.     Fourth, Kollaer's unilateral efforts to remove Counter-Plaintiffs outside of contractual procedure amounted to an oppressive exercise of control and bad-faith governance. Texas courts recognize such conduct as a breach of fiduciary duty in closely held entities when one member uses control to "freeze out" another or deprive them of contractual rights without legal process.

53.     As a direct and proximate result of these breaches of fiduciary duty Counter-Plaintiffs and the Companies suffered damages, including but not limited to: unreimbursed operational expenditures advanced by Counter-Plaintiffs, unpaid Operator and Management Fees, reputational harm, impairment of vendor and investor relationships, legal expenses incurred to defend their rights, and disruption of ongoing business operations. Counter-Plaintiffs seek actual damages, equitable relief, fee forfeiture or disgorgement if appropriate, and attorney's fees to the extent permitted by law.

### C. TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

54.     84 Energy and Shimek maintained valid and existing contractual relationships with 84 Energy Resources I LLC and 84 Resources Holdings LLC, including written Company Agreements appointing 84 Energy as Operator and Manager and entitling it to Operator Fees and reimbursement of expenses. They also maintained ongoing business relationships with vendors, field contractors, service providers, royalty owners, and working-interest partners in furtherance of their duties as Operator and Manager.

55.     Counter-Defendants had knowledge of these contractual and business relationships and of the rights and obligations under them.

56.     Counter-Defendants intentionally and improperly interfered with those contracts and relationships by, among other acts:

15

(a) falsely representing that 84 Energy and/or Shimek had been removed as Operator and Manager and lacked authority to act;

(b) communicating to vendors, contractors, working-interest owners, and regulatory personnel that they should cease following 84 Energy's directives;

(c) encouraging, directing, or conspiring with each other and with third parties to withhold payments, operational data, or cooperation from 84 Energy;

(d) attempting to engage or install an alternative operator or manager without complying with contractual or regulatory requirements; and

(e) using the defective October 20, 2025 removal letter as a tool to destabilize and undermine Counter-Plaintiffs' contractual rights

57.     These acts were unjustified and without authority. Counter-Defendants acted outside the scope of any legitimate authority, ignored contractual procedures, and were motivated by personal and financial interests inconsistent with the Companies' best interests.

58.     Their conduct also interfered with prospective business relations, including future development plans, vendor negotiations, production contracts, and opportunities for operational expansion, by creating uncertainty about operatorship and damaging Counter-Plaintiffs' reputation within the industry.

59.     As a direct and proximate result, Counter-Plaintiffs sustained damages including loss of contractual fees, interruption of business operations, unreimbursed expenses, and reputational harm. Counter-Plaintiffs seek recovery of actual, consequential, and exemplary damages for willful and malicious interference, and all other relief to which they are entitled.

### D.  FRAUD (AGAINST KOLLAER)

60.     Counter-Defendant Kollaer knowingly made false representations of material fact, acted with intent to deceive, and obtained personal benefit to the detriment of Counter-Plaintiffs.

61.     Without authority, Kollaer executed and recorded an assignment of a commercial office lease held in 84 Energy's name to a company he owns and controls, falsely representing

16

himself as a "partner" of 84 Energy. Kollaer knew that representation was false and that he lacked any ownership interest, partnership status, or agency authority to act for 84 Energy. His misrepresentation was made with the intent to induce the landlord and third parties to rely on it and to transfer the lease for his personal gain.

62.    Kollaer further acted fraudulently by entering into a Production Agreement on behalf of 84 Resources Holdings, through which he caused the Company to incur debt to a lender owned by Counter-Defendant Hanks. In that transaction, Kollaer included, as collateral, oil-and-gas leases and production interests owned solely by Counter-Plaintiff Energy Holdings—without its knowledge or consent—and concealed these actions.

63.    Kollaer made these false representations and omissions knowingly or recklessly, intending Counter-Plaintiffs and others to rely upon them. Counter-Plaintiffs and third parties did in fact rely on those misrepresentations, resulting in the unauthorized transfer and encumbrance of Company and individual property.

64.    As a direct and proximate result of Kollaer's fraudulent acts, Counter-Plaintiffs suffered substantial damages, including loss and impairment of property interests, legal expenses incurred to unwind or defend against the unauthorized transactions, and consequential and exemplary damages. Counter-Plaintiffs seek recovery of actual damages, punitive damages for intentional and malicious fraud, and attorney's fees as permitted by law.

## VII.   PRAYER

65.    Based on the foregoing, Defendants/Counter-Plaintiffs respectfully request that Kollaer take nothing by his claims and that judgment be entered in favor of Defendants/Counter-Plaintiffs. Defendants/Counter-Plaintiffs further respectfully request that the Court award judgment against Counter-Defendants as follows:

17

Copy from re:SearchTX

a.  A declaratory judgment that the October 20, 2025 removal and/or termination letter is null, void, and without legal effect, and that neither 84 Energy, LLC nor Aaron Shimek was properly removed as Manager, Operator, or in any other capacity from any of the entities identified therein;

b.  An award of actual damages, exemplary damages, equitable relief, and all other relief available at law or in equity arising from Counter-Plaintiffs breaches of contract, breaches of fiduciary duty, tortious interference and fraud claims;

c.  Court Costs;

d.  Attorney's Fees; and,

e.  All other relief to which Defendants/Counter-Plaintiffs have shown themselves entitled to in law or equity.

Respectfully submitted,

**HENDERSHOT COWART, PC**

*/s/ Simon W. Hendershot, III*
SIMON W. HENDERSHOT, III
SBN: 09417200
trey@hchlawyers.com
LACEY L. SPEARS
SBN: 24111392
lspears@hchlawyers.com
1800 Bering Drive, Suite 600
Houston, Texas 77057
Telephone: (713) 783-3110
Facsimile: (713) 783-2809

18

Copy from re:SearchTX

**<u>Certificate of Service</u>**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record pursuant to TEX. R. CIV. P. 21a on November 11, 2025.

**GRAY REED**
David Leonard
dleonard@grayreed.com
Texas Bar No. 24078847
Jeremy Walter
jwalter@grayreed.com
Texas Bar No. 24098572
Daniel B. Howry
dhowry@grayreed.com
Texas Bar No. 24130877
1300 Post Oak Blvd. Suite 2000
Houston, Texas 77056
T: (713) 986-7180
F: (713) 986-7100
**ATTORNEYS FOR PLAINTIFF ANDREW KOLLAER**

*/s/ Lacey L. Spears*
Lacey L. Spears

19

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Hendershot Cowart P.C. Eservice on behalf of Lacey Spears
Bar No. 24111392
eService@hchlawyers.com
Envelope ID: 107926469
Filing Code Description: Counter Claim/Cross Action/Interpleader/Intervention/Third Party Contest
Filing Description: Defendants' Original Answer and Counterclaims
Status as of 11/12/2025 9:13 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Leonard | | dleonard@grayreed.com | 11/11/2025 4:47:22 PM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 11/11/2025 4:47:22 PM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 11/11/2025 4:47:22 PM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 11/11/2025 4:47:22 PM | SENT |
| Division 11B | | BCDivision11B@txcourts.gov | 11/11/2025 4:47:22 PM | SENT |
| Lacey LynnSpears | | lspears@hchlawyers.com | 11/11/2025 4:47:22 PM | SENT |
| Hendershot Cowart P.C. Eservice | | eService@hchlawyers.com | 11/11/2025 4:47:22 PM | SENT |

Copy from re:SearchTX

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
11/21/2025

**EXHIBIT**

**13**



### THE BUSINESS COURT OF TEXAS

| | | |
|---|---|---|
| ANDREW KOLLAER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Cause No. 25-BC11B-0074 |
| | § | |
| | § | |
| 84 ENERGY, LLC, 84 ENERGY | § | |
| HOLDINGS, LLC, and AARON SHIMEK, | § | |
| | § | |
| *Defendants.* | § | |

### ASSIGNMENT ORDER

The undersigned presiding judge hereby assigns this case to Judge Marialyn Barnard of Business Court Division 4A, for administrative purposes of the Court.

**IT IS FURTHER ORDERED** that the Business Court Clerk give notice of this Order to each attorney of record and unrepresented party, if any, who have made an appearance. The cause number and venue of this case remain unchanged by this Order

DATED: November 21, 2025

_____
HON. GRANT DORFMAN
ADMINISTRATIVE PRESIDING JUDGE,
TEXAS BUSINESS COURT

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
11/24/2025 11:42 AM
Accepted by: Beverly Crumley
Case Number: 25-BC11B-0074

THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION

**EXHIBIT**

**14**

| | | |
|---|---|---|
| **ANDREW KOLLAER, MPC 84 I, LLC,** | § | |
| **AND KOLCAP, LLC,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | **CAUSE NO. 25-BC11B-0074** |
| **84 ENERGY, LLC, 84 ENERGY** | § | |
| **HOLDINGS, LLC,** | § | |
| **AND AARON SHIMEK,** | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS ANDREW KOLLAER, MPC 84 I, LLC, AND KOLCAP, LLC'S
FIRST AMENDED PETITION FOR DECLARATORY RELIEF AND VERIFIED
APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiffs Andrew Kollaer, Kolcap, LLC, and MPC 84 I, LLC file this First Amended Petition for Declaratory Relief and Application for Injunctive Relief against Defendants 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek.[1]

1.      84 Resources Holdings, LLC ("***RH***") and 84 Energy Resources I, LLC ("***ER***," collectively, the "***Production Companies***") are oil and gas operating companies with working interests in hundreds of oil and gas leases across multiple counties in Texas (collectively, the "***O&G Interests***"). This business is real and substantial—the Production Companies acquired the O&G Interests for approximately $25,000,000. As of September 2025, there were approximately 20 employees across two field offices in Kennard, Texas and Leesburg, Texas.

2.      The Production Companies are in the business of operating the O&G Interests to

---

[1]      This *First Amended Petition* adds Kolcap, LLC and MPC 84 I, LLC as Plaintiffs. MPC 84 I, LLC is the sole member of 84 Energy Resources I, LLC and brings direct and derivative causes of action on behalf of 84 Energy Resources I, LLC against 84 Energy, LLC and Aaron Shimek.

Kollaer owns and controls Kolcap, LLC, and Kolcap, LLC is a member of 84 Resources Holdings, LLC. Kolcap, LLC brings direct and derivative causes of action on behalf of 84 Resources Holdings, LLC against 84 Energy, LLC and Aaron Shimek principally related to the causes of action brought by 84 Basa 0224, LLC in Case No. 25-BC11A-0081.

4918-9472-3451.3

Copy from re:SearchTX

generate revenue from the extraction of hydrocarbons. Each of the Production Companies contracted with Defendant 84 Energy, LLC ("***84 Energy***") to handle oil and gas operations. 84 Energy is a "contract operator" designated as the operator of record with the Railroad Commission of Texas of all the O&G Interests.

3.      84 Energy's status as contract operator is terminable at will and not subject to any fixed term. *See* Exh. A (RH Company Agreement) and Exhibit C (ER Company Agreement). Because 84 Energy serves "at-will," the Production Companies have the authority to remove 84 Energy as the operator of record for the O&G Interests. *See id.*

4.      The Production Companies removed 84 Energy as contract operator by notice dated October 20, 2025. *See* Exh. R (Removal Letter to Defendants Dated October 20, 2025). The Production Companies removed 84 Energy as contract operator because, for example, just one month earlier, 84 Energy unilaterally and recklessly shut-in over 100 oil and gas wells. 84 Energy's decision was not part of any existing business strategy or otherwise approved by any member or investor. It was done out of pure retaliation after the investors made clear that 84 Energy's performance as operator was unacceptable, as detailed below, and that a change of operator would be required.

5.      These wells were active in September 2025 and generated revenue of approximately $40,000 per day. Because Defendants unilaterally shut them in, the wells are idle, no revenue is being generated, and the Production Companies' business has ground to a halt. This is a disastrous consequence for the Production Companies and their members, managers, and investors—nobody would have ever approved this course of action. This situation was created because Defendants "hold the keys" to the operatorship relative to 84 Energy's status with the Railroad Commission as the official operator of record.

6.      <u>**There is no justification for 84 Energy to unilaterally shut-in the wells and**</u>

2

Copy from re:SearchTX

**abandon the oilfield, while simultaneously refusing to transfer the operatorship to another qualified operator who will turn the wells back on, preventing loss of ER and RH's real property interests.  Defendants are holding the wells hostage and will only release them if an exorbitant ransom is paid.**

7.      Plaintiffs therefore request the Court issue a temporary restraining order, temporary injunction, and permanent injunction requiring 84 Energy to step down as operator and transition the operatorship to someone else.  To this end, Plaintiffs seek an injunction requiring Defendants to immediately execute dual-signature P-4's with HD Operating, LLC, a qualified operator selected by Plaintiffs (the P-4 is the official Railroad Commission form to transfer operatorship).  Further, while the P-4's are pending approval by the Railroad Commission, Defendant 84 Energy, LLC should also be ordered to authorize HD Operating, LLC to immediately resume all oilfield operations, including turning the oil wells back on.

8.      To be clear, there is strong precedent in Texas supporting the exact relief requested by Plaintiffs, namely, ordering the removal of an operator—particularly, an operator who has been duly removed but refuses to step down.[2]  These cases affirm injunctions in similar situations that are far less extreme than this one.  The *Tri-Star* case, detailed herein, is an essential authority and is attached hereto as Exhibit Q.

9.      **This injunctive relief is needed immediately because the Production Companies face an existential crisis.  There is a real and present danger that the**

---

[2]      *See Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 587 (Tex. App.—El Paso 2003, pet. denied) and *Flamingo Permian Oil & Gas, L.L.C. v. Star Expl., L.L.C.*, 569 S.W.3d 329, 330–31 (Tex. App.—El Paso 2019, no pet.).  The cases involved less extreme facts and, unlike 84 Energy, both involved operators with more substantial rights.  As a mere contract operator who works at the pleasure and behest of the Production Companies, 84 Energy has no viable ground to continue operation in the face of its removal by the Production Companies.  *See also See R & R Res. Corp. v. Echelon Oil & Gas, L.L.C.*, No. 03-05-00479-CV, 2006 WL 66458, at *2–3 (Tex. App.—Austin Jan. 10, 2006, no pet.); *Wolfe v. Wolfe Madewell 2019, LLC*, 2025 WL 1994858 (Tex. App.—Dallas July 17, 2025).

3

Copy from re:SearchTX

**$25,000,000 investment will go to zero, especially if the Court does not intervene at this moment.**

10.     **Oil and Gas Lease Termination.**[3]  If all the wells are not turned back on promptly, the Production Companies will lose oil and gas leases with the lessors/royalty owners. Losing the leases is equivalent to the Production Companies going out of business, because the only property they own are the leases.  The leases will be lost pursuant to "cessation of production clauses" contained in the oil and gas leases.  These clauses, which favor the lessor/royalty owner, state that the lease terminates if production ceases for a certain period of time, typically anywhere from 60 to 120 days.[4]  The Production Companies own many leases with 60-day termination clauses, which are currently set to terminate on December 7, 2025 (60 days after October 8, when 84 Energy shut-in the wells). *See* Exh. J (Exemplar Oil and Gas Leases).[5]  **Thankfully, it is not yet too late to save the leases.  With immediate Court**

---

[3]     The threat of such contractual losses justifies injunctive relief.  *See Tri-Star Petroleum Co.*, 101 S.W.3d at 587.

[4]     *BP America Prod. Co. v. Red Deer Resources, LLC*, 526 S.W.3d 389, 395-96 (Tex. 2017) ("[A] total cessation of production for the number of consecutive days defined in a lease's cessation-of-production clause automatically terminates the lease, without regard to the reasonableness of the operator's actions, absent a properly invoked savings clause.").

[5]     ER owns at least four leases, identified below, with 60-day termination clauses (*See* Pls' Exh. J). There are very likely several other leases with 60-day termination clauses, including leases in the Carroll Springs field.  Kollaer's work is ongoing to identify all such leases.

   i.   Oil, Gas and Mineral Lease dated December 11, 1970, recorded in Volume 779, Page 53 of the Deed Records of Anderson County, Texas, from Strong Memorial Cemetery, acting through its duly constituted and elected Trustees, Henry Melver, Harry Denson and Lester Denson, as Lessor, to R&M Drilling Company, as Lessee.
   ii.  Oil, Gas and Mineral Lease dated February 6, 1952, recorded in Volume 353, Page 171 of the Deed Records of Kaufman County, Texas, from Mrs. Robert Reed Humphrey, as Lessor, to Thos. D. Humphrey, as Lessee.
   iii. Oil, Gas and Mineral Lease dated April 14, 1987, recorded in Volume 893, Page 938 of the Deed Records of Kaufman County, Texas, from John E. Douglas, as Lessor, to Al Rowan, as Lessee.
   iv.  Oil, Gas and Mineral Lease dated June 1, 1950, recorded in Volume 331, Page 215 of the Deed Records of Kaufman County, Texas, from Roy S. Blowers and wife, Mary B. Blowers, as Lessor, to Thos. D. Humphrey, as Lessee.

4918-9472-3451.3

Copy from re:SearchTX

intervention, the Production Companies can secure a new operator who will turn the wells back on and eliminate the risk of the oil and gas leases from being terminated.

11.    **84 Energy Refuses to Relinquish the Operatorship Despite Having Been Removed and Walking Away from the Oilfield.**  Not only has 84 Energy instructed oilfield personnel to leave the oilfield—approximately 20 employees across two field offices—and has explicitly instructed them to not return unless otherwise instructed by Shimek or his father Kenneth.[6]  84 Energy has been removed as contract operator of the O&G Interests.  As noted above, Texas Courts have issued injunctive relief when an operator refuses to voluntarily step down.

12.    **Destruction of Business Enterprise.**  84 Energy is attempting to put the Production Companies out of business by ceasing oilfield operations, particularly by terminating all field personnel and discontinuing vendor relationships.  Any declaratory or monetary judgment Plaintiffs might obtain against Defendants will be an ineffective remedy because the resulting loss of and harm to their investment, *e.g.*, Production Companies' business operations, loss of personnel with know-how, business relationships, and reputation is immeasurable.  **It is not too late to save the business enterprise.  With immediate Court intervention, the Production Companies can secure a new operator who will re-mobilize field personnel so that the wells can be turned back on.**

13.    **Ongoing Environmental Contamination.**  84 Energy walked away from hundreds of oil wells.  All the while, 84 Energy remains the operator of record with the Railroad Commission and is the only entity authorized to conduct well operations.  But 84 Energy is ignoring its regulatory duties by ignoring the oil and gas wells.  Since the wells were shut in,

---

[6]    As detailed below, Shimek employs multiple family members through 84 Energy (including his father Kenneth and wife MacKenzie) and there are serious questions about their qualifications.

4918-9472-3451.3

Copy from re:SearchTX

environmental contamination was discovered in the Pittsburg Field during the week of October 17, 2025.



4918-9472-3451.3

Copy from re:SearchTX



*See* Exh. H (Photos of Environmental Contamination).

14.     These issues are not being addressed because 84 Energy walked away and is not monitoring the wells.  **It is not too late to address environmental issues and prevent new ones from occurring.  With immediate Court intervention, the Production Companies can secure a new operator who will address environmental issues and monitor the wells moving forward.**

15.     **Damage to Subsurface Reservoir.**  It is well-known in the oil and gas industry that shutting-in wells is very risky—particularly from a subsurface engineering perspective. Shutting-in wells, and ceasing the flow of hydrocarbons, risks damaging the reservoir, and jeopardizes the well's ability to return to production.  **It is not too late to preserve the reservoirs and prevent waste of natural resources.  With immediate Court intervention,**

4918-9472-3451.3

Copy from re:SearchTX

the Production Companies can secure a new operator who can bring these fields back online.

16.    **Unauthorized Assignment of Operatorship**.   On November 19, 2025, 84 Energy notified Plaintiffs that 84 Energy had purported to assign the operatorship of the Clarksville Cotton Valley Unit to a new operator, SND Operating, LLC.   *See* Exh. K (84 Energy Notice re: Unit).   84 Energy substantiated this assignment with a signed dual-signature P-4 Railroad Commission Form—the exact document subject to Plaintiffs' proposed injunction. Upon information and belief, 84 Energy received value from this assignment in the form of a release from SND Operating, LLC, excusing 84 Energy's payment defaults to SND Operating, LLC.   This assignment was both unauthorized and ineffective.   84 Energy was terminated as operator on October 20 and otherwise has no legal right to assign the operatorship of any part of the O&G Interests, including the Clarksville Cotton Valley Unit.   84 Energy did not obtain the Production Companies' permission to assign the operatorship, and the Companies object to it. **It is not too late to prevent Defendants from assigning the operatorship to other third parties and causing this situation to further spiral out of control.   With immediate Court intervention, the Production Companies can secure a new operator who can bring these fields back online and put an end to this saga.**

17.    **Defendants' Insolvency.**   Since October 7, 2025, and continuing through the recent mediation, Defendants threaten bankruptcy.   *See* Exh. D (84 Energy Letter to Investors). 84 Energy has likely been insolvent (and grossly undercapitalized) for over one year and that is one reason why it was removed as operator.   A Final Judgment was entered on September 29, 2025 against Defendants in favor of Prosperity Bank in the principal amount of $1,449,113.30. *See* Exh L. (Prosperity Bank Agreed Final Judgment).   84 Energy also defaulted under a lending agreement with a factoring company, Skyinance.   **It is not too late to provide Plaintiffs with a**

Copy from re:SearchTX

**remedy to prevent the Production Companies from suffering irreparable harm. With immediate court intervention, the Production Companies can secure a new operator to bring these fields back online, thereby providing Plaintiffs with a remedy against an insolvent adversary.**

18.     In sum, if an injunction is not granted, 84 Energy will continue to sit on its hands for no good reason, which will guarantee that the Production Companies' business will cease, environmental damage will occur, subsurface reservoirs will be damaged, natural resources will waste, all wiping out a $25,000,000 investment and leaving Plaintiffs with no recourse as Defendants are insolvent. Again, Defendants are holding the wells hostage and will only release them if an exorbitant ransom is paid. The stakes are high and time is of the essence.

### DISCOVERY (LEVEL 2)

19.     Discovery in this case should be conducted in accordance with Level 2, TEX. R. CIV. P. 190.3.

### PARTIES

20.     Plaintiff Andrew Kollaer ("*Kollaer*") is an individual residing in Harris County, Texas. Kollaer has standing in this case pursuant to TEX. CIV. PRAC. & REM. CODE § 37.004(a) on at least the following grounds:

| | |
|---|---|
| **RH – Kollaer is Manager of the Mgmt. Co.** | • RH is Managed by 84 Resources Management, LLC<br>• 84 Resources Management, LLC is managed by Kollaer |
| **ER – Kollaer is Manager of the Mgmt. Co.** | • ER is Managed by MPC Conventional Manager, LLC<br>• MPC Conventional Manager, LLC is managed by Magnolia Texas Management, LLC<br>• Magnolia Texas Management, LLC is managed by Kollaer |
| **MPC 84 I, LLC – Kollaer is Manager of the Mgmt. Co.** | • ER's Sole Member is MPC 84 I, LLC<br>• MPC 84 I, LLC is managed by MPC Conventional Manager, LLC<br>• MPC Conventional Manager, LLC is managed by Magnolia Texas Management, LLC<br>• Magnolia Texas Management, LLC is managed by Kollaer |

9

Copy from re:SearchTX

| | • Kollaer is also a Member of MPC 84 I, LLC |
|---|---|
| **Kolcap, LLC** | • Kolcap, LLC is a member of RH |
| | • Kollaer is the Member of Kolcap, LLC |

21.     Plaintiff MPC 84 I, LLC is a limited liability company organized under the laws of the State of Texas and its principal place of business is in Harris County, Texas.

22.     Plaintiff Kolcap, LLC is a limited liability company organized under the laws of the State of Texas and its principal place of business is in Harris County, Texas.

23.     Defendant 84 Energy, LLC has answered and appeared.

24.     Defendant 84 Energy Holdings, LLC has answered and appeared.   Upon information and belief, 84 Energy Holdings owns the entire outstanding membership interest in 84 Energy.  Aaron Shimek is the ultimate beneficial owner of both companies.

25.     Defendant Aaron Shimek has answered and appeared.  Shimek is the sole owner of 84 Energy Holdings. LLC, which owns and operates 84 Energy.

### VENUE AND JURISDICTION

26.     The relief sought is within the jurisdictional limits of this Court.  This Court has jurisdiction over Plaintiffs' claims pursuant to Sections 25A.004(b), (e) of the Texas Government Code.  The value of the rights at issue in this case, and the harm to the Production Companies if those rights are not enforced, exceeds $5 million and thus the amount-in-controversy exceeds $5 million.  *SafeLease Ins. Servs. LLC v. Storable, Inc.*, 707 S.W.3d 130, 134 (Tex. Bus. Ct. 2025); *Tex. Dep't of Pub. Safety v. Barlow*, 48 S.W.3d 174, 176 (Tex. 2001).

27.     In accordance with TEX. R. CIV. P. 47(c), Plaintiffs state that they seek nonmonetary relief along with an award of costs and his reasonable and necessary attorneys' fees.

28.     Venue is proper in Harris County because all or a substantial part of the events or

4918-9472-3451.3

Copy from re:SearchTX

omissions riving rise to Plaintiffs' claim occurred in Harris County.   TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).

<div align="center">EVIDENCE</div>

29.     In support of this Application, Plaintiffs submit the following evidence, which is attached hereto and incorporated herein for all purposes:

| Exhibit | Description |
| --- | --- |
| A. | Company Agreement of 84 Resources Holdings, LLC |
| B. | Company Agreement of 84 Resources Management, LLC |
| C. | Company Agreement of 84 Energy Resources I, LLC |
| D. | 84 Energy Letter to Investors dated October 7, 2025 |
| E. | 84 Energy's Response to Investor Letter Dated October 13, 2025 |
| F. | Termination and Removal Letter Dated October 20, 2025 |
| G. | Bonnie View South, LLC Default Letter Dated October 17, 2025 |
| H. | Photos of Environmental Contamination |
| I. | Declaration of Andrew Kollaer |
| J. | Exemplar Oil and Gas Leases Belonging to 84 Resources Holdings, LLC |
| K. | Notice from 84 Energy Regarding Clarksville Cotton Valley Unit Dated November 19, 2025 |
| L. | Signed Agreed Judgment Prosperity Bank Filed September 29, 2025 |
| M. | Shimek Emails With Fake Vendor |
| N. | Investor Request for Information to Shimek Dated September 8, 2025 |
| O. | Investor Demand Letter to 84 Energy Dated October 1, 2025 |
| P. | Investor Objections to Shut-in to 84 Energy Dated October 9, 2025 |
| Q. | *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 587 (Tex. App.—El Paso 2003, pet. denied) |
| R. | Removal Letter to Defendants Dated October 20, 2025 |
| S. | Kollaer Letter to BWT Accountants re Books and Records Dated Oct. 22, 2025 |
| T. | BWT Accountants Response to Kollaer Request for Books and Records Dated Oct. 24, 2025 (Attachments Excluded) |
| U. | Kollaer Letter to Shimek re: BVS Default Dated October 27, 2025 |
| V. | Doliver / JJN2 DC Default Letter to ER Dated November 5, 2025 |
| W. | Notice from 84 Energy re: Purported Assignment of Unit to SND Operating, LLC Dated November 19, 2025 |

<div align="center">FACTUAL BACKGROUND</div>

**A.     The Company Agreements**

30.     ***84 Energy Resources I, LLC ("ER").*** ER is a manager-managed limited liability company formed under the laws of the State of Texas.  *See* Exh. C (ER Company Agreement).

<div align="center">11</div>

Copy from re:SearchTX

ER owns approximately 113 oil and gas wells located in Polk and Newton Counties, Texas. ER's sole member is Plaintiff MPC 84 I, LLC, and ER was formed as a single-member entity. *See* Exh. C (ER Company Agreement) (single member entity and Plaintiff MPC 84 I, LLC admitted as sole member).

31.    Prior to October 20, 2025, 84 Energy was one of two managers of ER.  MPC Conventional Manager, LLC served as the co-manager of ER (and now its sole manager).  The following reflects ownership of ER's "A" membership shares:

| Equity Holders | Ownership % | At Close |
|---|---|---|
| JJN2 DC | 57.44172% | 1,145,147 |
| KH 2015 Trust | 22.57245% | 450,000 |
| Doliver Opp Fund I | 12.54025% | 250,000 |
| 84 Energy Holdings* | 4.93752% | 48,594 |
| Andrew Kollaer | 2.50805% | 50,000 |
| Total | 100.000% | 1,943,741 |

*Includes an upfront promote of 2.5% assigned at the initial closing

32.    Defendant 84 Energy Holdings, LLC owns a *de minimis* ownership interest in ER, totaling approximately 4.9%.

33.    ER is governed by a Company Agreement dated September 11, 2023 (the "***ER Company Agreement***").  *See* Exh. C (ER Company Agreement).  Article 5.11 of the ER Company Agreement vests the member (MPC 84 I, LLC) with the ability to remove a manager (such as 84 Energy) for "Cause."  ("A Manager may only be removed by the Member for Cause.")

34.    Section 1.12(i), in turn, defines "Cause" broadly to include, among other things:

(i)    "repeated failure to perform substantially his duties as a Manager or other associate of the Company or any of the Company Affiliates (other than

12

Copy from re:SearchTX

any such failure resulting from his disability) which failure, whether committed willfully or negligently, has continued unremedied for more than thirty (30) days after the Company has provided written notice thereof."

(iv)     "material breach of, or inability to meet the standards of operation customary in the field, or material failure or inability to perform its obligations under this Agreement as it pertains to the Annual Business Plan."

*See* Exh. C (ER Company Agreement).

35.     Section 1 of ER's Company Agreement appoints 84 Energy as contract operator of the oil and gas wells owned by ER.  *Id*. at §1.  Pursuant to Section 5.14, 84 Energy's status as contract operator terminates immediately as of the date ER removes 84 Energy as manager or in the event 84 Energy resigns.  Section 5.14 provides:

**Section 5.14 Operator.**    Notwithstanding anything contained herein to the contrary, the Operator, and not the Manager, is solely responsible for oil and gas operator services for the company in line with the approved Annual Business Plan. For the avoidance of doubt, in the event the Operator resigns or is moved removed as the Manager, the Operator shall no longer serve the Company to be effective as of the date of any such resignation or removal.

*See* Exh. C (ER Company Agreement).

36.     ER's relationship with 84 Energy is not subject to any separate operating agreement and 84 Energy's duties and responsibilities are not otherwise specifically enumerated in the ER Company Agreement.

37.     MPC 84 I, LLC, as sole member of ER, approved the removal of 84 Energy as manager of ER by written notice dated October 20, 2025.  ER's termination of 84 Energy left MPC Conventional Manager, LLC as the sole, remaining manager of ER as of that date.  As a result of these actions, and based on the plain language of Section 5.14, 84 Energy "shall no longer serve [ER]" as manager or contract operator.  *See* Exh. C (ER Company Agreement).

4918-9472-3451.3

Copy from re:SearchTX

38.     ***Resources Holdings, LLC ("RH").***  Like ER, RH is a manager-managed limited liability company formed under the laws of the State of Texas.  *See* Exh. A (RH Company Agreement).  The outstanding membership interest in RH is owned by a group of limited liability companies affiliated with various investors:

| Entity | Ownership | Capital Invested |
|---|---|---|
| 84 Basa 0224, LLC | 41.7% | $7,950,000.00 |
| JJN2 DC, LLC | 20.6% | $4,100,000.00 |
| SKM Partnership, Ltd | 12.0% | $2,450,000.00 |
| KDK Energy Fund I, LP | 7.7% | $1,500,000.00 |
| Pin Oak Targeted Strategies Master, LP | 5.2% | $1,000,000.00 |
| Doliver Private Opportunity Fund II, LP | 2.6% | $500,000.00 |
| LIG Capital, Ltd. | 5.1% | $1,000,000.00 |
| 84 Energy Holdings, LLC | 0.1% | $25,000.00 |
| Andrew Kollaer | 0.1% | $25,000.00 |
| Doliver Private Opportunity Fund III, LP | 4.9% | $1,000,000.00 |
| | 100.0% | $19,550,000.00 |

39.     Defendant 84 Energy Holdings, LLC owns a *de minimis* membership interest in RH, totaling approximately 0.1%.

40.     RH owns approximately 926 oil and gas wells located in twelve different counties in Texas.  Similar to ER, the investors are vested with minimal direct operational control, having delegated management of the company to a designated manager.

41.     Since October 20, 2025, 84 Resources Management, LLC and 84 Energy were co-managers of RH.  84 Energy is not an investor in RH and owned none of its membership interest.

42.     RH is governed by a Company Agreement dated March 15, 2024 (the "***RH Company Agreement***").  *See* Exh. A (RH Company Agreement).  Similar to ER, the RH Company Agreement indicates 84 Energy is the contract operator of the oil and gas wells owned by RH, but there is no separate operating agreement.  *See* Exh. A (RH Company Agreement).

14

Copy from re:SearchTX

The RH Company Agreement loosely references the operator, and the referenced Operating Agreement was never executed:

> "**Operating Agreement**": That certain Operating Agreement by and between the Operator and the Company.
>
> "**Operator**": 84 Energy, LLC, a Texas limited liability company.

*See* Exh. A at 7 (RH Company Agreement).

43.     Article 10.1(b) of the RH Company Agreement vests its members with the right to remove a manager upon a "Cause Event":

> Only upon a Cause Event, the Manager may be removed by written notice to the Manager from Members representing eighty percent (80%) of all Interests of all Members entitled to vote (other than Interests held by the Manager and/or Manager Affiliates.

*See* Exh. A at 33 (RH Company Agreement).

44.     Article I broadly defines "Cause" in terms of the entry of a final judgment entered in connection with the performance of a manager's duties broadly relating to events that have a material adverse effect on the business of the company such as material breaches, willful misconduct, and bad faith.  *See* Exh. A at 3 (RH Company Agreement).

**B.     <u>84 Energy is insolvent as a result of Shimek's self-dealing.</u>**

45.     Against this backdrop, it is evident that *<u>ownership</u>* and *<u>operational control</u>* of the Production Companies is largely separate.  This unique divide between ownership, control, and status as the operator of record with the Railroad Commission of Texas presented Shimek with an opportunity to engage in self-dealing transactions whereby he has abused his operational control of the Production Companies to favor his status as operator of record.

46.     For example, 84 Energy lacks financial wherewithal to serve as contract operator of over 1,000 oil and gas wells.  84 Energy is persistently undercapitalized and unable to fund

Copy from re:SearchTX

routine operational expenses in the ordinary course of business.  It relies on cash advances from members of the Production Companies.  This design was never intended and falls short of the industry standard.  84 Energy's undercapitalization has further been confirmed by an *Agreed Judgment* in favor of Prosperity Bank in the amount of $1,449,113.30.  *See* Exh. L. (Prosperity Bank Agreed Final Judgment).  84 Energy also defaulted under a loan with Skyinance, a factoring company.

47.    Having an undercapitalized and insolvent operator is intolerable.  Under these circumstances, an impartial manager acting in the interest of the Production Companies would seek to hold 84 Energy accountable as the contract operator.  But that is not possible here because Shimek refuses to act, as that would adversely impact him in his role as contract operator.

48.    84 Energy's insolvency also reflects its operational incompetence.  84 Energy's performance as operator has been a complete failure, and it therefore comes as no surprise that the financial returns have been far lower than projected.  84 Energy projected increases in hydrocarbon production, but in reality, production decreased by approximately 60%.



49.    Not only is 84 Energy incompetent from a technical production standpoint, it is also incompetent from an administrative standpoint.  For example, on August 7, 2025, Shimek

4918-9472-3451.3

Copy from re:SearchTX

lost $60,620 through a basic "phishing" scam when he wired money to a fraudulent bank account in a failed effort to pay a vendor invoice. Shimek was tricked by a fake representative of 84 Energy vendor, Archrock, using an obviously fake e-mail address of "ana.morales@*archrcok.com*." *See* Exh. M. (Shimek Emails with Fake Vendor). The imposter emailed Shimek with an implausible story that Archrock changed its bank account due to "some bogus checks" and needed immediate payment from 84 Energy because it was "experiencing some cash flow challenges." *See* Exh. M (Shimek Emails with Fake Vendor).

50.     Falling victim to this scam reflects complete carelessness by Shimek. Phishing scams are common and Shimek did not follow industry standards to verify wiring instructions and bank information. The fake e-mail address was open and obvious. Shimek also did not follow industry standards relative to wiring money, especially under suspicious circumstances. The notion that an Archrock representative would confide in Shimek about its bank accounts and cash flow problems is preposterous. Archrock is publicly traded on the New York Stock Exchange with a market capitalization exceeding $4 billion. Shimek simply was not paying attention.

51.     Unbelievably, ***Shimek got tricked again five days later***, and wired another $60,620 to a fraudulent bank account on April 12. Losing this money, twice, was devastating to cash flows given the ongoing cash crunch. Adding insult to injury, Shimek was working alongside a family member (his wife) who was apparently not properly trained either. Shimek was employing an unqualified family member to handle major administrative functions, in this case accounts payable, apparently without properly training or supervising her. There is no excuse for Shimek and his wife from getting tricked by a basic and obvious phishing scam.

52.     One month later, in September 2025, another $63,668.57 was lost due to 84 Energy's gross negligence relative to administrative matters, this time arising from stolen payroll

Copy from re:SearchTX

checks. Unfortunately, these stolen funds could not be recovered because too much time lapsed between the checks being issued and the checks being mailed. Again, Shimek was being careless with major administrative functions, leading to cash losses in a cash-strapped environment.

53.     Plaintiffs and the Production Companies' investors have complained to Shimek about these pressing issues for months. They have also been requesting additional information. For example, on September 19, 2025, the investors presented Shimek with an itemized list of specific questions (which are presented below to convey the scope and organization; the questions themselves are available in a legible format in Exhibit N):

| # | Category | Description | BMT responsible: please provide details on timing | Tab | Status | Expected Completion Date | Notes |
|---|----------|-------------|-----|-----|--------|-----|-------|
| 1 | Legal | Joint Operating Agreement | | | Open | 9/18/2025 | |
| 2 | Legal | 84 Resources Management LLC Legal Documents | | | Open | 9/18/2025 | need to see monthly activity and understand the liability. This also needs to be considered a direct deduction to current cash (preferably kept in a separate account) |
| 3a | Royalty | Suspense Details General Ledger and monthly rec (additions and payments) | | | Open | 9/18/2025 | need to see monthly actuals and we looking through the cracks and being reviewed |
| 3b | Royalty | Confirmation that Royalties at royalties associated with 84 Energy LLC are being paid monthly and the suspense items are being addressed and actively attempting to resolve | | | Open | 9/18/2025 | monthly |
| 4.1 | AP - Invoices | Invoices repository - Current and past. This includes all invoices since the acquisition and any current invoices that have been received but not paid | | | Open | 9/23/2025 | if this can not be done by 9/19/2025, please document why and explain why this is not considered a control existence |
| 4.2 | AP - Invoices | General Ledger Invoice Detail (2024-2025) | | | Open | 9/23/2025 | We have payment information, but need the invoice detail report from PakEnergy to secure the invoices. |
| 4.3 | AP - Invoices | C&S Leasing Invoices | | C&S Lease Service | Open | 9/23/2025 | |
| 4.4 | AP - Invoices | Creedence Inc Invoices | | Creedence Inc | Open | 9/23/2025 | |
| 4.5 | AP - Invoices | Gulf Coast Bank & Trust | | Gulf Coast Bank & Trust | Open | 9/23/2025 | |
| 4.6 | AP - Invoices | Support for all employee reimbursables over $1,000 | | Expense Report Support | Open | 9/23/2025 | |
| 4.7 | AP - Invoices | Sulfur River question regarding why services were shut down | | | Closed | 9/30/2025 | Yes, due to late payments Vendor did not want to mess with providing the service going forward. |
| 5 | AP - Invoices | BMT invoices - I believe most of these costs are G&A and relate to the operator, 84 Energy LLC (invoice approval and processing JIB). I don't believe these costs are supposed to be paid by the RE. I think the only expenses RH should pay for are the costs directly associated with RH books and reconciling the one bank account. If RH is responsible for G&A costs related to the operator's invoice and JIB process, please provide support for that agreement. | | | Open | 9/23/2025 | If this is accurate, please process a credit to 84 RH for the necessary amount for last month's JIB |
| 6.1 | AP - Invoices | 84 Energy Services - please add truck VIN to all past invoices | | 84 Energy Services | Open | 9/30/2025 | Are any of the trucks being charged to RH part of the BASA acquisition. If so, please process a credit for all of these charges. |
| 6.2 | AP - Invoices | 84 Energy Services - please provide employees | | 84 Energy Services | Open | 9/23/2025 | |
| 6.3 | AP - Invoices | 84 Energy Services invoices - please provide equipment ownership and set of measure details | | 84 Energy Services | Open | 9/23/2025 | |
| 7 | AP - Invoices | Listing of all invoices currently over 30 days past due | | | Open | 9/23/2025 | |
| 8 | AP - Invoices | Bone Transactions for Aug and Sep. | | | Open | 9/23/2025 | |
| 9 | PP&E | Truck Listing by VIN number, assigned driver, company they work for, are miles or routes are tracked | | | Open | 9/23/2025 | need more forward-looking analysis to be able to track performance and evaluate the use of RH capital/investment |
| 10 | Operations | Updated Production volumes forecast for 2025 with Work Over analysis | | | Open | 9/30/2025 | |
| 11 | Operations | 2025 Workovers Expense Details $565,888 | | | Open | 9/30/2025 | |
| 12 | Operations | 2025 Workovers Analysis - Budget vs Actual | | | Open | 9/30/2025 | |
| 13 | Operations | 2025 Workovers Analysis - Production results/ROI (current and forecast) | | | Open | 9/30/2025 | |
| 14 | Operations | Production impact associated with Sulfur River utility turned off | | | Open | | |
| 15 | Operations | First Purchaser Statements 2024-2025 | | | Open | 9/23/2025 | |
| 16 | Operations | JIB details from 2024-2025 | | | Open | 9/23/2025 | |
| 17 | Legal | Attorney update on New Horizon acquisition | | | Open | 9/23/2025 | Please provide as soon as possible so we can keep this process moving |
| 18 | Accounting | Manual Journal Entries Support | | Manual JE | Open | 9/23/2025 | Along with the support for each manual JE, please provide the process associated with advance payments |
| 19.1 | Accounting | 2025 Financial Analysis - Actual vs Budget (by month) | | | Open | 9/30/2025 | |
| 19.2 | Accounting | 2025 Financial Analysis - Actual vs Budget third quarter expectation with proposed 4th quarter budget | | | Open | 9/30/2025 | |
| 20 | PP&E | Fixed Asset Truck Equipment Listing for RH and 84 Energy LLC | | | Open | 9/23/2025 | |
| 21.1 | Payroll | Employee listing for 84 RH | | | Open | 9/23/2025 | |
| 21.2 | Payroll | Payroll support 2024-2025 | | | Open | 9/23/2025 | |
| 22 | Management | Equity Buyout amount | | | Open | 9/30/2025 | Please provide as soon as possible so we can keep this process moving |
| 23 | Accounting | Separate Accounting records | | | Open | | need to separate all accounting records based on the legal ownership. There should be no consolidation between the Operator and associated entities and RH. |
| 24 | System | Separate Accounting records | | | Open | 11/30/2025 | BMT not able to start until Oct. 16 |

*See* Exh. N (Investor Request for Information to Shimek Dated September 8, 2025).

54.     These questions are legitimate and Kollaer attempted to investigate them. But Kollaer has had little success because Shimek, refused to cooperate and share information. As the operator of record, Shimek is in exclusive control and possession of many business records of 84 Energy, and he hides them from others to protect himself from liability.[7] Shimek otherwise

---

[7]     The business records of 84 Energy, as contract operator of the Production Companies, necessarily include many of the books and records of the Production Companies. Shimek's choice to conceal these books and records directly contradicts the ER Company Agreement and RH Company Agreement, each

4918-9472-3451.3

Copy from re:SearchTX

refuses to give up his role as operator in favor of someone else with more financial and operational wherewithal, even though doing so would clearly be in the best interests of the Production Companies. There is simply no justification to allow 84 Energy to continue serving as operator of record of the oil and gas wells owned by the Production Companies.

55. This issue came to a head on October 1, 2025, when members and investors, JJN2 DC, LLC and 84 Basa 0224, LLC, sent a letter to Kollaer and Shimek, as representatives of the managers of ER and RH, demanding accountability for the poor results of the 84 Energy's operations (the "***Investor Letter***"). *See* Exh. O (Investor Request for Information to Shimek Dated October 1, 2025). These two entities have a tremendous amount of skin in the game: among other economic interests, they own a collective ~78% of the membership interest of ER and ~62% of the membership interest of RH.

56. The Investor Letter provided six examples of "severe mismanagement" by the manager, all directly attributable to Shimek:

  i.     Allegations of nonpayment of royalties.

  ii.    A recent lawsuit filed by Prosperity Bank against Defendants pertaining to a loan default exceeding $1 million.

  iii.   Allegations of nonpayment of oilfield vendors.

  iv.    Unanswered questions regarding conflict-of-interest transactions including 84 Energy's business with family members and related party transactions.

  v.     84 Energy's regulatory history with the Railroad Commission of Texas.

  vi.    Major deviations between "projected" and "actual" oil and gas production.

*Id.*

---

of which contains a provision allowing members of the Production Companies access to books and records. *See* Exh. A (RH Company Agreement); Exh. C (ER Company Agreement).

4918-9472-3451.3

Copy from re:SearchTX

57.     The Investor Letter also threatened to discontinue funding for the underlying oil and gas operations if these issues were not promptly resolved. *Id.* Needless to say, Kollaer was displeased to receive such a letter from the investors. But none of these allegations came as a surprise because most of these issues had already been discussed for several months; indeed, Kollaer has attempted to investigate many of these issues but has been stonewalled by Shimek.

58.     Upon receipt of the Investor Letter, Kollaer again attempted to engage with Shimek to investigate the allegations, but Shimek refused to reconsider his position or substantively engage.

59.     The Investor Letter set a response deadline of October 8, 2025. On October 7, Kollaer notified Shimek that he agreed with the investors' position and recommended cooperating with them.

60.     Shockingly, also on October 7, Shimek sent a letter to the investors threatening to shut-in the Production Companies' oil and gas wells and declare bankruptcy. *See* Exh. D (84 Energy Letter to Investors dated October 7, 2025). Ironically, and inexplicably, Shimek declared this proposed course to be in the Production Companies' best interest: "I will consult with counsel to determine the best way to shut-in the properties and conclude operations including but not limited to filing a bankruptcy proceeding to attempt to preserve the value of the properties and any and all claims owned by the company." *Id.*

61.     Shimek did not explain his bankruptcy threat and it is unclear who would be the filing debtor(s). Shimek does not have authority to file bankruptcy for ER or RH, so the debtor(s) would presumably be some combination of 84 Energy, LLC, 84 Energy Holdings, LLC, and/or Shimek individually.

62.     Further reflecting his bad faith, Shimek acted as if he had the unilateral right to take these actions. At no time prior to October 7 had Kollaer and Shimek ever discussed

Copy from re:SearchTX

shutting-in the wells or declaring bankruptcy, and it was appalling when Shimek took it upon itself to threaten the investors, acting as if he was authorized to act on behalf of the Production Companies.  Needless to say, Shimek's proposed course of action is wasteful of oil and gas resources, destructive of value, and not in the Production Companies' best interest.

63.     By this point in time, 84 Energy had received nearly 100 severance notices from the Railroad Commission for failed well tests and other operational deficiencies.  84 Energy also lost its bond to operate its legacy oil and gas assets in the State of Louisiana.

64.     Nonetheless, Shimek's October 7 letter largely brushed aside the substantive issues at hand, namely, the allegations of "severe mismanagement."  Shimek's dismissive attitude towards the investors is consistent with Kollaer's dealings with Shimek.

65.     It was even more shocking when Shimek made good on his threat to shut-in the wells and, on about October 9, began contacting field personnel and instructing them to shut in wells.

66.     The Production Companies' investors immediately responded by letter dated October 9 notifying Shimek they did not approve shutting-in the wells and considered Shimek to have abandoned them.  *See* Exh. P (Investor Objections to Shut-in to 84 Energy Dated October 9, 2025).  The investors also stated they were willing to take over the wells and begin operating them, largely in order to fill the void created by 84 Energy's dereliction of duty and to mitigate their damages.

67.     By this point, to the extent there was any doubt, the investors concluded it was not prudent to continue advancing funds to keep Shimek's failing operation afloat.  The investors had no duty to advance such funds and only did so in a good faith effort to resuscitate the Production Companies' business (in which they have a substantial economic interest as members and lenders) because Shimek had already materially breached his duties and obligations to the

21

4918-9472-3451.3

Copy from re:SearchTX

Production Companies.  Shimek, as operator, was living paycheck-to-paycheck—a far cry from the operative standard.

68.      Shimek responded by letter dated October 13 and, recognizing his mistake, clarified that he was *not* abandoning the wells.  *See* Exh. Q (84 Energy Letter to Investors Dated October 13, 2025).  The purpose of Shimek's strategic reversal was to support his ongoing effort to leverage a cash buyout from the investors.  By taking inconsistent action—abandoning the wells, yet refusing to step down as operator of record—Shimek is holding the oil and gas wells hostage in order to extort more money from the investors.  Make no mistake about it: 84 Energy's own actions confirm it abandoned the entire operatorship.

69.      On October 16, 2025, RH's lender, Bonnie View South, LLC ("***BVS***"), declared RH in default of a Production Agreement.  *See* Exh. G (Bonnie View South, LLC Demand Letter Dated October 17, 2025).   The factual basis of the default mirrors the prior complaints about Defendants concerning their ongoing operational incompetence and failure to disclose material information.  For example:

> First, we have a number of concerns regarding critical information that has been requested or that has been delivered in non-compliance with the requirements of the Production Agreement. Included in such concerns are the following:
>
> 1. As is our right under the Production Agreement, we have submitted multiple requests for information. Please immediately provide us with information requested.
>
> 2. The production information you have reported has been inconsistent. Please re-examine your reporting since the Effective Time and explain inconsistencies.
>
> 3. You have not timely reported Hydrocarbon sales as required under the Production Agreement. Please provide information for all Hydrocarbon sales since the Effective Time.
>
> 4. Accounting records you have provided have not segregated financial information for RH; to the contrary, your financial reporting has combined financial information for RH with financial information for other entities. Please provide separate financial information for RH as required under the Production Agreement.

22

Copy from re:SearchTX

5. You have failed to provide GAAP compliant financial information as required under the Production Agreement. Please provide such financial information.

6. You have failed to provide Compliance Certificates as required under the Production Agreement. Please provide such Compliance Certificates and note any deficiencies.

Secondly, the Production Agreement requires RH to cause the Subject Wells to be "prudently operated and produced" and to comply with specifically negotiated covenants in Section 6 of the Production Agreement. To our distress, we have witnessed numerous breaches of RH's obligations, including the following (without prior notice or our consent):

1. Failure to timely pay vendors and royalties, which failures have directly impaired production and Hydrocarbon sales and evidence clear breaches of RH's obligations.

2. Subject Wells have been abandoned and employees have been told to leave the field.

3. RH has failed to provide notice of adverse claims, particularly claims made against Operator. We are aware of lawsuits filed against the Operator by Prosperity Bank and Skyinance.

4. RH has been delinquent in payment of operating expenses and JIB processing to working interest owners.

5. Even before the Subject Wells were abandoned, production had declined dramatically, which is evidence of poor engineering practices.

*Id.*

70.     By this point in time, Kollaer had made more than a good faith effort to work with Defendants and try to get things back on track. Unfortunately, as these efforts increased, Defendants' cooperation and transparency decreased, making a compromise impossible.

71.     As of October 20, 2025, it became clear that Defendants were acting in bad faith in a manner that jeopardized the entire enterprise. Defendants had blatantly disregarded their contractual duties along with their fiduciary duties of loyalty, disclosure, and care. Therefore, on October 20, 2025, members and managers notified Defendants they had been removed from all capacities. This decision was unanimously approved by all members of RH, excluding 84 Energy Holdings, LLC, reflecting ~99.9% of the membership interest. This decision was also unanimously approved by all members of ER, excluding Shimek, reflecting ~95% of the

4918-9472-3451.3

Copy from re:SearchTX

membership interest.  **This decision was not a close call and the termination letter was approved by and transmitted with the consent of the Production Companies' members other than Defendant 84 Energy Holdings, LLC.**

---

1. **84 Energy, LLC has been removed for cause as manager of Energy Resources;**
2. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Energy Resources;**
3. **Aaron Shimek has been removed for cause as manager of Resources Management;**
4. **Resources Management has been removed as manager of Resources Holdings; and,**
5. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Resources Holdings.**

---

*See* Exh. R (Removal Letter to Defendants Dated October 20, 2025).

72.     The Removal Letter explained the decision was based on Defendants' escalating bad faith in the face of monthslong efforts to cooperate and restore normalcy.

---

We reference communications with you over the past few months, including but not limited to phone calls, in-person meetings, correspondence from the Major Investors dated October 1, 2025 and October 9, 2025, and a default letter from Bonnie View South, LLC dated October 16, 2025.  By and through these communications, we and those aligned with us have objected to the manner in which you have unilaterally and recklessly been doing business on behalf of Energy Resources, Resources Holdings, and Resources Management.  Your actions have caused incalculable and ongoing financial losses.  Against this backdrop, and given your refusal to change your ways, you have given us no option but to notify you that the following actions have been taken, effective immediately:

---

*See* Exh. R (Removal Letter to Defendants Dated October 20, 2025).

73.     With respect to ER, its sole Member, Plaintiff MPC 84 I, LLC, exercised its rights under Section 5.11 of the ER Company Agreement and removed 84 Energy as Manager, leaving MPC Conventional Manager, LLC as ER's sole manager.  Because 84 Energy was removed as Manager, pursuant to Section 5.14 of the ER Company Agreement, 84 Energy was also removed as operator.  With respect to RH, its manager, 84 Resources Management, LLC was removed by the Members pursuant to Section 10.1 of the RH Company Agreement.

74.     Shimek was not entitled to participate in this decision because he was deeply conflicted given his blatant allegiance to 84 Energy.  Shimek was particularly conflicted with

24

Copy from re:SearchTX

regards to decisions concerning the operatorship considering his control and ownership of 84 Energy.  Kollaer, as the only disinterested manager of 84 Resources Management, LLC, was authorized to act on behalf of 84 Resources Management, LLC, and thus RH, with respect to any transactions for which Shimek has a conflict—including the decision to remove 84 Energy as operator.

75.     Kollaer filed this lawsuit on October 20 because Defendants had already confirmed they would not honor any termination letter or otherwise voluntarily comply. Defendants' refusal to cooperate made litigation inevitable.

76.     On October 22, Kollaer continued his investigation by sending a demand letter to the accounting firm of Blakely & Week-Thome, PLLC ("***BWT***") who had been engaged by Shimek to handle 84 Energy's accounting for the Production Companies along with Shimek's legacy assets.[8]  *See* Exh. S (Kollaer Letter to BWT Accountants re Books and Records). Unfortunately, BWT followed Shimek's non-standard request to commingle the books and records of ER, RH, and Shimek's legacy assets, resulting in limitations being placed on Kollaer's access to the Production Companies' books and records, principally based on the "confidentiality" of Shimek's legacy assets.  *See* Exh. T (BWT Accountants Response to Kollaer Request for Books and Records).

77.     This confidentiality objection reflects an ongoing theme of Shimek not only being close-lipped about the Production Companies' finances, but even more so with respect to his legacy assets.  There is a reason Shimek does not want Kollaer and others to discover details

---

[8]     Legacy assets refer to oil and gas interests owned by 84 Energy in which Plaintiffs have no ownership or affiliation.  Shimek should have operated his legacy assets independently from the Production Companies, but over time, he commingled them and likely used money earmarked for the Production Companies for his legacy assets and/or affiliates.  Shimek traded-in four trucks belonging to the Production Companies and used that value to buy a vehicle for his affiliate 84 Energy Services, LLC.

4918-9472-3451.3

Copy from re:SearchTX

about his legacy assets, which have been a failure, as evident by the Prosperity Bank loan default and the *Donner* royalty lawsuit.

78.     On October 27, Kollaer forwarded the BVS demand letter to Shimek and demanded his cooperation in attempting to cure the BVS default.  *See* Exh. U (Kollaer Letter to Shimek re: BVS Default).  Kollaer expressly warned Shimek that he would be unable to defend RH against BVS' claims without Shimek's cooperation.  To date, Shimek has not responded to Kollaer's request for information.  RH was eventually sued by BVS on November 6, 2025 in Cause No. 25-BC11A-0081 before this same Court.

79.     On November 5, ER's lenders (and members), JJN2 DC, LLC and Doliver Income Fund I, LLC  declared ER in default of certain promissory notes.  *See* Exh. V (Doliver / JJN2 DC Default Letter to ER).  Defendants ignored this demand letter and have not responded to it.

80.     On November 12, the parties mediated with Chris Aycock.  Kollaer initiated this mediation as a good faith effort to resolve this dispute without Court intervention.  The parties reached an impasse on settlement negotiations on or about November 21.   Defendants' negotiating tactics confirm they are acting in bad faith and attempting to use 84 Energy's regulatory status as leverage to extract an undeserved windfall.

81.     As if the situation could not get worse, on November 19, Kollaer unexpectedly received a notice from Defendants stating 84 Energy had purported to assign its operatorship of the Clarksville Cotton Valley Unit in Red River County to SND Operating, LLC.  *See* Exh. W (Notice from 84 Energy re: Purported Assignment of Unit to SND Operating).  Defendants did not have authority to assign the operatorship, and the operatorship is otherwise not assignable. Defendants are apparently giving away assets belonging to the Production Companies as a vengeful act of spite.

26

Copy from re:SearchTX

82.     As of November 24, the situation is rapidly deteriorating as Defendants continue to raise the stakes through increasingly reckless actions.  Court intervention is desperately needed to preserve the investment in the O&G Interests and prevent other disastrous effects.

**ALTER EGO**

83.     Given the nature of Shimek's relationship with 84 Energy, 84 Energy should be treated as the alter ego of Shimek for purposes of all causes of action alleged herein, and Plaintiffs should be permitted to pierce the corporate veil and hold Shimek personally liable for all liabilities of 84 Energy.

84.     Shimek is the sole owner and manager of 84 Energy.  84 Energy is an undercapitalized entity that is near bankruptcy for failure to pay its obligations to vendors and other creditors.  84 Energy was never adequately capitalized to carry regular and ongoing expenses of operations through various billing cycles.

85.     Upon information and belief, Shimek has not followed corporate formalities for 84 Energy, including holding proper meetings of members, properly electing its managing member, proposing and approving and annual budget, or obtaining consents necessary for corporate action.

86.     Shimek has mixed the accounts and assets of 84 Energy, and the accounting thereof, with his own personal assets and used the assets of 84 Energy for his own personal use.

87.     Shimek's exclusive ownership and control has resulted in a complete unity of himself and 84 Energy such that there is no separation between the two.

88.     Through 84 Energy, Shimek has perpetrated actual fraud, numerous breaches of contracts, fiduciary duties, tort duties, and other obligations at law or equity, all with dishonesty and an intent to benefit himself over and above all other interested parties and evade existing legal obligations.

27

4918-9472-3451.3

CAUSES OF ACTION

A.      **MPC 84 I, LLC, Derivatively on Behalf of ER**

89.     Plaintiff MPC 84 I, LLC, pursuant to the Texas Business Organizations Code Chapter 101, brings its claims derivatively on behalf of ER.  MPC 84 I, LLC has standing because at all relevant times it has been a member of ER.

90.     MPC 84 I, LLC affirmatively pleads that it has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action, except for such fees or other payments, including attorneys' fees, as the court expressly approves to be paid to the Plaintiffs or on their behalf. MPC 84 I, LLC will fairly and adequately represent the interests of ER in enforcing and prosecuting its rights and has retained competent counsel in derivative litigation to enforce and prosecute this action.

91.     MPC 84 I, LLC affirmatively pleads that any demand, or further demand, on any of the Defendants should be excused as futile because Shimek is interested and/or lacks independence, and ER has fewer than 35 owners which excuses any compliance with a demand requirement.  In any event, demand has been made concerning the matters alleged herein and Shimek has rejected such demands on behalf of ER.

### Count I – Breach of Fiduciary Duty (Against Shimek and 84 Energy)

92.     Plaintiffs incorporate and re-allege all previous paragraphs as if fully set forth herein.

93.     As co-manager of ER, 84 Energy owed fiduciary duties to ER.  Included among them is the duty of loyalty, duty of good faith and fair dealing, and duty of care.  Such duties require 84 Energy to not usurp corporate opportunities or engage in transactions for its own

28

Copy from re:SearchTX

benefit at the expense of ER, to act honestly, fairly, and sincerely without taking advantage of ER, and to exercise due care in decision-making and action for the benefit ER.

94.     84 Energy has failed to fulfill these duties by, among other things, misusing and wasting company funds, self-dealing or insider enrichment, misappropriation of assets, manipulation and concealment of financial records, refusal to enforce valid company legal rights, carelessly losing $121,240 of ER's cash through an obvious scam (in concert with an unqualified family member/employee), shutting in productive wells, and refusing to consent to or otherwise permit (*e.g.*, by recusal) the disinterested members of ER (Kollaer) to select a new manager and operator.

95.     In addition, Shimek has knowingly induced, or itself participated in, the breach of fiduciary duties by 84 Energy such that Shimek is also liable for such breaches.

96.     All such breaches of duties violate applicable statutes setting forth such duties as well as the applicable company agreements for the relevant limited liability companies.

97.     Such breaches have resulted in lost revenue to ER as well as rightful control over its business operations, including management and operation of the O&G Interests.

98.     In addition, 84 Energy, as an agent of ER with respect to field operations at the wells, owes fiduciary duties to ER, the principal.  Such duties include loyalty and good faith. By way of the same conduct alleged above, 84 Energy has breached these duties.

99.     As a result of 84 Energy and Shimek's conduct, ER has suffered actual damages in an amount to be proven at trial.  Plaintiffs also request a constructive trust, fee forfeiture, and/or disgorgement of all fees and funds wrongfully kept and obtained by 84 Energy and Shimek through their breaches of fiduciary duty.  Further, Plaintiffs seek exemplary damages for the conduct set forth herein.  Finally, Plaintiffs seek an accounting of all revenue and expenses relating to the Production Companies since 84 Energy became operator.

4918-9472-3451.3

Copy from re:SearchTX

**Count II – Unjust Enrichment (Against Shimek and 84 Energy)**

100.     Plaintiffs incorporate and re-allege all previous paragraphs as if fully set forth herein.

101.     Shimek and 84 Energy took money and other benefits from operations of the O&G Interests that were not authorized by any agreement and kept those benefits for themselves. Indeed, to the extent that any agreements existing between 84 Energy and ER were void due to Shimek's conflict, such money and benefits should never have been controlled by Shimek or 84 Energy.

102.     ER has received no value, or inadequate value, in return for such money and benefits that were wrongfully taken by Shimek and 84 Energy.

103.     Such amounts should be returned to ER.

104.     As a direct and proximate result of these Defendants' conduct, ER has suffered damages and to the extent ER has no adequate remedy at law for Defendants' actions, the Court should compel Defendants to disgorge to ER all unlawful or inequitable proceeds or other property that Defendants received, stole, and/or withheld from ER.

**Count III – Conversion (Against Shimek and 84 Energy)**

105.     Plaintiffs incorporate and re-allege all previous paragraphs as if fully set forth herein.

106.     Shimek and 84 Energy took money and other valuable assets from ER without its consent.  Such money and assets include proceeds from oil and gas operations due and owing to ER, as well as the physical wells themselves, which Shimek and 84 Energy have shut in and controlled access to over and against ER's instructions.

107.     Shimek and 84 Energy wrongfully exercised dominion and control over such money and other assets, to the exclusion of ER without their consent.

30

Copy from re:SearchTX

108.    Defendants converted such money and assets for their own benefit by retaining and spending the funds or shutting in the wells and possessing and controlling access to the physical land.

109.    As a direct and proximate cause of these actions, ER has suffered damages, including the loss of money, the loss of authority and control to manage and operate the wells, and other consequential and incidental damages to be proven at trial.    Further, 84 Energy and Shimek's conduct rises to a level warranting exemplary damages, which ER seeks to recover at trial.

### Count IV – Gross Negligence (Against Shimek and 84 Energy)

110.    Plaintiffs incorporate and re-allege all previous paragraphs as if fully set forth herein.

111.    Centering around Shimek, Shimek and 84 Energy have committed gross negligence and willful misconduct in their operation of the O&G Interests.

112.    Shimek and 84 Energy all owe a duty of care to ER in their various capacities. Shimek's conduct, which applies vicariously to 84 Energy, is reckless and intentional, and constitutes a complete disregard of his (and thus their) duties to act with due care for the benefit of ER, instead of himself.  He has shut in the wells and ceased all production solely to extort the members of the Production Companies from an exorbitant payout.  And he then blocked ER from terminating 84 Energy and hiring a new operator to manage the O&G Interests and ER to ensure the company assets would be preserved and production would continue.  Shimek also carelessly lost $121,240 of ER's cash through an obvious scam.

113.    Such conduct created an extreme degree of risk, of which Shimek was plainly and actually aware, but Shimek continued in his conduct with conscious indifference as to how it would harm ER.

31

Copy from re:SearchTX

114. Such conduct has caused damages and also warrants exemplary damages.

**B.**   **Kolcap, LLC, Derivatively on Behalf of RH**

115. Plaintiff Kolcap, LLC, pursuant to the Texas Business Organizations Code Chapter 101, brings its claims derivatively on behalf of RH. Kolcap, LLC has standing because at all relevant times it has been a member of RH.

116. Kolcap, LLC affirmatively pleads that it has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action, except for such fees or other payments, including attorneys' fees, as the court expressly approves to be paid to the Plaintiffs or on their behalf. Kolcap, LLC will fairly and adequately represent the interests of RH in enforcing and prosecuting its rights and has retained competent counsel in derivative litigation to enforce and prosecute this action.

117. Kolcap, LLC affirmatively pleads that any demand, or further demand, on any of the Defendants should be excused as futile because Shimek is interested and/or lacks independence, and RH has fewer than 35 owners which excuses any compliance with a demand requirement. In any event, demand has been made concerning the matters alleged herein and Shimek has rejected such demands on behalf of RH.

### Count I – Breach of Fiduciary Duty (Against Shimek and 84 Energy)

118. Plaintiffs incorporate and re-allege all previous paragraphs as if fully set forth herein.

119. As co-manager of 84 Resources Management, LLC, the manager of RH, Shimek owed fiduciary duties to RH. Included among them is the duty of loyalty, duty of good faith and fair dealing, and duty of care. Such duties require Shimek to not usurp corporate opportunities or engage in transactions for his own benefit at the expense of RH, to act honestly, fairly, and

32

4918-9472-3451.3

Copy from re:SearchTX

sincerely without taking advantage of RH, and to exercise due care in decision-making and action for the benefit RH.

120.     Shimek has failed to fulfill these duties by, among other things, refusing to respond to requests for information and otherwise failing to disclose information belonging to RH that is in his sole possession and/or the possession of BWT.  Shimek has further failed to fulfill these duties by taking action that put RH in default under its Production Agreement with BVS.  Kollaer warned Shimek of these disastrous consequences by letter dated October 27 and requested his assistance in investigating and responding to BVS's notice of default.  Shimek did not respond, and has taken no action to use the information in his possession to defend RH from BVS's claims, thereby making it impossible for RH to cure any default or defend itself against BVS's claims under the Production Agreement, including the claims brought in Case No. 25-BC11A-0081.

121.     In addition, 84 Energy has knowingly induced, or itself participated in, the breach of fiduciary duties by Shimek such that 84 Energy is also liable for such breaches.  Through Shimek, 84 Energy is fully aware of the duties and responsibilities owed by Shimek to RH.  Yet, 84 Energy has acted so as to cause Shimek to fail to fulfill their duties.

122.     All such breaches of duties violate applicable statutes setting forth such duties as well as the applicable company agreements for the relevant limited liability companies.

123.     Such breaches will likely result in a judgment being entered against RH in Case No. 25-BC11A-0081 which will lead to disastrous consequences for RH.

124.     In addition, 84 Energy, as an agent of RH with respect to field operations at the wells, owes fiduciary duties to RH, the principal.  Such duties include loyalty and good faith. By way of the same conduct alleged above, 84 Energy has breached these duties.

33

4918-9472-3451.3

Copy from re:SearchTX

125.    As a result of 84 Energy and Shimek's conduct, RH has suffered actual damages in an amount to be proven at trial.  Plaintiffs also request a constructive trust, fee forfeiture, and/or disgorgement of all fees and funds wrongfully kept and obtained by 84 Energy and Shimek through their breaches of fiduciary duty.  Further, Plaintiffs seek exemplary damages for the conduct set forth herein.  Finally, Plaintiffs seek an accounting of all revenue and expenses relating to the Production Companies since 84 Energy became operator.

**C.      Request for Declaratory Relief**

126.    As set forth herein, various disputes have arisen regarding the rights, status, and obligations of the parties under the RH Company Agreement and the ER Company Agreement. Therefore, pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Plaintiffs seek declarations that:

(a)     Due to unlawful acts and omissions by Aaron Shimek, 84 Resources Management, LLC has been removed as manager of Resources Holdings pursuant to the Resources Holdings Company Agreement;

(b)     The members of 84 Resources Management, LLC may appoint a new Manager of the company;

(c)     Due to unlawful acts and omissions by Aaron Shimek, 84 Resources Management, LLC has materially breached the Resources Holdings Company Agreement such that it has been removed and/or terminated as its manager;

(d)     84 Energy, LLC has materially breached the Resources Holdings Company Agreement such that it has been removed and/or terminated as its contract operator;

(e)     84 Energy, LLC has been terminated as contract operator of all wells owned by Resources Holdings;

(f)     84 Energy, LLC has been removed as manager of Energy Resources pursuant to the Energy Resources Company Agreement;

(g)     84 Energy, LLC has materially breached the Energy Resources Company Agreement such that it has been removed and/or terminated as manager;

34

Copy from re:SearchTX

(h)   84 Energy, LLC has materially breached the Energy Resources Company Agreement such that it has been removed and/or terminated as its contract operator;

(i)   84 Energy, LLC has forfeited its B share Member Percentage Interest in MPC 84 I, LLC pursuant to Article 5.11 of the Energy Resources Company Agreement;

(j)   84 Energy, LLC has been terminated as contract operator of all wells owned by Energy Resources;

(k)   Aaron Shimek has been removed for cause as manager of Resources Management;

(l)   84 Energy, LLC's status as operator is not assignable, and any assignment thereof is invalid, including any assignment between 84 Energy, LLC and SND Operating, LLC;

(m)   Shimek is an interested party for purposes of any transactions between ER and/or RH and another company, such as 84 Energy, that is owned in whole or in part by Shimek.  Accordingly, Shimek shall have no right to vote or otherwise decide on whether 84 Energy can continue to operate the O&G Interests on behalf of ER and/or RH.  Also, any agreements between Shimek or 84 Energy and ER and/or RH are void (and/or voidable) due to his conflict of interest in entering into such agreements as agent for both sides of the contract;

(o)   84 Energy can no longer duly serve as operator of the O&G Interests on ER and/or RH's behalf given that the disinterested members and managers want to remove 84 Energy as operator, but Shimek continues to leverage the terms of the relevant company agreements to block such efforts;

(p)   Due to Shimek's egregious conduct to date, Shimek has disqualified himself and shall have no authority to continue to manage RH or ER in any way; and,

(q)   Kollaer, as the only disinterested manager of 84 Resources Management, LLC, shall thereby have authority to act on behalf of 84 Resources Management, LLC, and thus RH, with respect to any transactions for which Shimek has a conflict.

### PLAINTIFFS' VERIFIED APPLICATION FOR INJUNCTIVE RELIEF

127.   Plaintiffs' Application for injunctive relief is supported by the Declaration of Andrew Kollaer, attached as Exhibit I hereto and incorporated herein for all purposes.  Plaintiffs

35

4918-9472-3451.3

incorporate and re-allege all previous paragraphs as if fully set forth herein, including all evidence cited above.

128.    The function of temporary injunctive relief is to "maintain the status quo . . . which preceded the pending controversy." *Six Brothers Concrete Pumping, LLC v. Tomczak*, No. 01-21- 00161-CV, 2022 WL 17981577, at \*4 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, no pet. h.). A party seeking a temporary injunction must prove three specific elements: (1) a cause of action; (2) a probable right to relief; and (3) a probable, imminent, and irreparable injury in the interim. *See Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020); *see also* TEX. R. CIV. P. 683. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 202, 204 (Tex. 2002). An applicant for a temporary injunction need not establish that they will prevail at the final trial—only that they are entitled to preservation of the status quo pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993).

129.    Plaintiffs request a temporary restraining order, temporary injunction, and permanent injunction requiring 84 Energy to immediately execute dual-signature P-4's with HD Operating, LLC.  While the P-4's are pending approval with the Railroad Commission of Texas, 84 Energy must also be ordered to authorize HD Operating, LLC to immediately resume all oilfield operations.

**Preserving the Status Quo**

130.    The status quo is the last actual, peaceable, non-contested status that preceded the controversy.  *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).  Here, the status quo is when the O&G Interests were being operated by a willing and solvent operator who performed its work in a transparent fashion and in accordance with industry standards.

36

Copy from re:SearchTX

131.    To achieve this status quo, 84 Energy must be ordered to immediately transition the operatorship to a willing and solvent operator who will perform its work in a transparent fashion and in accordance with industry standards.  Plaintiffs have identified HD Operating, LLC as a qualified entity to replace 84 Energy, LLC as operator of record for the Production Companies.  This process requires 84 Energy to immediately execute dual-signature P-4's. While the P-4's are pending approval with the Railroad Commission of Texas, Defendant 84 Energy, LLC must be ordered to authorize HD Operating, LLC to immediately resume all oilfield operations.

**Valid Cause of Action / Probable Right to Relief**

132.    Establishing a probable right to relief does not require Plaintiffs to establish that he will prevail at trial.  *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993).  Rather, "[a] probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it."  *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd*., 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

133.    Plaintiffs must demonstrate a probable right to relief with respect to their claim concerning the removal of 84 Energy as operator of the O&G Interests.  Plaintiffs' claim for removal is premised upon the Company Agreements and Defendants' prior material breach of those agreements.  Plaintiffs have presented overwhelming evidence justifying the decision to remove 84 Energy.  Defendants have repeatedly failed and refused to act with full disclosure and have taken unilateral and reckless actions with respect to oil and gas technical and administrative activity.  84 Energy is not fit to serve as operator because it is insolvent, has no access to capital, and is in default under multiple loan agreements.  Moreover, there is no justification for 84 Energy to shut-in the wells, walk away from the oilfields, all the while refusing to transition the operatorship to someone else.

4918-9472-3451.3

Copy from re:SearchTX

134.    There are many other disputes between the parties but the only one that matters for purposes of this injunction is whether 84 Energy was properly and effectively removed as operator.  The unequivocal answer to this questions is "yes."

**Immediate and Irreparable Harm**

135.    The O&G Interests—for which Plaintiffs are responsible as manager and/or member of the Production Companies—face immediate and irreparable harm for at least seven reasons, as detailed above: 1) the oil and gas leases will terminate for cessation of production,[9] 2) 84 Energy refuses to relinquish the operatorship despite having been removed as operator and otherwise walking away from the oilfield, 3) the business enterprise will likely be destroyed because its operations will cease as result of the wells being shut-in, 4) there is likely ongoing environmental contamination, 5) there is likely ongoing damage to subsurface reservoirs, 6) 84 Energy is unlawfully assigning the operatorship to third parties for its own personal gain, and 7) Defendants are insolvent and a money judgment against them will be worthless.[10]

136.    Each of these categories presents an existential crisis to the business enterprise and is sufficient to demonstrate irreparable harm, as a matter of law.

**No Adequate Remedy at Law**

137.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 65.011(5), Plaintiffs are not required to demonstrate an inadequate remedy at law because Defendants' unlawful action threatens irreparable injury to real or personal property, namely, the O&G Interests owned by the Production Companies.  *See Tri-Star Petroleum Co.*, 101 S.W.3d at 592.

---

[9]      *See Tri-Star Petroleum Co.*, 101 S.W.3d at 587.

[10]     *See Flamingo Permian Oil & Gas, L.L.C.*, 569 S.W.3d at 330–31 ("…we believe that Star Exploration has shown a likelihood that [Flamingo] is unable to pay damages, which would justify the grant of injunctive relief.").

4918-9472-3451.3

Copy from re:SearchTX

**Bond**

138.   No bond is necessary because Defendants will benefit from an injunction because it will protect Shimek's alleged economic interest in the Production Companies.  Defendants will otherwise suffer no harm if an injunction is granted because 84 Energy is sitting on its hands.  Defendants will suffer no harm if the operatorship is resumed by someone else.  84 Energy is apparently willing to transfer the operatorship to someone else as evident through its assignment of the Clarksville Cotton Valley Unit to SND Operating, LLC.  Conversely, if an injunction is not granted, any economic interest in the Production Companies—including anything allegedly owned by Defendants—will be completely wiped out.  Nonetheless, should the Court so require, Plaintiffs stand ready to post an appropriate bond.

## ATTORNEYS' FEES

139.   Plaintiffs request an award of costs and their reasonable and necessary attorneys' fees incurred in this case and any appeals.  TEX. CIV. PRAC. & REM. CODE § 37.009; TEX. BUS. ORG. CODE, Ch. 101.

## PRAYER

Plaintiffs respectfully pray that Defendants be duly cited to appear and answer herein; and that upon a final hearing of the cause, judgment be entered for Plaintiffs against Defendants, for actual, compensatory, consequential, and incidental damages; together with prejudgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate; reasonable and necessary attorneys' fees; costs of court; exemplary or punitive damages; that the Court enter a declaratory judgment as pleaded for herein; the Court issue injunctive relief as pleaded for herein; and such other and further relief to which Plaintiffs may be entitled at law or equity.

4918-9472-3451.3

Copy from re:SearchTX

Respectfully submitted,

**GRAY REED**

By:*/s/  David Leonard*                           
        David Leonard
        dleonard@grayreed.com
        Texas Bar No. 24078847
        Jeremy Walter
        jwalter@grayreed.com
        Texas Bar No. 24098572
        Daniel B. Howry
        dhowry@grayreed.com
        Texas Bar No. 24130877
        1300 Post Oak Blvd. Suite 2000
        Houston, Texas 77056
        T: (713) 986-7198

**ATTORNEYS FOR PLAINTIFFS ANDREW KOLLAER, MPC 84 I, LLC, and KOLCAP, LLC**

4918-9472-3451.3

Copy from re:SearchTX

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all counsel of record by electronic filing in accordance with the Texas Rules of Civil Procedure on this November 24, 2025.

Simon W. Hendershot, III
Lacey L. Spears
HENDERSHOT COWART, P.C.
1800 Bering Drive, Suite 600
Houston, Texas 77057
Email: trey@hchlawyers.com
Email: lspears@hchlawyers.com

***Counsel for Defendants***

   */s/ David Leonard*
David Leonard

41

4918-9472-3451.3

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

*Execution Version*

┌─────────────┐
│ **EXHIBIT** │
│   **A**     │
└─────────────┘

**COMPANY AGREEMENT**

**OF**

**84 RESOURCES HOLDINGS, LLC**

**(A TEXAS LIMITED LIABILITY COMPANY)**

**DATED: March 15, 2024**

THE MEMBERSHIP INTERESTS OF 84 RESOURCES HOLDINGS, LLC, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE U.S. OR NON-U.S. SECURITIES LAWS, IN EACH CASE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE MEMBERSHIP INTERESTS MAY BE ACQUIRED FOR INVESTMENT ONLY, AND NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS; (II) THE TERMS AND CONDITIONS OF THIS COMPANY AGREEMENT; AND (III) THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT AND THE INVESTMENT REPRESENTATIONS FOR THE MEMBERSHIP INTERESTS. THE MEMBERSHIP INTERESTS WILL NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS, THIS COMPANY AGREEMENT AND THE SUBSCRIPTION AGREEMENT AND THE INVESTMENT REPRESENTATIONS. THEREFORE, PURCHASERS OF THE MEMBERSHIP INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

10619969 v11 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

# COMPANY AGREEMENT
## OF
## 84 RESOURCES HOLDINGS, LLC

### (a Texas Limited Liability Company)

This COMPANY AGREEMENT (this "**Agreement**") **of 84 Resources Holdings, LLC**, a Texas limited liability company (the "**Company**"), is made as of March 15, 2024, by and among **84 Resources Management, LLC**, a Texas limited liability company, as the Manager (as defined herein) of the Company, and the parties whose names and business addresses are listed from time to time as on the attached Annex A or are otherwise admitted as Members (as defined herein) pursuant to this Agreement.

WHEREAS, the Company was formed as a limited liability company under and pursuant to the Texas Business Organizations Code (the "**TBOC**") and other relevant laws of the State of Texas by the filing of a Certificate of Formation for the Company with the Secretary of State of Texas on February 7, 2024 (the "**Certificate of Formation**"); and

WHEREAS, each party listed on Annex A hereto as a Member has executed a Subscription Agreement providing for, among other things, the commitment of capital by that party to the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereto agree to be bound, as follows:

## ARTICLE I

### Definitions

As used herein, the following terms shall have the following meanings, and all defined terms that relate to accounting matters shall be interpreted in accordance with U.S. generally accepted accounting principles in effect from time to time except as otherwise specifically provided herein:

"**Adjusted Capital Account Deficit**": Means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or as of any other relevant determination date, after giving effect to the following adjustments: (i) credit to such Capital Account of any amounts which such Member is obligated to restore (pursuant to the terms of this Agreement or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Section 1.704-1(b)(2)(ii)(c), Regulations Section 1.704-2(g)(1), and Regulations Section 1.704-2(i)(5) after taking into account any net decrease in a Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain that has occurred as of the relevant determination date; and (ii) debit to such Capital Account of the items described in Regulations Sections 1.704-1 (b)(2)(ii)(d)(4), (5), and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith

"**Adjusted Amount**": The Capital Commitment of a Member, *minus* (i) with respect to a New Member, the amount by which that New Member's Capital Contributions made on the date of a Subsequent Closing is higher than it otherwise would be, as a result of an upward revaluation of one or more existing Portfolio Investments pursuant to Section 3.5(b), *plus* (ii) with respect to a New Member, the amount by

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

which that New Member's Capital Contributions made on the date of such Subsequent Closing is lower than it otherwise would be, as a result of a downward revaluation of one or more existing Portfolio Investments pursuant to Section 3.5(b).

"**Advisers Act**": The Investment Advisers Act of 1940, as amended from time to time.

"**Advisory Committee**": The Advisory Committee established by the Manager pursuant to Section 7.18.

"**Affiliate**": means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling thirty percent (30%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or Manager of such Person, or (iv) any Person who is an officer, director, Manager, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**": This Company Agreement of 84 Resources Holdings, LLC, including the annexes and schedules hereto, as the same may be amended or restated from time to time.

"**Allocation Provisions**": As defined in Section 4.1(e).

"**Alternative Investment Vehicle**": As defined in Section 7.7(b).

"**Assignee**": As defined in Section 10.2.

"**Authorized Investments**": As defined in Section 6.1(b).

"**Available Assets**": Cash and other assets of the Company that the Manager reasonably determines are available for distribution. Available Assets shall not include, without limitation, any amounts determined by the Manager to be reasonably necessary (i) to pay the Company's current liabilities and other current obligations; (ii) to establish reserves for other liabilities and obligations; (iii) to maintain adequate working capital for the continued conduct of the Company's business and to own and operate Portfolio Investments (but not to make Portfolio Investments other than Portfolio Investments in Progress); and (iv) to reinvest in Portfolio Investments.

"**Bank Regulated Member**": A Member subject to regulation under the Bank Holding Company Act of 1956, as amended, and the rules and regulations promulgated thereunder.

"**Benefit Plan Investors**": (i) An employee benefit plan (as such term is defined in Section 3(3) of ERISA) subject to Title I of ERISA, (ii) a plan subject to Code Section 4975 and defined in Code Section 4975(e), other than a governmental plan, or (iii) a partnership, commingled account of a fund, or any other entity whose assets include or are deemed to include the assets of one or more such employee benefit plans or plans in accordance with Section 3(42) of ERISA.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**Business Day**": Any day on which commercial banking institutions in Houston, Texas, are not authorized or required to close.

"**Capital Account**": As defined in <u>Section 4.1(a)</u>.

"**Capital Commitment**": For any Member, the amount set forth in such Member's Subscription Agreement stating the commitment of capital by that party to the Company.

"**Capital Contribution**": With respect to any Member, at any time, the amount of capital actually contributed to the Company by that Member.

"**Carrying Value**": With respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except that the Carrying Values of all Company assets shall be adjusted to equal their respective Fair Values, on the occurrence of any event described in <u>Section 4.1(d)(i)</u> or <u>(ii)</u>. Upon an adjustment to the Carrying Value (i) for capital account maintenance purposes and for purposes of computing Net Income and Net Loss, it shall be as though the asset was sold at Fair Value, and gain or loss shall be allocated to Capital Accounts pursuant to <u>Section 4.2</u> as though the proceeds of that sale had been distributed; and (ii) upon an adjustment, pursuant to the definition of Carrying Value, to the Carrying Value of any Company property subject to depreciation, cost recovery or amortization, any further deductions for depreciation, cost recovery or other amortization attributable to that property shall for purposes of Capital Account maintenance equal an amount that bears the same ratio to the Carrying Value at the beginning of that year or other period as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for that year or other period bears to the property's adjusted tax basis at the beginning of that year or other period; provided, however, that where the property has no remaining tax basis at the beginning of that year or other period, deductions for depreciation, cost recovery or other amortization attributable to that property for purposes of Capital Account maintenance shall be computed using any reasonable method as selected by the Manager.

"**Cause Event**": The entry of a final, non-appealable judgment by any court or governmental body of competent jurisdiction that the Manager has committed, in connection with the performance of its respective duties under the terms of this Agreement, fraud, gross negligence, willful misconduct, bad faith or an intentional and material breach of this Agreement that in any such case has a material adverse effect on the business of the Company.

"**Closing Date**": As defined in <u>Section 3.3</u>.

"**Closings**": As defined in <u>Section 3.3</u>.

"**Code**": The Internal Revenue Code of 1986, as amended from time to time, including successor provisions of succeeding law.

"**Co-Investment Opportunities**": Opportunities that the Manager elects to provide to Persons including, without limitation, any, all, or none of the Members (including Affiliates), or unrelated third parties, to invest in Portfolio Investments alongside the Company.

"**Company Legal Matter**": As defined in <u>Section 12.14</u>.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**Competing Business**". As defined in <u>Section 7.13</u>.

"**Competing Entity**": As defined in <u>Section 7.13</u>.

"**Capital Interest Members**": The parties who have executed a Subscription Agreement and are not Profits Interest Members, providing for, among other things, the commitment of capital by that party to the Company and listed as Capital Interest Members in <u>Annex A</u> hereto, as amended from time to time, in their capacities as Capital Interest Members of the Company, and, for purposes of the allocation and distribution provisions contained in <u>Articles IV</u>, <u>V</u>, and <u>XI</u>, an Assignee.

"**Disabling Event**": The occurrence of an event set forth in the TBOC.

"**Dissolution Sale**": All sales and liquidations by or on behalf of the Company of its assets in connection with or in contemplation of the winding-up of the Company.

"**Distributable Cash**": All cash revenues of the Company less the portion thereof used to pay all expenses incurred by or on behalf of the Company and to otherwise establish working capital, reserves and other amounts as the Manager reasonably determines to be necessary or appropriate for the proper operation of the Company's business or its winding up and liquidation. The Manager in its sole discretion may, at any time and from time to time, declare the funds of the Company to be Distributable Cash.

"**ERISA**": The Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Member**": A Member (other than a Governmental Plan Member) that is an "employee benefit plan" (as that term is defined in Section 3(3) of ERISA) subject to ERISA, or any entity deemed to hold "plan assets" of the foregoing under the Plan Asset Regulations.

"**Event of Dissolution**":  As defined in <u>Section 11.1</u>.

"**Expert**": As defined in <u>Section 10.1(c)</u>.

"**Expiration Date**": The earlier of (i) the ten (10th) anniversary of the date of the Final Closing, or (ii) any earlier date as required by <u>Section 10.1</u>.

"**Fair Value**": The value of any Portfolio Investments, securities or other assets measured at their fair value at the time of and as determined by the Manager, with the Manager taking into account factors that it determines to be appropriate under the circumstances, including without limitation, available appraisals, the discounted present value of estimated future cash flows, replacement costs and comparable market prices.

"**Final Closing**": The last Subsequent Closing, which shall not be more than twenty-four (24) months after the Initial Closing.

"**Financial Statements**": As defined in <u>Section 9.2(a)</u>.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**First Closing Date**": The earliest date that a Closing occurs in this Company, or Parallel Fund.

"**Fiscal Year**":  The fiscal year of the Company, determined in accordance with <u>Section 2.7</u>.

"**Fractions Rule**": As defined in <u>Section 4.1(e)</u>.

"**Funds**": Any Parallel Fund.

"**Funds Members**": The Members of any of the Funds.

"**Governmental Plan Member**": A Member that is a "governmental plan" as defined in Section 3(32) of ERISA.

"**Indemnified Party**": As defined in <u>Section 7.5(a)</u>.

"**Initial Closing**": means the first Closing at which a Member (other than the Initial Member) was admitted to the Company, subject to receiving the minimum Capital Commitments of $12,500,000.00.

"**Initial Member**": the Manager.

"**Interest**": At any time, the total Membership Interests and interests in Parallel Funds of any Member.

"**Investment Company Act**": The Investment Company Act of 1940, as amended from time to time.

"**Investment Period**": The date that is thirty (30) months from the First Closing Date.

"**Legal Counsel**": As defined in <u>Section 12.14</u>.

"**Limited Exclusion Right**": As defined in <u>Section 3.6</u>.

"**Losses**": As defined in <u>Section 7.6(a)</u>.

"**Major Investor**": Means 84 Basa 0224, LLC, or his designee.

"**Management Agreement**": That certain Management Agreement by and between the Manager and the Company.

"**Management Interests**": All of the interests of the Manager in the Company, including, without limitation, the Manager's Membership Interest and other rights and interests.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**Manager**": 84 Resources Management, LLC, a Texas limited liability company, and/or any successor or additional manager admitted pursuant to the terms hereof, in its capacity as a manager of the Company.

"**Manager Membership Interests**": As defined in Section 10.1(b).

"**Members**": Means, collectively, the Capital Interest Members and the Profits Interest Members treated as one class or group of members.

"**Membership Interest**": With respect to each Member, the ownership interest in the Company held by that Member.

"**Membership Percentage**": With respect to Capital Interest Members, means the percentage determined by taking such Capital Interest Member's actual Capital Contributions made to the Company as the numerator, and all of the Capital Interest Member's actual Capital Contributions made to the Company as the denominator, as of the date of such determination, and multiplying such quotient by ninety-nine and ninety one hundredths of a percent (99.90%). The Manager's Membership Percentage is ten one hundredths of a percent (0.10%).

"**Net Asset Value**": As of any specified date, the difference between: (i) the value of all securities, cash, and cash equivalents owned directly or indirectly by the Company as of such date, and (ii) any indebtedness of the Company or its subsidiaries as of such date (without duplication of any indebtedness considered in determining value pursuant to clause (i)).

"**Net Income**" or "**Net Loss**": Respectively, for each taxable year or other period, the Company's taxable income or loss for that taxable year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) and otherwise in accordance with the methods of accounting followed by the Company for federal income tax purposes, adjusted as follows:

(i)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be added to that taxable income or loss;

(ii)    depreciation, amortization and other cost recovery deductions, as well as gain or loss recognized upon the sale or exchange of Company assets, taken into account in computing that taxable income or loss shall be determined by taking into account any increase or decrease in the Carrying Value of Company assets;

(iii)   any items that are specially allocated pursuant to Section 4.2(b)(i), (ii), and (iii) or 4.2(d) shall not be taken into account in computing Net Income or Net Loss; and

(iv)    any expenditure of the Company described in Code Section 705(a)(2)(B) (or treated as such under Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

account in computing Net Income or Net Loss pursuant to this definition shall be deducted from that taxable income or loss.

"**Operating Agreement**": That certain Operating Agreement by and between the Operator and the Company.

"**Operator**": 84 Energy, LLC, a Texas limited liability company.

"**Parallel Fund**": Entities that are created to accommodate unique legal, tax or regulatory needs of Members, and that invest in Portfolio Investments side-by-side with the Company, generally on the basis of capital commitments available to make the investment (as determined in good faith by the Manager from time to time, taking into account, among other things, the portion of the Company's and the Parallel Fund's capital commitments allocated to investments meeting certain property type, diversification and other criteria, if any), in each case on substantially the same terms and conditions as the Company.

"**Percentage Interest**":  With respect to each Member or Manager, the Adjusted Amount of the Members and Manager *divided by* the aggregate Adjusted Amounts of all Members and Manager; *provided*, *however*, that the Percentage Interests of the Members and Manager in Portfolio Investments shall be adjusted by the Manager to take into account the exercise of any Limited Exclusion Rights, and the existence of any Defaulting Members.

"**Permitted Temporary Investments**": Investments in (i) U.S. government and agency obligations with maturities of not more than one (1) year and one (1) day from the date of acquisition; (ii) commercial paper with maturities of not more than six (6) months and one (1) day from the date of acquisition and having a rating assigned to that commercial paper by Standard & Poor's Ratings Services or Moody's Investors Service, Inc. (or, if neither organization rates such commercial paper at that time, by any nationally-recognized rating organization in the United States of America) equal to one of the two highest commercial paper ratings assigned by the organization, it being understood that as of the date hereof the ratings by Standard and Poor's Rating Services are "P1" and "P2" and the ratings by Moody's Investors Service, Inc. are "A1" and "A2;" (iii) interest-bearing deposits in United States, Canadian, Japanese or European Union countries' banks that have an unrestricted surplus of at least U.S. $250 million, maturing within one (1) year; and (iv) money market mutual funds with assets of not less than U.S. $500 million, substantially all of which assets are believed by the Manager to consist of items described in the foregoing clause (i), (ii) or (iii).

"**Person**": Any individual, partnership, corporation, limited liability company, joint venture, joint stock company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government, governmental agency, political subdivision of any government or other entity.

"**Plan Asset Regulations**": The final regulations promulgated by the Department of Labor found at 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA.

"**Portfolio Companies**": Entities (whether special purpose investment vehicles, other corporations, partnerships, limited liability companies or other entities) with interests in, or that are otherwise involved in the ownership, operation or management loan-related businesses or assets in which the Company owns a direct or indirect interest.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**Portfolio Investments**": Investments made by the Company and/or one or more of the Parallel Funds, either directly or indirectly through one or more limited liability entities, to acquire, own, improve, manage, renovate, maintain, hypothecate, transfer, finance, refinance, syndicate and/or ultimately sell for a profit certain real property in the United States. Any such assets acquired as part of a single portfolio or in a series of related transactions, including, without limitation, a series of investments in the same Portfolio Company, shall constitute one Portfolio Investment.

"**Portfolio Investments in Progress**": Any potential Portfolio Investment under review (i) prior to the Final Closing or (ii) on or about the Expiration Date, if either a letter of intent or similar written agreement, agreement in principle, acquisition agreement or other definitive agreement to invest (which in any case may be subject to conditions precedent or other provisions that make the agreement non-binding) has been entered into on behalf of the Company with respect to the Portfolio Investment.

"**Prime Rate**":    At any time, the rate of interest per annum stated at that time in *The Wall Street Journal* (or any successor publication thereto) as the base rate on corporate loans for at least seventy-five percent (75%) of the thirty (30) largest banks in the United States.

"**Profits Interest**": Has the meaning set forth in Revenue Procedures 93-27 and 2001-43.

"**Profits Interest Member**" means the Manager.

"**Qualified Capital Contribution**" means any Capital Contribution made by the Member on or prior to the date twenty-four (24) months following the Initial Closing.

"**Qualifying Member**" means a Member whose Capital Contributions are made to the Company prior to the date that is twenty-four (24) months following the Initial Closing.

"**Qualified Member Distribution**" means a distribution made to a Qualifying Member equal to ten percent (10%) per annum of such Qualifying Member's Capital Contribution(s) accruing from the date such Capital Contribution(s) were paid to the Company and such accrual ending on the date that is twenty-four (24) months following the Initial Closing. Qualified Member Distribution(s) shall be deemed a coupon on the Capital Contributions and not a return of the Capital Contribution made by such Qualifying Member. No Qualified Member Distribution will be earned and paid for Capital Contributions made after the twenty-four (24) month anniversary of the Initial Closing.

"**Qualified Member Percentage**" With respect to Qualifying Members, means the percentage by taking such Qualifying Member's actual Qualified Capital Contribution(s) made to the Company as the numerator, and all of the Qualifying Members' actual Qualified Capital Contributions made to the Company as the denominator, as of the date of such determination, and multiplying such quotient by 100 percent (100%).

"**Regulation Y**": As defined in Section 7.9.

"**Regulations**": Income tax regulations promulgated under the Code, as those regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**REOC**": A "real estate operating company" as that term is defined in the Plan Asset Regulations.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

"**Required Interest**": As defined in <u>Section 12.3(a)</u>.

"**Revaluation Profit**":  With respect to a Member, the distributions received by that Member pursuant to <u>Section 3.5(b)</u> that represent the cost of carry or, as a result of a revaluation of one or more Portfolio Investments under <u>Section 3.5(b)</u>, that Member's share of any unrealized profit from those Portfolio Investments that the Member is deemed to have sold to New Members.

"**Separate Account**": As defined in <u>Section 9.4</u>.

"**Side Letter Agreement**": As defined in <u>Section 12.5</u>.

"**Subscription Agreement**": Each of the Subscription Agreements between the Company and the Members.

"**Subsequent Closing**": As defined in <u>Section 3.3</u>.

"**Substitute Member**": As defined in <u>Section 10.4</u>.

"**Tax Distributions**": As defined in <u>Section 5.3</u>.

"**Transfer**": With respect to any Member's Membership Interest, the sale, exchange, transfer, assignment, pledge, creation of a security interest in or encumbrance on or other disposition of the interest or any economic interest therein (including, without limitation, as a result of any participation or swap transaction) either directly, indirectly, by operation of law or otherwise.

"**UBIT**": As defined in <u>Section 7.15</u>.

"**Unfunded Capital Commitment**":  With respect to a Member, the amount by which (i) the sum of (A) that Member's Capital Commitment *plus* (B) distributions to that Member in respect of a return of Capital Contributions pursuant to <u>Section 3.5(b)</u> (other than that Member's Revaluation Profit) ***plus*** (C) the amount of any distributions made to that Member pursuant to <u>Section 5.2(a)</u> before the Expiration Date, ***exceeds*** (ii) the aggregate of all Capital Contributions made to the Company by that Member.

"**Unrecovered Capital Balance**": With respect to each Member, at any time, the aggregate amount of all Capital Contributions previously made by the Member (taking into account the effect of Subsequent Closings pursuant to <u>Section 3.5</u>, as provided in <u>Section 3.5(b)</u>), *minus* any amounts that have previously been distributed or deemed distributed to that Member pursuant to <u>Section 5.2(a)</u>.

"**VCOC**": A "venture capital operating company" as that term is defined in the Plan Asset Regulations.

## ARTICLE II

## General Provisions

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

2.1    **Name**. The name of the Company shall be "84 Resources Holdings, LLC" The Manager is authorized to make any variations in the Company's name that the Manager deems necessary or advisable. The Manager shall provide written notice to each Member of any change in the name of the Company.

2.2    **Organizational Certificates and Other Filings**. If requested by the Manager, the Members shall immediately execute all certificates and other documents, and any amendments or renewals of those certificates and other documents, as thereafter reasonably required, consistent with the terms of this Agreement, that are necessary or helpful for the Manager to accomplish all filing, recording, publishing and other acts that may be appropriate to comply with all requirements for (i) the formation, continuation and operation of the Company as a limited liability company under the laws of the State of Texas; and (ii) all other filings required to be made by the Company. Notwithstanding anything contained herein to the contrary, Membership Interests of the company are not, and shall not be, certificated.

2.3    **Purpose and Powers**. The Company is organized for the object and purpose of making investments in Portfolio Investments in accordance with the investment criteria described in Section 6.1, owning, managing, supervising and disposing of those investments, sharing the profits and losses therefrom and engaging in activities necessary, incidental or ancillary thereto, and engaging in any other lawful act or activity for which limited liability companies may be organized under the TBOC in furtherance of the foregoing. Notwithstanding any other provision of this Agreement, the Company, and the Manager on behalf of the Company, may execute, deliver and perform those agreements and documents that the Company determines are necessary or desirable for the formation and organization of the Company. In furtherance of this purpose, the Company shall have all powers necessary, suitable or convenient to accomplishing the aforesaid purpose, subject to the limitations and restrictions set forth in Section 6.1 or elsewhere in this Agreement, as principal or agent, including, without limitation, all of the powers that may be exercised by the Manager on behalf of and, except as specifically provided herein, at the expense of the Company pursuant to this Agreement or the TBOC. The foregoing purposes and powers include, without limitation, the following, directly or indirectly:

(a)    to engage in investment activities that the Manager determines, including, without limitation, to purchase for investment purposes, sell, exchange, invest and reinvest in, and otherwise trade, directly or indirectly, in and with Portfolio Investments and other Company property and funds;

(b)    to acquire for investment purposes, improve, maintain, manage, mortgage, sell or exchange and otherwise deal with the assets and/or businesses that constitute the Portfolio Investments;

(c)    to alter or restructure the Company's investment in any Portfolio Investment at any time during the term of the Company without any pre-condition that the Manager make any distributions to the Members in connection therewith;

(d)    to invest Company funds in Permitted Temporary Investments;

(e)    to pay the commissions, fees or other charges to Persons (including the Manager and its Affiliates) in connection with any transactions entered into by or on behalf of the Company;

(f)    to seek representation in the management of Portfolio Companies (and otherwise, if applicable, in connection with other Portfolio Investments), which representation may involve,

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

without limitation, securing representation on boards of directors of Portfolio Companies, creditors' committees, management committees of companies, committees or other governing bodies in respect of those companies or investments, or the employment on behalf of the Company of experts to render managerial assistance to any such companies or investments, and any other rights that may be necessary to maintain the status of the Company as a VCOC or REOC;

(g)     either by itself, through its Affiliates or by contract with others, to have and maintain one or more offices within or without the State of Texas, and in connection therewith to rent, lease or purchase office space, facilities and equipment, to engage and pay personnel and do those other acts and things and incur those other expenses on its behalf that are necessary or advisable in connection with the maintenance of the office(s) and the conduct of the business of the Company;

(h)     to open, maintain and close accounts with brokers;

(i)     to open, maintain and close bank accounts, and draw checks and other orders for the payment of moneys;

(j)     to engage accountants, consultants, custodians, appraisers, tax advisers, a Manager, attorneys, asset and property managers, leasing brokers, and any and all other third-party agents and assistants, both professional and nonprofessional, and to compensate them in the manner that the Manager reasonably deems necessary or advisable;

(k)     to enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to carrying out its purpose;

(l)     to Transfer, reallocate or acquire Membership Interest pursuant to Article X;

(m)     to sue and be sued, to prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment with respect to claims against the Company, and to execute all documents and make all representations, admissions and waivers in connection therewith;

(n)     to register or qualify the Company under any applicable U.S. federal or state laws or foreign laws, or to obtain exemptions under those laws, if that registration, qualification or exemption is deemed necessary or desirable by the Manager;

(o)     to form one or more corporations, limited liability companies, real estate investment trusts, partnerships or other entities, to register or qualify those entities as provided in clause (n) above, and to utilize those entities as vehicles for making investments, and to otherwise carry out the business of the Company and cause those entities to take any action that the Manager would have the authority to take on behalf of the Company;

(p)     to structure investments for tax purposes for one or more classes or types of Members;

(q)     to reinvest proceeds from Portfolio Investments during the Investment Period;

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(r)    to make any and all elections and filings for U.S. federal, state, local and foreign tax purposes including those to adjust the basis of Company property pursuant to Code Sections 734(b), 743(b), and 754 or comparable provisions of state, local or foreign law;

(s)    to purchase insurance including, without limitation, property and casualty insurance and liability insurance;

(t)    finance (or refinance) any Portfolio Investment, guarantee any Portfolio Investment's debt, or incur other debt (in each case, in any form, as long as the security for that debt is secured by Company property) for Company purposes including, without limitation, to pay, indemnification obligations, or to establish reserves; and

(u)    to take any other actions that are necessary to further the business of the Company.

2.4    **Principal Place of Business**. The Company shall maintain its office and principal place of business at, and its business shall be conducted from, [ADDRESS], or any other place(s) inside or outside the United States that the Manager reasonably selects.

2.5    **Registered Office and Registered Agent**. The address of the Company's registered office in Texas initially is that address the Manager determines to make.  The name and address of the Company's registered agent for service of process in the State of Texas initially is as identified in the Certificate of Formation.

2.6    **Term**. The term of the Company commenced on the filing of the Certificate of Formation in the office of the Secretary of State of the State of Texas, and shall continue until the Company is dissolved pursuant to Section 11.1.

2.7    **Fiscal Year**. The Fiscal Year of the Company shall end on each December 31, unless otherwise required under Code Section 706. The Company shall have the same Fiscal Year for U.S. federal and state income tax purposes and for financial and partnership accounting purposes.

## ARTICLE III

### Capital Contributions; Membership Interest

3.1    **Initial Closing**. The minimum amount of Capital Commitments that needs to be raised as a condition of the Initial Closing is $12,500,000.00.

3.2    **Capital Commitments**.

(a)    **Size of Capital Commitments**. The Company shall accept total Capital Commitments up to $[●] million, which amount the Manager may increase in Manager's sole discretion.

(b)    **Manager**. The Manager may, but shall not be required to invest, in the Company and/or any Parallel Funds, directly or indirectly, and whether as Manager or Member, capital (whether in cash or properties), which shall be contributed on the same terms and at the same times as other Members.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(c)    **Capital Interest Member**. The Capital Commitment and Capital Contribution of each Capital Interest Member shall equal at least $100,000.00 (unless the Manager agrees to a lower amount).

3.3    **Capital Contributions**.  Capital Interest Members shall be admitted to the Company at the Initial Closing and at any subsequent closing held up to twenty-four (24) months after the Initial Closing (in each case, a "**Subsequent Closing**," and together with the Initial Closing, the "**Closings**"), each such Closing to be held on a date specified by the Manager (the date of a given Closing being referred to as a "**Closing Date**"). After being admitted, each Member shall make contributions to the Company on Capital Demand Dates specified in Capital Demand Notices provided to them, in accordance with and subject to the limitations set forth in this Section 3.3. Contributions of capital by the Members shall be made in U.S. dollars by wire transfer of federal funds to Company account(s) specified in the applicable Capital Demand Notice. Other than as set forth in this Article III, no Member shall be entitled to any interest or compensation by reason of its Capital Contributions or by reason of serving as a Member. No Member or Manager shall be required to lend any funds to the Company. Except as contemplated by Section 3.10, no Capital Demand Date shall occur after the Expiration Date. On any Capital Demand Date, and each Member shall contribute to the Company in U.S. dollars an amount equal to its portion of the Unfunded Capital Commitment specified by the Manager in a Capital Demand Notice.

3.4    **Capital Demand Notices**.

(a)    A "**Capital Demand Date**" means a date on which Members are required by the Manager to contribute capital to the Company, which date (i) shall be specified by the Manager in a Capital Demand Notice delivered by the Manager to each of the Members; (ii) except in the case of a capital call made in accordance with the five (5)-day periods set forth in Section 3.7 and 3.8, shall be no less than ten (10) Business Days from the date of delivery of a Capital Demand Notice by the Manager; and (iii) shall in no event, except as contemplated in Section 3.10, occur after the Expiration Date.

(b)    A "**Capital Demand Notice**" means a written notice requiring the contribution of capital to the Company, which notice shall (i) be delivered by the Manager to each Member; (ii) call for contribution to the Company of the amount of capital determined by the Manager to be appropriate to fund existing or contemplated Portfolio Investments, to make payments to meet the expenses of the Company permitted to be paid by the Company hereunder (including payment of any indemnification obligations), in each case consistent with clause (iii) of this Section 3.4(b); and (iii) subject to Section 3.5, call for a contribution of capital by each Member in an amount that represents that Member's Membership Interest of the aggregate of the amounts payable by all Member and Manager on the relevant Capital Demand Date, as adjusted by the Manager to take into account the exercise of any Limited Exclusion Rights and the existence of any Defaulting Members. Notwithstanding the foregoing, the Manager, by prompt notice to each Member by e-mail, facsimile, or as otherwise permitted under this Agreement, which shall be delivered at least ten (10) Business Days before the Capital Demand Date, may postpone the Capital Demand Date one or more times for any reason, to a specific date, or to a future date to be confirmed on three (3) Business Days' advanced notice; *provided*, *however*, that except as permitted under Section 3.10, no Capital Demand Date may be postponed to a date later than the Expiration Date.

3.5    **Subsequent Closing**.

(a)    At each Subsequent Closing, Annex A hereto shall be amended appropriately to reflect the admission of additional Members and, if applicable, the increase in Capital Contributions by Members, and the Manager shall take any appropriate action in connection therewith. Further, the Manager shall cause

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

*Annex A* to be amended from time to time to reflect the transfer of Membership Interests and changes in Capital Contributions that are accomplished in accordance with this Agreement.

(b)    If Membership Interests are sold to Members at a Subsequent Closing (including, without limitation, the sale of additional Membership Interests to previously admitted Members), then those Members shall fund their proportionate share (based on Capital Commitments after giving effect to the Subsequent Closing and, if the Manager has so elected as described below, adjusted upward or downward at the Manager's discretion to reflect the valuation (as set forth below) of existing Portfolio Investments) of (i) any Portfolio Investment made before a Subsequent Closing and (ii) any Capital Contributions made to pay fees and expense before such Subsequent Closing, *plus* interest at ten percent (10%) *per annum* from the date of each applicable funding, *less* that Manager's proportionate share of all distributions made to Members and Manager admitted in prior Closings. Those amounts shall be paid to the Company and, then if the Manager so elects, shall be distributed to the pre-existing Members and Manager. If the Manager determines to make that distribution, the distribution shall be made in proportion to the Members and Manager' respective Percentage Interests, and not pursuant to Section 5.2 (and those amounts, exclusive of the interest amount, shall increase those Members' and Manager's Unfunded Capital Commitments pursuant to the definition thereof and shall decrease those Members' and Manager's Unrecovered Capital Balance). If the Manager determines that a revaluation is appropriate, then the Portfolio Investment(s) will be valued at the increased or decreased revalued amount. For purposes of Article IV and Sections 5.2 and 5.4, any amounts contributed to the Company by Members at a Subsequent Closing ("**New Members**") including, without limitation, amounts resulting from the sale of additional Interests to previously-admitted Members, shall be treated as if the New Members have purchased a pro rata share of the Membership Interests from the pre-existing Members and Manager, and a portion of the Capital Account of each pre-existing Members and Manager shall be allocated to those New Members, so that after the allocation, the Capital Account of any New Members and any pre-existing Members and Manager are in proportion to their respective Percentage Interests. If a downward revaluation of one or more existing Portfolio Investments occurs, then a New Member's Unfunded Capital Commitment shall be reduced by the amount necessary to cause the ratio (the "**Ratio**") that the New Member's Unfunded Capital Commitment bears to its Adjusted Amount to be the same as the Ratio of previously admitted Members. Each Member that purchases a Membership Interest at a Subsequent Closing shall be deemed to have made a Capital Contribution equal to the amount contributed to the Company at such Subsequent Closing (excluding any cost of carry payment or any payment representing Revaluation Profit).

3.6    **Failure to Contribute**. Unless a Member or the Manager is excluded from investing pursuant to Section 3.7 or is excused from investing by Section 3.9, on any failure by any Member or Manager to pay in full when due the called-for percentage of its Unfunded Capital Commitment, (i) interest shall accrue on the outstanding unpaid balance of that called-for percentage, from and including the date that payment was due until the earlier of the date of payment to the Company of that called-for percentage (together with accrued interest thereon) or the time, if any, that the Member's Membership Interest is sold as provided in Section 10.6(e), at the *lesser of* (A) the rate of seven (7%) *per annum* over the Prime Rate, and (B) the maximum rate permitted by applicable law; and (ii) the Manager shall have the right, in addition to its other rights hereunder or under applicable law, to provide to all Members and Manager other than the Defaulting Member a Capital Demand Notice calling for contribution to the Company of the Capital Contribution that the Defaulting Member failed to make. Any capital call pursuant to clause (ii) of the immediately preceding sentence shall not increase any non-Defaulting Member's Capital Commitment (or Unfunded Capital Commitment), and any amount contributed by any Member or Manager pursuant to a Capital Demand Notice made under clause (ii) shall reduce that Member or Manager's Unfunded Capital Commitment in accordance with the definition of that term.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

3.7 **Limited Exclusion Right**. Before investing in any Portfolio Investment, the Manager shall have the right (a "**Limited Exclusion Right**") to exclude any Member from participating in the investment in a Portfolio Investment and in any item of income, gain, loss, deduction, credit or distribution with respect thereto, if the Manager determines in good faith that:

(a) participation by that Member in the Company's investment in that Portfolio Investment will (i) result in a violation by the Company of any statute, rule, regulation or order of any federal, state or other regulatory agency or other governmental body applicable to the Company, the Parallel Funds, the Portfolio Investment or any other Funds Member or (ii) subject the Company, the Parallel Funds, any Portfolio Investment or any other Funds Member to a material penalty under any such statute, rule, regulation or order;

(b) participation by that Member in the Company's investment in the Portfolio Investment would require the Company to register as an investment company under the Investment Company Act or would require the Manager, or any of its Affiliates to register as an investment adviser under the Advisers Act; or

(c) participation by that Member in the Company's investment in the Portfolio Investment would cause (or be reasonably likely to cause) a significant delay, extraordinary expense or a material adverse effect on the Company or its Affiliates, the Portfolio Investment, a Member, a Manager, or Parallel Fund.

If the Manager exercises its Limited Exclusion Right hereunder, then it shall notify each Member to be excluded, at least five (5) days before investing in any Portfolio Investment. That notice shall be accompanied by reasonable detail of the basis for the exclusion, including a summary of the facts leading to the Manager's exercise of its Limited Exclusion Right. The Manager shall give at least five (5) days' advanced notice to the non-excluded Members of the amount of any additional capital that they are required to contribute to consummate the proposed investment as to which the Limited Exclusion Right has been exercised.

3.8 **Profits Interest**. The Company may designate any Membership Interest as a Profits Interest.

(a) Profits Interests are interests solely in profits and shall not have initial capital accounts associated therewith. It is intended that there is no liquidation value at the time of issuance of any Profits Interest. In order to eliminate any liquidation value of the Profits Interest at the time of the issuance of such Profits Interest, the Profits Interest will not benefit from any sale of any asset of the Company except to the extent of its direct or indirect interest in the excess of the value of such asset at the time of its disposition, over the value of such asset on the date of the issuance of the Profits Interest. Holders of Profits Interests will be allocated income, gain, loss and deduction of the Company to take into account the reverse Section 704(c) principles as contemplated by Treasury Regulation Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(2)(iv)(g), and 1.704-1(b)(4)(i). The Profits Interests may be granted subject to such vesting and such other terms and conditions as may be determined by the Manager.  It is the intent of the Members and the Company that Profits Interests shall represent an interest in the Company that qualifies as a "profits interest" within the meaning of Revenue Procedure 93-27, 1993—C.B 343, or any successor authority thereto.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(b)     The Manager's Membership Interest shall be a Profits Interest in the Company and shall be fully vested upon execution of this Agreement. The Manager, as holder of Profits Interest shall have the voting and economic rights set forth in other Articles in this Agreement.

3.9     **Follow-On Contributions**. On the Expiration Date, the amount of each Member's Unfunded Capital Commitment shall be canceled, and the Manager shall no longer be entitled to deliver Capital Demand Notices, except to the extent necessary to obtain funds to (i) pay fees and expenses; (ii) complete Portfolio Investments In Progress; (iii) repay all principal, interest and other amounts owing; and (iv) to establish and fund a reserve for any of the foregoing items (i) through (iii) (items (i) through (iv) are, collectively, the "**Follow-On Contributions**"). The Manager shall have the right to deliver Capital Demand Notices with respect to the Follow-On Contributions after the Expiration Date.

3.10     **Termination of Investment Period**. On the *earliest* to occur *of*: (i) the date that is thirty (30) month after the First Closing Date; and (ii) the Manager's determination that changes in laws or regulations applicable to the Company or changes in business conditions make termination of the Investment Period necessary or advisable. If there are Unfunded Capital Commitments, the Manager, on written notice to all Members, shall cancel all outstanding Capital Commitments subject, however, to the continuation of Capital Commitments to the extent provided in Section 3.9. On the cancellation of all then Unfunded Capital Commitments, the Investment Period shall terminate (subject to the obligations to fund pursuant to Section 3.9).

## ARTICLE IV

### Capital Accounts and Allocations

4.1     **Capital Accounts**.

(a)     The Company shall maintain a separate capital account (a "**Capital Account**") for each Member. A Member's Capital Account shall be (i) *increased* by:

(A)     the cash amount of all Capital Contributions made by that Member to the Company pursuant to this Agreement, and

(B)     that Member's allocable share of Net Income and any special allocations of income or gain pursuant to Section 4.2(c) or (d);

and (ii) *decreased* by:

(A)     the amount of cash and the Fair Value of any property distributed to that Member by the Company (net of any Company liabilities assumed by that Member or that are secured by any such property) pursuant to this Agreement including, without limitation, Tax Distributions under Section 5.3, and

(B)     that Member's allocable share of Net Loss and any special allocations of loss or deduction pursuant to Section 4.2(c) or 4.2(d);

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

and otherwise shall be maintained in accordance with Code Section 704(b) and Regulations Section 1.704-1(b)(2)(iv).

(b)     If any Membership Interest is Transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent that Capital Account relates to the Transferred Interest, except as otherwise provided in Regulations Section 1.704-1(b)(2)(iv)(m).

(c)     In accordance with Regulations Section 1.704-1(b)(2)(iv)(e), immediately before the distribution of any property (other than cash) to a Member, the Capital Account of each Member shall be increased or decreased, as the case may be, to reflect the manner in which the unrealized income, gain, loss and deduction inherent in that property (that has not previously been reflected in the Capital Accounts of the Members) would be allocated among the Members if there were a taxable disposition of that property for its Fair Value.

(d)     Immediately before:

(i)     a contribution of money or other property (other than a *de minimis* amount) to the Company by a new or existing Member with respect to a Membership Interest, unless all existing Members (and no new Members) make such a contribution in proportion to their Membership Interests, or

(ii)     a distribution of money or other property (other than a *de minimis* amount) by the Company to a retiring or continuing Member, with respect to a Membership Interest, unless all Members receive simultaneous distributions of money, or undivided interests in the distributed property, in proportion to their Membership Interests,

the Capital Account of each Member shall be increased or decreased, as the case may be, to reflect the manner in which the unrealized income, gain, loss and deduction inherent in all of the Company's property (that has not previously been reflected in the Capital Accounts of the Members) would be allocated among the Members if there were a taxable disposition of all of that property for its Fair Value and a corresponding distribution of proceeds, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(f). In the case of an event described in Section 3.4, that adjustment shall be made pursuant to this Section 4.1(d) and Section 3.4, and only to the extent that the Manager has determined to revalue any Portfolio Investment.

(e)     The provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "**Allocation Provisions**") are intended to comply with Code Section 514(c)(9)(E) and the Regulations thereunder (the "**Fractions Rule**"), and Code Section 704(b) and the Regulations thereunder, and shall be interpreted and applied in a manner consistent with the Fractions Rule. Notwithstanding anything to the contrary in this Agreement, the Allocation Provisions are deemed modified, with effect from the date of this Agreement, to the extent necessary to comply with the Fractions Rule, and without limiting the foregoing, any allocation for a particular year pursuant to the Allocation Provisions that would violate the requirements of the Fractions Rule shall not be made and there shall instead be made (i) allocations for that year consistent with the Fractions Rule, but to the extent consistent with the Fractions Rule those allocations shall deviate as little as possible from the allocations generally provided herein as determined by the Manager and (ii) adjustments pursuant to Section 4.2(d). Within thirty (30) days after the Manager's determination that a deemed modification has taken place, the

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

Manager shall provide written notice of that determination to each Member. Notwithstanding anything to the contrary contained herein, the Manager and its members shall not be liable to any Member in connection with any violation of the requirements of the Fractions Rule.

4.2     **Allocations to the Members**.

(a)     Except as provided in Section 4.2, items of Net Income and Net Loss in each Fiscal Year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distribution that would be made to such Member if:

(i)     The Company were dissolved and terminated;

(ii)     The affairs of the Company were wound up and each Company asset was sold for cash equal to its Fair Value (except that any Company asset actually sold during the current year shall be treated as sold for the actual proceeds of the sale);

(iii)     All Company liabilities were satisfied; and

(iv)     The net assets of the Company were distributed to the Members in accordance with Section 5.2(a) immediately after giving effect to such allocation.

To the extent that any loss or deduction otherwise allocable to a Member causes such Member to have an Adjusted Capital Account Deficit as of the end of the Fiscal Year to which such loss or deduction relates, such loss or deduction shall instead be allocated to the other Members in proportion to positive Capital Account balances, until their Capital Accounts are all reduced to zero, then the remainder shall be allocated by their respective Membership Interest.

(b)     Notwithstanding anything to the contrary in this Section 4.2:

(i)     "nonrecourse deductions" as defined in Regulations Section 1.704-2, shall be allocated among all Members (including the Manager) in proportion to their respective Membership Interest, and, if there is a net decrease in Company minimum gain for a Company taxable year (as described in Regulations Section 1.704-2(f)), then each Member will be allocated items of Company income and gain for that year equal to its share of the net decrease in Company minimum gain (as described in the Regulations and to the extent provided for in the Regulations). This Section 4.2(b)(i) is intended to be a "minimum gain chargeback" that complies with Regulations Section 1.704-2(f). "Member nonrecourse deductions" as defined in Regulations Section 1.704-2(i) shall be allocated in accordance with that provision, including the chargeback provided therein;

(ii)     subject to Section 4.2(b)(i), if a Member's Capital Account has been reduced to zero, then Net Loss otherwise allocable to that Member shall instead be allocated to the Manager, and Net Income shall thereafter be allocated first to the Manager until that allocation has been fully offset;

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(iii)    to the extent required for allocations pursuant to this <u>Section 4.2</u> to have substantial economic effect, if a Member unexpectedly receives an adjustment, allocation or distribution described in subparts (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii)(d), then that Member shall be allocated items of income or gain in an amount and manner sufficient to eliminate as quickly as possible any deficit Capital Account balance created for purposes of Regulations Section 1.704-1(b)(2)(ii)(d) by that adjustment, allocation or distribution. This provision is intended to be a "qualified income offset" that complies with Regulations Section 1.704-1(b)(2)(ii)(d);

(iv)    subject to <u>Section 4.1(e)</u>, any special allocations pursuant to this <u>Section 4.2(b)</u> shall be taken into account in computing subsequent allocations pursuant to this <u>Section 4.2</u>, so, to the extent possible, that the net amount of any items allocated to each Member will be equal to the net amount that would have been allocated to each Member if the special allocations pursuant to this <u>Section 4.2(b)</u> had not occurred, including by allocating Net Income to the Manager to reverse any allocation pursuant to <u>Section 4.2(b)(i)</u>;

(v)    any non-cash items of Net Income or Net Loss shall be allocated pursuant to <u>Section 4.2(a)</u> as if those non-cash items were distributable pursuant to <u>Sections 5.2</u> or <u>5.4</u>;

(vi)    the Members intend that the Allocation Provisions shall produce final Capital Account balances of the Members that will permit liquidating distributions in accordance with final Capital Account balances under <u>Section 11.3(b)</u> to be made (after unpaid loans and interest thereon, including those owed to Members, have been paid) in a manner identical to the order of priorities set forth in <u>Section 5.2</u>. Notwithstanding anything to the contrary except in <u>Section 4.1(d)</u> (relating to Code Sections 704(b) and 514(e)(9)(E)), to the extent that the Allocation Provisions would fail to produce those final Capital Account balances, (A) Net Income and Net Losses for the current taxable year and future taxable years (or items of gross income and deduction of the Company for those years) may be reallocated among the Members by the Manager as necessary to produce that result (or, to the extent it is not possible to achieve that result with allocations of items of income (including gross income) and deduction for the current year and future years, then for prior open taxable years) as reasonably determined by the Manager, and (B) the Manager shall amend those provisions if and to the extent necessary to produce that result without the consent of any other Member being required; and

(vii)    the Manager shall have the power to amend this Agreement without the consent of the other Members, as it reasonably considers advisable, to make the allocations and adjustments described in <u>Section 4.1(e)</u> and <u>Section 4.2(b)(vi)</u>. To the extent that the allocations and adjustments described in <u>Section 4.1(e)</u> and <u>Section 4.2(b)(vi)</u> result in a reduction in the distributions that any Member will receive under this Agreement, compared with the amount of the distributions that that Member would receive if all distributions were made pursuant to the order of priority set forth in <u>Section 5.2</u>, then the Company may make a guaranteed payment (within the meaning of Code Section 707(c)) to that Member (to be made at the time that Member otherwise would receive the distributions that have been reduced) to the extent that payment does not violate the requirements of Code Sections 704(b) and 514(c)(9)(E), or may take any other action, as reasonably determined by the Manager, to accomplish the intended economic priorities set forth in <u>Section 5.2</u>.

(c)    if the Allocation Provisions are modified pursuant to <u>Section 4.1(d)</u> (but only to the extent the Allocation Provisions would have violated the Fractions Rule in the absence of any modification) or <u>Section 4.2(b)</u> (other than <u>Sections 4.2(b)(vi)</u> and <u>4.2(b)(vii)</u>), then allocations thereunder for subsequent

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

periods shall be adjusted, to reverse the effect of those modifications on the Capital Accounts of the Members as rapidly as possible without causing this Agreement to fail to comply with the Fractions Rule.

(d)      If the Carrying Value of any Company asset differs from its adjusted tax basis for U.S. federal income tax purposes, then income, gain, loss and deduction with respect to that asset shall be allocated for U.S. federal income tax purposes, as reasonably determined by the Manager, in accordance with the principles of Code Sections 704(b) and (c), to take account of the difference between Carrying Value and adjusted basis of that asset.

4.3      **Negative Capital Accounts**. Except as may be required by law, no Member shall be required to reimburse the Company for any negative balance in that Member's Capital Account.

<div align="center">

**ARTICLE V**

**Distributions**

</div>

5.1      **Withdrawal of Capital**. Except as otherwise expressly provided in this Agreement, no Member has the right to withdraw capital from the Company or to receive any distribution or return of its Capital Contribution. Distributions of Company assets that are provided for in this Agreement shall be made only to Persons who, according to the books and records of the Company, are the record holders of Membership Interests on the date determined by the Manager as the date the Members are entitled to those distributions.

5.2      **Cash Distributions**.

(a)      The Manager shall include distributions of Distributable Cash at its discretion. Upon any distribution of Distributable Cash, Distributable Cash (as defined below) shall be applied by the Manager in the following order of priority:

(i)      *first*, 100% of Distributable Cash to the Qualifying Members, pro rata, based on their Qualified Member Percentages, in an amount equal to the unpaid Qualified Member Distribution until all Qualifying Member's earned Qualified Member Distributions have been paid;

(ii)      *second*, 100% of Distributable Cash will be distributed to and among the Members, pro rata, based on their respective Membership Percentages (at the time of such distribution), until the Members on a combined basis received distributions in an amount equal to 1.25x their Capital Contribution (inclusive of any Qualified Member Distribution);

(iii)      *third*, any remaining Distributable Cash will distributed (A) 80% to and among the Members, pro rata, in proportion to their respective Membership Percentages (at the time of such distribution) and (B) 20% to Manager, until the Members on a combined basis received an amount equal to 2x their Capital Contribution (inclusive of any Qualified Member Distribution), which shall be calculated exclusive of any distributions made to the Members under this Section 5.2(a)(iii);

(iv)      *fourth*, Distributable Cash will be distributed (A) 65% to and among the Members, pro rata, in proportion to their respective Membership Percentages (at the time of such distribution)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

and (B) 35% to Manager, until the Members on a combined basis received an amount equal to 3x their Capital Contribution (inclusive of any Qualified Member Distribution), which shall be calculated exclusive of any distributions made to the Members under Section 5.2(a)(iv); and

(v)     *thereafter*, any remaining Distributable Cash shall be distributed (A) 50% to and among the Members, pro rata, in proportion to their respective Membership Percentages (at the time of such distribution) and (B) 50% to Manager.

(b)     Notwithstanding any provision of this Article V, all amounts distributed in connection with the dissolution of the Company or the sale or other disposition of all or substantially all the assets of the Company that leads to a dissolution of the Company will be distributed to the Members in accordance with Section 11.3.

(c)     Pending distribution, funds held by the Company that are required to be distributed pursuant to this Section 5.2 shall be invested in Permitted Temporary Investments to the extent practicable.

5.3     **Tax Distributions**. The Manager may make distributions of Distributable Cash to itself and to the Members in an amount sufficient to discharge tax liabilities of the Members attributable to their investment in the Company (collectively, a "**Tax Distributions**"); *provided*, that Tax Distributions may only be made to the extent that the Company has generated taxable income (taking into account any prior year losses and any foreign tax credits earned by the Company); and, *provided*, *further*, the aggregate amount of the Tax Distribution distributed each tax year may not exceed, in the aggregate, (a) the *sum* of (i) the highest individual federal long-term capital gains tax rate multiplied by the amount of the net long term capital gain allocated to the Members and (ii) the highest individual combined federal, state and local rates for individuals living in New York City (taking into account the deductibility of state and local taxes) multiplied by the amount of ordinary income and net short term capital gain allocated to the Members (taking into account loss carryovers), *minus* (b) any distributions previously made to the Members in the same tax year.

5.4     **General Distribution Provisions**.

(a)     Any cash distribution to the Members pursuant to Sections 5.2, 5.3, or 11.3 shall be made in U.S. dollars.

(b)     At the discretion of the Manager, certain marketable securities may be distributed to the Members prior to the liquidation of the Company. Upon liquidation, distributions may be made in-kind to the Members in proportion to the amounts distributable to the Members pursuant to Section 11.3.

5.5     **Restricted Distributions**. Notwithstanding any provision to the contrary contained in this Agreement, the Company and the Manager (on behalf of the Company) shall not make a distribution to any Member on account of its Membership Interest if that distribution would violate any applicable law.

## ARTICLE VI

### Investment Criteria

6.1     **Investment Criteria**.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(a)      The Manager, on behalf of the Company, is authorized to make investments in accordance with the investment criteria contained in this Section 6.1 and the provisions of Section 2.4.

(b)      The investment objective of the Company is to achieve superior returns by making investments, directly or indirectly, in Portfolio Investments. In addition, when the funds of the Company are not invested, directly or indirectly, in Portfolio Investments, distributed to the Members or applied towards the expenses of the Company, then the Manager (on behalf of the Company) may invest those funds in Permitted Temporary Investments (all of the types of investments in which the Company is authorized to invest under this Section 6.1 are referred to herein as "**Authorized Investments**").

(c)      The Manager, on behalf of the Company (including investment vehicles of the Company) shall be permitted to finance (or refinance) any Portfolio Investment, guarantee any Portfolio Investment's debt, or incur other debt (in each case, in any form, as long as the security for that debt is secured by Company property) for Company purposes including, without limitation, to pay indemnification obligations, or to establish reserves.

6.2      **ERISA Matters**.

(a)      The Manager shall use reasonable efforts to conduct the affairs and operations of the Company in a manner such that the Company will qualify as a VCOC or REOC, or to ensure that investment in the Company by Benefit Plan Investors is not "significant" for purposes of the Plan Asset Regulations.

(b)      Each Member that is or will be an ERISA Member on the Closing Date when it is admitted to the Company shall so notify the Manager at or prior to that Closing Date, and any Member that, at any time that it remains a Member, becomes an ERISA Member shall promptly so notify the Manager.

(c)      The Manager will notify each ERISA Member in writing as soon as the Manager has reason to believe that there is a substantial likelihood that the Company's underlying assets constitute "plan assets" under ERISA.

(d)      If the Manager provides the notification described in Section 6.2(c), or if an ERISA Member provides an opinion of counsel to the Manager (which opinion and counsel are reasonably satisfactory to the Manager) that the ERISA Member's holding of a Membership Interest would constitute or cause a violation of ERISA or Code Section 4975, the Manager and such ERISA Member shall use their reasonable efforts to effectuate an amendment to this Agreement or take such other actions which, in the opinion of such counsel, would enable compliance with ERISA or Code Section 4975, as applicable. If no such amendment or other actions will enable compliance with ERISA or Code Section 4975, then notwithstanding the first sentence of Section 10.2 the Manager shall consent to the transfer of that ERISA Member's Membership Interest, and the Manager will provide reasonable assistance to that ERISA Member in effecting the transfer. If the Manager provides the notification described in Section 6.2(c), or if an ERISA Member provides an opinion of counsel to the Manager (which opinion and counsel are reasonably satisfactory to the Manager) that the Company holds "plan assets" of that ERISA Member, then the Manager may elect to liquidate the Company as soon as reasonably practicable, taking into account the need to preserve the Company's assets.

6.3      **Non-U.S. Members**. On the request of a potential Member who is not a citizen of the United States, the Manager reasonably shall consider alternative structures for Portfolio Investments that

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

could limit, reduce, or eliminate a potential non-U.S. Member's exposure to local, state, and/or federal tax liabilities. The Manager may (but shall be under no obligation to) pursue any alternative structure for any Portfolio Investment. The Non-U.S. party shall pay all expenses associated with the investigation, formation, and/or implementation of any alternative structure, and that formation (if any) shall not have any detrimental effect on any existing Member.

## ARTICLE VII

## Management

7.1     **Relationships**.

(a)     Notwithstanding any provision to the contrary in this Agreement, the management, operation and control of the Company and its business shall be vested exclusively in the Manager. The Manager shall exercise all powers necessary and convenient for the purposes of the Company, on behalf and in the name of the Company. The Manager is designated, and is specifically authorized to act at Company expense as, the "tax matters partner" under the Code and in any similar capacity under state, local or non-U.S. law. As the tax matters partner, the Manager will file federal income tax returns for the Company. Notwithstanding anything to the contrary contained herein, the acts of the Manager in carrying on the business of the Company as authorized herein shall bind the Company.

(b)     Subject to the disclosure and reporting requirements contained in Article IX, the Manager may keep confidential from the Members any information known by the Manager relating to Portfolio Investments made by the Company or Authorized Investments being considered by the Company, including, without limitation, information relating to Portfolio Companies in which the Company is considering making an investment, if the Manager believes in good faith that disclosure of that information is reasonably likely to have a material adverse effect on the Company or any of the Portfolio Investments or could result in a violation of applicable law or breach of contract.

(c)     The Company and the Manager may enter into an agreement pursuant to which the Manager delegates to another Person some or all of the Manager's authority to manage and operate the Company. It is further understood and agreed that whenever any action is required to be taken or consent required to be given by the Manager pursuant to the terms of this Agreement, then to the extent of that delegation any such action may be performed on its behalf by the Manager, and any such consent may be granted by the Manager.

(d)     A Member has no right to, and shall not, participate in the management or control of the Company's business or act for or bind the Company, and only has the rights and powers granted to Members in this Agreement or the TBOC.

(e)     Any and all rights, including voting rights, pertaining to any Portfolio Investments shall be vested exclusively in the Company and may be exercised only by the Manager acting in accordance with this Agreement, and no Member, either alone or acting with one or more other Members, has any such rights with respect to the Portfolio Investments.

7.2     **Liability of the Members**. Except for the obligations under this Agreement and under the Subscription Agreements, the liability of the Members is limited to the maximum extent permitted by the

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

TBOC. In no event shall the Members be obligated to make additional Capital Contributions. Losses and expenses incurred by the Company during any Fiscal Year shall be allocated among the Members in accordance with the procedures for allocating losses set forth in Section 4.2. If a Member is required under the TBOC to return to the Company or pay amounts previously distributed to that Member for the benefit of the Company's creditors, then the obligation of that Member to return or pay any such amount to the Company shall be the obligation of that Member and not the obligation of the Manager.

7.3    **Investment Company Act, Advisers Act**. The Company is being formed so as to be exempt from registration under the Investment Company Act and so as to make the Manager exempt from registration under the Advisers Act. If changing laws, regulations and interpretations, or other facts and circumstances, make it necessary or advisable to register the Company under the Investment Company Act or to register the Manager under the Advisers Act, then the Manager has the power to take any action that it reasonably deems advisable in light of those changing conditions to permit the Company to continue in existence and to carry on its activities as provided for herein, including, without limitation, registering the Company under the Investment Company Act or the Manager under the Advisers Act and taking any and all action necessary to secure that registration, and amending this Agreement as provided in Section 12.3.

7.4    **Qualification**. The Manager shall qualify itself and the Company to do business in each jurisdiction where the activities of the Company make qualification necessary, or where qualification is necessary or desirable to protect the limited liability of the Members.

7.5    **Liability of the Manager**.

(a)    The Manager, its Affiliates, or their respective partners, officers, members, shareholders, directors and employees (each, an "**Indemnified Party**"), shall not be liable to the Company or to any Member for any act or omission of the Indemnified Parties in connection with the conduct of the Company's affairs or otherwise in connection with this Agreement or the matters contemplated herein, unless a court or governmental body of competent jurisdiction determines in a final judgment that the specified act or omission resulted solely from the Indemnified Party's fraud, bad faith, willful misconduct, gross negligence or intentional and material breach of a material term of this Agreement, **BUT NOT FOR THE MANAGER'S NEGLIGENT ACTS OR OMISSIONS**. In addition, no Indemnified Party shall be liable to the Company or to any Member(s) for any mistake, negligence, dishonesty or bad faith of any broker, adviser or other agent of the Company selected with reasonable care by the Manager. The standard of liability in this paragraph shall apply in lieu of any standard that otherwise would be imposed by applicable law.

(b)    The Manager may consult with legal counsel and other experts selected by it, and any act or omission suffered or taken by it on behalf of the Company or believed by the Manager in good faith and in reliance on and in accordance with the advice of those experts to be in furtherance of the Company's interests shall be deemed to be reasonable and proper, and the Manager shall be fully protected for any such act or omission.

7.6    **Indemnification**.

(a)    To the fullest extent permitted by law, the Company shall indemnify and save harmless each of the Indemnified Parties from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated (collectively, "**Losses**"), that are incurred by any Indemnified Party and arise out of or are related to the affairs or activities of the Company or any alternative investment structure through which Portfolio Investments are made, including acting as a director or member of a company any securities of which are or were a Portfolio Investment, or the performance by that Indemnified Party of any of the Manager's responsibilities hereunder or otherwise in connection with the matters contemplated herein or therein; *provided*, *however*, that an Indemnified Party shall not be entitled to indemnification hereunder to the extent it is determined by any court or governmental body of competent jurisdiction in a final judgment that any Losses resulted solely from an Indemnified Party's fraud, bad faith, willful misconduct, gross negligence or intentional and material breach of this Agreement, **BUT IT IS SO ENTITLED IF THE LOSSES RESULTED FROM THE MANAGER'S ORDINARY NEGLIGENT ACTS OR OMISSIONS**. The satisfaction of any indemnification and any saving harmless pursuant to this <u>Section 7.6(a)</u> shall be from and limited to Company assets, and no Member shall have any personal liability on account thereof. If for any reason (other than the gross negligence, willful misconduct, bad faith, fraud or intentional and material breach of this Agreement by any Indemnified Party) the foregoing indemnification is unavailable to an Indemnified Party, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable to the Indemnified Party as a result of the loss, claim, cost, damage or liability to appropriately reflect the relative benefits received by the Company on the one hand, and the Indemnified Party on the other hand in addition to the relative fault of the Company and the Indemnified Party, as well as any relevant equitable considerations.

(b)     Expenses (including legal fees and costs) reasonably incurred by an Indemnified Party in defense or settlement of any loss that may be subject to a right of indemnification hereunder shall be advanced by the Company before the final disposition thereof on receipt of an undertaking by or on behalf of the Indemnified Party to repay any amount to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(c)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which any Indemnified Party otherwise may be entitled by contract or as a matter of law or equity and shall extend to any Indemnified Party's successors, assigns and legal representatives.

(d)     An Indemnified Party shall first seek recovery under any other indemnity or any insurance policies by which that Indemnified Party is indemnified or covered, as the case may be, but only to the extent that the indemnitor with respect to any indemnity or the insurer with respect to any insurance policy provides (or acknowledges its obligation to provide) that indemnity or coverage, as the case may be, on a timely basis. If the Indemnified Party is other than the Manager, then that Indemnified Party shall obtain the written consent of the Manager before entering into any compromise or settlement that would result in an obligation of the Company to indemnify that Indemnified Party.

7.7     <u>**Co-Investment Opportunities; Alternative Investment Vehicles**</u>.

(a)     During the Investment Period, the Company may, at the Manager's exclusive option, provide Co-Investment Opportunities in instances in which the Manager determines that it is not in the Company's best interest to invest (or that the Company is prohibited from investing under the terms of this Agreement) the entire amount required to fund a given Portfolio Investment because of the size or risk inherent in that Portfolio Investment. Any Co-Investment Opportunities will be on substantially similar terms and conditions that the Manager determines are fair and reasonable to the Company, and may include the payment of fees and profits interests to the Manager or its Affiliates. The Manager may allocate and

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

reallocate Portfolio Investments among the Company and the Parallel Funds on a basis that it determines is fair and reasonable to the Company.

(b)     If Limited Exclusion Rights have been exercised in respect of the Company's prospective investment in a Portfolio Investment that, in the Manager's good faith determination, raises a substantial likelihood of a violation by the Company of the Fractions Rule, then, unless the Company is contractually obligated to invest in that Portfolio Investment and breach of the relevant contractual obligation would give rise to material liability for the Company, the Company shall not invest in that Portfolio Investment. However, notwithstanding any contrary provision in this <u>Section 7.7</u> or elsewhere in this Agreement, if the Manager so elects, the investment in that Portfolio Investment may be made by a partnership, limited liability company or other entity formed by the Manager to make that investment (an "**Alternative Investment Vehicle**") as long as all Members, other than those Members who exercised their Limited Exclusion Rights in respect of that Portfolio Investment, are provided an opportunity to participate in the Alternative Investment Vehicle on a pro rata basis based on their relative Capital Contributions. The Manager also may cause one or more Members to fund all or a portion of their Capital Contributions with respect to a proposed Portfolio Investment in one or more Alternative Investment Vehicles or in different classes of securities of an Alternative Investment Vehicle, (i) where the legal nature of an investment in that proposed Portfolio Investment will permit only certain investors (*e.g.*, tax-exempt investors or qualifying pension plans) to hold direct interests (or certain classes of interests) therein, or (ii) if, in the Manager's good faith determination, one or more Alternative Investment Vehicles will provide overall tax or legal efficiencies not otherwise obtainable if the proposed Portfolio Investment were acquired directly by the Company. Any Alternative Investment Vehicle shall have economic terms and a management structure substantially similar, to the extent practicable, to those of the Company and (if applicable) the Parallel Funds, and the Manager or an Affiliate thereof shall serve as the managing manager or in some other managing fiduciary capacity with respect thereto. Any Alternative Investment Vehicle shall be structured in a manner that does not adversely affect the profits or liabilities under this Agreement of the Members who do not participate in the Alternative Investment Vehicle. Any Alternative Investment Vehicle shall be operated separately and independently from the Company, without any economic or financial tie-ins to the Company.

7.8     **Manager as Member**. The Manager shall also be a Member to the extent that it acquires by Transfer or otherwise all or any part of the Interest of a Member, and to that extent shall be treated as a Member in all respects. The consent of Members to a Transfer of a Member's Membership Interest to the Manager need not be obtained.

7.9     **Meetings of the Members**. The Manager shall call an annual meeting of the Members, at any time and place that the Manager determines (but in no event more than one hundred twenty (120) days after the end of the Fiscal Year). The Manager may call special meetings of the Members from time to time and shall call a special meeting of the Members if requested by at least fifty percent (50%) of the Interests, at a reasonably convenient date, time, and place, all as determined by the Manager but in no event to be less than twenty (20) nor more than sixty (60) days after the receipt of the requisite request. The Members may ask questions of the representative(s) of the Manager and Manager that are present at that meeting. The Manager shall cooperate reasonably with the Members in connection with that meeting and shall provide to the Members an agenda of matters that the Manager anticipates being discussed at that meeting and any reasonably requested information (consistent with the provisions of this Agreement) relevant to that meeting. Members, however, shall not be entitled to any rights other than those granted hereunder or required by the TBOC. At any meeting, a vote may be taken in person or by proxy, and any Member may select a designee to attend and vote at any meeting or may attend any meeting by telephone. At any meeting, Members holding a majority of the Interests shall constitute a quorum. Actions contemplated by this

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

Agreement requiring a vote of the Members shall be taken at a meeting of the Members, or may be taken by written consent in lieu of a meeting. Notwithstanding any other provision hereof to the contrary, no Bank Regulated Member shall have the right to vote (whether in person, by proxy, by execution of a written consent or otherwise) any portion of that Bank Regulated Member's voting rights that exceeds 4.99% of the entire vote being taken as to any matter presented to the Members or the Members pursuant to this Agreement, if and to the extent that the exercise of voting rights would violate Regulation Y of the Board of Governors of the Federal Reserve System (C.F.R. Part 225) or any successor to that Regulation ("**Regulation Y**").

7.10     **Non-U.S. Ownership**. Each Member hereby agrees to provide the Manager with any information that the Manager reasonably requests from time to time with respect to foreign citizenship, residency, ownership, or control of a Member so as to permit the Manager to evaluate and comply with any regulatory and tax requirements applicable to the Company or proposed investments of the Company.

7.11     **Confidentiality of Information**.

(a)     The Manager and the Company shall use reasonable efforts to keep confidential any confidential information obtained by those parties in those capacities relating to any Member (other than disclosure to the Manager's employees, agents, advisers, or representatives responsible for matters relating to the Company); *provided*, *however*, that the foregoing shall not prevent any such Person from complying with any legal requirements applicable to that Person; *provided*, *further*, that the foregoing shall in no way prevent the Manager from conducting the affairs of the Company in the ordinary course.

(b)     Each Member agrees to keep confidential, and not to make use of (other than for purposes reasonably related to its Membership Interest or for purposes of filing that Member's tax returns or for other routine matters required by law) or disclose to any Person, any information or matter received from or relating to the Company and its affairs and any information or matter related to any Portfolio Investment (other than disclosure to that Member's employees, agents, advisers, or representatives responsible for matters relating to the Company); *provided*, *however*, that, a Member may disclose any such information to the extent that (i) the information is or becomes generally available to the public through no act or omission of that Member, (ii) the information otherwise is or becomes known to that Member other than by disclosure by the Company or the Manager; *provided*, *however*, the source of that information is not bound by a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality, or (iii) that Member is required by law to disclose the information.

7.12     **Business with Affiliates**. In addition to the services and transactions specifically contemplated by this Agreement, the Manager, its Affiliates and their representatives and advisers may provide services and engage in transactions with the Company, the Portfolio Companies and their Affiliates on terms and conditions that are customary in arm's-length transactions of that type. Fees paid for management services will be at competitive, arm's-length market rates for full service/best of-market management services. The service provider will be entitled to indemnity and exculpation with respect to loss or damage suffered by the service provider other than loss or damage arising out of the service provider's gross negligence, willful misconduct or fraud.

7.13     **Subsequent Funds**. Neither the Manager nor shall the Manager permit any Affiliate of the Manager to (at the time in question), act as Manager or the primary source of transactions on behalf of, and accept investors into, another pooled investment vehicle (other than the Parallel Funds and Alternative Investment Vehicles, a "**Competing Entity**") the primary investment objective of which is the acquisition

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

of producing, conventional oil and gas fields in Texas (a "**Competing Business**"), until the earlier of (i) the end of the Investment Period, or (ii) when at least sixty percent (60%) of the aggregate Capital Contributions have been invested, or committed to be invested, in Portfolio Investments.

7.14    <u>**Limitations on the Manager**</u>.

(a)    Anything contained in any other Section of this Agreement notwithstanding, the Manager and its Affiliates shall not have any authority or be entitled: (i) to perform any act in violation of any applicable law or regulation thereunder, including applicable federal and state securities laws; (ii) to perform any act in violation of the TBOC or this Agreement; (iii) to perform any other act expressly requiring the consent of the Members under this Agreement without first obtaining that consent; or (iv) to avoid its ultimate obligations under this Agreement by delegation of authority or responsibility.

(b)    Anything contained in any other Section of this Agreement notwithstanding, the Manager and its Affiliates shall not have any authority or be entitled to perform any of the following acts (each, a "<u>Major Decision</u>", collectively, the "<u>Major Decisions</u>") without the approval of Major Investor:

(i)    Causing a Liquidation Event;

(ii)    Change the purpose of the Company;

(iii)    Adopting a plan or proposal for a complete or partial bankruptcy of the Company;

(iv)    Adopting any voluntary change in the tax classification for U.S. federal income tax purposes of the Company;

(v)    Commencing or settling any litigation, investigation, proceeding or governmental or regulatory action for an aggregate amount over $10,000;

(vi)    Incur any indebtedness, pledge or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person;

(vii)    Enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange, or other acquisition (including by merger, consolidation, acquisition of stock, or acquisition of assets) by the Company of any assets and/or equity interests of any Person;

(viii)    Enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange, or other disposition (including by merger, consolidation, sale of Interests, or sale of assets) by the Company of any assets;

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

     (ix)     Changing the total number of, or voting power of, the Managers; and

     (x)     Making any material amendments or modifications, or waivers of restatements of, the organizational documents of the Company (in addition to consent requirements under <u>Section 12.3</u>).

     (c)     The Manager shall endeavor to cause the Company to maintain cash reserves for operating expenses, capital expenditures, repairs, replacements, contingencies and related items in those amounts that the Manager deems necessary or advisable.

     7.15    <u>**UBIT**</u>. The Manager will use reasonable efforts (which may, but need not, include forming alternative entities such as real estate investment trusts) to minimize the Company's income that is subject to "unrelated business income tax" under the Code ("**UBIT**") to the extent reasonably practicable and consistent with its objective of maximizing the pre-tax returns of all of the Members; *provided, however,* that the Manager and its members shall not be liable to any Member in connection with any UBIT incurred by the Company and paid, allocated to, or reported by any Member.

     7.16    **Annual Business Plan**. Each year, the Manager shall prepare or cause to be prepared a business plan of the Company (each such plan, an "**Annual Business Plan**") which shall set forth all material activities of the Company in reasonable detail, shall provide a budget of projected revenue and expenses, including but not limited to, administrative and operational expenses, and specify strategic plans of the Company for the upcoming fiscal year. For the first eighteen (18) months following the Effective Date, the Annual Business Plan for each fiscal year shall be reviewed and approved by Major Investor, quarterly, and then semi-annually until the thirty sixth (36th) month following the Effective date and thereafter the Annual Business Plans shall be submitted for approval according to this Section 5.05 not less than sixty (60) days prior to the first day of the fiscal year covered thereby. The Managers shall vote to approve or disapprove the Annual Business Plan for each fiscal year within thirty (30) days after receipt thereof. The Annual Business Plan may be modified as appropriate from time to time during the fiscal year with the prior written approval of Major Investor, in accordance with this <u>Article VII</u>. The Annual Business Plan for the first eighteen (18) months following the Effective Date, including a budget of projected revenue and expenses, is attached as <u>Exhibit A</u>. Pursuant to the Annual Business Plan, any expenditure or series of related expenditures in excess of $20,000.00 over the budgeted line item amount or in excess of $75,000.00 over the entire budget will require the approval of Major Investor.

     7.17    **Compensation and Reimbursement of Manager**.  Except as otherwise in an approved Annual Business Plan, the Manager shall not be compensated for its services as the Manager, but the Company shall reimburse the Manager for all ordinary, necessary, and direct expenses incurred by the Manager on behalf of the Company in carrying out the Company's business activities.

     7.18    <u>**Advisory Committee**</u>.

     (a)     The Manager may appoint an Advisory Committee that consists of at least three (3) Persons who may or may not be affiliated with the Manager. The Manager shall disclose and present to the Advisory Committee for its review those matters that the Manager determines should receive Advisory Committee review, including, without limitation, (i) Annual Business Plan, or (ii) potential investments.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(b)      If any member of the Advisory Committee resigns or is removed, then the Manager may appoint a successor.  The Manager has the right, effective on delivery of written notice, to remove members of the Advisory Committee.

(c)      The Manager may call meetings of the Advisory Committee from time to time, and shall call a meeting of the Advisory Committee if so requested by a majority of the members of the Advisory Committee, at the principal place of business of the Manager on any date on which the Manager, together with a majority of the members of the Advisory Committee, may mutually agree, any such agreement not to be unreasonably withheld.  If any change in the date, time or place of any meeting occurs, then the Manager shall promptly give reasonable notice to the members of the Advisory Committee.  A member of the Advisory Committee may participate in any meeting of the Advisory Committee by telephone.

(d)      Neither the Advisory Committee nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and in no event shall a member of the Advisory Committee be considered a manager of the Company by agreement, estoppel or otherwise, or be deemed to participate in the control of the business of the Company as a result of the performance of his duties hereunder or otherwise.  No fees shall be paid by the Company to the members of the Advisory Committee, but those members shall be entitled to reimbursement by the Company for their reasonable out-of-pocket expenses with respect to their attendance at meetings.

(e)      To the extent permitted by law, the Advisory Committee shall not owe any duties (fiduciary or otherwise) to any Member or the Company, in respect of the activities of the Advisory Committee. No Member who has a representative serving on the Advisory Committee shall be deemed to be an Affiliate of the Company or the Manager solely by reason of that membership.  In addition to, and without limiting the foregoing, the Manager is authorized to enter into additional agreements on behalf of the Company that provide for the exculpation and indemnification of the members of the Advisory Committee and their Affiliates and that contain additional provisions related to the Advisory Committee and its members, it being understood that those agreements may provide for levels of exculpation and indemnification that are more favorable to those Persons than comparable provisions in this Agreement that benefit the Manager and its Affiliates.

## ARTICLE VIII

### Allocation of Expenses

8.1      **Allocation of Expenses**. The expenses that the Manager determines are specific to the Company or to one or more of the Funds (including, without limitation, expenses associated with Company or Fund level taxes or brokerage commissions) shall be allocated to the Company or the appropriate Fund, as the case may be, on a basis that the Manager determines is fair and reasonable.

## ARTICLE IX

### Books and Records and Reports to Members

9.1      **Records and Accounting**.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(a)       Proper and complete records and books of account of the business of the Company, including a list of the names, addresses, and interests of all Members, shall be maintained at the Company's principal place of business. Except as otherwise expressly provided herein, those records and books of account shall be maintained on an accrual basis that allows the proper preparation of the Company's financial statements and tax returns, and shall be kept in U.S. dollars. Any Member, or its duly authorized representatives, shall be entitled, at its own expense, for any purpose reasonably related to its interest as a Member of the Company, and subject to Section 7.10, to a copy of the list of names, addresses, and interests of the Members. Subject to Section 9.1(b), each Member may, for any reason reasonably related to its interest, examine the books of account, records, reports and other papers relating to the Company that are not legally required to be kept confidential or secret, and may make copies and extracts therefrom at its own expense and may discuss the affairs, finances, and accounts of the Company with the Manager and the Company's independent public accountants (and by this provision the Company authorizes those accountants to discuss with each Member the finances, accounts and affairs of the Company), all during regular business hours as may reasonably be requested. The Manager shall maintain the records of the Company for three (3) years following termination of the Company.

(b)       Notwithstanding anything contained herein to the contrary, if the Company is or may be constrained in any respect in its ability to make any Authorized Investment or retain any Portfolio Investment, as a result of a Member's ownership of a Membership Interest, and after reasonable attempts by the Company to mitigate the circumstances, then to the fullest extent permitted by applicable law, that Member shall not be entitled to have access to any information or documents with respect to the portion of the business of the Authorized Investment or Portfolio Investment, as the case may be, that gives rise to the constraint, to the extent reasonably necessary to remove the constraint, and that Member and the Manager shall use their respective reasonable efforts in good faith to negotiate an arrangement (that may include, without limitation, alteration of any of the terms of this Agreement to the extent mutually acceptable to the Member and the Manager) that has the objective of permitting the Company to make or retain the investment.

9.2       **Audit and Report**.

(a)       Within one hundred twenty (120) days of the end of the Fiscal Year, the Manager will provide to the Members a performance analysis for each Portfolio Investment.

(b)       Within forty five (45) days of the end of each fiscal quarter, the Manager will provide to the Members: (i) unaudited financial statements consisting of a balance sheet, income statement and statement of cash flows ("**Financial Statements**") of the Company; and (ii) an investment activity report indicating Portfolio Investments made and realized, specifying for each such investment the relevant industry and country and, as appropriate, size of new investment or return on realized investment, and a brief narrative description of other material events affecting the Company and its investments during the quarter. Within ten (10) days of the end of each calendar month, the Manager will provide to the Members with a calculation of the Net Asset Value.

(c)       After the end of each Fiscal Year, subject to the receipt of all necessary and appropriate information about Portfolio Investments or from other relevant Persons, the Manager shall exercise reasonable efforts to cause the independent certified public accountants to prepare and transmit, within one hundred twenty (120) days following the close of that Fiscal Year, a report setting forth in sufficient detail all transactions effected by the Company during that Fiscal Year, to enable each Member to prepare its U.S. federal income tax return, and shall mail that report to (i) each Member and (ii) each former Member (or

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

its successor or legal representative) who may require that information in preparing its federal income tax return.

(d)     Any allocations of unrelated business taxable income to any Member shall be reported to that Member in sufficient detail to enable that Member to file its annual Form 5500 and Form 990 filings (or any successor forms).

(e)     Except as required by a court of law with competent jurisdiction, or information that has become public through disclosure by someone other than the specified Member, no Member may disclose any information disclosed by the Company to that Member under this Section 9.2, other than to that Member's directors, officers, managers, lawyers, accountants, and other professional advisers.

9.3     **Withholding**.

(a)     The Manager is authorized but not obligated to take any action that it determines to be necessary or appropriate to cause the Company and its subsidiaries to comply with any withholding requirements established under Code Section 1445 with regard to (i) the sale of "U.S. real property interests" (as defined in the Code), (ii) the distribution of cash or property to any Member who is a "foreign person" (as defined in Regulations Section 1.1445-2(b)(2)(i)(c)), or (iii) the Transfer of interests in the Company.

(b)     As determined by the Manager, and as provided for or to be provided in the Code or Regulations under Code Sections 1441, 1442, 1445 and 1446, the Manager may elect to withhold a portion of any distribution payable to any Members and assignees who are "foreign persons" or who fail to provide to the Company an appropriate certificate in accordance with the applicable provisions of those Code Sections or applicable Regulations thereunder.

(c)     To the extent that any state statute similar to Code Section 1445 applies to any Portfolio Investment, the Manager is authorized to take those actions that it determines to be necessary or appropriate to cause the Company and its subsidiaries to comply with the withholding requirements thereunder, including, without limitation (if deemed necessary or appropriate by the Manager), withholding the appropriate portion of distributions otherwise required to be made to any Member who is subject to that state statute.

(d)     To the extent that the Manager is required to withhold taxes under the laws of countries other than the United States, the Manager is authorized to withhold a portion of any distribution payable to any Members or their assignees.

9.4     **Separate Accounts**. The Manager and any Member may agree to treat all or any portion of that Member's Membership Interest as a separate Membership Interest (each such portion being a "**Separate Account**") for purposes of computing the allocation set forth in Section 4.2(a)(iii), and distributions (and accordingly Capital Accounts and other items) attributable to each such Separate Account. Any such Separate Accounts shall be maintained as determined necessary or advisable by the Manager.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

## ARTICLE X

### Transfers, Withdrawals and Default

10.1    <u>Transfer, Withdrawal, Removal and Suspension of the Manager</u>.

(a)    The Manager shall not have the right to withdraw as Manager and the manager of the Manager shall not have the right to withdraw as manager of the Manager. Notwithstanding the foregoing (or any other provision hereof to the contrary), the following are expressly permitted and shall not be considered violations of this <u>Section 10.1(a)</u> or any other provision of this Agreement: (i) a pledge by the Manager of its Membership Interest, if any, that is contemplated by <u>Sections 6.3</u>, or otherwise, and (ii) any Transfer of the Interests held by the Manager or the manager of the Manager to an Affiliate of the Manager or its manager as long as that Affiliate agrees to be bound by the foregoing Transfer restrictions, and in any such event, that Person shall become a Member hereunder; *provided*, *however*, that, in any of the foregoing cases, the Transfer does not and will not, with notice and/or passage of time, result in a default under any material financing document unless the financing to which the financing documents relate is intended to be repaid contemporaneously with that Transfer.

(b)    Only upon a Cause Event, the Manager may be removed by written notice to the Manager from Members representing eighty percent (80%) of all Interests of all Members entitled to vote (other than Interests held by the Manager and/or Manager Affiliates). If the Manager is removed pursuant to the immediately preceding sentence, then, within fifteen (15) days after that removal, pursuant to written notice delivered to the Members, it may exercise its option to either (i) cause the Company to purchase all of the removed Manager's Management Interests, if any, for cash (at a price determined in accordance with <u>Section 10.1(c)</u>) and pay in full any fees due and owing by the Company to the Manager, or (ii) the removed Manager's Management Interests, if any, shall be converted into a Membership Interest (in accordance with <u>Section 10.1(e)</u>). Failure of the Manager to provide written notice shall be deemed election of clause (i) of the preceding sentence. In addition, within fifteen (15) days after removal, at the removed Manager's option exercised by delivering written notice delivered to the Members, the Manager also may elect to sell to the Company, and the Company shall purchase for cash, a pro rata share of any Membership Interest and membership interests in any Funds and Alternative Investment Vehicles (if applicable) held by the Manager or any Affiliate of the Manager (the "**Manager Membership Interests**") (at a price determined in accordance with <u>Section 10.1(c)</u>). The pro rata share shall be determined Portfolio Investment by Portfolio Investment, based on the proportionate equity investment of the Company and each Parallel Fund in that Portfolio Investment. The removal of the Manager pursuant to this <u>Section 10.1(b)</u> shall, in accordance with the TBOC, constitute a Disabling Event, and, on that removal, the Expiration Date shall be deemed to have occurred.

(c)    All valuation decisions of Management Interests and the Manager Membership Interests pursuant to this <u>Section 10.1</u> shall be determined based on a valuation by an independent major investment banking firm or other appropriate independent valuation expert (an "**Expert**") selected by the Manager and approved by Members representing a majority of Members. The Expert's valuation shall represent the value of all Portfolio Investments. In valuing each Portfolio Investment, the Expert shall assign a going concern value or liquidation value, as appropriate, considering the Company's business plan with respect to those investments at the time of the Manager's removal. The Expert shall not apply a discount because (if applicable) assets are owned on a co-investment or minority basis. In determining estimated values, the Expert generally shall assume the operation and disposition of investments in the ordinary course of business, without regard to temporary market fluctuations or aberrations, and shall further assume, in the case of projected sales of investments, that neither buyers nor sellers are acting under an undue compulsion

Company Agreement of
84 Resources Holdings, LLC                                      33                              10619969 v11 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

to buy or sell. The value of the Management Interests shall equal the amount the Manager would have been entitled to receive if (i) all of the Portfolio Investments had been sold for a net price that reflects the value of the Portfolio Investments (as determined pursuant to this paragraph), (ii) the Company received its share of those proceeds, and (iii) the Company's proceeds are distributed as provided in Section 5.2. The value of the Manager Membership Interests shall equal the aggregate amount that the applicable Persons would have received if all Portfolio Investments had been sold for a net price that reflects the value of those investments (as determined pursuant to this paragraph). The Expert's valuation shall be binding on the Members. The cost of any such valuation shall be borne by the Company.

(d)     The Manager shall cease to be the manager of the Company on the occurrence of a Disabling Event. On that cessation, the Manager, if any, shall resign from that position. In addition, after that cessation and resignation, neither the Manager nor its successors in interest shall have any of the powers, obligations or liabilities of a manager of the Company under this Agreement or under applicable law arising after the date of that cessation or resignation. Subject to Section 11.1(b), on the occurrence of any Disabling Event, the Company shall be dissolved and wound up in accordance with the provisions of Article XI.

(e)     If the Manager is removed, then a proposed successor Manager shall be admitted as a Manager only if the following terms and conditions are satisfied:

(i)     the admission of that Person shall have been consented to by at least fifty percent (50%) of the Interest of all Members (other than the former Manager (including Affiliates) and Affiliates of the proposed successor Manager) ;

(ii)     the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement, by executing a counterpart hereof and any other documents or instruments required or appropriate to effect the admission of that Person as a Manager as of the effective date of the removal or withdrawal of the former Manager, confirming that the newly-admitted Manager is authorized to and shall continue the business of the Company without dissolution; and

(iii)     a certificate evidencing the admission of that Person as a Manager shall have been filed for recordation.

10.2     **Certain Restrictions on Transfers**. Except as specifically provided otherwise in this Agreement, no Member may Transfer (or enter into an agreement to Transfer) all or any part of its Membership Interest without the prior written consent of the Manager (other than, with respect to an ERISA Member or Governmental Plan Member, to a single successor plan or trustee, governmental unit or other funding agent), which consent shall be given, withheld, conditioned, or delayed in the Manager's discretion. Without limiting the generality of the preceding sentence, unless waived by the Manager, (i) no Transfer shall be permitted if it is effected through an established securities market or secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704, or would make the Company ineligible for "safe harbor" treatment under Code Section 7704 and the Regulations promulgated thereunder; (ii) no Transfer shall be permitted that has a reasonable likelihood of requiring registration or qualification of the Company or any Affiliates or the securities of any of them under federal, state or foreign securities laws; (iii) to the extent that the Company is then relying, or desires to preserve its ability to rely, on Section 3(c)(7) of the Investment Company Act, each transferee of a Member's Interest (each, an "**Assignee**") shall be a "qualified purchaser," as that term is defined in the Investment Company Act; (iv) to

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

the extent that the Company is then relying, or desires to preserve its ability to rely, on Section 3(c)(1) of the Investment Company Act, no Transfer shall be permitted that would increase the number of the Company's beneficial owners under Section 3(c)(1) of the Investment Company Act; and (v) no Transfer shall be permitted if that Transfer would result in the Company's being considered to have terminated within the meaning of Code Section 708. Any Transfer made in violation of the provision shall be void, of no force and effect.

10.3 **Assignments by Members**.

(a) An assignment by a Member or an Assignee of any Membership Interest shall be effected by (i) delivery to the Manager and the Assignee of an executed instrument of assignment and assumption, reasonably satisfactory in form and substance to the Manager and the Assignee, and any other documentation (including legal opinions) that the Manager or legal counsel to the Company and the Assignee deems advisable and reasonably requests; (ii) payment of any expenses, including attorneys' fees and expenses, incurred by the Company in connection with that assignment; and (iii) the written consent by the Manager to that assignment (unless otherwise provided in Section 10.2).

(b) If any Membership Interest is Transferred during any accounting period in compliance with this Section 10.3, then Net Income, Net Loss, each item thereof, and all other items attributable to that Transferred Interest for the period shall be divided, and allocated between the transferor and the transferee by taking into account their varying interests during that period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of that Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making those allocations and distributions, the Company shall recognize the Transfer on the date of the written instrument whereby the Manager receives valid notice of the assignment.

(c) The Company and the Manager are entitled to treat the record owner (on the books of the Company) of any Membership Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to that owner until a written instrument of assignment of that Interest has been received and accepted by the Manager and recorded on the books of the Company.

(d) Any purported Transfer by a Member or any assignee of a Member of a Membership Interest that is not in compliance with this Agreement is hereby declared to be null and void and of no force or effect whatsoever.

10.4 **Substitute Members**. No Assignee has the right to become a substitute Member (a "**Substitute Member**") on Transfer of a Membership Interest to it unless and until all the following conditions are satisfied:

(a) the duly executed and acknowledged written instrument of assignment and assumption, reasonably satisfactory in form and substance to the Manager, has been filed with the Company;

(b) the transferring Member and the Assignee have executed and acknowledged any other instruments and taken any other action that the Manager deems reasonably necessary or desirable to effect

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F-77756351AADB

the substitution, including, without limitation, the execution by the Assignee of a Subscription Agreement and a counterpart to this Agreement;

(c)    other than with respect to an ERISA Member or Governmental Plan Member, an assignment to a single successor plan or trustee, governmental unit or other funding agent, the conditions in Sections 10.2 and 10.3 have been satisfied, and, if requested by the Manager, the Member or the Assignee has obtained an opinion of counsel reasonably satisfactory to the Manager as to the matters that the Manager reasonably requests;

(d)    the Member or the Assignee has paid to the Company any amount of money that is sufficient to cover all reasonable expenses incurred by or on behalf of the Company in connection with the substitution; and

(e)    other than with respect to an ERISA Member or Governmental Plan Member, an assignment to a single successor plan or trustee, governmental unit or other funding agent, the Manager has consented in writing to the substitution.

10.5    **Assignee's Rights**.

(a)    Unless an Assignee becomes a Substitute Member in accordance with Section 10.4, the Assignee shall not be entitled to any of the rights (including voting rights) granted to a Member hereunder or under the TBOC, other than the right to receive (or be allocated) the share of Net Income and Net Loss, distributions and any other items attributable to a Member's Interest to which its assignor otherwise would be entitled.

(b)    Any Member that Transfers all of its Membership Interest shall cease to be a Member; *provided*, *however*, that that Member shall be obligated to make Capital Contributions required by Section 3.3 until its Assignee(s) is admitted as a Substitute Member(s).

10.6    **Defaulting Member**.

(a)    If within ten (10) Business Days after a Capital Demand Date any Member fails to contribute any percentage of the Capital Commitment required to be contributed by that Member pursuant to this Agreement (such percentage being the "***Default Percentage***"), then that Member is a "*Defaulting Member*" with respect to the Default Percentage of its Membership Interest (the "***Default Interest***") but not with respect to the remainder of that Member's Membership Interest and the following paragraphs of this ***Section 10.6*** shall apply (including, if the Default Percentage is less than 100%, as if the Defaulting Member held two (2) separate Membership Interests, the Default Interest and its other Membership Interest with respect to which the Defaulting Member shall not be treated as a Defaulting Member).  Notwithstanding any provision in this ***Section 10.6*** to the contrary, no default by any Member with respect to that Member or Manager's Capital Contribution relieves any other Member of its obligation to make a Capital Contribution(s).  The Manager may obtain loans from Members or unrelated third parties to cover any Defaulting Member's failure to contribute a Capital Commitment.  Notwithstanding anything to the contrary in this Agreement, no Member is obligated to increase its Capital Commitment.

(b)    Whenever the vote, consent or decision of the Members is required or permitted pursuant to this Agreement or the BOC, including, without limitation, for purposes of amendments of this Agreement

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

or approval of any merger or consolidation of the Company, any Defaulting Member is not entitled to participate in that vote or consent, or to make that decision to the extent of the Default Interest, and that vote, consent, or decision shall be tabulated or made as if the Defaulting Member was not a Member with respect to the Default Interest.

(c)     The Manager has the right to determine whether (i) a Defaulting Member is entitled to make any further contributions of capital to the Company with respect to the Default Interest; *provided*, *however*, that the Defaulting Member remains fully liable to the Company to the extent of its Unfunded Capital Commitment and (ii) any income or gain with respect to Portfolio Investments (including distributions with respect thereto) acquired before the date of the Defaulting Member's default that are allocable to the Default Interest shall be forfeited to the remaining Members in proportion to their Percentage Interests.

(d)     The Manager may cause the Company to force a sale of the Defaulting Member's Default Interest to the other Members at a price equal to fifty percent (50%) of the aggregate Capital Contributions attributable to the Default Interest, minus expenses, Losses and deductions previously allocated to that Default Interest.  The Manager shall notify each Member in writing ("***Default Sale Notice***") that the Default Interest is for sale and the purchase price thereof, and each Member (other than the Defaulting Member) shall have fifteen (15) days after the date of the Default Sale Notice to elect to purchase its proportionate share, based on Percentage Interests, of the Default Interest.  If any Member exercised its option to purchase none or less than all of the Default Interest, each Member who elected to purchase the Default Interest shall have until the thirtieth (30th) day following the Default Sale Notice within which to notify the Manager of its election to purchase the remaining portion of that Default Interest.  The Defaulting Member shall transfer the Default Interest to the purchaser(s) thereof free and clear of all liens and encumbrances, other than those imposed pursuant to this Agreement.  Each Members hereby irrevocably constitutes and appoints the Manager as its attorney-in-fact to execute any documents necessary to carry out the terms of this ***Section 10.6(d)***.  Each Member hereby acknowledges that such power of attorney is coupled with an interest, is irrevocable and is transferable to any successor Manager of the Company.

(e)     No right, power, or remedy conferred on the Manager in this ***Section 10.6*** is exclusive, and each right, power, or remedy shall be cumulative and in addition to every other right, power or remedy, whether conferred in this ***Section 10.6*** or now or hereafter available at law or in equity or by statute or otherwise.  No course of dealing between the Manager and any Defaulting Member and no delay in exercising any right, power, or remedy conferred in this ***Section 10.6*** or now or hereafter existing at law, in equity, or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power, or remedy.

(f)     Each Member acknowledges by its execution of this Agreement that it has been admitted to the Company in reliance on its agreements under this Agreement, that the Manager and the Company may have no adequate remedy at law for a breach of this Agreement, and that damages resulting from a breach of this Agreement may be impossible to ascertain at the time hereof or of any breach.

(g)     As security for the prompt and complete payment of each Member's obligation to make Capital Contributions in accordance with this Agreement, and fund its Unfunded Capital Commitments hereunder, each Member hereby grants and pledges to the Company a security interest in and continuing lien on all of that Member's right, title, and Membership Interest, whether now owned or existing or hereafter acquired or arising (collectively, the "**Collateral**").  Each Member hereby consents to the making of that grant and pledge by each other Member.  Each Member hereby represents and warrants to the Company that except for the lien granted to the Company hereunder, that Member owns and, as to all

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

Collateral whether now existing or hereafter acquired, will continue to own, the Collateral free and clear of any and all liens, rights, or claims of all other Persons (other than nonconsensual liens, which nonconsensual liens the Member agrees to discharge or bond around promptly after learning of them), and the Member shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Company. The respective chief executive office of each Member is located at the address set forth on Annex A hereto. Each Member will from time-to-time promptly execute and deliver all further instruments, endorsements and other documents and take any further actions that the Company reasonably requests in obtaining the full benefits of the grant made hereunder. No Member shall change its name, identity, corporate structure, location of its chief executive office or jurisdiction of organization without (i) to the extent reasonably practicable, giving the Company at least fifteen (15) days' prior written notice describing the new name, identity, corporate structure or new location, and providing any other information in connection therewith that the Company reasonably requests, and (ii) taking all actions reasonably requested by the Company to maintain the security interest of the Company in the Collateral intended to be granted hereby at all times fully perfected with the same priority and in full force and effect. If a Member becomes a Defaulting Member, then in addition to its other remedies set forth herein, then with respect to the Default Interest only, the Company shall be entitled to enforce the security interest granted herein to collect any Unfunded Capital Commitments, shall have all of the rights of a secured party under the Uniform Commercial Code, shall have all rights now or hereafter existing under all other applicable laws and, subject to any mandatory requirements of applicable law then in effect, shall have all the rights set forth herein and all the rights set forth with respect to the Collateral in any other agreement between the parties including, without limitation, the Subscription Agreements; *provided*, *however*, these rights and remedies shall apply with respect to only the Default Interest. The Company shall not pledge the Members' or Manager's pledges set forth above.

10.7    **Further Actions**. The Manager shall cause this Agreement to be amended to reflect (as appropriate) the occurrence of any of the transactions referred to in this Article X, as promptly as practicable after that occurrence.

10.8    **Admissions and Withdrawals Generally**. Except as provided herein, no Member has the right to withdraw from the Company and no additional Member may be admitted to the Company.

10.9    **Obligations of a Prior Manager**. If the Manager is removed, withdraws or Transfers its Interest as manager of the Company in accordance with the terms of this Agreement, then that Person has no further obligation or liability as a manager of the Company pursuant to this Agreement with respect to or in connection with any obligations or liabilities arising from and after that removal, withdrawal or Transfer, and all future obligations and liabilities shall automatically cease and terminate and be of no further force or effect with respect to the Manager; *provided*, *however*, that nothing contained herein relieves the Manager of any obligations or liabilities (i) that accrue before that removal or withdrawal or (ii) that result from a dissolution of the Company caused by the act of the Manager, where liability is imposed on the Manager by law or by the provisions of this Agreement, subject to the limits on liability and the Manager's right to indemnification under Sections 7.5 and 7.6.

## ARTICLE XI

## Term and Dissolution of the Company

11.1    **Term**. The term of the Company commenced on the date of the filing of the Certificate of Formation pursuant to the TBOC and continues until the Company is dissolved, which dissolution shall occur on the first of any of the following events (each an "**Event of Dissolution**"):

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

(a)      the first December 31st after the tenth (10th) anniversary of the Initial Closing; *provided, however*, that the term of the Company may be extended by the Manager for up to two (2) additional consecutive one (1)-year terms after that date, upon the approval of a majority-in-interest of the Members, to permit an orderly dissolution;

(b)      the occurrence of a Disabling Event; *provided*, *however*, that the Company shall not be dissolved if, within ninety (90) days after that Disabling Event, a majority-in-interest of the Members (other than the Manager and its Affiliates), or any greater number that may be required by the TBOC (constituting, in any event, no less than a majority-in-interest of all Members), agrees in writing to continue the business of the Company and to the appointment, effective as of the date of the Disabling Event, of a substitute Manager to replace the existing Manager who has ceased to be a manager of the Company;

(c)      after the Investment Period, a good faith determination by the Manager that the Company has disposed of and reduced to cash substantially all of its Portfolio Investments; or

(d)      the entry of a decree of judicial dissolution under the TBOC.

11.2    **Winding-Up**. On the occurrence of an Event of Dissolution, the Company shall be wound up and liquidated as promptly as business circumstances allow. The Manager or, if there is no manager, a liquidator appointed by a majority-in-interest of the Members, shall proceed with the Dissolution Sale and the final distribution. In the Dissolution Sale the Manager or the liquidator shall use its best efforts to reduce to cash and cash equivalent items those assets of the Company that the Manager or the liquidator determines to sell, subject to obtaining fair value for those assets and any tax or other legal considerations.

11.3    **Final Distribution**. Subject to the TBOC, after the Dissolution Sale, the proceeds thereof and the other assets of the Company (including, without limitation, restricted securities) shall be paid or distributed in one or more installments in the following order of priority:

(a)      To creditors of the Company (including, if applicable, the Manager and its Affiliates), to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, including the expenses of winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof); and then

(b)      The remaining proceeds, if any, *plus* any remaining assets of the Company, shall be applied and distributed to those Members in the same manner as distributions under Section 5.2(a).

After that distribution, the Members shall execute, acknowledge and cause to be filed a certificate evidencing the cancellation of the certificate of limited partnership of the Company, at which time the Company shall be terminated.

## ARTICLE XII

### Miscellaneous

12.1    **Sole and Absolute Discretion**. Except as otherwise expressly stated in this Agreement, all actions that any Manager may take and all determinations that any Manager may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of that Manager.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

12.2    **Power of Attorney**. Each Member hereby acknowledges and confirms that it has duly appointed the Manager and the manager of the Manager and the officers of that manager, and any successor of it or them, as its true and lawful attorney-in-fact coupled with an interest for the limited purposes and on the terms and conditions specified in the power of attorney contained in the Subscription Agreement. That appointment shall expire immediately if the Manager is subject to bankruptcy proceedings or is adjudicated incompetent by a court of competent jurisdiction.

12.3    **Amendments**.

(a)    Except as required by law or required for an amendment to Annex A hereto pursuant to Section 3.4, or amendments made pursuant to Section 4.1(e), this Agreement may be amended only by the Manager with the consent of a majority-in-interest of the Members; *provided, however,* that amendments to this Agreement and the Certificate of Formation that do not adversely affect the Members, the Funds Members, the Company, or Parallel Funds may be made from time-to-time, by the Manager, without the consent of any of the Members or the Funds Members, as the case may be, (i) to amend any provision of this Agreement and the Certificate of Formation that requires any action to be taken by or on behalf of the Manager or the Company pursuant to requirements of Texas law if the provisions of Texas law are amended, modified or revoked so that the taking of that action is no longer required; (ii) to take any action in light of changing regulatory conditions or of the then current ERISA regulations, as the case may be, that is necessary to permit the Company to continue in existence; (iii) to add to the duties or obligations of the Manager, or to surrender any right granted to the Manager herein, for the benefit of the Members or the Funds Members; (iv) to correct any clerical mistake or to correct or supplement any immaterial provision herein or in the Certificate of Formation that may be inconsistent with any other provision herein or therein, or to correct any printing, stenographic or clerical errors or omissions, that are not inconsistent with the provisions of this Agreement or the status of the Company as a partnership for federal income tax purposes; and (v) to change the name of the Company or to make any other change that is for the benefit of, or not adverse to the interests of, the Members or the Funds Members; *provided, however,* that except as provided in Sections 4.1(e), 4.2(b)(vi) and 4.2(b)(vii), no amendment shall (i) disproportionately alter the Interest of a Member in allocations under Section 4.2 or in distributions under Section 5.2 without the consent of that Member; (ii) change the percentage in Interests of Members, as applicable (the "**Required Interest**") necessary for any consent required hereunder to the taking of an action, unless that amendment is approved by Members, as the case may be, who then hold Interests equal to or in excess of the Required Interest for the subject of that proposed amendment; (iii) reduce the percentage of Members required to approve amendments as provided in the other clauses of this Section 12.3 without the consent of the percentage of Members required by that clause before the effectiveness of any reduction; or (iv) amend Section 6.2 or the proviso to Section 3.3 without the consent of a majority-in-interest of all ERISA Members.

(b)    Any amendment to this Agreement that may be made solely with the approval of the Manager, and any amendment to Annex A hereto pursuant to Section 3.4, may be executed on behalf of each Member by the Manager pursuant to the power of attorney given by the Members under the Subscription Agreement. Each Member hereby agrees that, on the request of the Manager, the Member shall execute any amendment to this Agreement that has been duly authorized pursuant to Section 12.3(a).

(c)    Any request for consent of the Members in this Section 12.3 shall be made by written notification from the Manager to the Members at the address listed on Annex A hereto. Failure of a Member to respond within thirty (30) days after notification is sent shall be deemed a consent to the proposed amendment by that Member.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

12.4 **Complete Agreement**. This Agreement (together with, to the extent provided herein, any Side Letter Agreements that may be entered into by the Manager from time to time and the Subscription Agreement) constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter hereof and replaces and supersedes any prior oral or written agreements by and among the Members. Notwithstanding the provisions of this Agreement or any Subscription Agreement, it is hereby acknowledged and agreed that the Manager, on its own behalf or on behalf of the Company, and without the approval of any Member, may enter into a side letter or similar agreement (a "**Side Letter Agreement**") with a Member that has the effect of establishing rights under, or altering or supplementing the terms hereof or of any Subscription Agreement with respect to such Member. The parties agree that any terms contained in a Side Letter Agreement with a Member shall govern with respect to such Member notwithstanding the provisions of this Agreement or any Subscription Agreement, and that any right purported to be extended to all Members pursuant to such Side Letter Agreement (including any withdrawal right) shall govern with respect to all Members notwithstanding the provisions of this Agreement or any Subscription Agreement. The Manager may provide, but shall not be required, to the Members who are not parties to a Side Letter Agreement copies of such Side Letter Agreement or, if such Side Letter Agreements contain confidential information with respect to any Member that is a party thereto, descriptions of the material terms thereof.

12.5 **Severability**. Each provision of this Agreement is severable and if for any reason any provision that is not essential to effect the basic purposes of the Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable and contrary to the TBOC or existing or future applicable law, then that invalidity shall not impair the operation of or affect those provisions of this Agreement that are valid. In that case, this Agreement shall be construed so limit any term or provision to make it enforceable or valid within the requirements of any applicable law, and if that term or provision cannot be so limited, then this Agreement shall be construed to omit that invalid or unenforceable provisions.

12.6 **Notices**. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if sent (i) if to any Member, to the Person specified at the Member's business address set forth on Annex A hereto and to his designees if written notice specifying the Person and address of the designee is provided to the Person required to give notice, and (ii) if to the Company or the Manager, to the Manager at the Manager's business address set forth on Annex A hereto; or to another address that any Member, the Manager or the Initial Member shall have last designated by notice to the Company at least fifteen (15) days prior thereto, and in the case of a change in address by the Manager, by notice to the Members. Any notice shall be deemed to have been duly given if personally delivered or sent by certified, registered or overnight mail, or courier. or by e-mail or facsimile transmission confirmed by letter, and shall be deemed received, unless earlier received, (i) if sent by certified or registered mail, return receipt requested, three (3) Business Days after the date sent; (ii) if sent by overnight mail or courier, one (1) Business Day after the date sent; (iii) if sent by e-mail or facsimile transmission, on the date sent; *so long as* that confirmatory notice is sent promptly thereafter by first-class mail, postage prepaid; and (iv) if delivered by hand, on the date of receipt.

12.7 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflict of laws principles.

12.8 **Successors and Assigns**. Except with respect to the rights of Indemnified Parties, and the Manager hereunder, none of the provisions of this Agreement shall be for the benefit of or enforceable by the creditors of the Company, and this Agreement shall be binding on and inure to the benefit of the Members, the Initial Member, and their legal representatives, successors, and permitted assigns.

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

12.9    **Counterparts**. This Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument.

12.10    **Headings; Gender; Time Periods, etc**. The Section headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof. As used herein, masculine pronouns include the feminine and neuter, and the singular includes the plural. If any time period set forth herein expires on a day that is not a Business Day, then that time period shall automatically be extended to the first Business Day immediately following the non-Business Day on which the time period would otherwise expire. The term "including," as used herein shall mean "including, without limitation."

12.11    **Delivery of Organizational Documents, etc**. The Manager shall provide a copy of the Certificate of Formation, this Agreement and each amendment to the Certificate of Formation or this Agreement to each Member.

12.12    **Further Assurances**. Each Member shall take any and all action necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.4.

12.13    **Waiver of Partition** . Each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's property.

12.14    **Acknowledgment** . Kane Russell Coleman Logan PC ("**Legal Counsel**") serves as the Company's counsel, and also acts as counsel to the Manager and certain of its affiliates (collectively, the "**Company Entities**"), in connection with the formation of the Company, the offering of the Interests herein, and certain other matters for which it is specifically engaged, but will not act as counsel for the Company's acquisition of real properties and related matters. Kane Russell disclaims any obligation to verify the Company Entities' compliance with their obligations under either applicable law or the governing documents of the Company. In acting as counsel to the Company Entities, Kane Russell has not represented and will not represent any Members. No independent counsel has been retained to represent the Members. Accordingly, potential investors and Members have not had the benefit of independent counsel in the structuring of the Company or determination of the relative interests, rights, and obligations of the Manager.

*[Remainder of Page Intentionally Left Blank.*
*Signature Page to Follow.]*

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**MEMBERS**:

**84 Basa 0224, LLC**

By: _____

Name:  Tom Hanks
Title:  Owner

Company Agreement of
84 Resources Holdings, LLC                    Signature Page                    10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**JJN2 DC, LLC**

By: _J. J. Oshins_
DocuSigned by:
890BB7499F614AF...

Name:  J. J. Oshins
Title:  Principal

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**84 Energy Holdings, LLC**

By: _____

Name:  Aaron Shimek
Title:  Owner

Company Agreement of
84 Resources Holdings, LLC                    Signature Page                    10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**Kolcap, LLC**

By: _Andrew Kollaer_
C34090F7AA0041D...

Name:  Andrew Kollaer
Title:  Owner

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**KDK Energy Fund I, LP**

By: _____

Name:  Kamden Kanaly
Title:  Principal

Company Agreement of
84 Resources Holdings, LLC                    Signature Page                    10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

LJG Capital, Ltd.

By: _Casey Gorder_

Name:  Casey Gorder
Title:  Principal

Company Agreement of
84 Resources Holdings, LLC                    Signature Page                    10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**Pin Oak Targeted Strategies Master, LP**

By: _Barret Rouse_

Name:  Barret Rouse

Title:  Owner

Company Agreement of
84 Resources Holdings, LLC                Signature Page                10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**Doliver Private Opportunity Fund II, LP**

By: _Skip McBride_
      1847143A3CAA4D9...

Name:  Skip McBride
Title:  Principal

Company Agreement of
84 Resources Holdings, LLC        Signature Page        10619969 (73808.00006.000)

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**MANAGER**:

84 Resources Management, LLC,
a Texas limited liability company

By: _Andrew Kollaer_

Name: Andrew Kollaer
Title: Manager

By: _[signature]_

Name: Aaron Shimek
Title: Manager

**PROFITS INTEREST MEMBERS**:

84 Resources Management, LLC,
a Texas limited liability company

By: _Andrew Kollaer_

Name: Andrew Kollaer
Title: Manager

By: _[signature]_

Name: Aaron Shimek
Title: Manager

Company Agreement of
84 Resources Holdings, LLC                       Signature Page                       10619969 (73808.00006.000)

Copy from re:SearchTX

ANNEX A

**NAMES, ADDRESSES, PERCENTAGES AND CAPITAL CONTRIBUTIONS OF
CAPITAL INTEREST MEMBERS**

| Name and Address for Notice | Percentage | Capital Contribution |
|---|---|---|
| 84 Basa 0224, LLC<br>675 Bering, Suite 110<br>Houston, Texas 77057 | 62.85% | $7,950,000 |
| JJN2 DC, LLC<br>2000 Bering, Suite 6000<br>Houston, Texas 77056 | 13.04% | $1,650,000 |
| 84 Energy Holdings, LLC<br>1902 Winners Circle<br>Richmond, Texas 77406 | 0.20% | $25,000 |
| KolCap, LLC<br>5834 Shady River<br>Houston, Texas 77057 | 0.20% | $25,000 |
| KDK Energy Fund I, LP<br>1616 South Voss Rd, Suite 800<br>Houston, Texas 77057 | 7.91% | $1,000,000 |
| Pin Oak Targeted Strategies<br>Master, LP<br>510 Bering, Suite 100<br>Houston, Texas 77057 | 7.91% | $1,000,000 |
| Doliver Private Opportunity<br>Fund II, LP<br>6363 Woodway, Suite 763<br>Houston, Texas 77057 | 3.95% | $500.000 |
| LIG Capital, Ltd.<br>3819 De Zavala Rd.<br>Shavano Park, Texas 78231 | 3.95% | $500,000 |
| | | **$12,650,000** |

**NAMES, ADDRESSES, PERCENTAGES AND CAPITAL CONTRIBUTIONS OF
PROFITS INTEREST MEMBERS**

| Name and Address for Notice | Percentage | Capital Contribution |
|---|---|---|
| 84 Resources Management, LLC<br>675 Bering, Suite 140<br>Houston, Texas 77057 | 0.40% | $50,000 |

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

<u>EXHIBIT A</u>

**Annual Business Plan**

| | Budget 01/01/24 01/31/24 | Budget 02/01/24 02/29/24 | Budget 03/01/24 03/31/24 | Budget 04/01/24 04/30/24 | Budget 05/01/24 05/31/24 | Budget 06/01/24 06/30/24 | Budget 07/01/24 07/31/24 | Budget 08/01/24 08/31/24 | Budget 09/01/24 09/30/24 | Budget 10/01/24 10/31/24 | Budget 11/01/24 11/30/24 | Budget 12/01/24 12/31/24 | 12-Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning of Period | | | | | | | | | | | | | |
| End of Period | | | | | | | | | | | | | |
| **Volumes:** | | | | | | | | | | | | | |
| Oil - Bopd | 440 | 439 | 436 | 434 | 483 | 483 | 478 | 527 | 528 | 522 | 523 | 517 | 470 |
| Gas - MCFS | 1,440 | 1,340 | 1,420 | 1,370 | 1,410 | 1,360 | 1,400 | 1,400 | 1,350 | 1,390 | 1,340 | 1,380 | 16,600 |
| Oil - BBLS | 13,197 | 12,289 | 13,077 | 12,597 | 14,476 | 13,994 | 14,345 | 15,798 | 15,317 | 15,656 | 15,180 | 15,516 | 171,442 |
| NGL - GALS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **INCOME:** | | | | | | | | | | | | | |
| Gas | $4,376 | $4,072 | $2,285 | $2,302 | $2,552 | $2,713 | $3,081 | $3,192 | $3,065 | $3,265 | $3,690 | $4,497 | $39,091 |
| Oil | 940,823 | 910,391 | 1,035,561 | 988,323 | 1,128,861 | 1,084,271 | 1,103,672 | 1,206,205 | 1,160,562 | 1,177,365 | 1,133,762 | 1,151,146 | 13,020,943 |
| NGL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Severance Tax | (43,606) | (42,183) | (47,807) | (45,635) | (52,119) | (50,080) | (51,000) | (55,725) | (53,616) | (54,404) | (52,430) | (53,290) | (601,895) |
| Transportation Charges | (32,993) | (30,723) | (32,692) | (31,491) | (36,191) | (34,986) | (35,861) | (39,496) | (38,292) | (39,141) | (37,949) | (38,790) | (428,606) |
| **Net Revenue** | $868,600 | $841,556 | $957,347 | $913,498 | $1,043,103 | $1,001,919 | $1,019,892 | $1,114,177 | $1,071,719 | $1,087,085 | $1,047,074 | $1,063,563 | $12,029,532 |
| **Operating Expense:** | | | | | | | | | | | | | |
| Administrative Overhead | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $500,000 |
| Field Personnel | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 131,510 | 1,578,124 |
| Insurance | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 200,000 |
| Salt Water Disposal | 31,603 | 31,524 | 31,446 | 31,367 | 31,288 | 31,210 | 31,132 | 31,054 | 30,977 | 30,899 | 30,822 | 30,745 | 374,069 |
| Equipment rental, trucking | 2,492 | 2,486 | 2,479 | 2,473 | 2,467 | 2,461 | 2,455 | 2,448 | 2,442 | 2,436 | 2,430 | 2,424 | 29,494 |
| Compression | 2,555 | 2,549 | 2,542 | 2,536 | 2,530 | 2,523 | 2,517 | 2,511 | 2,504 | 2,498 | 2,492 | 2,486 | 30,244 |
| Power and Electricity | 187,472 | 187,003 | 186,536 | 186,070 | 185,604 | 185,140 | 184,678 | 184,216 | 183,755 | 183,296 | 182,838 | 182,381 | 2,218,989 |
| LAARS credit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Material and Supplies | 45,037 | 44,925 | 44,812 | 44,700 | 44,589 | 44,477 | 44,366 | 44,255 | 44,144 | 44,034 | 43,924 | 43,814 | 533,078 |
| Repairs and Maintenance | 63,963 | 63,803 | 63,644 | 63,485 | 63,326 | 63,168 | 63,010 | 62,852 | 62,695 | 62,538 | 62,382 | 62,226 | 757,093 |
| Treating Costs | 32,363 | 32,282 | 32,201 | 32,121 | 32,041 | 31,960 | 31,881 | 31,801 | 31,721 | 31,642 | 31,563 | 31,484 | 383,060 |
| Testing | 7,276 | 7,258 | 7,240 | 7,222 | 7,204 | 7,186 | 7,168 | 7,150 | 7,132 | 7,114 | 7,096 | 7,078 | 86,122 |
| Ad Valorem Tax | 9,282 | 9,259 | 9,236 | 9,212 | 9,189 | 9,166 | 9,144 | 9,121 | 9,098 | 9,075 | 9,052 | 9,030 | 109,864 |
| Well Services Expense | 62,752 | 62,595 | 62,438 | 62,282 | 62,127 | 61,971 | 61,816 | 61,662 | 61,508 | 61,354 | 61,201 | 61,048 | 742,753 |
| Workovers-recurring | 1,090 | 1,088 | 1,085 | 1,082 | 1,079 | 1,077 | 1,074 | 1,071 | 1,069 | 1,066 | 1,063 | 1,061 | 12,905 |
| Miscellaneous | 4,339 | 4,328 | 4,317 | 4,306 | 4,295 | 4,285 | 4,274 | 4,263 | 4,253 | 4,242 | 4,231 | 4,221 | 51,352 |
| **TOTAL OPERATING EXPENSES:** | $631,735 | $630,609 | $629,487 | $628,367 | $627,249 | $626,135 | $641,690 | $640,581 | $639,475 | $638,372 | $637,272 | $636,174 | $7,607,147 |
| **EBITDAX** | $236,865 | $210,947 | $327,860 | $285,131 | $415,854 | $375,784 | $378,202 | $473,595 | $432,243 | $448,713 | $409,802 | $427,389 | $4,422,386 |
| Workovers-non-recurring | $0 | $0 | $0 | $0 | $0 | $200,000 | $0 | $0 | $200,000 | $0 | $0 | $0 | $400,000 |
| EQUIPMENT-CAPITALIZED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IDC COSTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **EBITDA** | $236,865 | $210,947 | $327,860 | $285,131 | $415,854 | $175,784 | $378,202 | $473,595 | $232,243 | $448,713 | $409,802 | $427,389 | $4,022,386 |
| Preferred Coupon $12,650,000 10% | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $105,417 | $1,265,000 |
| **Net Cash Flow** | $131,448 | $105,530 | $222,443 | $179,715 | $310,437 | $70,367 | $272,785 | $368,179 | $126,827 | $343,296 | $304,386 | $321,973 | $2,757,386 |
| Price per MCF | $3.04 | $3.04 | $1.61 | $1.68 | $1.81 | $2.00 | $2.20 | $2.28 | $2.27 | $2.35 | $2.75 | $3.26 | $2.35 |
| Price per BBL | $71.29 | $74.08 | $79.19 | $78.46 | $77.98 | $77.48 | $76.94 | $76.35 | $75.77 | $75.20 | $74.69 | $74.19 | $75.95 |
| Price per NGL | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

**COMPANY AGREEMENT**
**OF**
**84 Resources Holdings, LLC**
(a Texas limited liability company)

**TABLE OF CONTENTS**

*Page*

ARTICLE I Definitions ................................................................................................................ 1

ARTICLE II General Provisions ................................................................................................. 9

2.1      **Name**. ................................................................................................. 10

2.2      **Organizational Certificates and Other Filings** ............................. 10

2.3      **Purpose and Powers** ...................................................................... 10

2.4      **Principal Place of Business** ........................................................... 12

2.5      **Registered Office and Registered Agent** ...................................... 12

2.6      **Term** ................................................................................................ 12

2.7      ***Fiscal Year*** ................................................................................... 12

ARTICLE III Capital Contributions; Membership Interest ....................................................... 12

3.1      **Initial Closing**. ............................................................................... 12

3.2      **Capital Commitments**. ................................................................... 12

3.3      **Capital Contributions**. ................................................................... 13

3.4      **Capital Demand Notices**. ............................................................... 13

3.5      **Subsequent Closing**. ...................................................................... 13

3.6      **Failure to Contribute**. .................................................................... 14

3.7      ***Limited Exclusion Right***. .............................................................. 15

3.8      **Profits Interest**. .............................................................................. 15

3.9      **Follow-On Contributions**. .............................................................. 16

3.10     **Termination of Investment Period**. ............................................... 16

ARTICLE IV Capital Accounts and Allocations ........................................................................ 16

4.1      **Capital Accounts**. ........................................................................... 16

4.2      **Allocations to the Members** .......................................................... 18

4.3      **Negative Capital Accounts**. ........................................................... 20

ARTICLE V Distributions ........................................................................................................... 20

5.1      **Withdrawal of Capital**. .................................................................. 20

5.2      **Cash Distributions**. ........................................................................ 20

5.3      **Tax Distributions** ........................................................................... 21

5.4      **General Distribution Provisions**. ................................................... 21

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

5.5      **Restricted Distributions**......................................................................................21

ARTICLE VI Investment Criteria...................................................................................................21

6.1      **Investment Criteria**.........................................................................................21

6.2      **ERISA Matters**................................................................................................22

6.3      **Non-U.S. Members**.........................................................................................22

ARTICLE VII Management ............................................................................................................23

7.1      **Relationships**...................................................................................................23

7.2      **Liability of the Members**.................................................................................23

7.3      **Investment Company Act, Advisers Act**.........................................................24

7.4      **Qualification**...................................................................................................24

7.5      **Liability of the Manager**.................................................................................24

7.6      **Indemnification**..............................................................................................24

7.7      **Co-Investment Opportunities; Alternative Investment Vehicles**....................25

7.8      **Manager as Member**.......................................................................................26

7.9      **Meetings of the Members**...............................................................................26

7.10     **Non-U.S. Ownership**......................................................................................27

7.11     **Confidentiality of Information**........................................................................27

7.12     **Business with Affiliates**...................................................................................27

7.13     **Subsequent Funds**...........................................................................................27

7.14     **Limitations on the Manager**...........................................................................28

7.15     **UBIT**................................................................................................................29

7.16     **Annual Business Plan**.....................................................................................29

7.17     **Compensation and Reimbursement of Manager**............................................29

ARTICLE VIII Allocation of Expenses..........................................................................................30

8.1      **Allocation of Expenses**...................................................................................30

ARTICLE IX Books and Records and Reports to Members ..........................................................30

9.1      **Records and Accounting**.................................................................................30

9.2      **Audit and Report**............................................................................................31

9.3      **Withholding**....................................................................................................32

9.4      **Separate Accounts**.........................................................................................32

ARTICLE X Transfers, Withdrawals and Default..........................................................................33

10.1     **Transfer, Withdrawal, Removal and Suspension of the Manager**..................33

10.2     **Certain Restrictions on Transfers**..................................................................34

10.3     **Assignments by Members**...............................................................................35

10.4     **Substitute Members**........................................................................................35

Copy from re:SearchTX

DocuSign Envelope ID: 3C1FF680-C6AF-434D-B4F4-77756351AADB

| | | |
|---|---|---|
| 10.5 | **Assignee's Rights**. | 36 |
| 10.6 | **Defaulting Member**. | 36 |
| 10.7 | **Further Actions**. | 38 |
| 10.8 | **Admissions and Withdrawals Generally** | 38 |
| 10.9 | **Obligations of a Prior Manager**. | 38 |

ARTICLE XI Term and Dissolution of the Company ........ 38

| | | |
|---|---|---|
| 11.1 | **Term**. | 38 |
| 11.2 | **Winding-Up**. | 39 |
| 11.3 | **Final Distribution**. | 39 |

ARTICLE XII Miscellaneous ........ 39

| | | |
|---|---|---|
| 12.1 | **Sole and Absolute Discretion** | 39 |
| 12.2 | **Power of Attorney**. | 40 |
| 12.3 | **Amendments**. | 40 |
| 12.4 | **Complete Agreement**. | 41 |
| 12.5 | **Severability**. | 41 |
| 12.6 | **Notices**. | 41 |
| 12.7 | **Governing Law**. | 41 |
| 12.8 | **Successors and Assigns**. | 41 |
| 12.9 | **Counterparts**. | 42 |
| 12.10 | **Headings; Gender; Time Periods, etc**. | 42 |
| 12.11 | **Delivery of Organizational Documents, etc**. | 42 |
| 12.12 | **Further Assurances**. | 42 |
| 12.13 | **Waiver of Partition**. | 42 |
| 12.14 | **Acknowledgment** | 42 |

ANNEXES

Annex A        Members' Capital Contributions and Business Addresses

EXHIBITS

Exhibit A        Annual Business Plan

Copy from re:SearchTX

**EXHIBIT B**

## COMPANY AGREEMENT

### OF

### 84 RESOURCES MANAGEMENT, LLC
**A Texas Limited Liability Company**

**February 27, 2024**

Copy from re:SearchTX

# COMPANY AGREEMENT
## OF
## 84 RESOURCES MANAGEMENT, LLC
### A Texas Limited Liability Company

This COMPANY AGREEMENT OF 84 Resources Management, LLC, a Texas limited liability company (the "**Agreement**"), dated as of February 27, 2024 (the "**Effective Date**"), is adopted by the undersigned as the initial Managers and the initial Members of the Company.

## ARTICLE I
## DEFINITIONS

Section 1.1      <u>Certain Definitions</u> . As used in this Agreement, the following terms shall have the meanings indicated:

(a)      "**Agreement**" has the meaning given that term in the introductory paragraph to this document.

(b)      "**Assignee**" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to <u>Section 3.5</u>.

(c)      "**Bankruptcy**" or "**Bankrupt**" means, with respect to any Person, that (a) such Person (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for such Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Person's or of all or any substantial part of such Person's properties; or (b) against such Person, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and 120 days have expired without dismissal thereof or with respect to which, without such Person's consent or acquiescence, a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties has been appointed and 60 days have expired without the appointment's having been vacated or stayed.

(d)      "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of Houston are authorized or required to close.

(e)      "**Capital Contribution**" means any contribution by a Member to the capital of the Company.

(f)      "**Certificate**" has the meaning given that term in <u>Section 2.1</u>.

Copy from re:SearchTX

(g)　**"Code"** means the Texas Business Organizations Code and any successor statute, as amended from time to time.

(h)　*"Company"* means 84 Resources Management, LLC, a Texas limited liability company.

(i)　**"Dispose"**, **"Disposing"**, or **"Disposition"** means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law).

(j)　**"Divorce"** means the legal divorce of a Member and the establishment of a Spouse's Fraction as a result of such divorce or other termination of the Marital Relationship of any Member (other than by death), or upon the partition of community property or other disposition of property between a Member and such Member's Spouse.

(k)　**"Marital Relationship"** means a civil union, domestic partnership, marriage, or any other similar relationship that is legally recognized in any jurisdiction.

(l)　**"Market Value"** shall mean the deemed value of the Company for purposes of redemption or purchase of an Affected Member's Membership Interest pursuant to <u>Article XIII</u> hereof. Market Value shall mean the value of the Company, less any indebtedness, as agreed to by the Company and Affected Member (or their estate or custodian), or, if no such agreement is reached, then the Market Value shall be determined as follows: the Managers (unless the Affected Member is a Manager, in which case, only the Manager that is not an Affected Member) will select an independent third-party business appraiser of regional or national recognition (the **"Appraiser"**). The Appraiser will then determine the Market Value of the Company by determining the fair market value (by any methods determined to be reasonable by the Appraiser) of the Company. Any valuation shall take into account any applicable indebtedness or other appropriate obligations related to the Company. Upon the conclusion of its work, the Appraiser will then deliver its written report (the **"Report"**) to each of the Company and the Affected Member within thirty (30) days after the date of its selection. The determination by the Appraiser of the Market Value will be final and binding on each of the Company and the Affected Member. The Appraiser's determination of the Market Value will be made without giving regard to restrictions on transfer of equity, minority ownership, if applicable, the lack of voting rights, if applicable, or the absence of a public market for the sale or other liquidity of the equity of the Company. The fees and expenses of the Appraiser will be shared equally between the Company and the Affected Member.

(m)　**"Majority Interest"** means Members holding among them at least a majority of all Sharing Ratios.

(n)　**"Manager"** means the Persons named in the Certificate as Managers of the Company and any Persons hereafter elected as Manager of the Company as provided in this Agreement but does not include any Person who has ceased to be a manager of the Company.

Copy from re:SearchTX

(o)    **"Member"** means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement but does not include any Person who has ceased to be a member in the Company.

(p)    **"Membership Interest"** or **"Interest"** means the interest of a Member in the Company and his or her rights with respect to the same, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve acts or transactions.

(q)    **"Officers"** means the officers appointed pursuant to Article VII.

(r)    **"Permitted Transferee"** means (a) a descendant of a Member, including descendants by adoption if the adoption was a court adoption of a minor; (b) any parent or sibling of a Member; (c) a descendant of a sibling of a Member including those by adoption as defined in (a) above; (d) a trust created for the benefit of anyone in (a) through (c) above; (e) a charitable remainder trust under the Texas Business Organizations Code as amended from time to time; (f) the trustee of a trust created for the benefit of such Member; (g) any other Member; (h) any entity wholly owned by a Member, or anyone in (a) through (c) above; (i) any beneficiary of a trust that is a Member; (j) any owner of a beneficial interest in any partnership, corporation, limited liability company, or other entity that is a Member; or (k) to any other person approved by the Majority Interest.

(s)    **"Person"** has the meaning given that term in Section 1.002(69-b) of the Code.

(t)    **"Proceeding"** has the meaning given that term in Section 9.1.

(u)    **"Shares"** means the Shares of ownership interest in the Company, the initial number of Shares assigned to each Member being set forth on Schedule A of this Agreement.

(v)    **"Sharing Ratio"** means the relative percentage Interest of each Member in the Company, which shall be equal to the percentage derived by dividing the number of Shares held by such Member by the total number of Shares held by all Members. The initial Sharing Ratios of the Members are set forth on Schedule A of this Agreement.

(w)    **"Spouse"** means a spouse, a party to a civil union, a domestic partner, a same-sex spouse or partner, or any individual in a Marital Relationship with a Member.

(x)    **"Spouse's Death"** means the death of a Member's Spouse (or former Spouse) prior to the death of such Member, and, in connection with such death, the establishment of a Spouse's Fraction to which (or to a portion of which) such Member does not succeed.

(y)    **"Spouse's Fraction"** means that portion (if any) of a Member's Membership Interest (expressed as Membership Interest) that such Member's Spouse, such Member's former Spouse, such Member's Spouse's estate, or such Member's former Spouse's estate is determined to own by a court of competent jurisdiction or, in the absence of a judicial determination, by a written agreement between the Member and such Spouse, such Spouse's estate, such former Spouse, or such former Spouse's estate.

Copy from re:SearchTX

(z)      **"Tax Code"** means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

Section 1.2      **Construction**. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

# ARTICLE II
## ORGANIZATION

Section 2.1      **Formation**. The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas, effective as of the date hereof.

Section 2.2      **Name**. The name of the Company is "84 Resources Management, LLC", and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

Section 2.3      **Registered Office; Registered Agent; Principal Office in the United States; Other Offices**. The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code. The Company may have such other offices as the Managers may designate from time to time.

Section 2.4      **Purposes**. The purposes of the Company are as set forth in the Certificate.

Section 2.5      **Term**. The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

Section 2.6      **Foreign Qualification**. Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Copy from re:SearchTX

Section 2.7     **Mergers and Exchanges**. The Company may be a party to: (a) a merger, or (b) an exchange or acquisition of the type described in the Code, if approved by a Majority Interest.

## ARTICLE III
## MEMBERSHIP

Section 3.1     **Initial Members**. The names and addresses of the Members of the Company are set forth on Schedule A.

Section 3.2     **Additional Members**. Additional Shares of Membership Interests may be created and issued by the Company to Members and third parties only with the consent of the Managers and a Majority Interest. The terms of admission or issuance must specify the Sharing Ratios applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties. The creation of any new class or group shall be reflected in an amendment to this Agreement indicating the different rights, powers, and duties.

Section 3.3     **Liability to Third Parties**. No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

Section 3.4     **Restrictions on the Disposition of an Interest**.

(a)     Except as specifically provided in this Section 3.4, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest. Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.4 shall be, and is hereby declared, null and void *ab initio*. Notwithstanding the foregoing, Members may Dispose of their Membership Interest to a Permitted Transferee without the consent of a Majority Interest provided that they comply with the provisions set forth in this Agreement, including Section 3.4(c).

(b)     Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "**Offer**") such portion of the Membership Interest (the "**Offered Interest**") for sale to the Company and the other Members (the "**Remaining Members**"). The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "**Proposed Price**"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section and which shall set forth the Sharing Ratio attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "**Proposed Terms**"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer. The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the Offer. If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day

Copy from re:SearchTX

period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Sharing Ratios. Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions. The payment of the respective purchase price shall be payable pursuant to the Proposed Terms. If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.4(b), then the selling Member may sell not less than all of the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)     The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.4 have been satisfied and the Company has received a document which:

(i)     has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

(ii)     includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

(iii)     sets forth the Sharing Ratios which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Sharing Ratio of the Member effecting the Disposition before the Disposition); and

(iv)     contains a representation and warranty that the Disposition was made in accordance with all applicable laws and regulations (including securities laws).

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.4(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.4 have been met.

(d)     The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

Section 3.5     **Admission of Assignees or Members**. Except as provided in the next sentence of this Section 3.5, a Disposition effected pursuant to Section 3.4 shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are

attributable to the purchased Interest. Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Managers.

Section 3.6    **Withdrawal**. A Member does not have the right or power to withdraw from the Company as a Member.

Section 3.7    **Compensation for Members**. No Member shall receive any compensation from the Company in such Member's capacity as a Member. However, any Member may be employed in the business of the Company at the discretion of the Managers and, in connection therewith, may receive reasonable compensation for services rendered.

Section 3.8    **Other Activities**. The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument. Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member. Except as otherwise provided in this Agreement or any other agreement or instrument, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others. The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

Section 4.1    **Initial Contribution**. The initial Members shall make capital contributions to the Company as set forth on Schedule A.

Section 4.2    **Return of Contributions**. A Member is not entitled to the return of any part of its Capital Contribution or to be paid interest in respect of either its capital account or its Capital Contribution. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

Section 4.3    **Additional Capital Contributions**. The Majority Interest shall have the sole authority to determine whether or not Additional Capital Contributions ("**Additional Capital Contributions**") shall be made to the Company by the Members to enable the Company to cause the assets of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities. Each Member shall pay to the Company the Additional Capital Contribution set forth in a written notice from the Managers (a "**Call Notice**") for an Additional Capital Contribution; provided that, in connection with any such Call Notice, the amount of each

Copy from re:SearchTX

Member's Additional Capital Contribution shall equal the product of (a) the aggregate amount of Additional Capital Contributions being requested of the Members by the Managers (b) multiplied by such Member's Sharing Ratio. Each Call Notice shall be submitted to the Members by the Managers at the direction of the Majority Interest and shall set forth therein (i) the date by which the Additional Capital Contributions being called for are due and payable, provided that such date may be no sooner than fifteen (15) days after the date such notice is sent to the Members, (ii) the total amount of the Additional Capital Contributions being called for from the Members, (iii) the Additional Capital Contribution to be made by the Member to which the Call Notice is directed, (iv) the Company account to which such Additional Capital Contribution is to be paid, including wiring information, and (v) such other information as deemed necessary by the Managers. All Additional Capital Contributions to the Company by the Members shall be made by check or by wire transfer of immediately available funds to the account designated by the Managers in the Call Notice relating to such Additional Capital Contribution.

Section 4.4    **Failure to Make Additional Capital Contributions**. If a Member (the "**Defaulting Member**") fails to make all or any portion of an Additional Capital Contribution that the Member is required to make as provided in this Agreement by the time required under this Agreement, which failure continues after twenty-one (21) days notice from the Company to the Defaulting Member, the other Members in proportion to their Sharing Ratios or in such other percentages as they may agree (such other Members to be referred to as the "**Lending Members**," whether one or more), may advance the portion of the Defaulting Member's Additional Capital Contribution that is in default, with the following results:

(i)    the sum advanced constitutes a loan from the Lending Members to the Company,

(ii)    the amount loaned shall bear interest at the rate of twelve percent (12%) per annum, compounded monthly, from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Members, and

(iii)    all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Members until the loan and all interest accrued on it have been paid in full to the Lending Members (with payments being applied first to accrued and unpaid interest and then to principal).

Section 4.5    **Capital Accounts**. A capital account shall be established and maintained for each Member. Each Member's capital account:

(a)    shall be increased by:

(i)    the amount of money contributed by that Member to the Company,

(ii)    the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

Copy from re:SearchTX

(iii)      allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

(b)      shall be decreased by:

(i)      the amount of money distributed to that Member by the Company,

(ii)      the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

(iii)      allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

(iv)      allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' capital accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single capital account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the capital account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

Section 5.1      **Allocations**. All items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Members in accordance with their relative Sharing Ratios, provided, however, any allocation of loss as provided above that would have the effect of creating or increasing a negative balance in a Member's capital account shall instead be allocated to Members with positive capital account balances to the extent and in proportion to such positive capital account balances and, to the extent the allocation of loss exceeds such positive capital account balances, such loss shall be allocated to the Member in accordance with their relative Sharing Ratios.

Copy from re:SearchTX

Section 5.2     **Distributions**. The Company shall distribute to the Members, from time to time, such cash and/or property as the Managers shall determine with the amount of any such distribution allocated among the Members in proportion to their relative Sharing Ratios.

Section 5.3     **Allocation of Income or Gain Upon a Liquidating Event**. Notwithstanding the provisions of Section 5.1, income or gain arising from the sale, exchange, transfer or other disposition by the Company which, individually or together with similar dispositions, results in the disposition of all or substantially all of its respective assets and properties, or the liquidation of the Company (a *"Liquidating Event"*) shall be allocated in the following manner:

        (a)     First, between the Members in such a manner as to place the positive balances in the capital accounts of such Members in a ratio equal to their respective Sharing Ratios; and

        (b)     Thereafter, between the Members in proportion to their respective Sharing Ratios.

## ARTICLE VI
## MANAGERS

Section 6.1     **Number of Managers; Management by Managers**. The Company shall initially have two (2) Managers. The number of Managers may be changed from time to time by resolution of the Managers. Except for situations in which approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers. The Managers, as Managers, shall have with respect to the Company the powers and duties of the Board of Directors of a corporation formed under the Code. The act of a majority of the Managers then serving shall be the act of the Managers. No Manager shall take any action with respect to the management of the Company without the consent or authorization of a majority of the Managers then serving, except as provided in this Agreement.

In furtherance thereof, subject only to any express provision of this Agreement conferring a right of consent, approval or joinder of the Members, the Managers shall have the full, exclusive and complete right, power and authority to manage, control and make all decisions and give (or withhold) all consents or approvals with respect to the business, operations, investments and affairs of the Company and its properties, and to do all things which, in the sole judgment of the Managers, are necessary, proper or desirable to carry out and exercise the foregoing authority. The Managers shall also have full power and authority to implement or cause to be implemented the decisions of the Members.

Section 6.2     **Qualification and Election**. The Managers shall be elected by a Majority Interest at any meeting of the Members called for that purpose. Each Manager elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner hereinafter provided.

Section 6.3     **Vacancy**. Any vacancy occurring among the Managers shall be filled by a vote of a Majority Interest. A Manager elected to fill a vacancy shall be elected for the unexpired

Copy from re:SearchTX

term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

Section 6.4    **Change of Number**. The number of Managers may be increased or decreased from time to time by amendment to this Agreement with the consent of a Majority Interest, but no decrease shall have the effect of shortening the term of any incumbent Manager. Any vacancy to be filled by reason of an increase in the number of Managers shall be filled by election at any meeting of Members.

Section 6.5    **Meetings**. Meetings of the Managers may be called by the Managers or any Member. No annual meetings shall be required. The Person calling the meeting may fix any place for holding the meeting. Notice of each meeting of the Managers shall be given to each Manager at least three days before the date of the meeting, in writing. Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any meeting need be specified in the notice or waiver of notice of such meeting.

Section 6.6    **Written Consent**. Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Managers necessary to take action at a meeting at which all Managers were present and voted.

Section 6.7    **Deadlock**. If at two successive meetings of the Managers, the Managers are unable to reach a decision regarding an issue submitted for consideration by the Managers at such meetings (a "**Deadlock**"), the Managers shall refer the matter subject to the Deadlock to the Members, who shall attempt to resolve such matter within 10 Business Days after referral to them of the Deadlock issue (or, if mutually agreed by the Members, a longer period of time). Any resolution agreed to by the Members shall be final and binding on the Company and the Members. During the continuation of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices and this Agreement until such time as such Deadlock is resolved. If the Deadlock is with respect to the approval of the Company's annual business plan or budget, the Company shall operate its business in accordance with the business plan or budget then in effect. If the Members are unable reach agreement as to the issue within the time period set forth in this Section 6.7 (including any agreed extensions), the Deadlock shall be decided as provided in Article XII below.

## ARTICLE VII
## OFFICERS

Section 7.1    **Appointment**. The Managers may but shall not be required to designate individuals to serve as officers of the Company as the Managers shall determine from time to time, including but not limited to a President and one or more Vice Presidents. No officer need be a resident of the state of Texas, a Member or a Manager. Any officers so designated shall have such authority to perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the

Copy from re:SearchTX

Managers pursuant to the third sentence of this <u>Section 7.1</u>. Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same individual. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

Section 7.2     <u>**Resignation**</u>. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an officer shall not be deemed of itself to create contract rights on the part of any person. Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

## ARTICLE VIII
## MEETINGS OF MEMBERS

Section 8.1     <u>**Meetings**</u>.

    (a)     A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy. Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

    (b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to <u>Section 8.5</u>.

    (c)     Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to <u>Section 8.4</u> or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting. If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

    (d)     Meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Sharing Ratios of all Members. No annual meetings shall be required. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a meeting is the date any Member first signs the notice of that meeting.

Copy from re:SearchTX

(e)      Written or printed notice stating the place, day and hour of the meeting shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 14.2, with postage thereon prepaid. Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any meeting need be specified in the notice or waiver of notice of such meeting.

Section 8.2      **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Sharing Ratios held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

Section 8.3      **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

Section 8.4      **Conduct of Meetings**. All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

Section 8.5      **Action by Written Consent or Telephone Conference**.

(a)      Any action required or permitted to be taken at any meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Sharing Ratios that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the

Copy from re:SearchTX

consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Sharing Ratios that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

      (b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

      (c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**ARTICLE IX**
**INDEMNIFICATION**

Section 9.1     **Right to Indemnification**. Subject to the limitations and conditions as provided in this Article IX, each Manager who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, provided such Person acted in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Person, except for any such loss, damage or claim incurred by reason of gross negligence or

Copy from re:SearchTX

willful misconduct of such Person, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

Section 9.2 **Advance Payment**. The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

Section 9.3 **Indemnification of Officers, Employees and Agents**. The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

Section 9.4 **Non-exclusivity of Rights**. The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

Section 9.5 **Insurance**. The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

Section 9.6 **Member Notification**. To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing

Copy from re:SearchTX

to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

Section 9.7 **Savings Clause**. If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

Section 9.8 **Standard of Care**. In the performance of their respective duties under this Agreement, and with respect to any action taken by the Managers on behalf of or with respect to the Company, the Managers shall use reasonable, good faith efforts to conduct the business of the Company in good and businesslike manner and in accordance with good business practice.

Section 9.9 **Exculpation**. Neither any Manager nor any Member (each a "**Covered Person**") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence or willful misconduct of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## ARTICLE X
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

Section 10.1 **Maintenance of Books**. The Company shall keep books and records of account and shall keep minutes of the proceedings of its Managers and Members.

Section 10.2 **Reports**. On or before the 120th day following the end of each fiscal year during the term of the Company, the Managers of the Company shall cause the Company to provide such financial information regarding the Company as the Majority Interest shall reasonably request.

## ARTICLE XI
## EVENT REQUIRING A WINDING UP, LIQUIDATION, AND TERMINATION

Copy from re:SearchTX

Section 11.1    **Event Requiring a Winding Up**. The Company shall wind up its affairs on the first to occur of the following (a *"Event Requiring a Winding Up"*):

    (a)    the written consent of a Majority Interest;

    (b)    the date the Company has no Members; or

    (c)    the entry of a decree requiring a winding up of the Company under Section 11.301 of the Code.

Section 11.2    **Liquidation and Termination**. Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator. The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties. The steps to be accomplished by the liquidator are as follows:

    (a)    as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

    (b)    the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

    (c)    the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in Section 4.3) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

    (d)    all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

Section 11.3    **Certificate of Termination**. On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas and take such other actions as may be necessary to terminate the legal existence of the Company.

Section 11.4    **Deficit Capital Accounts**. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the capital account of any Member shall not be an asset of the Company, upon winding up of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

Copy from re:SearchTX

# ARTICLE XII
## DISPUTE RESOLUTIONS

Section 12.1 **Generally**. The Members, for themselves and their respective heirs, legal representatives, successors and assigns (hereinafter collectively designated "**Parties**"), agree that if at any time a dispute arises among the Parties concerning the interpretation or application of any provision of this Agreement under any particular circumstances (herein designated "**Dispute**"), such Dispute shall be subjected to mediation, as described in this Section 12.1 and the resolution of the dispute as provided in this Section 12.1 shall be final as between the parties to the dispute and may be enforced or preserved upon application to any court of competent jurisdiction.**Mediation Procedures**If any Member desires to mediate any Dispute, such Member (the "**Movant**," whether one or more) shall notify the other Members (the "**Respondent**," whether one or more) of the Dispute desired to be mediated, including a brief statement of the matter in controversy. If the Members are not able to resolve the Dispute within ten (10) days after the Movant notifies the Respondent of its desire to mediate (the "**Mediation Notice**"), then, within ten (10) days immediately after the expiration of the aforesaid ten (10) day period, the Members shall attempt to agree upon an independent mediator. If the Members are unable to reach an agreement upon an independent mediator within such second ten (10) day period, then any Member shall be entitled to request that the JAMS/Endispute ("**JAMS**") (or similar mediation service of a similar national scope if JAMS no longer then exists) appoint an independent mediator who shall serve as mediator for all purposes hereof. The Members agree that Movant shall pay one-half (1/2) of the mediator's services and the Respondent shall pay one-half (1/2) of the mediator's services. The cost of the mediator's services shall be paid in advance upon request by the mediator or any other party.

(b)     Within ten (10) days after selection of the mediator, the mediator shall call for and set a meeting among the Members and the mediator for the purpose of mediating the Dispute. If the Members are unable to resolve the Dispute within thirty (30) days after the Mediation Notice (the "**Mediation Period**"), the Dispute shall be decided by arbitration as provided in Section 12.3 below.

Section 12.3 **Arbitration Procedures.**

(a)     **General Rules**. Except for mediation provided in Section 12.2 above, and as this Article XII otherwise provides to the contrary, all proceedings required by this Article XII shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (hereinafter designated "**AAA**") as then in effect; provided that such rules shall be applied in accordance with Texas law and that any questions which are not resolved by such rules shall be determined by Texas law. All parties to an arbitration proceeding under this Article XII shall make all reasonable efforts to perform their obligations under this Article XII promptly, recognizing that time is of the essence.

(b)     **English Rule - Loser Pays**. The parties prevailing in an arbitration proceeding under this Article XII or in a legal proceeding brought in a court of competent jurisdiction to enforce or preserve the rights awarded pursuant to an arbitration proceeding under this Article XII, including all appeals, shall be entitled to recover from the other

Copy from re:SearchTX

parties all costs and expenses incurred by the prevailing parties with respect to all of the proceedings, including reasonable attorneys' fees.

(c) **Written Notice of Arbitration**. Any party wishing to submit any dispute to arbitration (hereinafter designated **"Petitioner"**) shall provide written notice of the arbitration containing the information required below to the other parties to the dispute (hereinafter designated **"Respondents"**) and simultaneously shall file copies of the written notice of arbitration with the regional office of the AAA for Houston, Texas, together with the appropriate fee as provided in the AAA's administrative fee schedule. All communications with the AAA regarding the arbitration proceedings shall be directed to the regional office for Houston, Texas, unless the AAA directs otherwise. The written notice of arbitration shall provide a brief description of the nature of the dispute and the resolution sought by Petitioner.

(d) **Written Response**. Within twenty (20) days after receiving the notice of arbitration, each of the Respondents shall provide the Petitioner and the AAA with a written response describing the Respondent's opinion of the nature of the dispute and the resolution desired by the Respondent.

(e) **List of Arbitrators**. As soon as reasonably possible after receiving each response notice, the AAA shall compile a list of arbitrators which are available and are qualified to arbitrate the dispute, which list shall contain the names of a number of arbitrators equal to one plus the number of parties to the dispute (Petitioner plus each Respondent) in rank order, and shall provide that list to Petitioner and each of the Respondents, together with a return date which is seven (7) days after the date on which the AAA sends the list to the Petitioner and each of the Respondents, excluding Saturday, Sunday, and holidays.

(f) **Deletions from the List of Arbitrators**. Unless otherwise agreed, Petitioner and each of the Respondents shall meet on the return date specified by the AAA at the Principal Office at 10:00 A.M. local Texas time, at which time each of them shall strike one name from the list of arbitrators provided by the AAA, and if any of them fails to attend the meeting, the AAA shall strike one name from the list on behalf of each missing one of them. The highest ranking arbitrator whose name remains on the list after an arbitrator has been stricken by or on behalf of Petitioner and each of the Respondents shall be the arbitrator of the dispute. If the arbitrator selected in this manner for any reason fails to perform as required by this Article XII, the procedures provided in this paragraph shall be repeated until an arbitrator is selected which performs as required.

(g) **Arbitration of the Dispute**. The arbitration shall be held in Houston, Texas, at a location determined by the AAA. The decision of the arbitrator shall be final as between Petitioner and Respondents and may be enforced or preserved upon application to any court of competent jurisdiction.

<div align="center">

**ARTICLE XIII**
**BUY-OUT EVENTS**

</div>

Copy from re:SearchTX

Section 13.1     <u>Buy-Out Events</u>. This Article XIII shall apply to any of the following events (each a "**Buy-out Event**") with respect to a Member:

(a)     such Member becomes legally incapacitated;

(b)     such Member dies;

(c)     such Member is the subject of an Involuntary Event;

(d)     such Member is party to a Divorce or Spouse's Death shall occur; and

In each case, the Member with respect to whom a Buy-out Event has occurred is referred to herein as the "**Affected Member**".

Section 13.2     <u>Required Sale of Membership Interest Upon Incapacitation</u>. Within the later of: (a) 6 months following the incapacitation of a Member, or (b) 45 days following the determination of the purchase price for the Membership Interest of the incapacitated Affected Member as provided in <u>Section 13.6</u>, the Company shall have an option to purchase from the estate or custodian of the Affected Member, and the estate or custodian of the Affected Member shall be required sell to the Company, all of the Membership Interest owned by such Affected Member for the price determined under <u>Section 13.6</u>, and pursuant to the other terms and conditions set forth in <u>Section 13.7</u>.<u>**Death of Member**</u>. Within three (3) months following the death of a Member, the Company shall have an option to purchase from the estate of the Affected Member, and the estate of the Affected Member shall be required sell to the Company, all of the Membership Interest owned by such Affected Member for the price determined under <u>Section 13.6</u>, and pursuant to the other terms and conditions set forth in <u>Section 13.7</u>.<u>**Involuntary Transfers; Bankruptcy; Operation of Law**</u>.  If any Member, at any time during the period of ownership of any Membership Interest, becomes Bankrupt or is subject to any Disposition of any right or interest in the Membership Interest owned by such Member by operation of law (other than a Disposition to the Company) (the occurrence of any such event, an "**Involuntary Event**"), such Affected Member shall notify the Company in writing of the Involuntary Event within 5 days following the occurrence of such Involuntary Event, and within the later of: (a) 3 months following such notice to the Company (or within 3 months following the Involuntary Event if timely notice is not so given), or (b) 45 days following determination of the purchase price for the Membership Interest owned by such Affected Member as provided in <u>Section 13.6</u>, the Company may elect to purchase from such Affected Member, and the Affected Member shall sell to the Company in the event the Company so elects, all of the Membership Interest owned by such Affected Member for the price determined under <u>Section 13.6</u> and upon the other terms and conditions set forth in <u>Section 13.7</u>.  The failure of the Company to elect to purchase the Membership Interest offered pursuant to this <u>Section 13.4</u> shall not affect the respective rights to purchase the same Membership Interest (or any portion thereof) under any other provision of this Agreement in the event of a proposed Disposition thereof to any receiver, petitioner, assignee, transferee, or other person attempting to obtain an interest in the Membership Interest by a proposed transfer or by operation of law.<u>**Required Sale of Membership Interest Upon Divorce or Spouse's Death**</u>In the event of a Divorce of a Member, such Member will endeavor to ensure that none of such Member's Membership Interest are a part of the divorce partition. However, if the divorcing Member's Membership Interest are made part of the divorce partition or a Spouse's Death occurs, any Spouse's Fraction conveyed to a Spouse or the estate of a Spouse will

Copy from re:SearchTX

immediately convert to a non-voting interest, and such Member (first) and then the Company (second) shall have the option to purchase such Spouse's Fraction by providing written notice within 30 days after the Disposition of such Spouse's Fraction.   With respect to the foregoing, the applicable Member shall provide notice to the Company within 15 days after the Disposition of such Spouse's Fraction of its desire to purchase the same and the failure to notify the Company of the same within such 15 day' period shall constitute an irrevocable waiver of such Member to purchase the same.**Determination of Purchase Price**.  The purchase price for any Membership Interest to be acquired under this <u>Article XIII</u> shall be the value of such purchased Membership Interest based on the Market Value of the Company (which shall be equal to the Membership Interest owned by the subject Affected Member *times* the Market Value).  Market Value shall be as disclosed and affirmed by the Managers.**Closing and Payment of Purchase Price**.  At the closing of the sale of any Membership Interest to be purchased and sold under <u>Sections 13.2</u> through <u>13.5</u>, on or before the date provided in such Sections, the Affected Member shall deliver duly executed instruments in valid form evidencing the Membership Interest to be sold and purchased under such Sections, duly endorsed for transfer, free and clear of any liens or encumbrances, and the Company shall deliver to the Affected Member selling such Membership Interest, a promissory note in an amount equal to the applicable purchase price, which note or notes shall provide for eight (8) equal, quarterly payments of principal, commencing on the day that is ninety (90) days from the date of the note, together with simple interest on the balance thereof equal to the Wall Street Journal Prime Rate as of the date of such note(s).

## GENERAL PROVISIONS

Section 14.1    <u>**Offset**</u>. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

Section 14.2    <u>**Notices**</u>. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

Section 14.3    <u>**Entire Agreement**</u>. This Agreement constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

Section 14.4    <u>**Effect of Waiver or Consent**</u>. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the

Copy from re:SearchTX

performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 14.5 **Amendment or Modification**. This Agreement may be amended or modified from time to time only by a written instrument adopted by the Managers and executed and agreed to by a Majority Interest.

Section 14.6 **Binding Effect**. Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

Section 14.7 **Governing Law; Severability**. THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby, and that provision shall be enforced to the greatest extent permitted by law.

Section 14.8 **Further Assurances**. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 14.9 **Waiver of Certain Rights**. Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

Section 14.10 **Indemnification**. To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

Section 14.11 **Notice to Members of Provisions of this Agreement**. By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate. Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

Copy from re:SearchTX

Section 14.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

Section 14.13 **Cross-references.** References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

Section 14.14 **Representations, Warranties and Covenants of the Members.** Each of the undersigned Members hereby represents and warrants to and covenants with the Company and each officer, manager, member and agent of the Company that:

(a) General:

(i) The undersigned Members have all requisite authority to enter into this Agreement and to perform all the obligations required to be performed by the undersigned Members hereunder.

(ii) The undersigned Members are not acquiring the Interests as an agent or otherwise for any other person.

(b) Information Concerning the Company:

(i) The undersigned Members have received all the information that the undersigned Members consider necessary or appropriate for deciding whether to acquire the Interests. The undersigned Members have had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offer and sale of the Interests and the business, properties, prospects and financial condition of the Company and to obtain additional information (to the extent that the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to the undersigned Members or to which the undersigned Member had access.

(ii) The undersigned Members acknowledge that the Company is newly formed and has no operating history, and will, immediately following consummation of the transactions contemplated by this Agreement, hold no assets other than the cash received as a result of the capital contributions made by the Members, and the undersigned Members are familiar with the business, operations and prospects of the Company.

(iii) The undersigned Members understand that the acquisition of the Interests involves various risks, including those outlined in this Agreement.

(iv) The undersigned Members understand that no federal or state agency has passed upon the Interests or made any finding or determination concerning the fairness or advisability of this investment.

Copy from re:SearchTX

(v)     The undersigned Members understand that estimates and projections like any that may have been provided by the Company to the undersigned Members, by their nature, involve significant elements of subjective judgment and analysis that may or may not be correct; that there can be no assurance that such projections or goals will be attained; and that any projections and estimates contained in materials provided to the undersigned Members should not be relied upon as a promise or representation of the future performance of the Company.

(c)     Status of Undersigned:

(i)     The undersigned Members have such knowledge, skill and experience in business, financial and investment matters so that he is capable of evaluating the merits and risks of an investment in the Interests.

(ii)     The undersigned Members are an "accredited investor" as defined in Rule 501(a) under the Securities Act of 1933 (the "**Securities Act**").     The undersigned Members agree to furnish any additional information requested to assure compliance with applicable Federal and State Securities Laws in connection with the acquisition and sale of the Interests.

(d)     Restrictions on Transfer or Sale of Interests:

(i)     The undersigned Members are acquiring the Interests solely for their own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the Interests.  The undersigned Members understand that the Interests have not been registered under the Securities Act or any State Securities Laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of the undersigned Members and of the other representations made by the undersigned Members in this Agreement. The undersigned Members understand that the Company is relying upon the representations and agreements contained in this Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions.

(ii)     The undersigned Members understands that the Interests are and will be "restricted securities" under applicable federal securities laws and that the Securities Act and the rules of the Securities and Exchange Commission (the "Commission") provide in substance that the undersigned Members may dispose of the Interests only pursuant to an effective registration statement under the Securities Act or an exemption therefrom, and the undersigned Members understand that the Company has no obligation or intention to register any of the Interests (except for the registration rights granted hereunder), or to take action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder). Accordingly, the undersigned Members understand that under the Commission's rules, the undersigned Members may dispose of the Interests principally only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations as in the hands of the

Copy from re:SearchTX

undersigned Members.  As a consequence, the undersigned Members understand that he must bear the economic risks of the investment in the Interests for an indefinite period of time.

(iii)     The undersigned Members understand that there is no public market for the Interests and such a public market may never develop.

(iv)     The undersigned Members agree:  (A) that he will not sell, assign, pledge, give, transfer or otherwise dispose of the Interests or any interest therein, or make any offer or attempt to do any of the foregoing, except pursuant to a registration of the Interests under the Securities Act and all applicable State Securities Laws or in a transaction which is exempt from the registration provisions of the Securities Act and all applicable State Securities Laws; (B) that the certificate(s) for the Interests will bear a legend making reference to the foregoing restrictions; and (C) that the Company and any transfer agent for the Interests shall not be required to give effect to any purported transfer of such shares except upon compliance with the foregoing restrictions.

(v)     The undersigned Members have not offered or sold any portion of his Interests and has no present intention of dividing his Interests with others or of reselling or otherwise disposing of any portion of his Interests either currently or after the passage of a fixed or determinable period of time or upon the occurrence or nonoccurrence of any predetermined event or circumstance.

(vi)     The undersigned Members acknowledge that neither the Company nor any other person offered to sell the Interests to it by means of any form of general advertising, such as media advertising or seminars.

(vii)     The undersigned Members have not used any person as a "Purchaser Representative" within the meaning of SEC Regulation D to represent it in determining whether it should acquire the Interests.

Section 14.15     **Legal Representation**.  The Members acknowledge that they have been advised that they should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Members' behalf and to obtain the advice of such legal counsel relating to such documentation.

*[signature page follows]*

Copy from re:SearchTX

**IN WITNESS WHEREOF**, the initial Manager and Members have executed this Agreement as of the date first set forth above.

<u>**COMPANY**</u>:

**84 RESOURCES MANAGEMENT, LLC,**
a Texas limited liability company

By: _____
Name: Andrew Kollaer
Title:  Manager

By: _____
Name: Aaron Shimek
Title:  Manager

<u>**MEMBERS**</u>:

_____
Andrew Kollaer

_____
Aaron Shimek

Copy from re:SearchTX

<u>EXHIBIT A</u>

## FORM OF SPOUSAL CONSENT

### CONSENT OF SPOUSES

The undersigned are the spouses of the Members and are executing this Agreement in connection with the execution of this Agreement by the Members. Each of the undersigned acknowledges and represents as follows: I have been provided a copy of the Agreement and have had the opportunity to read and review the Agreement of 84 RESOURCES MANAGEMENT, LLC, a Texas limited liability company ("**Company**") and the Members. I approve of all of the provisions of the Agreement and agree to be bound by and accept the terms of the Agreement, but I understand that I am not a Member of the Company. My execution of this Agreement does not alter the legal status, characterization or rights of management of any membership interests now or hereafter acquired by my spouse, and my spouse's membership interests are subject to my spouse's sole management, control and disposition. I understand that the Company and the Members will rely on this acknowledgment and consent in conducting the Company's activities and operations.

Dated as of  2/27/24

<u>SPOUSES OF MEMBERS</u>:

Company Agreement of
84 Resources Management, LLC

EXHIBIT A

10611003 (73808.00006.000)

Copy from re:SearchTX

Schedule A

| Name and Address of Each Member | Initial Sharing Ratio | No. of Shares | Capital Contribution |
|---|---|---|---|
| Andrew Kollaer<br>5834 Shady River Dr<br>Houston, TX 77057 | 50% | | |
| Aaron Shimek<br>1902 Winner's Cir<br>Richmond, TX 77406 | 50% | | |

Company Agreement of
84 Resources Management, LLC

SCHEDULE A

10611003 (73808.00006.000)

Copy from re:SearchTX

<div style="border:1px solid">

**EXHIBIT**

**C**

</div>

COMPANY AGREEMENT

OF

84 ENERGY RESOURCES I, LLC

SEPTEMBER 11, 2023

THE MEMBERSHIP INTERESTS OF 84 ENERGY RESOURCES I, LLC (THE "COMPANY") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  SUCH MEMBERSHIP INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS COMPANY AGREEMENT.  THE MEMBERSHIP INTERESTS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS COMPANY AGREEMENT.  THEREFORE, PURCHASERS OF SUCH INTERESTS MAY BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

Copy from re:SearchTX

<div align="center">

**COMPANY AGREEMENT**

**OF**

**84 ENERGY RESOURCES I, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

</div>

This COMPANY AGREEMENT (this "**Agreement**"), effective upon the Texas Secretary of State's acceptance of the Certificate of Formation (the "**Effective Date**"), is executed and agreed to, for good and valuable consideration, by and among MPC Conventional Manager, LLC, a Texas limited liability company, and 84 Energy LLC, a Texas limited liability company, as the "**Co-Managers**" and collectively, the "**Manager**" of the Company, and MPC 84 I, LLC, a Texas limited liability company, as the Member, pursuant to the provisions of the Code, on the following terms and conditions:

<div align="center">

**ARTICLE I.**
**THE COMPANY**

</div>

**Section 1.01    Formation**. **84 Energy Resources I, LLC** (the "**Company**") was formed as a limited liability company under and pursuant to the Texas Business Organizations Code (the "**Code**") and other relevant laws of the State of Texas by the filing of a Certificate of Formation for the Company with the Secretary of State of Texas on September 11, 2023 (the "**Certificate of Formation**"). The Members hereby agree to operate the Company as a limited liability company under the terms of this Agreement and the Code. Whenever the terms of this Agreement conflict with the Code, the terms of this Agreement shall control, except with respect to any matters contained in the Code that cannot be modified or waived by a limited liability company operating agreement.

**Section 1.02    Company Name**. The name of the Company shall be "84 Energy Resources I, LLC". The Company shall conduct business under that name or such other names complying with applicable law as the Manager may determine from time to time.

**Section 1.03    Purpose**. The purpose for which the Company is organized is to acquire the Newton and Livingston Fields from BXP Operating. In addition, the Company is organized to transact any and all lawful business for which a limited liability company may be organized under the Code.

**Section 1.04    Principal Place of Business**. The Company's principal office may be either within or outside the State of Texas as the Manager may determine from time to time.

**Section 1.05    Duration**. The Company shall exist until terminated in accordance with this Agreement.

**Section 1.06    Registered Office and Registered Agent.** The name and address of the initial registered agent and initial registered office of the Company in the State of Texas shall be as provided in the Certificate of Formation. The Manager may change the registered office and the registered agent of the Company from time to time. The Manager may cause the Company to

<div align="center">2</div>

Copy from re:SearchTX

qualify to do business as a limited liability company (or other entity in which the Members have limited liability) in any other jurisdiction and to designate any registered office or registered agent in any such jurisdiction.

**Section 1.07   Single Member Entity**.  The Member intends that this Company be a single-member entity and be disregarded for Federal Income Tax purposes. The sole Member is MPC 84 I, LLC, a Texas limited liability company, as of the date hereof.

**Section 1.08   Admission of the Member**.  Simultaneously with the execution and delivery of this Agreement, MPC 84 I, LLC is admitted as the Member of the Company.

**Section 1.09   Title to Property**. All real, personal and other property (including securities) owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Member's Interest in the Company shall be personal property for all purposes. Except as otherwise provided in this Agreement, the Company shall hold all of its real, personal and other property (including securities) in the name of the Company and not in the name of any Member.

**Section 1.10   Payments of Individual Obligations**. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member.

**Section 1.11   Independent Activities; Transactions With Affiliates**.

(a)     The Manager and any of its Affiliates shall be required to devote only such time to the affairs of the Company as the Manager determines in its sole discretion may be necessary to manage and operate the Company. Except as otherwise limited by this Agreement (including **Section 8.02(f)** (Confidentiality), the Manager shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

(b)     Insofar as permitted by applicable law and except as provided below and in **Section 8.02(f)** (Confidentiality), each Manager (acting on its own behalf) and each Member (acting on its own behalf) may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member, and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Manager or Member from engaging in such activities, or require the consent of the Company or any Member to permit the Manager or any Member to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, the Company and each Member hereby waives, relinquishes, and renounces any such right or claim of participation by virtue of this Agreement.  No Manager or Member shall incur any liability to the Company or any other Member as a result of engaging in any such other business, venture or activity.

(c)     To the extent permitted by applicable law and except as otherwise provided in this Agreement, each Manager, when acting on behalf of the Company, is hereby authorized to purchase property from, sell property to, or otherwise deal with any Member, acting on its own behalf, or any Affiliate of any Member, provided that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale,

3

Copy from re:SearchTX

purchase, or other transaction had been entered into with an independent third party.

Section 1.12   Definitions. Capitalized words and phrases used in this Agreement have the following meanings:

(a)   "**Additional Capital Contribution**" means any additional contribution of a Member to the capital of the Company credited to such Member pursuant to **Section 2.02** of this Agreement.

(b)   "**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)   Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704 2(g)(1) and 1.704 2(i)(5); and

(ii)   Debit to such Capital Account the items described in Sections 1.704 1(b)(2)(ii)(d)(4), 1.704 1(b)(2)(ii)(d)(5) and 1.704 1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704 1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)   "**Affiliate**" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or Manager of such Person, or (iv) any Person who is an officer, director, Manager, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

(d)   "**Agreement**" or "**Company Agreement**" means this Agreement of Membership, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

(e)   "**Bankrupt Member**" means any Member (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee,

4

Copy from re:SearchTX

receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and 120 days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and 90 days have expired without the appointment's having been vacated or stayed, or 90 days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

(f)     "**Business Day**" means a day of the year on which banks are not required or authorized to close in Houston, Texas.

(g)     "**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to **Section 3.02** or **Section 3.03** hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

(ii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to **Section 3.02** or **Section 3.03** hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)     In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)     In determining the amount of any liability for purposes of **Section 1.12(g)(i)** and **Section 1.12(g)(ii)** hereof, there shall be taken into account IRC Section 752(c) and any other applicable provisions of the IRC and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704 1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributions or distributed property or which are assumed by the Company, Manager, or Members), are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Member pursuant to **Article XIII** hereof upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between

5

the Capital Accounts of the Manager and Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704 1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704 1(b).

(h)     "**Capital Contributions**" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member.

(i)     "**Cause**" means any of the following:

(i)     repeated failure to perform substantially his duties as a Manager or other associate of the Company or any of the Company Affiliates (other than any such failure resulting from his disability) which failure, whether committed willfully or negligently, has continued unremedied for more than thirty (30) days after the Company has provided written notice thereof;

(ii)     fraud or embezzlement;

(iii)     material dishonesty or breach of fiduciary duty against the Company or any of the Company Affiliates;

(iv)     willful misconduct or gross negligence which is injurious to the Company or any of the Company Affiliates;

(v)     material breach of, or inability to meet the standards of operation customary in the field, or material failure or inability to perform its obligations under this Agreement as it pertains to the Annual Business Plan;

(vi)     any conviction of, or the entering of a plea of guilty or *nolo contendere* to, a crime that constitutes a felony (or any state-law equivalent) or that involves moral turpitude, or any willful or material violation of any federal, state, or foreign securities laws;

(vii)     any conviction of any other criminal act or act of material dishonesty, disloyalty, or misconduct that has a material adverse effect on the property, operations, business, or reputation of the Company or any of the Company Affiliates;

(viii)     the unlawful use (including being under the influence) or possession of illegal drugs on the premises of the Company or any of the Company Affiliates while performing any duties or responsibilities with the Company or any of the Company Affiliates; or

(ix)     the material breach of any covenant undertaken herein, any effective employment agreement, or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Affiliates.

6

Copy from re:SearchTX

(j)        "**Certificate**" has the meaning set forth in **Section 1.05** hereof.

(k)        "**Code**" means the Texas Business Organizations Code as amended from time to time (or any corresponding provisions of succeeding law).

(l)        "**Company**" means the Company formed pursuant to the Certificate and this Agreement and the Company continuing the business of this Company in the event of dissolution as herein provided.

(m)        "**Dispose, Disposed, Disposing and Disposition**" shall mean a sale, assignment, transfer, gift, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance, or the acts thereof, whether voluntarily, pursuant to court order or by operation of law.

(n)        "**Distributable Cash**" means all cash revenues of the Company less the portion thereof used to pay all expenses incurred by or on behalf of the Company, including the Management Fee, and to otherwise establish working capital, reserves and other amounts as the Manager reasonably determines to be necessary or appropriate for the proper operation of the Company's business or its winding up and liquidation or other purposes (including payment of taxes and unforeseen or contingent liabilities, debts or obligations). The Manager in its sole discretion may, at any time and from time to time, declare the funds of the Company to be Distributable Cash.

(o)        "**Equity Securities**" means any and all Interests of the Company and any securities of the Company convertible into, exchangeable for, or exercisable for, such Interests, and warrants or other rights to acquire such Interests.

(p)        "**Fiscal Year**" means (i) the period commencing on the effective date of this Agreement and ending on the succeeding December 31, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to **Article III** hereof.

(q)        "**Fundamental Business Transaction**" has the meaning set forth in **Section 7.03**.

(r)        "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)        The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager, provided that, if the contributing Member is a Manager, the determination of the fair market value of a contributed asset shall require the consent of a Required Interest of the Members;

(ii)        The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or

7

existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Manager or Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Manager and Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Manager or Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager, provided that, if the distributee is a Manager, the determination of the fair market value of the distributed asset shall require the consent of a Required Interest of the Members; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to IRC Section 734(b) or IRC Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704 1(b)(2)(iv)(m) and **Section 3.02(c)** hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this **Section 1.10(q)(iv)** to the extent the Manager determines that an adjustment pursuant to **Section 1.10(q)(ii)** hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this **Section 1.10(q)(iv)**.

(s)    "**Initial Capital Commitment**" means, with respect to each Member, the initial Capital Contribution of such Member shown on the Company's books and records.

(t)    "**Interest**" means a Member's entire interest in the Company, including the Member's right to share in income, gains, losses, deductions, credits, or similar items of, and to receive distributions from, the Company pursuant to this Agreement and the Code, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Code, and the right to receive information concerning the business and affairs of the Company to the extent herein provided.

(u)    "**IRC**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(v)    "**Liquidating Event**" has the meaning set forth in **Section 13.01** hereof.

(w)    "**Majority of the Percentage Interests**" means the affirmative vote or consent of Members holding more than fifty percent (50%) of the Percentage Interest of all Members.

(x)    "**Management Fee**" has the meaning set forth in **Section 5.09(b)** hereof.

(y)    "**Management Overhead Charges**" has the meaning set forth in **Section 5.07** hereof.

8

Copy from re:SearchTX

(z)      "**Manager**" means any Person who (i) is referred to as such in the first paragraph of this Agreement or has become a Manager pursuant to the terms of this Agreement, and (ii) has not ceased to be a Manager pursuant to the terms of this Agreement. "Manager" means all such Persons.

(aa)     "**Manager Change of Control**" means, with respect to the Manager, the acquisition of ownership, beneficially or of record, by any Person or "group" (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules of the Securities Exchange Commission thereunder as in effect on the date hereof) (but excluding any Subsidiary or Affiliate of the Manager) of equity interests of such Manager representing more than 50% of the total voting power represented by the issued and outstanding equity interests of such Manager.

(bb)     "**Member**" means the Person admitted to the Company, as provided in this Agreement, but excludes any such person that has ceased to be a Member as provided in this Agreement or the Code.

(cc)     "**Operator**" means 84 Energy LLC.

(dd)     "**Operator Fee**" has the meaning set forth in **Section 5.09(c)** hereof.

(ee)     "**Percentage Interest**" means, with respect to any Member, the Percentage Interest of each Member as set forth on the Company's books and records and incorporated herein for all purposes.

(ff)      "**Permitted Transfer**" has the meaning set forth in **Section 11.03** hereof.

(gg)     "**Permitted Transferee**" means (a) a descendant of a Member, including descendants by adoption if the adoption was a court adoption of a minor; (b) any parent or sibling of a Member; (c) a descendant of a sibling of a Member including those by adoption as defined in (a) above; (d) a trust created for the benefit of anyone in (a) through (c) above; (e) a charitable remainder trust under the Code; (f) the trustee of a trust created for the benefit of such Member; (f) any other Member; (g) any entity wholly owned by a Member, or anyone in (a) through (c) above; (h) any beneficiary of a trust that is a Member; (i) any owner of a beneficial interest in any Membership, corporation, limited liability company, or other entity that is a Member; or (j) to any other Person approved by the Manager; provided, however, with respect to a trust, charitable remainder trust or other entity, only so long as the only person or persons with control as defined in **Section 1.12(c)** above over such trust, charitable remainder trust or other entity is one or more of the persons in (a) through (c) above; and further provided, that any transfer to another Member may only be made if first offered on a pro rata basis on the same terms to all Members.

(hh)     "**Person**" means any individual, company, corporation, trust, or other entity.

(ii)     "**Profits and Losses**" means for each Fiscal Year or other period the amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a). (For purposes of this **Section 1.12(ii)**, all items of income, gain, loss or deductions that are required to be stated separately pursuant to IRC Section 703(a)(1) shall be included in taxable income or loss, with any necessary adjustments to comply with IRC Section

9

704(b) and the Regulations thereunder as determined in the reasonable judgment of the Manager).

(jj)    "**Reconstitution Period**" has the meaning set forth in **Section 13.01** hereof.

(kk)    "**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the IRC, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(ll)    "**Regulatory Allocations**" has the meaning set forth in **Section 3.03** hereof.

(mm)    "**Requester**" has the meaning set forth in **Section 9.01(b)** hereof.

(nn)    "**Required Interest**" means the affirmative vote or consent of Members holding at least seventy-five percent (75%) of the Percentage Interests of all Members.

(oo)    "**Securities Act**" has the meaning set forth in **Section 8.02(e)** hereof.

(pp)    "**Subscription Agreement**" shall mean the subscription agreement in a form determined by the Manager, executed and delivered by each Member and accepted by the Manager, providing for such Member's subscription and agreement to be bound by this Agreement as a Member.

(qq)    "**Tax Representative**" has the meaning set forth in **Section 9.04** hereof.

(rr)    "**Unreturned Capital Contribution**" means the aggregate of all Capital Contributions paid in cash or assets in kind to the Company by a Member, less any such Capital Contribution repaid to such Member pursuant to this Agreement.

## ARTICLE II.
## MEMBER'S CAPITAL CONTRIBUTIONS

**Section 2.01   Members**. In the event there is more than one Member, each Member of the Company shall, collectively, be referred to herein as the "**Members**." Any references to the "Members" shall refer to all existing Members of the Company, even if there is only one. Unless reimbursed from proceeds of any financing, which the Manager may authorize in its sole discretion, the amount of all formation expenses paid by the Manager and/or its Affiliates shall be treated by the Company as a credit to the Initial Capital Commitment for the purchase of any Interests acquired by the Manager or an Affiliate of the Manager and accordingly, shall be treated as part of such Member's Capital Contribution to the Company. If the credit for such formation expenses are to be allocated among two or more of the Manager and such Affiliates, the amount of such allocation shall be made by the Manager in its sole discretion.

**Section 2.02   Additional Capital Contributions**. The Manager may request, but may not require, that the Members make additional contributions to the capital of the Company.  Any additional contributions shall be in cash and shall be made by the Members pro rata in proportion to their Percentage Interests, unless otherwise agreed by the Members.

**Section 2.03   Other Matters**.

10

Copy from re:SearchTX

(a)     Except as and to the extent otherwise provided in this Agreement, no Member shall demand or receive a return of his Capital Contributions or withdraw from the Company without the consent of all Members. Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(b)     No Member shall receive any interest, salary or drawing with respect to his Capital Contributions or his Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as a Member, except as otherwise provided in this Agreement.

(c)     No Member (in its capacity as such) shall be personally liable for the debts, liabilities, contracts, or any other obligations of the Company, except as imposed by Section 101.114 of the Code and other than to the extent of (i) the amount of any distribution received by such Member in violation of the provisions of this Agreement and (ii) to the extent required by law, the amount of any distributions distributed to such Member in violation of the Code. Except as otherwise provided by any other agreements among the Members or mandatory provisions of applicable state law, a Member shall be liable only to make his Capital Contributions and shall not be required to lend any funds to the Company or, after his Capital Contributions have been made, to make any additional Capital Contributions to the Company, unless authorized or required pursuant to the terms of this Agreement.

(d)     No Manager shall have any personal liability for the repayment of any Capital Contributions of any Member.

## ARTICLE III.
## ALLOCATIONS

**Section 3.01   Profits and Losses.** For purposes of maintaining Capital Accounts and in determining the rights of the Members among themselves, Profits and Losses, if any, for a Fiscal Year or other period, shall be allocated among the Members so that the Capital Accounts of each Member at the end of that fiscal year or other period, immediately after making the allocation, are as nearly as possible equal to the distributions that would be made to the Members pursuant to **Section 13.02** if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their fair market value, all Company liabilities were satisfied, and the net assets of the Company were distributed in accordance with **Section 13.02** to the Members immediately after making the allocation. The parties intend that the tax allocation provisions of this Agreement shall prevent each Member from having an Adjusted Capital Account deficit and shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances to be made in a manner identical to the order of priorities set forth in **Section 13.02**.

**Section 3.02   Special Allocations**. The following special allocations shall be made in the following order:

(a)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704 1(b)(2)(ii)(d)(4), Section 1.704 1(b)(2)(ii)(d)(5) or Section 1.704 1(b)(2)(ii)(d)(6) of the Regulations, items of Company

11

Copy from re:SearchTX

income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this **Section 3.02(a)** shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this **Article III** have been tentatively made as if this **Section 3.02(a)** were not in the Agreement.

(b)     <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Company Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704 2(g)(1) and 1.704 2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this **Section 3.02(b)** shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this **Section 3.02(b)** have been made as if **Section 3.02(a)** hereof and this **Section 3.02(b)** were not in the Agreement.

(c)     <u>Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to IRC Section 734(b) or IRC Section 743(b) is required, pursuant to Regulations Section 1.704 1(b)(2)(iv)(m)(2) or Regulations Section 1.704 1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Manager or Member in complete liquidation of his interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Manager and the Members in accordance with their interests in the Company in the event that Regulations Section 1.704 1(b)(2)(iv)(m)(2) applies, or to the Manager or Member to whom such distribution was made in the event that Regulations Section 1.704 1(b)(2)(iv)(m)(4) applies.

**Section 3.03    Curative Allocations**. The allocations set forth in **Section 3.02** hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this **Section 3.02**. Therefore, notwithstanding any other provision of this **Article III** (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Manager's and Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Manager or Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to **Section 3.01**.

**Section 3.04    Other Allocation Rules**.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under IRC Section

12

706 and the Regulations thereunder.

(b)     The Members are aware of the income tax consequences of the allocations made by this **Article III** and hereby agree to be bound by the provisions of this **Article III** in reporting their shares of Company income and loss for income tax purposes.

**Section 3.05   Tax Allocations.** All income, gains, losses and deductions of the Company shall be allocated among the Members in the same manner as such allocations are made for book purposes pursuant to **Section 3.01, Section 3.02, Section 3.03**, and **Section 3.04**. This **Section 3.05** is solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

<div align="center">

**ARTICLE IV.**
**DISTRIBUTIONS**

</div>

**Section 4.01   Distributions of Distributable Cash.**   Subject to **Section 4.03** and **Article XIII**, no later than the 60th day after the end of each calendar quarter (i) the Manager shall determine the Distributable Cash available to the Company and (ii) if Distributable Cash is available for distribution, the Manager shall cause the Company to distribute to the Members an amount in cash equal to the Distributable Cash to the Members pro rata in proportion to the Members respective Percentage Interest.

**Section 4.02   Amounts Withheld**. All amounts withheld pursuant to the IRC or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company, the Manager or the Members shall be treated as amounts distributed to the Manager and the Members pursuant to this **Article IV** for all purposes under this Agreement. The Manager is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the IRC or any provisions of any other federal, state or local law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

**Section 4.03   Annual Tax Distribution.** Within sixty (60) days following the end of each Fiscal Year in which Members are allocated taxable income for income tax purposes, the Company shall distribute to each Member no less than the amount determined by multiplying each Member's distributive share of taxable income by the highest applicable federal, state and local tax rate (a "**Tax Distribution**"); *provided*, *however*, that the Company shall only be obligated to make Tax Distributions pursuant to this **Section 4.03** to the extent that it has Distributable Cash available in the ordinary course of its business as determined by the Manager, and nothing in this **Section 4.03** shall require the Company to liquidate non-cash assets, to borrow funds, to reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business or to require additional capital contributions for the purpose of making such Tax Distributions. Any Tax Distribution made to a Member pursuant to this **Section 4.03** shall be considered an advance of distributions otherwise required to be made to such Member, and, accordingly, shall be set off against the amount of such distributions subsequently to be made to such Member.

<div align="center">13</div>

Copy from re:SearchTX

# ARTICLE V.
# MANAGEMENT

**Section 5.01   Authority of the Manager**. Subject to the limitations and restrictions set forth in this Agreement (including, without limitation, those limitations and restrictions expressly set forth in this **Article V** and **Section 5.08**), the Manager shall have, except for the responsibilities and obligations of the Operator, the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by Managers under the Code including, without limitation, the right and power to:

(a)     Operate and maintain the business of the Company as the Manager shall determine is necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(b)     Care for and distribute funds to the Manager and Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(c)     Contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(d)     Engage in any kind of activity and perform and carry out contracts of any kind necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a Company under the laws of each state in which the Company is then formed or qualified;

(e)     Make any and all elections for federal, state, and local tax purposes to the extent permitted by applicable law;

(f)     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(g)     Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(h)     Pay all taxes, licenses, or assessments of whatever kind or nature imposed upon or against any property owned or held by the Company, and for such purposes to make such returns and do all such acts or things as may be deemed necessary or advisable by the Company; and

(i)     Establish, maintain, and supervise the deposit of any monies or securities of the Company with federally insured banking institutions or other institutions as may be selected by the Manager, in accounts in the name of the Company with such institutions

14

Copy from re:SearchTX

**Section 5.02   Number and Qualifications of Managers**. The Managers of the Company may consist of one or more Persons. Unless amended as described in this **Section 5.02**, the number of Managers of the Company is two. The number of Managers of the Company may be increased or decreased by amendment to this Agreement. A Manager is not required to be a resident of Texas or Member of the Company.  The initial Managers of the Company shall be the Persons who are referred to as such in the first paragraph of this Agreement.

**Section 5.03   Deadlock**.

(a)   If at two successive meetings of the Mangers, the Managers are unable to reach a decision by the required vote regarding a transaction submitted for consideration by the Managers at such meetings (a **"Deadlock"**), the Managers shall refer the matter subject to the Deadlock to an independent third party to be selected by the Managers, who shall attempt to resolve such matter within 10 Business Days after referral to said third-party of the Deadlocked issue (or, if mutually agreed by the Managers, a longer period of time). Any resolution decided by the independent third-party shall be final and binding on the Company and the Members.

(b)   During the continuation of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices and this Agreement until such time as such Deadlock is resolved. If the Deadlock is with respect to the approval of the Company's Annual Business Plan or budget, the Company shall operate its business in accordance with the business plan or budget then in effect

**Section 5.04   Officers and Other Agents**. Each Manager is an agent of the Company for the purpose of carrying out the Company's business in accordance with the authority granted by action of the Managers. The Manager may appoint such officers or other agents of the Company as the Manager may deem appropriate and may remove any such officer or agent at any time with or without cause. The Manager may delegate to the Company's officers such powers and duties as the Manager may deem appropriate and subsequently revoke or modify those powers and duties, and except to the extent that the Manager determines otherwise, each officer will have the powers and duties normally associated with an officer having a similar title within a Texas corporation. The Manager also may delegate authority to other Persons and revoke that delegation as the Manager may deem appropriate including the power to delegate authority.

**Section 5.05   Annual Business Plan.** Each year, the Managers shall prepare or cause to be prepared a business plan of the Company (each such plan, an "Annual Business Plan") which shall set forth all material activities of the Company in reasonable detail, shall provide a budget of projected revenue and expenses, which shall include adjustments as reasonably necessary to the Management Fee and Operator Fee, and specify strategic plans of the Company for the upcoming fiscal year; provided, however, that the Operator Fee shall not be reduced without the prior written consent of the Operator.  For the first eighteen (18) months following the Effective Date, the Annual Business Plan for each fiscal year shall be reviewed and approved by the Managers quarterly, and then semi-annually until the thirty sixth (36th) month following the Effective date and  thereafter the Annual Business Plans shall be submitted for approval according to this **Section 5.05** not less than sixty (60) days prior to the first day of the fiscal year covered thereby.  The Managers shall vote to approve or disapprove the Annual Business Plan for each fiscal year within thirty (30) days

15

after receipt thereof.  The Annual Business Plan may be modified as appropriate from time to time during the fiscal year with the prior written approval of the Managers in accordance with this **Article V**. The Annual Business Plan for the first eighteen (18) months following the Effective Date, including a budget of projected revenue and expenses, is attached as Exhibit A. Pursuant to the Annual Business Plan, any expenditure or series of related expenditures in excess of $10,000.00 will require the approval of the Manager.

Section 5.06 **Right to Rely on Manager**.

(a)     Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(i)     The identity of the Manager or any Member;

(ii)     The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company;

(iii)     The Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)     Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

(b)     The signature of the Manager shall be necessary and sufficient to convey title to any real property owned by the Company or to execute any promissory notes, trust deeds, mortgages, or other instruments of hypothecation, and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of the Manager shall be sufficient to execute any "statement of Company" or other documents necessary to effectuate this or any other provision of this Agreement. All of the Members do hereby appoint the Manager as their attorney in fact for the execution of any or all of the documents described in this **Section 5.05(b)**.

Section 5.07 **Restrictions on Authority of Manager**. Notwithstanding the provisions of **Section 5.01** above, the Manager shall not have the authority to, and covenants and agrees that it shall not without the consent of a Required Interest of the Members, knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement.

Section 5.08 **Duties and Obligations of Manager**. Except as otherwise provided for herein, including but not limited to the responsibilities and obligations of the Operator, the Managers shall act jointly, and not independently, in performing their duties hereunder. The Managers shall:

(a)     For a period of twelve (12) months from and after the Effective Date, each Aaron Shimek and Andrew Kollaer, both individually or through an entity either now in existence or to be formed, shall grant the other a right of first offer and/or refusal on those deals, as such deals may relate to on-shore conventional operated opportunities in Texas and Louisiana, that as

16

of the Effective Date are new opportunities not previously engaged or invested in by either party or an Affiliate. For the purposes of this Agreement, opportunities "previously engaged or invested in" by any party shall include without limitation any opportunity that (i) is located adjacent to or within a five (5) mile radius of any existing wells or other facilities owned by such party, (ii) will be developed in connection with existing assets or serviced by – in whole or part – existing facilities owned by such party, or (iii) arises from or in connection with such party's pre-existing relationship with any third party. Upon a party's receipt of written notice of any such opportunity to which the right of first offer and/or refusal shall apply pursuant to this Section 5.08(a), the party receiving said notice shall have a reasonable opportunity to review and/or commit to the opportunity, but in no event more than thirty (30) days following receipt of said notice.

(b) The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Manager or any of its Affiliates, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Manager or any of its Affiliates, (ii) maintaining books and financial records of the Company separate from the books and financial records of any Manager and its Affiliates, and observing all Company procedures and formalities, including, without limitation, and maintaining minutes of Company meetings, (iii) causing the Company to pay its liabilities from assets of the Company, and (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(c) The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Texas and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged and (ii) for the accomplishment of the Company's purposes in accordance with the provisions of this Agreement and applicable laws and regulations.

(d) In exercising the powers granted by this Agreement and in performing the duties required by this Agreement, the Manager has a duty to account to the Company and to hold for the Company any property, profit or benefit derived by the Manager in conducting and winding up the Company's business and affairs or from the Manager's use of any of the Company's assets and properties. Consistent with this duty, the Manager or any Affiliate of the Manager may own, operate or invest in any property or business venture which is not owned or operated by the Company without providing notice to the Company, the other Members or any assignees and without allowing the participation of the Company, the other Members or any assignees, such that neither the Company nor any Member or assignee shall have any rights with respect to any such properties or business ventures nor any claims with respect to their effect on the Company. Also consistent with this duty, the Manager or any Affiliate of the Manager may transact business of any kind with the Company and any of the Members or assignees on terms that are commercially reasonable and no less favorable to the Company than in an arm's length transaction.

(e) Except as otherwise provided in this Agreement, in exercising the powers granted by this Agreement and in performing the duties required by this Agreement, the Manager has a duty to act in good faith with the reasonable belief that the Manager's actions are in the Company's reasonable interests; provided that an error in judgment by itself shall not constitute a

17

Copy from re:SearchTX

violation of this duty. Consistent with this duty, the Manager may act without liability to the Company, the other Members or any assignee in reliance upon any written instrument which is reasonably believed by the Manager to be genuine and to have been signed or presented by the proper parties. Also consistent with this duty, the Manager may act or refrain from acting without liability to the Company, the other Members or any assignee in reliance upon any opinion of any consultant or adviser with respect to matters which the Manager reasonably believes to be within the consultant's or adviser's professional competence.

(f)     The Manager shall cause to be provided, or cause the Company to carry, such insurance as is customary in the business in which the Company is engaged and in the places in which it is so engaged.

(g)     The Manager shall cause the Company to pay all costs and expenses of organizing and continuing the Company.  The types of expenses the Company shall be responsible for include, without limitation, travel costs, consulting fees, accounting costs, legal expenses, costs incurred by the Manager in the preparation and distribution of reports and other communications of, and distributions made by, the Manager to the Members concerning the Company. If any such costs and expenses are or have been paid by the Manager, or any of its Affiliates, on behalf of the Company, then (unless applied as part of a Member's Initial Capital Commitment) the Manager (or its Affiliates) shall be entitled to be reimbursed for such payment within five (5) days of written request therefore if the Company has available funds, or as soon thereafter as funds become available.

**Section 5.09   Compensation and Loans**.

(a)     <u>Compensation and Reimbursement</u>. Except as otherwise provided in this **Section 5.09**, but without limiting **Article VI**, no Member shall receive any salary, fee, or draw for services rendered to or on behalf of the Company, nor shall any Member be reimbursed for any expenses incurred by such Member on behalf of the Company.

(b)     <u>Management Fee</u>.   In consideration of the financial and other services provided to the Company, the Company shall pay Magnolia Texas Management an initial fee of $125,000 per annum for corporate finance and capital budget services, as said fee may be adjusted pursuant to the Annual Business Plan according to **Section 5.05**. Such fee will be paid for the first twelve (12) months following the Effective Date, subject to extension as approved in the Annual Business Plan.

(c)     <u>Operator Fee</u>.   In consideration of the management and other services provided to the Company, the Company shall pay Operator an initial fee of $180,000 per annum for oil and gas operator services, as said fee may be adjusted pursuant to the Annual Business Plan according to **Section 5.05**.  Such fee will be paid for the first twelve (12)  months following the Effective Date, subject to extension as approved in the Annual Business Plan.

(d)     <u>Expenses</u>. Each Co-Manager may charge and be reimbursed by the Company for any direct expenses reasonably incurred in connection with the Company's business to the extent set forth in the Annual Business Plan.

(e)     <u>Loans</u>. Any Member (or Affiliate of a Member) may, with the consent of

18

Copy from re:SearchTX

the Manager and a Required Interests, lend or advance money to the Company. If any Member (or Affiliate of a Member) shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan or advance by a lending Member (or Affiliate of a lending Member) shall be repayable out of the Company's cash and shall bear interest at such rate as the Manager and the lending Member (or an Affiliate of a lending Member) shall agree but not in excess of the lesser of (a) twelve percent (12%) per annum and (b) the maximum rate permitted by law and be upon such other terms and for such maturities as the Manager deems reasonable in view of all of the facts and circumstances, and the repayment of which loan may be designated as having priority to distributions pursuant to this Agreement.  None of the Members shall be obligated to make any loan or advance to the Company.

Section 5.10   **Temporary Investments**. All Company property in the form of cash not otherwise invested shall be deposited for the benefit of the Company in one or more accounts of the Company, maintained in such financial institutions as the Manager shall determine or shall be invested in short term liquid securities or other cash equivalent assets or shall be left in escrow, and withdrawals shall be made only in the regular course of Company business on such signature or signatures as the Manager may determine from time to time.

Section 5.11   **Resignation and Removal.**  A Manager may resign at any time by giving Written notice to the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  A Manager may only be removed by the Member for Cause.  A vacancy in the position of a Manager may be filled by the Member.  Notwithstanding the foregoing, in the event a Manager is removed pursuant to 5.12 below, the Member may elect not to fill any vacancy so long as one Manager remains.

19

**Section 5.12      Effect of Resignation/Removal on B Shares.**

(a)      In the event any Manager, or any of said Manager's Affiliates, also owns any B Share Member Percentage Interest in MPC 84 I, LLC and ceases to be a Manager due to being removed for Cause, such Manager (or such Affiliate) shall forfeit its B Share Member Percentage Interest in MPC 84 I, LLC and said interest shall be transferred to MPC 84 I, LLC pursuant to Article XI of the company agreement of MPC 84 I, LLC.

(b)      If, prior to the second anniversary from the Effective Date, any Manager, or any of said Manager's Affiliates,  who also owns any B Share Member Percentage Interest in MPC 84 I, LLC ceases to be a Manager due to resignation, such Manager's (or such Affiliate's) B Share Member Percentage Interest shall be forfeited as follows: one-fourth (1/4) of the issued B Share Percentage Interests for each sixth month period from and after the Effective Date, with 100% being forfeited if resignation occurs prior to the sixth month anniversary, 75% being forfeited if resignation occurs between the sixth month and twelve month  anniversary, 50% being forfeited if resignation occurs between the twelfth and eighteenth months, and 25% if resignation occurs during the eighteenth month and the second anniversary. Any forfeited portion of such removed Manager's B Share Member Percentage Interest shall be transferred to MPC 84 I, LLC pursuant to **Article XI** of the company agreement of MPC 84 I, LLC.

(c)      Upon the resignation or removal of 84 Energy LLC as a Manager, the Company shall take all reasonable and necessary steps to change its name with the Texas Secretary of State and within the market to cease using the number "84" as part of its name.

**Section 5.13   Vacancy**. A vacancy in the position of a Manager may be filled by the Member.  Notwithstanding the foregoing, in the event a Manager is removed pursuant to **Section 5.12** above, the Member may elect not to fill any vacancy so long as one Manager remains.

**Section 5.14   Operator.**  Notwithstanding anything contained herein to the contrary, the Operator, and not the Manager, is solely responsible for oil and gas operator services for the Company in line with the approved Annual Business Plan. For the avoidance of doubt, in the event the Operator resigns or is removed as Manager, the Operator shall no longer serve the Company to be effective as of the date of any such resignation or removal.

**ARTICLE VI.**
EXCULPATION, INDEMNIFICATION AND ADVANCEMENT

**Section 6.01   Exculpation**.

(a)      For purposes of this Agreement, "**Covered Person**" means any current or former (i) Manager, (ii) Member, (iii) officer of the Company and (iv) Affiliate, member, partner, shareholder, director, officer, employee, agent or advisor of the Manager or any Member. The term "Covered Person" shall also mean any Person with the power, whether through ownership of voting securities, by contract or otherwise, to direct or cause the direction of the actions of the Manager or Member (a "**Control Person**").

(b)      A Covered Person shall not be liable to the Company or any of the Members for any loss, damage or claim incurred based on any breach of fiduciary duty or otherwise by

20

reason of or arising out of (i) any act or omission in the Covered Person's capacity as a Covered Person or (ii) the fact that the Covered Person is or was a Covered Person (**INCLUDING ANY LOSS, DAMAGE, OR CLAIM ARISING OUT OF THE COVERED PERSON'S NEGLIGENCE**) or (iii) the operations, business or affairs of the Company or any of its subsidiaries, except to the extent that such loss, damage, or claim is determined by final non-appealable order of a court of competent jurisdiction to have been directly caused by the fraud, gross negligence, willful misconduct, or intentional and material breach of this Agreement by the Covered Person.

(c)    The provisions of this Agreement, including this **Section 6.01**, are intended to limit liability with regard to duties (including fiduciary duties), if any, owed or asserted to be owed by Covered Persons, and such provisions shall in no way be deemed to create or impose duties on Covered Persons. The provisions of this Agreement, including this **Section 6.01**, to the extent that they expand or restrict the duties (including fiduciary duties) and liabilities of any Covered Person otherwise existing at law or in equity, are agreed by the Manager and Members to modify, to that extent, such duties and liabilities of such Covered Person and, to extent of any such restriction, this **Section 6.01** shall be construed as a waiver of such duties to the fullest extent permitted by applicable law. IN FURTHERANCE AND WITHOUT LIMITATION OF THE FOREGOING, THE MANAGER AND MEMBERS AGREE THAT, TO THE FULLEST EXTENT NOT PROHIBITED BY THE CODE, (I) ALL FIDUCIARY DUTIES OF THE COVERED PERSONS ARE HEREBY ELIMINATED AND WAIVED AND DISCLAIMED AND (II) DEFAULT FIDUCIARY DUTIES WILL NOT BE READ INTO THIS AGREEMENT OR OTHERWISE APPLY TO THE COVERED PERSONS.

**Section 6.02   Scope of Duties of Covered Persons**.

(a)    The Members, in their capacity as Members, are not agents of the Company and have no agency authority on behalf of the Company. The Members, in their capacity as Members, owe no fiduciary duty to the Company, the Managers, or the other Members.

(b)    The duties of the Managers that are owed by reason of their capacity as Managers are owed to the Company, and the Managers shall owe no duty to any individual Member or Manager. The duty to the Company of a Manager or officer, and the duty to the Company, if any, of a Control Person of a Manager, shall be limited as set forth in **Section 6.01**.

**Section 6.03   Indemnification**. Subject to **Section 6.01**, a Covered Person shall be entitled to indemnification from the Company for any cost, loss, damage, claim, settlement, judgement or other amounts incurred by reason of or based on any demands, actions, suits or other proceedings of any kind in which the Covered Person may be involved as a party or otherwise relating to the fact that the Covered Person is or was a Covered Person and to the performance or nonperformance of any act concerning the activities, omissions, operations or business of the Company (**INCLUDING ANY LOSS, DAMAGE OR CLAIM ARISING OUT OF THE COVERED PERSON'S NEGLIGENCE**), except that no Covered Person shall be entitled to be indemnified hereunder (a) to the extent that any cost, loss, damage, claim, settlement, judgement or other amount incurred by that Covered Person is determined by a final, non-appealable order of a court of competent jurisdiction to have been caused by the fraud, gross negligence, willful misconduct or intentional and material breach of this Agreement of or by any such Covered Person,

21

Copy from re:SearchTX

(b) to the extent that the Covered Person is determined by a final, non-appealable order of a court of competent jurisdiction to have received from the Company a personal benefit to which the Covered Person is not legally entitled, (c) in connection with any proceeding initiated or asserted by the Company or any of its Affiliates against such Covered Person, or (d) in connection with any proceeding initiated (which shall not be deemed to include counterclaims or affirmative defenses) or participated in as an intervenor or amicus curiae by such Covered Person unless such initiation of or participation in the proceeding is authorized, either before or after its commencement, by the Manager (or is such Covered Person is a Manager, by a Required Interest). Any indemnity under this **Section 6.03** shall be satisfied solely out of and to the extent of Company assets only, and no Manager or Member shall have any personal liability on account thereof.

Section 6.04   **Expenses**. Expenses (including legal fees) incurred in good faith by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company before the final disposition of the claim, demand, action, suit or proceeding upon receipt by the Company of a Written undertaking by or on behalf of the Covered Person to repay that amount if it shall be determined that the Covered Person is not entitled to be indemnified under **Section 6.03**. The Company may enter into indemnity contracts with any Covered Person and the Managers may adopt Written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this **Section 6.04** and containing other procedures regarding indemnification as are appropriate.

Section 6.05   **Insurance**. The Company may purchase and maintain insurance, to the extent and in amounts the Managers deem reasonable, on behalf of Covered Persons and other Persons as the Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by that Person in connection with the activities of the Company, regardless of whether the Company would have the power to indemnify that Person against the liability under this Agreement. The Company shall have no obligation to fund indemnification of any Person to the extent the liability is covered by insurance. The Company's obligation to fund indemnification of any Person shall commence only after all available insurance has been exhausted.

Section 6.06   **Duration of Protection**. All provisions of this **Article VI** shall apply to any former officer, Member or Manager or Control Person thereof for all actions or omissions taken while such officer, Member or Manager was an officer, Member or Manager, as applicable, to the same extent as if that person were still an officer Member or Manager, as applicable.

Section 6.07   **Competing Business**. Except as provided in Section 5.08 above, a Covered Person may engage in or possess an interest in any business venture of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. The Covered Person shall not be obligated to disclose or present any particular opportunity to the Company even if that opportunity is of a character that, if disclosed or presented to the Company, could be taken by the Company, and the Covered Person shall have the right to take for its own account (individually or as a partner, shareholder, fiduciary or otherwise) or to recommend to others any such particular opportunity.

22

Section 6.08   **Survival.**  The provisions of this **Article VI** shall survive any termination of this Agreement.

<div align="center">

**ARTICLE VII.**
**ROLE OF MEMBERS**

</div>

Section 7.01   **Rights or Powers**. The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.

Section 7.02   **Voting Rights**. Except as otherwise provided in this Agreement or the Code, the affirmative vote of Members holding a majority of the Percentage Interest in the Company constitutes an act of the Members.  A Member may vote at a meeting in person or by a proxy executed in writing by the Member to another Member.

Section 7.03   **Votes Required to Approve Certain Actions**. A Fundamental Business Transaction of the Company or an action that would make it impossible for the Company to carry out the ordinary business of the Company must be approved by the affirmative vote of the Members holding a Required Interest. For purposes of this Agreement, the term "**Fundamental Business Transaction**" shall mean the financing of any kind that would require the pledge of Company assets or a merger, interest exchange, conversion, or sale of all or substantially all of the Company's assets, or a change in the Company's purpose as stated in **Section 1.03**.

Section 7.04   **Withdrawal**. Prior to the dissolution of the Company in accordance with **ARTICLE XIII**, a Member does not have the right or power to withdraw from the Company as a Member without the consent of the Manager and all Members.

<div align="center">

**ARTICLE VIII.**
**REPRESENTATIONS AND WARRANTIES**

</div>

Section 8.01   **In General**. As of the date hereof and by execution and delivery of this Agreement, each of the Members hereby makes each of the representations and warranties set forth in **Section 8.02** hereof, and such warranties and representations shall survive the execution of this Agreement.

Section 8.02   **Representations and Warranties**. Each Member hereby represents and warrants that:

(a)   Due Incorporation or Formation; Authorization of Agreement. If such Member is a corporation, limited liability company, or other entity, it is (i) duly organized or duly formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, company, or other entity power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby, and (ii) duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Each Member also represents and warrants that it (i) has the individual, corporate, company, Company or other entity

<div align="center">23</div>

Copy from re:SearchTX

power and authority to execute and deliver this Agreement and to perform its obligations hereunder and, if such Member is a corporation, limited liability company, or other entity, the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, company, or other entity action and (ii) this Agreement constitutes the legal, valid, and binding obligation of such Member.

(b)    No Conflict With Restrictions; No Default. Neither the execution, delivery and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions or provisions of the articles of incorporation, bylaws, or limited liability company agreement of such Member or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization or approval under any indenture, mortgage, lease agreement or instrument or other agreement to which such Member is a party or by which such Member is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member.

(c)    Governmental Authorizations. Any registration, declaration or filing with, or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member of and under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made or obtained on or before the execution of this Agreement.

(d)    Litigation. There are no actions, suits, proceedings or investigations pending or, to the knowledge of such Member, threatened, against or affecting such Member or any of its properties, assets or businesses in any court or before or by any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator; and such Member has not received any currently effective notice of any default, and such Member is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, binding upon such Member.

(e)    Investment Representations. Such Member is an "qualified purchaser" as defined under the Securities Act of 1933 (the "**Securities Act**"). Such Member has received such information concerning the Company, the Interests and the proposed investment in ECP GOM, and has thoroughly read such information and understands the nature of the risks involved in acquiring an Interest in the Company and has asked any questions of the Manager which such Member desires to ask and has received answers or other information from the Manager with respect to all such questions satisfactory to such Member. Such Member understands that no state or federal government authority has or will make any finding, determination, recommendation or

24

Copy from re:SearchTX

endorsement relating to the fairness of an investment in the Company or the Interests. Such Member understands that the transferability of an Interest is restricted and that a Member cannot expect to be readily able to liquidate its investment including in case of an emergency, and that such Member may have to, and is prepared to, continue to bear the economic risk of holding its Interest for an indefinite period and suffer any loss up to the amount of the Member's entire capital contributions. Such Member is making an investment in the Company solely for its own account and not for the account of others, and is not buying with the present intention of re-selling, transferring or subdividing all or any portion of the Interest in the Company purchased and presently intends to hold same for the term of the Company. Each Member understands and agrees that (i) the Interests have not been registered under the Securities Act in reliance upon an exemption from such registration, and that in the absence of either an effective registration statement covering the Interests under the Securities Act and any applicable state securities laws, or an opinion of counsel satisfactory to the Manager that registration is not required under said act and securities laws, he may will not sell, offer to sell, transfer, pledge or hypothecate his Interest in the Company, (ii) the Company has no obligation whatsoever to prepare, and does not expect ever to prepare, any such registration statement, and (iii) the restrictions on transfer of Interests hereunder and under the Securities Act and states securities laws may severely affect the liquidity of such Member's Interests.

        (f)    Confidentiality. Except as necessary to perform such Manager or Member's duties and obligations to the Company and evaluate such Member's investment in the Company ("Permitted Uses"), or as required by law or an order of a court of competent authority, each Manager and each Member, during the period in which such Manager is a Manager or Member is a Member (as applicable) and at all times thereafter, shall keep confidential and shall not directly or indirectly disclose to others, and shall use its reasonable efforts to prevent its Affiliates and any of its, or its Affiliates', present or former employees, agents, and representatives from disclosing to others, without the prior written consent of the Manager, any information or other materials in any form or media, oral or written, disclosed before or after the date hereof which (i) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or (ii) pertains to the Company or its Affiliates or the business, investments, operations, portfolio companies of the Company or its Affiliates, or (iii) pertains to confidential or proprietary information of the Manager or any Member or the Company or which the Manager or any Member has labeled in writing as confidential or proprietary. Each Member will notify the Manager in writing before disclosing any such confidential information pursuant to any such law or court order to give the Company the opportunity to seek a protective order.  No Manager or Member shall, during the period in which such Manager is a Manager or Member is a Member (as applicable) and at all times thereafter, use, and each Member shall use its reasonable efforts to prevent any Affiliate of such Member from using, any information or other materials in any form or media, oral or written, disclosed before or after the date hereof which (x) pertains to this Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or (y) pertains to the Company or its Affiliates or the business, investments, operations, portfolio companies of the Company or its Affiliates, or (z) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the Permitted Uses.  A Manager or Member may disclose the information described in clauses (i), (ii), (iii), (x), (y) or (z) above to its agents and representatives to the extent necessary to permit such agents and representatives to assist the Manager or Member in any Permitted Use, provided that such Manager or Member shall inform

Copy from re:SearchTX

each such representative of the confidentiality and non-use obligations of this Section 8.02(f) and such Manager or Member, respectively, shall be responsible for any breach thereof by its agents or representatives.  If a Member ceases to hold any Interest in the Company, such Member shall promptly deliver to the Company or, at the Company's election, destroy all materials (including all soft and hard copies) in such Member's possession or control that contain or relate to information described in clauses (i), (ii), (iii), (x), (y) or (z) above.  The Company may disclose any information concerning the Company or any Member necessary to comply with applicable laws and regulations and each Member shall cooperate with the Company in connection therewith. The Manager may disclose information for purposes of regulatory or marketing purposes.

## ARTICLE IX.
## BOOKS AND RECORDS

**Section 9.01   Books and Records**.

(a)     The Manager shall keep or cause to be kept books and records of the Company using a method consistent with that described in Treasury Regulation Section 1.704-1(b). Income, gain, loss and deduction of the Company (including income and gain exempt from tax and expenditures not deductible in computing the Company's taxable income) shall be computed based upon the book value of the Company's property using the same methods (e.g., cash or accrual accounting, or straight line or accelerated depreciation) as are used in computing the Company's taxable income. The books of the Company, for both tax and financial reporting purposes, shall be kept using the method of accounting selected by the Manager. The books and records of the Company shall be maintained at the Company's principal office.

(b)     The Company shall provide a Member or an assignee of a membership interest access to the Company's books and records to the extent and as provided by this Section. A Member or an assignee of a membership interest who desires to examine or copy any of the Company's books and records (the "**Requester**") shall give written notice to the Company specifying the books and records that the Requester desires to examine or copy and stating a proper purpose for examining or copying the requested books and records. Subject to this subsection and subsection (c) of this Section, within five (5) days after the Requester submits such a written notice, the Company will make available at its principal office the requested books and records if the requested books and records are required to be maintained by the Company under the Code or consist of other information regarding the business, affairs and financial condition of the Company that is reasonable for the Requester to examine and copy. The requested books and records will be made available during regular business hours, and the examination and copying shall be at the expense of the Requester. The Manager may deny a Requester's request for access to the Company's books and records and information if the Requester: (i) has improperly used information obtained through a prior examination of the books and records of the Company or of any other entity; or (ii) was not acting in good faith or for a proper purpose in making the Requester's request for information.   The confidentiality of any books, records or other information obtained under this **Section 9.01(b)** must be maintained in accordance with the covenants in **Section 8.02(f)**.

(c)     The Manager may keep confidential from a Requester, for such period of time as the Manager deems reasonable, any information that the Manager reasonably believes to

26

Copy from re:SearchTX

be in the nature of trade secrets or other information the disclosure of which the Manager believes is not in the best interest of the Company or could put at a competitive disadvantage or damage the Company or its business, investments, operations, portfolio companies or prospects or which the Company is required by law or by agreement with a third party to keep confidential.

**Section 9.02   Reports**. As soon as is reasonably practicable after the end of each Company fiscal year, the Manager shall cause to be prepared and furnished to each Member, at the Company's expense, a balance sheet of the Company (dated as of the end of the fiscal year then ended), and a related statement of income, loss and change in financial position for the Company (for the same year). Such financial information shall reflect the beginning balance in each Member's Capital Account as of the first day of such year, all distributions of cash made to each Member during the year, and the ending balance in each Member's Capital Account as of the last day of the year and is not required to be audited.

**Section 9.03   Tax Returns and Information; Governing Documents**. The Members intend for the Company to be treated as a partnership solely for income tax purposes, and each Member and the Company shall file all tax returns and take all reporting positions consistent with such treatment. The Manager shall prepare or cause to be prepared all federal, state and local income and other tax returns which the Company is required to file and shall furnish each Member both a copy of such Member's Schedule K-1 and the Company's tax return as soon as is reasonably practicable after the end of each Company fiscal year. On written request to the Company, the Company shall provide to a Member or an assignee of a membership interest a free copy of (i) the Certificate of Formation, including any amendments to or restatements of the certificate of formation; (ii) this Agreement, including any amendments to or restatements of this Agreement; and (iii) any federal, state and local tax returns of the Company for each of the preceding six (6) years.

**Section 9.04   Tax Representation**.

(a)   Andrew Kollaer is designated as the initial designated "partnership representative" of the Company within the meaning of Code Section 6223 ("**Tax Representative**"). Any cost or expense incurred by the Tax Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, will be paid by the Company.  The Tax Representative shall have sole authority to act on behalf of the Company for purposes of subchapter C of Chapter 63 of the Code and any comparable provisions of state or local income tax laws. For purposes of this **Section 9.04**, unless otherwise specified, all references to provisions of the Code shall be to such provisions as enacted by the Bipartisan Budget Act of 2015.

(b)   The Person serving as the Tax Representative shall be automatically removed as the Tax Representative upon the death, dissolution and/or winding up, legal incompetency or Bankruptcy of such Person, and the Person serving as the Tax Representative may be removed at any time by the Manager. Upon such removal of the Tax Representative, a successor to serve in such position shall be designated by the Manager.

(c)   If the Company qualifies to elect pursuant to Code Section 6221(b) (or successor provision) to have federal income tax audits and other proceedings undertaken by each

27

Copy from re:SearchTX

Member rather than by the Company, the Company shall make such election.

(d)     Notwithstanding other provisions of this Agreement to the contrary, if any "partnership adjustment" (as defined in Code Section 6241(2)) is determined with respect to the Company, the Tax Representative, in the discretion of the Tax Representative, may cause the Company to elect pursuant to Code Section 6226 to have any such adjustment passed through to the Members for the year to which the adjustment relates (i.e., the "reviewed year" within the meaning of Code Section 6225(d)(1)). In the event that the Tax Representative has not caused the Company to so elect pursuant to Code Section 6226, then any "imputed underpayment" (as determined in accordance with Code Section 6225) or "partnership adjustment" that does not give rise to an "imputed underpayment" shall be apportioned among the Members of the Company for the taxable year in which the adjustment is finalized in such manner as may be necessary (as determined by the Manager in good faith) so that, to the maximum extent possible, the tax and economic consequences of the partnership adjustment and any associated interest and penalties are borne by the Members based upon their interests in the Company for the reviewed year.

(e)     Each Member agrees that, upon request of the Tax Representative, such Member shall take such actions as may be necessary or desirable (as determined by the Tax Representative) to (1) allow the Company to comply with the provisions of Code Section 6226 so that any "partnership adjustments" are taken into account by the Members rather than the Company or (2) file amended tax returns with respect to any "reviewed year" (within the meaning of Code Section 6225(d)(1)) to reduce the amount of any "partnership adjustment" otherwise required to be taken into account by the Company.

### ARTICLE X.
### AMENDMENTS; MEETINGS

**Section 10.01  Amendments**.

(a)     Amendments to this Agreement may be proposed by any Member. A proposed amendment shall be adopted and be effective as an amendment hereto if it is approved by the Manager and a majority of the Percentage Interests of the Members. Notwithstanding the foregoing, a Disposition of an Interest or the addition of Members pursuant to **Section 11.01** and **Section 11.02**, respectively, shall not be considered an amendment to this Agreement for the purposes of this **Section 10.01(a)**.

(b)     Notwithstanding **Section 10.01(a)** hereof, this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would (i) modify the limited liability of a Member, (ii) reduce the interest of a Member in Profits, Losses, other items, or in any Company distributions or rights thereto, (iii) reduce the Capital Account of such Member, or (iv) affect such Member's voting rights, in each case of (ii), (iii) or (iv), other than pursuant to dilution (in Percentage Interest, allocation of Profits and Losses or rights to distributions) occurring in connection with the issuance of additional equity securities as permitted by this Agreement, and in each case where such amendment is disproportionately adverse to such Member relative to other Members.  On any amendment to this Agreement, the Company will give prompt written notice thereof to each Member that has not consented to such amendment.

28

Copy from re:SearchTX

**Section 10.02  Meetings of the Members**.

  (a) Meetings of the Members may be called by any Manager and shall be called upon the written request of Members holding at least sixty percent (60%) of the Percentage Interests in the Company; provided, that the Company is not required to hold regular meetings of Members. The call shall state the nature of the business to be transacted. Notice of any such meeting shall be given to all Members not less than ten (10) Business Days nor more than thirty (30) days prior to the date of such meeting. Members may vote in person or by proxy at such meeting. Whenever the vote or consent of Members is permitted or required under this Agreement or the Code, such vote or consent may be given at a meeting of Members or may be given in accordance with the procedure prescribed in **Section 10.03** or **Section 10.04** hereof.

  (b) For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Manager or the Members requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days or less than ten (10) Business Days before any such meeting.

  (c) At any meeting of Members, each Member may authorize any Person or Persons to act for him by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be in writing and signed by the Member or his attorney in fact and filed with the Company's secretary prior to or at the time of a meeting. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Unless coupled with an interest, every proxy shall be revocable at the pleasure of the Member executing it.

  (d) Each meeting of Members shall be conducted by the Manager or such other Person as the Manager may appoint pursuant to such rules for the conduct of the meeting as the Manager or such other Person deems appropriate.

**Section 10.03  Actions by Written Consent**. An action may be taken without holding a meeting, without providing notice, or without taking a vote if a written consent or consents stating the action to be taken is obtained from the number of Members or Managers, as appropriate, necessary to have at least the minimum number of votes that would be necessary to take the action at a meeting at which each Member or Manager, as appropriate, entitled to vote on the action is present and votes and such written consent is filed with the minutes of the meetings of the Members. Any of the following shall satisfy the requirement for a written consent: an originally signed document; a photographic, photostatic, facsimile or similarly reliable reproduction of an originally signed document; or an electronic message if the transmission contains or is accompanied by information allowing a determination (i) that the message was transmitted by the consenting Member or Manager and (ii) of the date of the transmission. Unless otherwise dated, a consent given by electronic message is considered given on the date transmitted.

**Section 10.04  Meetings by Alternative Methods.** Any meeting of Members may be conducted in any manner authorized pursuant to Section 6.002 of the Code, as such Section 6.002 may be hereafter amended, renumbered or otherwise modified.

Copy from re:SearchTX

**Section 10.05  Participation Constitutes Presence**. A Person participating in a meeting is considered present at the meeting, unless the participation is for the express purpose of objecting to the transaction of business at the meeting on the ground that the meeting has not been lawfully called or convened.

# ARTICLE XI.
## DISPOSITION OF COMPANY INTERESTS

**Section 11.01  Restrictions on the Disposition of an Interest.** No Member or assignee of an Interest shall make any Disposition of part or all of its Interest, whether now owned or hereafter acquired, except (a) to a Permitted Transferee; or (b) with the consent of the Manager, which consent may be withheld in its sole discretion. Any Disposition authorized pursuant to (a) or (b) of the preceding sentence is a "**Permitted Transfer**".

**Section 11.02  Conditions to Transfers to Permitted Transferees**. A Disposition to a Permitted Transferee is not permitted until the following conditions are satisfied:

(a)    The transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Disposition and to confirm the agreement of the transferee to be bound by the provisions of this Agreement. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it incurs in connection with such Disposition.

(b)    The Disposition will not cause the Company to terminate for federal income tax purposes and the Disposition will not cause the application of the rules of the IRC Sections 168(g)(1)(B) and 168(h) (generally referred to as the "tax exempt entity leasing rules") or similar rules to apply to the Company, Company property, or the Members and the transferor shall furnish to the Company an opinion of counsel to such effect. Such counsel and opinion shall be reasonably satisfactory to the Manager. The Members shall provide to such counsel any information available to such Members relevant to such opinion.

(c)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Interest until it has received such information.

(d)    Either (a) such Interest shall be registered under the Securities Act, as amended, and any applicable state securities laws, or (b) such Disposition will be exempt from all applicable registration requirements and will not violate any applicable laws regulating the Disposition of securities and, except in the case of a Disposition to another Member, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to such effect.

30

(e)     Such Disposition will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended, and the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to such effect. The Members shall provide to such counsel any information available to such Members relevant to such opinion.

(f)     If the transferor is a Manager, the transferor and transferee shall provide the Company with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the other Members, to the effect that such Disposition will not cause the Company to become taxable as a corporation for federal income tax purposes.

(g)     The Manager may, in its sole discretion, after written notification to all Members, waive any and all requirements set forth in **Section 11.02(a)** through **Section 11.02(f)**.

(h)     Upon the request of a Manager, a Disposition made to a Permitted Transferee shall not become effective until the Manager has received from the Permitted Transferee an irrevocable power of attorney appointing the Member transferring such Interest or portion thereof as the attorney-in-fact for said Permitted Transferee with full power and authority to deal in any way with such Interest or portion thereof, as the case may be. Further, the power of attorney shall provide that in the event of the death of the attorney-in-fact the Permitted Transferee will, within ninety (90) days after said death, appoint one person approved by the Manager to deal with the Interest of all Permitted Transferees and, having failed to do so, the Manager shall have the right to appoint a substitute attorney-in-fact to deal with such Interest or portion thereof, as the case may be. Said power of attorney shall be binding upon the Permitted Transferee, his heirs, successors and assigns.

**Section 11.03 Prohibited Transfers**. Any purported Disposition of an Interest that violated this Agreement or is not to a Permitted Transferee as set forth herein (a "**Permitted Transfer**") shall be null and void and of no force or effect whatever and the Company may shall not recognize it; *provided* that, if the Company is required to recognize a Disposition that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Interest transferred shall be strictly limited to the transferor's economic rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest (but expressly excluding all management rights), which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company, and such transferee shall have assignee status only and in no event be construed as a Member for any reason.

In the case of a Disposition or attempted Disposition of an Interest that is not a Permitted Transfer, the parties engaging or attempting to engage in such Disposition shall be liable to indemnify and hold harmless the Company, the Managers and the other Members from all cost, liability, and damage that any of such indemnified parties may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Disposition or attempted Disposition and efforts to enforce the indemnity granted hereby.

**Section 11.04  Rights of Unadmitted Assignees; Admittance of Members**.

Copy from re:SearchTX

(a)    In General. A Person who acquires an Interest but who is not admitted as a substituted Member in accordance with this Agreement (including a Permitted Transferee) shall have the status of an assignee only and shall be entitled only to economic allocations and distributions with respect to such Interest in accordance with this Agreement (expressly excluding all management rights), and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Manager or a Member under the Code or this Agreement.

(b)    The Company may admit new Members (or transferees of any Interests of existing Members) into the Company by the affirmative vote or consent of the Manager and a Required Interest. As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Manager, as the Manager may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation, reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the other governance documents of the Company which the Company deems necessary or desirable in connection with such admission.  In no event shall a party be admitted to the Company as a new Member if such admission would be in violation of applicable federal or state securities laws or would adversely affect the treatment of the Company as a partnership for income tax purposes.

### ARTICLE XII.
### POWER OF ATTORNEY

**Section 12.01  Manager as Attorney In Fact**. Each Member hereby appoints the Manager as that Member's attorney-in-fact for the purpose of executing, swearing to, acknowledging, and delivering all certificates, documents, and other instruments which may be necessary, appropriate, or advisable in the judgment of the Manager in furtherance of the business of the Company or complying with applicable law, including, without limitation, filings of any certificates or applications for authority required by the Company. This power of attorney does not grant to the Manager the authority to vote on behalf of any Member on any matter presented to the Members or to otherwise take any action in contravention of the limitations contained in this Agreement. This power of attorney is irrevocable and is coupled with an interest. On request by the Manager, a Member shall confirm its grant of its power of attorney or any authorized use thereof by the Manager and shall execute, swear to, acknowledge, and deliver any such certificate, document or other instrument.

### ARTICLE XIII.
### DISSOLUTION AND WINDING UP

**Section 13.01  Liquidating Events**. The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("**Liquidating Events**"):

(a)    The determination by the Manager and a Required Interest to dissolve, wind up, and liquidate the Company;

32

Copy from re:SearchTX

(b)      The occurrence of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Company; or

(c)      upon the effective date of a final decree of judicial dissolution under the Code.

The Members hereby agree that, notwithstanding any provision of the Code, the Company shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Liquidating Event, then within an additional ninety (90) days after such determination or the last day of such ninety (90) day period, as the case may be (the "**Reconstitution Period**"), a Required Interest may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new Membership on terms identical to those set forth in this Agreement and having as a Manager a Person elected by such Required Interest. Upon any such election by a Required Interest, all Members shall be bound thereby and shall be deemed to have consented thereto. Unless such an election is made within the Reconstitution Period, the Company shall wind up its affairs in accordance with **Section 13.02** hereof. If such an election is made within the Reconstitution Period, then:

(i)      The reconstituted Membership shall continue until the occurrence of a Liquidating Event as provided in this **Section 13.01**; and

(ii)      All necessary steps shall be taken to cancel this Agreement and the Certificate and to enter into a new Company agreement and certificate of Membership, and the successor Manager may for this purpose exercise the powers of attorney granted the Manager pursuant to **Article XII** hereof;

provided that the right of a Required Interest to select a successor Manager and to reconstitute and continue the business of the Company shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted Company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

**Section 13.02  Winding Up**. Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company property has been distributed pursuant to this **Section 13.02** and the Certificate has been terminated in accordance with the Code. The Manager (or, in the event there is no remaining Manager, any Person elected by Members with a right to vote a majority of the Percentage Interests held by the Members) shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and Property, shall cause the Company property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause

33

Copy from re:SearchTX

the Company property or proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

(a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than the Members and to the expenses of liquidation;

(b)     Second, to the payment and discharge of all of the Company's debts and liabilities to the Members;

(c)     Third, to the establishment of sufficient and adequate reserves for the Company's winding up and liquidation, including the payment of costs, expenses and liabilities, (which reserves, to the extent no longer needed by the Company, shall be distributed in accordance with the order of priority set forth in subsections (d) and (e) below;

(d)     Fourth, one hundred percent (100%) to the Members in proportion to their relative Unreturned Capital Contributions until the total Unreturned Capital Contributions of the Members is reduced to zero;

(e)     Fifth, one hundred percent (100%) to the Member.

No Manager shall receive any additional compensation for any services performed pursuant to this **Article XIII**.

**Section 13.03 Compliance with Certain Requirements of Regulations; Deficit Capital Accounts.** In the event the Company is "liquidated" within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g), (a) distributions shall be made pursuant to this **Article XIII** to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704 1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Manager and Members pursuant to this **Article XIII** may be:

(a)     distributed to a trust established for the benefit of the Manager and Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Manager arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Manager and Members from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Manager and Members pursuant to **Section 13.02**; or

(b)     withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Manager and Members as soon as practicable.

34

Copy from re:SearchTX

**Section 13.04 Deemed Distribution and Recontribution**. Notwithstanding any other provision of this **Section 13.04**, in the event the Company is liquidated within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g) but no Liquidating Event has occurred, the Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Property in kind to the Manager and Members, who shall be deemed to have assumed and taken subject to all Company liabilities, all in accordance with their respective Capital Accounts and if any Manager's Capital Account has a deficit balance (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Manager shall contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704 1(b)(2)(ii)(b)(3). Immediately thereafter, the Manager and Members shall be deemed to have recontributed the Property in kind to the Company, which shall be deemed to have assumed and taken subject to all such liabilities.

**Section 13.05 Rights of Manager and Members**. Except as otherwise provided in this Agreement, (a) each Manager and Member shall look solely to the assets (including securities) of the Company for the return of his Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company in return for such Capital Contribution, and (b) no Member shall have priority over any other Member as to the return of his Capital Contributions, distributions, or allocations.

**Section 13.06 Notice of Dissolution**. In the event a Liquidating Event occurs or an event occurs that would, but for provisions of **Section 13.01**, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

## ARTICLE XIV.
## MISCELLANEOUS

**Section 14.01 Notices**. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by first class mail, return receipt requested, overnight courier, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a hard copy of the telephone conversation or facsimile communication sent by first class mail, return receipt requested or overnight courier, charges prepaid and addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members:

       (a)    If to the Company, to the Company at the address set forth in **Section 1.04** hereof;

       (b)    If to a Member, to the address set forth opposite his name on the Company's books and records.

Copy from re:SearchTX

Any such notice shall be deemed to be delivered, given, and received for all purposes as of the date so delivered.

**Section 14.02  Binding Effect**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

**Section 14.03  Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. The terms of this Agreement are intended to embody the economic relationship among the Members and shall not be subject to modification by, or be conformed with, any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

**Section 14.04  Time**. Time is of the essence with respect to this Agreement.

**Section 14.05  Headings**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**Section 14.06  Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**Section 14.07  Incorporation by Reference**. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

**Section 14.08  Further Action**. Each Member, upon the request of any Manager, agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**Section 14.09  Variation of Pronouns**. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

**Section 14.10  GOVERNING LAW. THE LAWS OF THE STATE OF TEXAS SHALL GOVERN THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION OF THE RIGHTS AND DUTIES OF THE MEMBERS**.

**Section 14.11  Counterpart Execution**. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

**Section 14.12  Sole and Absolute Discretion**. Except as otherwise provided in this Agreement, all actions which any Manager may take and all determinations which any Manager

Copy from re:SearchTX

may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Manager.

**Section 14.13 Specific Performance**. Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

**Section 14.14 WAIVER OF JURY TRIAL.**

**EACH OF THE MEMBERS IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**Section 14.15 CONSENT TO JURISDICTION.**

**EACH MEMBER ACKNOWLEDGES THAT THIS AGREEMENT IS PERFORMABLE IN HARRIS COUNTY, TEXAS AND (I) IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY TEXAS COURT OR FEDERAL COURT SITTING IN HARRIS COUNTY, TEXAS IN ANY ACTION ARISING OUT OF THIS AGREEMENT, (II) AGREES THAT ALL CLAIMS IN SUCH ACTION MAY BE DECIDED IN SUCH COURT, (III) WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM, AND (IV) CONSENTS TO THE SERVICE OF PROCESS BY MAIL. A FINAL JUDGMENT IN ANY SUCH ACTION SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW OR AFFECT ITS RIGHT TO BRING ANY ACTION IN ANY OTHER COURT.**

**Section 14.16 Waiver of Partition.**  No Member shall have any interest in any specific assets or other property of the Company solely by virtue of their being a Member of the Company. Without limiting the foregoing, each Member irrevocably waives any right that it may have to maintain any action for partition with respect to any specific assets or other property of the Company.

**Section 14.17 Legal Representation.** The Members acknowledge and agree that Kane Russell Coleman and Logan, P.C. ("**KRCL**") has represented the Company and Manager in connection with this Agreement and the other transactions related hereto (the "**Transactions**"). Each Member acknowledges and agrees that: (a) prior to and as of the time of entering into this Agreement (1) no Member nor any Affiliate of Member has established an attorney-client relationship with KRCL, (2) KRCL has not been asked to provide legal advice to a Member or an

37

Affiliate of a Member, (3) neither a Member nor any Affiliate of a Member has relied on KRCL for legal advice, and (b) KRCL's attorney-client relationship with the Company, its Affiliates, or Manager, or its Affiliates, does not create an attorney-client relationship between any Member or any Affiliate of a Member and KRCL. Furthermore, each Member agrees that KRCL and Blank Rome may continue to provide legal advice to the Company, any of its Affiliates, and to the Manager in any matter, regardless of whether that matter is adverse to the interests of a Member or any Affiliate of a Member, that KRCL may undertake to provide legal representation to any other Member or any other Member's Affiliate on any matter not directly related to this Agreement or the Transactions, and that such legal representation by KRCL of the Company or any of its Affiliates shall not be a basis for disqualifying KRCL from providing legal representation the Company with respect to this Agreement or the Transactions.

[**SIGNATURE PAGE FOLLOWS**]

38

DocuSign Envelope ID: B78458AD-734D-4088-9552-45E255DDFF81

**IN WITNESS WHEREOF**, the undersigned has entered into this Agreement as of the day first above set forth.

<u>**MEMBER**</u>:

 **MPC 84 I, LLC,**
a Texas limited liability company

By:    **MPC Conventional Management, LLC,**
a Texas limited liability company,
its Manager

       By:    **Magnolia Texas Management, LLC,**
a Texas limited liability company,
its Co-Manager

          By: _Andrew Kollaer_
          Name: Andrew Kollaer
          Title: Partner

       By:    **JJN2 DC, LLC,**
a Texas limited liability company,
its Co-Manager

          By: _Justin Jay Oshins_
          Name: Justin Jay Oshins
          Title: Manager

Copy from re:SearchTX

## Exhibit A

## Budget of Projected Revenue and Expenses

4Q23 Budget - Summary

| | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Begin | 10/1/2023 | 11/1/2023 | 12/1/2023 | 1/1/2024 | 2/1/2024 | 3/1/2024 | 4/1/2024 | 5/1/2024 | 6/1/2024 | 7/1/2024 | 8/1/2024 | 9/1/2024 |
| Period End | 10/31/2023 | 11/30/2023 | 12/31/2023 | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | 7/31/2024 | 8/31/2024 | 9/30/2024 |
| OIL VOL - BBLS | 7,122.48 | 6,841.35 | 8,242.75 | 8,211.15 | 7,655.39 | 8,093.23 | 8,597.92 | 8,804.20 | 8,619.39 | 8,295.04 | 8,351.62 | 8,314.61 |
| GAS VOL - MCF | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| LIQS VOL - GAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| LIQS VOL - BBL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OIL REVENUE | $580,482.27 | $557,569.87 | $671,783.76 | $669,208.47 | $623,913.89 | $659,598.48 | $700,730.48 | $717,542.28 | $702,480.68 | $676,045.98 | $680,657.15 | $677,640.93 |
| GAS REVENUE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LIQUIDS REVENUE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| GROSS REVENUE | $580,482.27 | $557,569.87 | $671,783.76 | $669,208.47 | $623,913.89 | $659,598.48 | $700,730.48 | $717,542.28 | $702,480.68 | $676,045.98 | $680,657.15 | $677,640.93 |
| OIL PRODUCTION TAX | $26,702.18 | $25,648.21 | $30,902.05 | $30,783.59 | $28,700.04 | $30,341.53 | $32,233.60 | $33,006.94 | $32,314.11 | $31,098.12 | $31,310.23 | $31,171.48 |
| GAS PRODUCTION TAX | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LIQUIDS PRODUCTION TAX | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL PRODUCTION TAX | $26,702.18 | $25,648.21 | $30,902.05 | $30,783.59 | $28,700.04 | $30,341.53 | $32,233.60 | $33,006.94 | $32,314.11 | $31,098.12 | $31,310.23 | $31,171.48 |
| SE Tax % | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% | 4.60% |
| OIL & GAS DEDUCTS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL OIL & GAS DEDUCTS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| REVENUE AFTER TAX & DEDUCTS | $553,780.08 | $531,921.66 | $640,881.70 | $638,424.88 | $595,213.85 | $629,256.95 | $668,496.88 | $684,535.33 | $670,166.57 | $644,947.86 | $649,346.93 | $646,469.44 |
| LEASE OPER EXPENSES | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| AFE/WELL ADVANCES | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PUMPER & GAUGER | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 | $19,600.00 |
| ADMIN OVERHEAD | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 | $10,485.00 |
| CONTRACT LABOR | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 | $2,575.00 |
| ELECTRICITY, FUEL & POWER | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 | $40,500.00 |
| PROD SUPERINTENDENT | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 | $5,800.00 |
| WORKOVER COSTS | $21,150.00 | $0.00 | $408,254.00 | $0.00 | $21,150.00 | $21,000.00 | $21,000.00 | $0.00 | $21,000.00 | $104,000.00 | $0.00 | $49,254.00 |
| CHEMICALS | $21,150.00 | $21,000.00 | $21,000.00 | $21,000.00 | $21,000.00 | $155,939.00 | $364,482.00 | $0.00 | $0.00 | $21,000.00 | $21,000.00 | $21,000.00 |
| REPAIR & MAINT | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 | $26,000.00 |
| INSURANCE | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 | $1,300.00 |
| HAULING | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 |
| MATERIALS & SUPPLIES | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 |
| HOT OIL TREATMENTS | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| STEAM CLEANING | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RENTALS | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 |
| SALT WATER DISPOSAL | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 |
| ENGINEERING & GEOLOGICAL | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SERVICE EQUIPMENT | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 |
| CONSULTING | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| INSPECTION | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| WELL TREATMENT | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 |
| WATER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| WIRELINE SERVICES | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PERF, LOG & TEST | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 | $75.00 |
| ROADS & LOCATION | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 |
| VACUUM TRUCK SERVICE | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 |
| COMMUNICATIONS | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 |
| PUMP REPAIR & MAINT | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| TRAVEL EXPENSES | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 |
| POSTAGE & SHIPPING | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| COMPRESSOR RENT | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 | $52,000.00 |
| RECORDING FEES | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 |
| PRODUCTION DATA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| GAS MEASUREMENT SERV | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 |
| GAS TRANSPORTATION | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| COMPRESSOR REPAIRS | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 |
| AUTO EXPENSE | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 |
| EMPLOYEE AUTO INSURANCE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SURFACE FACILITY MAINT | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 |
| FUEL GAS ROYALTY | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SWD FACILITY | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 |
| FUEL GAS SEVERANCE TAX | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| FUEL GAS PURCHASE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PLUG & ABANDON | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SHUT IN ROYALTY PMTS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SAFETY EQUIP & MAINT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ENVIRONMENTAL | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 |
| OPER EMPLOYEE COST | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 | $21,500.00 |
| MINIMUM ROYALTY | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| EQUIP DAMAGE CLAIMS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| OPER BOND COST | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 | $2,250.00 |
| LOE - BAD DEBTS EXPENSE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| MISCELLANEOUS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL LEASE OPERATING EXPENSES | $272,560.00 | $272,560.00 | $680,814.00 | $272,560.00 | $272,560.00 | $407,054.00 | $272,560.00 | $272,560.00 | $376,560.00 | $272,560.00 | $272,560.00 | $317,814.00 |
| PROPERTY & AD VAL TAX | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 |
| PRODUCTION AD VAL TAX | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL AD VALOREM TAX | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 | $8,186.57 |
| TOTAL INTANGIBLE/COMPLETION | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Net Lease Cash Flow | $273,033.51 | $251,175.08 | -$48,118.87 | $357,678.31 | $158,528.28 | -$15,971.63 | $387,750.31 | $403,788.76 | $285,420.00 | $364,201.29 | $368,600.35 | $316,468.87 |
| Operator Fee | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 |
| Financial Management Fee | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 | $10,416.67 |
| Net Operating Cash Flow | $247,616.84 | $225,758.42 | -$73,535.54 | $332,261.64 | $133,111.61 | -$41,388.29 | $362,333.64 | $378,372.09 | $260,003.33 | $338,784.62 | $343,183.69 | $291,052.20 |

Exhibit A to  Company Agreement
84 Energy Resources I, LLC

Copy from re:SearchTX



EXHIBIT D

1902 Winners Circle, Richmond, TX 77406 | Phone: (361) 655-4761

October 7, 2025

84 Energy Resources I, LLC
84 Resource Holdings, LLC

**In Re:  Investor Letter to 84 Resources Management, LLC, 10/1/25**

Major Investors,

I am in receipt of your letter directed to the managers of 84 Resources Management, dated October 1, 2025. Many of the concerns that are listed have already been responded to, discussed, or do not apply. The proposed Second Amendment to the Company Agreement is not acceptable.

You have recently denied payment of routine expenses such as well insurance, communications, fuel, and other employee-related costs associated with the continued operation of the wells. In addition, your letter cites that the major investors will not fund capital expenditures, management/operator fees or other operating costs unless the proposed amendment is executed. As such, the most prudent course of action is for the operator to shut-in the entire asset base. The operator is not responsible for fronting expenses on behalf of the investors nor are we going to take on the liability of maintaining an active operation with no certainty that the expenses incurred will be approved for payment all while not being paid fees owed for the management of the operation. It appears that the major investors prefer a conclusion of operations. If that is your wish, I will consult with counsel to determine the best way to shut-in the properties and conclude operations including but not limited to filing a bankruptcy proceeding to attempt to preserve the value of the proprieties and any and all claims owned by the company.

In view of the circumstances, a prompt reply is needed, with no response I am left with no choice but to proceed as described.

Regards,

Aaron Shimek
President
84 Energy, LLC



| EXHIBIT E |
| --- |

1902 Winners Circle, Richmond, TX 77406 │ Phone: (361) 655-4761

---

October 13, 2025

84 Energy Resources I, LLC
84 Resource Holdings, LLC

**In Re:  Investor Letter to 84 Resources Management, LLC, 10/9/25 and 10/10/25**

Major Investors,

I am in receipt of your letters dated October 9 and 10, 2025. I understand you are now willing to pay for certain operational expenses. I've heard nothing regarding going forward operations. It is still unclear as to what the plan is with respect to the assets of 84 Energy Resources I, LLC and 84 Resource Holdings, LLC.

The operator, 84 Energy, has not abandoned operations on these properties. On October 7th, you received notice of an imminent shut-in due to the numerous actions of the major investors.  You have cited that a "working interest owner is going to step-in, pick-up the assets and operate them." As you are aware, 84 Energy, LLC is legally the operator of these properties and any changes to the operatorship require my consent and authorization.

Your proposed amendment and verbal confirmation of plans to remove the operator and me as manager upon execution of referenced amendment, is not a solution I agree with. For months I have engaged in numerous discussions with all parties involved, complied with investor reporting requests that are pertinent to 84 ER/RH, provided requested documents, and yet you continue to say that I am unwilling to engage. I have communicated with JJ numerous times around solutions here and recently stated that I would discuss a transition, yet no follow-up has occurred nor has any proposal other than walking away been presented. In addition, I told Andrew on October 9th, and again on the 10th that I am more than willing to come to the table to discuss offers and ways to potentially resolve the current situation. However, I will not have my seat at the table taken away, which is the current proposal from the investors. It would appear that the investors are only willing to engage so long as it is on their terms.

In your letter on October 1st the major investors refused to fund capital expenditures, management/operator fees, and other operating costs.  After requesting payment for business-critical items, on October 3rd you again denied funding for these expenses. Based on these refusals, the operator was left with no choice but to shut-in the entire asset base. The operator is not responsible for fronting expenses on behalf of the investors. This has been done consistently in the past and it has caused numerous problems for the operating

Copy from re:SearchTX



1902 Winners Circle, Richmond, TX 77406 │ Phone: (361) 655-4761

company and for me personally. The operator will not continue to take on the liability of maintaining an active operation with no certainty that the expenses incurred will be approved for payment, including the fees owed for the management of the operation. You have now stated that certain expenses will be paid on October 14th. Many of these are the same expenses that were expressly denied on October 3rd. At this time, there is great uncertainty as to what the investors will approve or deny going forward, which in turn leaves the operator at risk.

You highlight that a Q4 budget was not formally submitted. It is not the sole responsibility of the operator to present the budget. Historically, Andrew has been responsible for investor management, including putting together budgets and presenting them. I have had numerous discussions with him regarding the Q4 budget including projected spending levels, personnel adjustments, capital plans, and other information required from the operator. Many of these items remain unchanged from what was presented and approved for Q3. To further complicate the situation, the major investors notified us that they would not approve of any spending unless the proposed amendment was executed. In addition, based on the letter received on October 1st, the investors have preemptively denied approval of a budget. Despite this, I have told Andrew numerous times, I am willing to continue to discuss budgets.

As operator, I have maintained many operator functions and responsibilities, even to my detriment, yet I am consistently met with resistance. For example, just this past Friday, while working with the operators accounting firm to complete the August JIB cycle, I was notified that the process is being held up by Andrew's refusal to approve items not pertaining to that JIB. In addition, based on information he has shared with the accounting group, they are increasingly concerned about payment and likely unwilling to continue work. As you are aware, this is not the first time others have interfered with operator accounting processes. This is in direct contrast to being continuously told that all expenses will be paid and no one is trying to prevent operator functions including the facilitation of payments. The operator is responsible for facilitating these payments, yet others are interfering, delaying, denying items such as JIB payments, threatening to withhold payments, and hindering the operator's ability to execute these functions in a timely manner, or even at all.

There should be alignment between the operator and the investors, however you continue to see the operator as optional. There must be an operator in place in order to extract any value from the underlying assets. From the onset, I have treated this platform as my own, assembling the companies' prospects, sourcing significant transactions, and operating the wells. I engaged in these efforts on the premise that I would have the controls as outlined in the entity documents and 84 Energy LLC would be the operator. Your proposal to shift operatorship away from my entity and divest me of control is therefore not in keeping with the parties' understandings or contractual framework.

Copy from re:SearchTX



1902 Winners Circle, Richmond, TX 77406 │ Phone: (361) 655-4761

I continue to be available to the investor group. Please reach out to me so that we can resolve (as amicably as possible) our existing business issues.

Regards,

Aaron Shimek
President
84 Energy, LLC

Copy from re:SearchTX

<div style="text-align:center; border:1px solid;">

**EXHIBIT**

**F**

</div>

October 20, 2025

84 Energy, LLC                                               *Via Certified Mail, Return Receipt Requested*
84 Energy Holdings, LLC
Aaron Shimek
1902 Winner's Cir.
Richmond, Texas 77406

Dear Aaron:

We are writing in our various capacities as investors, managers, and/or members of 84 Energy Resources I, LLC ("Energy Resources"), 84 Resources Holdings, LLC ("Resources Holdings"), and 84 Resources Management, LLC ("Resources Management").

We reference communications with you over the past few months, including but not limited to phone calls, in-person meetings, correspondence from the Major Investors dated October 1, 2025 and October 9, 2025, and a default letter from Bonnie View South, LLC dated October 16, 2025.  By and through these communications, we and those aligned with us have objected to the manner in which you have unilaterally and recklessly been doing business on behalf of Energy Resources, Resources Holdings, and Resources Management.  Your actions have caused incalculable and ongoing financial losses.  Against this backdrop, and given your refusal to change your ways, you have given us no option but to notify you that the following actions have been taken, effective immediately:

1. **84 Energy, LLC has been removed for cause as manager of Energy Resources;**
2. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Energy Resources;**
3. **Aaron Shimek has been removed for cause as manager of Resources Management;**
4. **Resources Management has been removed as manager of Resources Holdings; and,**
5. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Resources Holdings.**

Because you have previously expressed your unwillingness to cooperate on these matters, a lawsuit will be filed against you in order to confirm the effect of this letter.  In so doing, we are seeking a complete separation from you along with the formal removal of 84 Energy, LLC as the P-4 operator of record with the Railroad Commission of Texas.

This notice does not intend to present a complete recitation of all facts and we reserve all rights. This notice constitutes a presentment of claims under Texas Civil Practice and Remedies Code § 38.001. We intend to recover our attorney's fees and costs from you.

Regards,


*/s/ Andrew Kollaer*              */s/ J.J Oshins*              */s/ Tom Hanks*
Andrew Kollaer                   J.J Oshins                   Tom Hanks

Copy from re:SearchTX

**EXHIBIT
G**

**BONNIE VIEW SOUTH LLC**
675 Bering Drive, Suite 703
Houston, Texas 77057

*VIA E-mail*

84 Resource Holdings, LLC
2000 Bering, Suite 703
Houston, Texas 77057
Attn: Andrew Kollaer
E-mail: Andrew@84-energy.com
Attn: Aaron Shimek
E-mail: Aaron@84-energy.com

*Re: Demands Regarding Production Agreement*

Dear Andrew and Aaron:

We write in reference to two agreements between Bonnie View South LLC ("Bonnie View", "we"
or "us") and 84 Resource Holdings, LLC ("RH" or "you"): 1) that certain Conveyance of
Production Payment (the "Conveyance"), effective as of (the "Effective Time"), pursuant to which,
Bonnie View purchased and acquired from RH a Production Payment in the Leases and Subject
Wells, as described in Exhibit A of the Conveyance, and 2) that certain Production Agreement (the
"Production Agreement") between Bonnie View and RH, effective as of the Effective Time.
Capitalized terms not otherwise defined in this letter have the meanings given to those terms in the
Production Agreement and Conveyance.

This letter serves as formal notice of our concerns arising from your management of the Subject
Wells.

First, we have a number of concerns regarding critical information that has been requested or that
has been delivered in non-compliance with the requirements of the Production Agreement.
Included in such concerns are the following:

1. As is our right under the Production Agreement, we have submitted multiple requests for
   information. Please immediately provide us with information requested.

2. The production information you have reported has been inconsistent. Please re-examine
   your reporting since the Effective Time and explain inconsistencies.

3. You have not timely reported Hydrocarbon sales as required under the Production
   Agreement. Please provide information for all Hydrocarbon sales since the Effective Time.

4. Accounting records you have provided have not segregated financial information for RH;
   to the contrary, your financial reporting has combined financial information for RH with
   financial information for other entities. Please provide separate financial information for
   RH as required under the Production Agreement.

1

Copy from re:SearchTX

5. You have failed to provide GAAP compliant financial information as required under the Production Agreement. Please provide such financial information.

6. You have failed to provide Compliance Certificates as required under the Production Agreement. Please provide such Compliance Certificates and note any deficiencies.

Secondly, the Production Agreement requires RH to cause the Subject Wells to be "prudently operated and produced" and to comply with specifically negotiated covenants in Section 6 of the Production Agreement. To our distress, we have witnessed numerous breaches of RH's obligations, including the following (without prior notice or our consent):

1. Failure to timely pay vendors and royalties, which failures have directly impaired production and Hydrocarbon sales and evidence clear breaches of RH's obligations.

2. Subject Wells have been abandoned and employees have been told to leave the field.

3. RH has failed to provide notice of adverse claims, particularly claims made against Operator. We are aware of lawsuits filed against the Operator by Prosperity Bank and Skyinance.

4. RH has been delinquent in payment of operating expenses and JIB processing to working interest owners.

5. Even before the Subject Wells were abandoned, production had declined dramatically, which is evidence of poor engineering practices.

We demand that all breaches and delinquencies be immediately cured and all necessary steps taken to resume production of the Subject Wells.

In doing so, we demand that the Operator be replaced by a capable operator and that RH take all necessary steps to ensure that the Subject Wells are prudently operated and produced and that all of RH's obligations under the Production Agreement are satisfied.

We are also concerned with the conflicts of interest arising between the Managers of RH and the Operator. The Managers own the Operator, and it is our concern that the Managers have violated their fiduciary duties to RH by failing to enforce rights and remedies against the Operator and for allowing or directing the Operator to take actions that have caused the breaches and damage outlined above.

No later than 10 days from receipt of this letter, please:

1. Deliver evidence that RH has replaced the Operator with a qualified Operator and taken all steps necessary to resume production and cure all the breaches outlined above.

2. Provide all of the information requested or identified as deficient in this letter.

2

Copy from re:SearchTX

Unless and until this matter is resolved in full, we expressly reserve all rights and remedies at law and in equity, including the right to pursue litigation, seek injunctive relief, and recover costs, interest, and attorneys' fees where permitted. Nothing herein shall be construed as a waiver or limitation of any such rights.

We prefer to resolve this matter amicably and without the need for further action. Please direct all communications regarding this demand to Tom Hanks at tom.hanks0558@gmail.com. We appreciate your prompt attention and anticipate your timely response.

Sincerely,

Bonnie View South LLC

By: _____
    Tom Hanks, Member

By: _____
    Karen Hanks, Member

3

**EXHIBIT H**





Copy from re:SearchTX

Docusign Envelope ID: AE4AFC5E-77DB-4EF3-B5B9-CD9B6FFC53C8



**EXHIBIT**

**I**

## THE BUSINESS COURT OF TEXAS
### ELEVENTH DIVISION

| | | |
|---|---|---|
| **ANDREW KOLLAER,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CAUSE NO. 25-BC11B-0074** |
| **84 ENERGY, LLC, 84 ENERGY** | § | |
| **HOLDINGS, LLC,** | § | |
| **AND AARON SHIMEK,** | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF ANDREW KOLLAER

1.      "My name is Andrew Kollaer.  I am over the age of twenty-one and am fully competent to provide sworn testimony.  I have personal knowledge of the factual matters set forth in this declaration, all of which are true and correct.  All opinions stated herein are to a reasonable degree of professional certainty, based on my professional judgment, my personal knowledge of the facts giving rise to this dispute, my background and experience, and other factors as detailed herein.

2.      I graduated with a BBA in Finance from Texas A&M University.  I earned an MBA from the McCombs School of Business at the University of Texas at Austin.  I have 20 years of experience sourcing, evaluating, and managing oil and gas investments.  My experience covers operated, non-operated, and royalties/minerals.  I gained this experience through roles at Buckhorn Resources, Intrepid Financial Partners, OMERS Strategic Investments, and Guggenheim Partners.  In these roles, I routinely evaluated the operational performance of oil and gas operating companies.  For example, at Guggenheim, I was part of a six-person

Docusign Envelope ID: AE4AFC5E-77DB-4EF3-B5B9-CD9B6FFC53C8

investment team that managed over $600mm of invested debt and equity capital in private oil and gas companies. Further, in my roles at Intrepid and Buckhorn Resources, I valued oil and gas assets based on well performance, operational efficiencies, and rock quality. In all of these roles, I managed the investments that were executed on behalf of the investors. Such work included daily investment management to ensure that the companies were being prudent operators in the field and maintaining prudent financial controls, accounting, tax, and risk management. Because of my experience and education, I am familiar with oilfield industry standards and practices, particularly private investments in traditional oil and gas projects.

3.      I hold a number of different roles with respect to RH, RM, and ER, as defined and described in paragraph 20 of the Application.

4.      I have been personally involved with RH, RM, and ER on a daily basis since their inception. My duties and responsibilities include the management of all operations including accounting, budgeting, finance, land work, regulatory compliance, investor relations, business development, and field operations. As part of my duties and responsibilities, I routinely worked with, among others, Aaron Shimek, JJ Oshins, Nathan Merchant, and Tom Hanks. These duties and responsibilities overlap with my prior experience at Buckhorn Resources, Intrepid Financial Partners, OMERS Strategic Investments, and Guggenheim Partners.

5.      I reviewed Plaintiffs' *First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief*. I have firsthand personal knowledge of the factual events cited therein given my roles described above. As evident from the documents themselves, I was personally involved with most if not all of the events giving rise to this dispute. I reviewed all of the exhibits in real time as these events were unfolding. I reviewed these exhibits in preparing my testimony for this Declaration.

Copy from re:SearchTX

Docusign Envelope ID: AE4AFC5E-77DB-4EF3-B5B9-CD9B6FFC53C8

6.      I also reviewed the Verification of Nathan Merchant attached to Plaintiffs' Application for Temporary Restraining Order in Case No. 25-BC11A-0081.  I agree with those facts and have personal knowledge about them insofar as Mr. Merchant describes our work together.

7.      Accordingly, I have personal knowledge of the facts stated in the Application.  I swear and affirm that the statements of facts contained in the Application at paragraphs 1-5; 9-18; 20; 30-82; 135-136; and, 138 are true and correct to the best of my knowledge.

8.      With regards to the photos marked as Exhibit H, both photos were taken in the Pittsburg Field the week of October 17, 2025 by 84 Energy field personnel.

9.      I am familiar with HD Operating Co., LLC and believe it is a qualified operator because it is solvent, experienced, and—most importantly—ready, willing, and able to assume the operatorship.  It is my understanding that HD Operating Co., LLC is affiliated with Tom Hanks and Johnny Duncan, two individuals who are heavily invested in the Production Companies and are very motivated to see it succeed.  I have worked with them relative to the Production Companies and know they are familiar with these oilfields and the personnel required to properly operate them.  HD Operating Co., LLC is solvent based on the prior cash investments made by their owners into the Production Companies.

10.      I prepared the following graph using monthly net production data prepared by the BWT Accounting firm which was sourced from revenue statements in accordance with monthly accounting cycles and compared to the budgeted production forecast at closing of the Basa acquisition.

Copy from re:SearchTX

Docusign Envelope ID: AE4AFC5E-77DB-4EF3-B5B9-CD9B6FFC53C8



11.     My date of birth is January 6, 1984, and my address is 2000 Bering, Suite 703,

Houston, Texas 77057.  I declare under penalty of perjury that the foregoing is true and correct."

Executed in Harris County, State of Texas, on November 24, 2025.

By:     /s/
        ANDREW KOLLAER

Copy from re:SearchTX

VOL **0893** PAGE **938**
Producers 88 (4-76) Revised Paid Up
with 640 Acres Pooling Provision

**EXHIBIT**
**J**
**5,232**

POUND PRINTING & STATIONERY COMPANY
2323 FANNIN, HOUSTON, TEXAS 77002, (713) 659-3159

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this ___14th___ day of _____April_____ 19 _87_, between

_____John E. Douglas_____

Lessor (whether one or more), whose address is:

and _____Al Rowan; P. O. Box 216; Van, Texas  75790_____, Lessee, WITNESSETH:

1. Lessor in consideration of _____Ten_____ Dollars
($ 10.00 _____), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in

_____Kaufman_____ County, Texas, to-wit:

Being 96-3/4 acres of land, being all of block No. 4 of the
subdivision of the N/2 of the Edward Fitzgerald Survey, A-150,
Kaufman County, Texas and beginning at the southwest corner of
200 acres conveyed by Bell Ragunt and husband, to J. F. Tharp:

THENCE West 657 Varas;
THENCE North 833-3/10 Varas;
THENCE East 657 Varas;
THENCE South 833-3/10 to the place
of beginning.

~~This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether lying in said survey or surveys or in adjoining surveys, although not included within the boundaries of the land particularly described above.~~

2. This is a paid up lease and subject to the other provisions herein contained, this lease shall be for a term of __3__ years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) to pay lessor for gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, one-eighth of the amount realized from the sale of gasoline or other products extracted therefrom and one-eighth of the amount realized from the sale of residue gas after deducting the amount used for plant fuel and/or compression; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and, thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and

may be deposited in the _____First National_____ Bank at
_____Kemp, Texas_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owners of this lease, severally as to acreage owned by each.

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of ten percent (10%) thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, for the drilling or operation of a well at a regular location or for obtaining maximum allowable from any well to be drilled, drilling or already drilled, units thereafter created may conform substantially in size with those prescribed or permitted by governmental regulations. Lessee under the provisions hereof may pool or combine acreage covered by this lease or any portion thereof as to oil and gas in any one or more strata and units so formed need not conform in size or area with other units into which the leased premises is combined as to any other stratum or strata, and oil units need not conform as to area with gas units. The pooling in one or more instances shall not exhaust the rights of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit. Lessee may at its election exercise its pooling option before or after commencing operations for or completing an oil or gas well on the leased premises, and the pooled unit may include, but it is not required to include, land or leases upon which a well capable of producing oil or gas in paying quantities has theretofore been completed or upon which operations for the drilling of a well for oil or gas have theretofore been commenced. In the event of operations for drilling on or production of oil or gas from any part of a pooled unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this instrument or the instrument designating the pooled unit, such operations shall be considered as operations for drilling on or production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease and in such event operations for drilling shall be deemed to have been commenced on said land within the meaning of paragraph 5 of this lease; and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease (or in each such separate tract) and included in the unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. The production from an oil well will be considered as production from the lease or oil pooled unit from which it is producing and not as production from a gas pooled unit; and production from a gas well will be considered as production from the lease or gas pooled unit from which it is producing and not from an oil pooled unit. The formation of any unit hereunder shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interest as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool as provided above with consequent allocation of production as above provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

VOL 0893 PAGE 939

5. If at the expiration of the primary term, oil, gas, or other mineral is not being produced on said land, or from land pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than 60 consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas, or other mineral is produced from said land, or from land pooled therewith. If at the expiration of the primary term of this lease and after oil, gas, or other mineral is produced from said land, or from land pooled therewith, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within 60 days after the cessation of such production, but shall remain in force and effect so long as such operations are prosecuted with no cessation of more than 60 days after the they result in the production of oil, gas, or other mineral, so long thereafter as oil, gas, or other mineral is produced from land pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof, may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of and draining the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances. Lessee may at any time execute and deliver to Lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U.S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. No obligation reasonably to develop the leased premises shall arise during the primary term. Should oil, gas or other mineral in paying quantities be discovered on said premises, then after the expiration of the primary term, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator, but in discharging this obligation it shall in no event be required to drill more than one well per forty (40) acres of the area retained hereunder and capable of producing oil in paying quantities and one well per 640 acres plus an acreage tolerance not to exceed 10% of 640 acres of the area retained hereunder and capable of producing gas or other mineral in paying quantities, if after the expiration of the primary term, Lessee considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties, and other monies accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessee) shall be paid out of the royalty herein provided. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

10. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any applicable law, order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the lease premises; and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

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
Tax ID (Soc. Sec.) No.

_John E. Douglas_
John E. Douglas

STATE OF  Texas
COUNTY OF  Dallas

INDIVIDUAL ACKNOWLEDGMENT

Before me, the undersigned authority, on this day personally appeared ___John E. Douglas___

known to me to be the person ____ whose name ____ is (are) subscribed to the foregoing instrument, and acknowledged to me that ____ executed the same as ____ free act and deed for the purposes and consideration therein expressed.
Given under my hand and seal of office this 22nd day of April , 19 87

My Commission Expires
1/23/88

Notary Public in and for the State of Texas
Notary's Printed Name: A.H. Lindquist

STATE OF ____
COUNTY OF ____

HUSBAND AND WIFE ACKNOWLEDGMENT

Before me, the undersigned authority, on this day personally appeared ____ and ____
husband and wife, known to me to be the persons whose names are subscribed to the forgoing instrument, and acknowledged to me that they executed the same as their free act and deed for the purposes and consideration therein expressed.
Given under my hand and seal of office this ____ day of ____, 19___

My Commission Expires

Notary Public in and for the State of Texas
Notary's Printed Name:

FILED FOR RECORD at 3:29 o'clock P. M. 6-2- 1987 JAMES K. GRAHAM
CLERK COUNTY COURT, KAUFMAN COUNTY, TEXAS, BY ____ DEPUTY

171

IN TESTIMONY WHEREOF, witness my hand this....21th.....day of.........May.........A.D. 19 51

*Jeff Still*

THE STATE OF TEXAS,  
COUNTY OF....KAUFMAN

Before me, the undersigned authority, on this day personally appeared.....Jeff Still........known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the.....21st.....day of.....May.....A. D. 19 51

(Brownie Henry)  
Notary Public in and for.....Kaufman.....County, Texas.

---

FILED FOR RECORD THE *19* DAY OF FEBRUARY, A. D. 1952 AT *8 30* O'CLOCK *A.* M.  
RECORDED THE *26* DAY OF FEBRUARY, A. D. 1952  
VANCE THREALKELD, COUNTY CLERK,  
BY *Martha Anne Paul* DEPUTY KAUFMAN COUNTY, TEXAS

---

Producers 88 Revised 8-41—Texas                                             Texas Standard Form

## OIL, GAS AND MINERAL LEASE    611

THIS AGREEMENT made this.....6th.....day of.....February.....19 52 between

Mrs. Robert Reed Humphrey, of 4600 Lawther Drive, Dallas, Texas

Lessor (whether one or more), and.....Thos. D. Humphrey

Lessee, WITNESSETH:

1. Lessor in consideration of.....Ten and no/100 — — — — — — — — — — — — — — — — —Dollars

($ 10.00 — — — — — ) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products,

and housing its employees, the following described land in.....Kaufman.....County, Texas, to-wit:

An undivided three-eighths (3/8) interest in and to 50 acres of land, more or less, out of the Ed Fitzgerald Survey, in Kaufman County, Texas, and out of the Southwest corner of R. S. Blowers 200 acre tract, and being described as follows:  
BEGINNING at the Southwest corner of the said R. S. Blowers 200 acre tract, and the Southeast corner of the E. P. Tuggle 96.7 acre tract, and the Northwest corner of the Tuggle 184.5 acre tract; THENCE North with the West line of the said R. S. Blowers 200 acre tract 2178 feet to a point for corner; THENCE East 1000 feet to point for corner; THENCE South 2178 feet to a point in the South line of the said R. S. Blowers 200 acre tract and the North line of the said Tuggle 184.5 acre tract to a point for corner; THENCE West with the South line of the said R. S. Blowers 200 acre tract 1000 feet to the place of beginning, containing 50 acres of land, more or less,

and containing.....50.....acres, more or less. In the event a resurvey of said lands shall reveal the existence of excess and/or vacant lands lying adjacent to the lands above described and the lessor, his heirs, or assigns, shall, by virtue of his ownership of the lands above described, have preference right to acquire said excess and/or vacant lands, then in that event this lease shall cover and include all such excess and/or vacant lands which the lessor, his heirs, or assigns, shall have the preference right to acquire by virtue of his ownership of the lands above described and said lands acquired by the lessor, and the lessee shall pay the lessor for each excess and/or vacant lands at the same rate per acre as the cash consideration paid for the acreage hereinabove mentioned.

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

3. The Royalties to be paid Lessor are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) all other minerals mined and marketed, one-tenth either in kind or value at the well or mine. If Lessor's election, except that an sulphur the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessee shall have the privilege at its risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

4. If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in

Republic National.....Bank at.....Dallas, Texas.....(which bank and its successors are Lessor's agent; and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of

Eighteen and 75/100 — — — — — — — — — — — — — — — — — — — — — —Dollars

Copy from re:SearchTX

**Deed Record 353 – Page 171**

172

(\$ 18.75 ...) (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. ...

[The main body of this lease consists of numbered paragraphs 6 through 12, which are too faded to reproduce reliably.]

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES:

_Wm Walter Reed Humphrey_

_J. D. Humphrey Jr_

---

WIFE'S SEPARATE ACKNOWLEDGMENT

THE STATE OF TEXAS,
COUNTY OF  DALLAS

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Robert Reed Humphrey ... wife of Thos. D. Humphrey ... known to me to be the person whose name is subscribed to the foregoing instrument, and having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Robert Reed Humphrey, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ____ day of February, A. D. 19 52

(L. S.)

_J. Mildred Adams_
Notary Public in and for   Dallas   County, Texas.

---

FILED FOR RECORD THE _19_ DAY OF FEBRUARY, A. D. 1952 AT _8:15_ O'CLOCK _A_. M.

RECORDED THE _26_ DAY OF FEBRUARY, A. D. 1952.

BY _____ DEPUTY

VANCE THREALKELD, COUNTY CLERK
KAUFMAN COUNTY, TEXAS

Copy from re:SearchTX

Deed Record 353 – Page 172

Producers 88 (Revised) Sept.—Texas 1704 Texas Standard Form

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this 1st day of June, 1950, between Roy S. Blowers and wife, Mary B. Blowers, of Westfield, Chautauqua County, New York, Lessor (whether one or more), and Thos. D. Humphrey Lessee, WITNESSETH:

1. Lessor in consideration of Ten and No/100 Dollars ($10.00) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees, the following described land in Kaufman County, Texas, to-wit:

50 acres of land, more or less, out of the Ed Fitzgerald Survey, in Kaufman County, Texas, and out of the southwest corner of R. S. Blowers 200 acre tract, and being described as follows:

BEGINNING at the southwest corner of the said R. S. Blowers 200 acre tract, and the southeast corner of the E. B. Tuggle 96.7 acre tract, and the northwest corner of the Tuggle 184.5 acre tract; THENCE North with the west line of the said R. S. Blowers 200 acre tract 2178 feet to a point for corner; THENCE East 1000 feet to point for corner; THENCE South 2178 feet to a point in the south line of the said R. S. Blowers 200 acre tract and the north line of the said Tuggle 184.5 acre tract to a point for corner; THENCE West with the south line of the said R.S. Blowers 200 acre tract 1000 feet to the place of beginning, containing 50 acres of land, more or less

and containing 50 acres, more or less. In the event a resurvey of said lands shall reveal the existence of excess and/or vacant lands lying adjacent to the lands above described and the lessor, his heirs, or assigns, shall, by virtue of his ownership of the lands above described, have preference right to acquire said excess and/or vacant lands, then in that event this lease shall cover and include all such excess and/or vacant lands which the lessor, his heirs, or assigns, shall have the preference right to acquire by virtue of his ownership of the lands above described as and when acquired by the lessor; and the lessee shall pay the lessor for such excess and/or vacant lands at the same rate per acre as the cash consideration paid for the acreage hereinabove mentioned.

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

3. The Royalties to be paid Lessor are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be fifty cents (50c) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

4. If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Union Trust Company Bank at Westfield, New York (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Fifty & No/100 Dollars ($50.00), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases. In this connection the above described premises shall be treated as comprising 50 acres, whether there be more or less.

5. If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas or other mineral is produced from said land. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding on Lessee until Lessee shall be furnished with a certified copy of recorded instrument evidencing same. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part save as herein expressly provided. If the obligation for reasonable development should require the drilling of a well or wells, Lessee shall have ninety (90) days after ultimate judicial ascertainment of the existence of such obligation within which to begin the drilling of a well, and the only penalty for failure to do so shall be the termination of this lease save as to ten (10) acres for each well being worked on and/or being drilled and/or producing oil or gas to be selected by Lessee so that each 10-acre tract will embrace one such well.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land and in event Lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid Lessor shall be reduced proportionately.

10. If any operation permitted or required hereunder, or the performance by Lessee of any covenant, agreement or requirement hereof is delayed or interrupted directly or indirectly by any past or future acts, orders, regulations or requirements of the Government of the United States or of any state or other governmental body, or any agency, officer, representative or authority of any of them, or because of delay or inability to get materials, labor, equipment or supplies, or on account of any other similar or dissimilar cause beyond the control of Lessee, the period of such delay or interruption shall not be counted against the Lessee, and the primary term of this lease shall automatically be extended after the expiration of the primary term set forth in Section 2 above, so long as the cause or causes for such delays or interruptions continue and for a period of six (6) months thereafter; and such extended term shall constitute and shall be considered for the purposes of this lease as a part of the primary term hereof. The provisions of Section 4 hereof, relating to the payment of delay rentals shall in all things be applicable to the primary term as extended hereby just as if such extended term were a part of the original primary term fixed in Section 2 hereof. The Lessee shall not be liable to Lessor in damages for failure to perform any operation permitted or required hereunder or to comply with any covenant, agreement or requirement hereof during the time Lessee is relieved from the obligations to comply with such covenants, agreements or requirements.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES: Clara B. Bristol

R. S. Blowers

Mary B. Blowers

Copy from re:SearchTX

JOINT ACKNOWLEDGMENT

New York

THE STATE OF ~~TEXAS,~~

COUNTY OF Chautauqua

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Roy S. Blowers and Mary B. Blowers, , his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed; and the said Mary B. Blowers , wife of the said Roy S. Blowers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mary B. Blowers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 12th day of June, 1950.

(L. S.)

Clara B. Bristol

Notary Public in and for Chautauqua County, ~~Texas~~ York.

---

FILED FOR RECORD THE 16 DAY OF June, A.D. 1950, AT 3 O'CLOCK __.M.

RECORDED THIS 19 DAY OF June, A.D. 1950.

FLOYD   SHUMPERT, CLERK, COUNTY COURT

KAUFMAN COUNTY, TEXAS

BY Betty Clynes, DEPUTY

---

1697

E-1130—ASSIGNMENT OF LIEN, CONTRACT, ETC.—Clark &.   Clark & Courts, Houston-Dallas-San Antonio

Assignment of John McCoy Note to Perry Blythe

## ASSIGNMENT

THE STATE OF TEXAS,

COUNTY OF   Kaufman

KNOW ALL MEN BY THESE PRESENTS:

That I ~~we~~ Clark Pevehouse and wife, Carrie Pevehouse

of   Dallas, County, Texas, for and in consideration of the sum of   One Thousand Dollars ($ 1000.00 ),

to me in hand paid by   Perry Blythe

the receipt of which is hereby acknowledged, have bargained, sold and assigned, and by these presents do grant, bargain, sell, assign and transfer unto the said   Perry Blythe

his executors, administrators and assigns, a certain   Vendor's Lien Note in the principal sum of $1000.00 payable in six installments, the first five being in the amount of $100.00 each and due on or before the first day of January 1951,1952,1953,1954,1955 and $500.00 due on or before January 1st,1956. Said Note executed by John McCoy and wife,Varree McCoy,and being in part payment for 64.8 acres of land out of the William A. Thompson Survey situated in Kaufman County, Texas.

**Deed Record 331 – Page 216**

*Deed* VOL. 229 PAGE 53

40862

A-1-66
PRODUCERS 88 REV.
WITH POOLING PROVISION

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this __11th__ day of __December__ 19__70__, between

Strong Memorial Cemetery, acting through its duly constituted and elected Trustees, Henry McIver, Harry Denson and Lester Denson,

Lessor (whether one or more), whose address is: __Slocum, Texas__

and __R & M Drilling Company, P.O. Box 399, Elkhart, Texas__ Lessee, WITNESSETH:

1. Lessor in consideration of __TEN AND NO/100 DOLLARS & Other Valuable Consideration__ xxx

($ __10.00 OVC__ ), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, lease and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessee adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in __Anderson__ County, Texas, to-wit:

All that certain tract or parcel of land situated in the W. R. Wilson Survey, Abstract #66, known as the Strong Memorial Cemetery, located aboutone (1) mile West of the Village of Slocum, and being the same tract or parcel of land described in a Deed recorded in Vol. 199, Page 518, Deed Records of Anderson County, Texas, described by metes and bounds as follows, to-wit:

Starting at a stone in the center of the Slocum-Denson Springs Highway which is 174 yards from a stone culvert, place of beginning, THENCE S. 10 W. 210 yards, rock for corner; THENCE W. 10 N. 174 yards to center of Highway for corner; THENCE E. with said Highway to the place of beginning, containing 3 acres of land, more or less.

This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described above. For the purpose of calculating the rental payments hereinafter provided for, said land is estimated to comprise __3__ acres, whether it actually comprises more or less.

2. Subject to the other provisions herein contained, this lease shall be for a term of __5__ years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

[remaining numbered paragraphs 3 through 7 in fine print]

5. If operations for drilling are not commenced on said land or on acreage pooled therewith as above provided on or before one year from this date, the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender (or shall make a bona fide attempt to pay or tender, as hereinafter stated) to the credit of Lessor in __Elkhart State Bank__ Bank

at __Elkhart__ __Texas__, (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of __Three and No/100__ Dollars

($ __3.00__ ), (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months.

Copy from re:SearchTX

*54*

## VOL. *229* PAGE *54*

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U. S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. In the event of the death of any person entitled to rentals hereunder, Lessee may pay or tender such rentals to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence satisfactory to it as to the heirs or devisees of the deceased and that all debts of the estate have been paid. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rentals to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository; and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

9. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. After the discovery of oil, gas or other mineral in paying quantities on said premises, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator but in discharging this obligation it shall in no event be required to: (a) drill more than one well per 40 acres of the area retained hereunder and capable of producing oil in paying quantities from any formation, stratum or strata situated between the surface and the top of the Glen Rose Formation thereunder; (b) drill more than one well per 160 acres of the area retained hereunder and capable of producing oil in paying quantities from any formation, stratum or strata situated beneath the top of the Glen Rose Formation thereunder; and (c) drill more than one well per 640 acres plus an acreage tolerance not to exceed 10% of 640 acres in the area retained hereunder and capable of producing gas or other mineral in paying quantities.

10. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in the oil, gas or other minerals on, in or under said land less than the entire fee simple estate, whether or not this lease purports to cover the whole or a fractional interest, then the royalties and rentals to be paid Lessor shall be reduced in the proportion that his interest bears to the whole and undivided fee and in accordance with the nature of the estate of which Lessor is seized. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same. Failure of Lessee to reduce rental paid hereunder shall not impair the right of Lessee to reduce royalties.

11. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or on land pooled therewith or from producing oil or gas therefrom or from land pooled therewith by reason of scarcity of or inability to obtain or use equipment or material, or by operation of force majeure, any Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises or land pooled therewith, and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

12. As an additional consideration for the execution of this Oil, Gas and Mineral Lease, it is mutually agreed and understood that Lessee, its successors and assigns, shall not ever locate a well, or place the drilling equipment, slush pits, roads, tank batteries, or anything necessary in connection with the drilling, producing and marketing oil from the above described lands on the premises described herein, and that the Lessee will continue operations at the same location as the well which has been previously drilled on or off-setting said premises, and that any additional wells shall be directionally drilled so that the same may be bottomed on the above described lands, but the surface shall not be used by Lessee, its successors or assigns.

13. It is understood and agreed by and between the parties hereto that the Lessee herein, its successors and assigns shall pay to Lessor herein by depositing the same to the account of the Lessor at Elkhart State Bank at Elkhart, Texas, a minimum monthly royalty payment of Thirty Dollars ($30.00) per month beginning on the 15th day of January 1971, and thereafter on or before the 15th day of each succeeding month, it being understood that the royalties to be paid to Lessor from production of oil and/or gas from said lease shall be 1/8th of such production as is provided in Paragraph 3; however, at such time as 1/8th of the production totals less than $30.00 per month, the Lessee shall pay the minimum monthly royalty payment provided hereinabove.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

STRONG MEMORIAL CEMETERY

By _Henry McIver_
    Henry McIver

_Harry Denson_
    Harry Denson

_Lester Denson_
    Lester Denson

        TRUSTEES

Copy from re:SearchTX

VOL. 229 PAGE 55

THE STATE OF TEXAS      X

COUNTY OF ANDERSON      X

BEFORE me the undersigned, a Notary Public in and for said County and State on this day personally appeared Henry McIver, Harry Denson, and Lester Denson, known to me to be the persons and officers whose names are subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Strong Memorial Cemetery and that they executed the same as the act of such Strong Memorial Cemetery for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN under my hand and seal of office this the 11th day of December 1970.

Dorothy Parker
Notary Public in and for
Anderson County, Texas.

FILED FOR RECORD AT 2:15 O'CLOCK P. M. 12-11 19 70 STANLEY WALTON
CLERK COUNTY COURT, ANDERSON CO., TEXAS    By _____ Deputy

Copy from re:SearchTX



**EXHIBIT K**

1902 Winners Circle, Richmond, TX 77406 | Phone: (361) 655-4761

---

November 19, 2025

To: Investors and Working Interest Owners

Re: Change of Operator – Clarksville Cotton Valley Unit, Red River County, Texas

Dear 84 Resources Management and 84 Resources Holdings,

This notice is to formally inform you that the operator for the above-referenced oil and gas leases and associated operations has changed effective November 19, 2025. This change is required based on provisions in the Joint Operating Agreement for the subject field.

Former Operator:

84 Energy, LLC

New Operator:

SND Operating, LLC

The new operator will assume responsibility for all operational, regulatory, and reporting obligations. This includes, but is not limited to:

• Daily field operations

• Regulatory filings and compliance

• Revenue distribution and accounting

• Production reporting

• Lease maintenance and contractor management

Copy from re:SearchTX



1902 Winners Circle, Richmond, TX 77406 │ Phone: (361) 655-4761

---

No action is required by you at this time. All ownership interests, revenue decimal interests, and existing agreements remain unchanged. You will begin receiving all future revenue checks, statements, and communications from the new operator.

We appreciate your cooperation during this transition and look forward to continuing to operate efficiently and transparently on your behalf.

Sincerely,

Aaron Shimek
President
84 Energy, LLC

┌─────────────┐
│  **EXHIBIT** │
│             │
│  ·  **L**    │
└─────────────┘

Filed
9/29/2025 12:00 AM
**Beverley McGrew Walker**
District Clerk
Fort Bend County, Texas
Erica Rodriguez

### NO. 25-DCV-333589

| | | |
|---|---|---|
| PROSPERITY BANK, | § | IN THE 400th JUDICIAL DISTRICT |
|     Plaintiff, | § | |
| | § | |
| **vs.** | § | IN AND FOR |
| | § | |
| 84 ENERGY LLC, 84 ENERGY | § | |
| HOLDINGS LLC, and | § | |
| AARON PAUL SHIMEK, | § | |
|     Defendants. | § | FORT BEND COUNTY, TEXAS |

### AGREED JUDGMENT

On this day came on to be heard the above-entitled and numbered cause wherein PROSPERITY BANK, a Texas banking association, is the Plaintiff and 84 ENERGY LLC, 84 ENERGY HOLDINGS LLC, and AARON PAUL SHIMEK are the Defendants. The Court finds that Defendants have appeared in this case by virtue of their signatures below and agreement to this Judgment. Plaintiff and Defendants, by their signatures below, have announced to the Court that they have reached an agreement resolving all disputes between them. The Court has reviewed the pleadings and the papers on file, has considered the announcement of the above-mentioned parties, and has determined that it has jurisdiction over the subject matter and the parties to this proceeding. The Court is of the opinion that, based upon the referenced agreement between parties, that judgment should be rendered in favor of PROSPERITY BANK and against 84 ENERGY LLC, 84 ENERGY HOLDINGS LLC, and AARON PAUL SHIMEK as stated herein.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff, PROSPERITY BANK, have and recover of and from 84 ENERGY LLC, 84 ENERGY HOLDINGS LLC, and AARON PAUL SHIMEK, jointly and severally, judgment as follows:

        (a) actual damages, after all just and lawful offsets, as of August 11, 2025, of **$1,449,113.30** under Loan No. *******693 (comprised of $1,398,110.23 in principal, $49,398.05 in interest, and bank fees of $1,605.02);

J.

ROUTED TO COURT 9/29/2025 ER
RT'D TO D.CLERK   10/01/2025 ER
Copy from re:SearchTX

(b) pre-judgment interest at the variable contract rates of WSJP+1.250% per annum from August 12, 2025, through the day before the date of the signing of this Judgment;

(c) post-judgment interest at the contract rate as allowed by law from the date of judgment until paid;

(d) reasonable, necessary, and customary attorney's fees in the amount of $4,972.50;

(e) costs of collection under the Loan Documents in the amount of $583.56 (fees for recording additional deeds of trust executed in connection with a forbearance agreement); and

(f) all taxable costs of Court (incurred to date and post-judgment), including but not limited to the amount of $384.81 (for filing fee, and request for issuance of citation, of which costs the Court hereby takes judicial notice as they are stated in the Clerk's record of this case).

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff, PROSPERITY BANK, shall have all writs and processes as may be necessary to enforce this Judgment.

All relief not expressly granted herein is denied. This judgment is final, disposes of all claims and all parties, and is appealable.

The Court orders execution to issue for this Judgment.

SIGNED on this _____ day of **9/29/2025** _____ 2025.

_____
JUDGE PRESIDING

Copy from re:SearchTX

**AGREED:**

PROSPERITY BANK, a Texas Banking Association,

By: _____
Jason Reep, Vice President and
Authorized Representative on behalf of said Bank

**AGREED:**

84 ENERGY LLC

By: _____
Aaron Paul Shimek, Authorized Representative

84 ENERGY HOLDINGS LLC

By: _____
Aaron Paul Shimek, Authorized Representative

_____
Aaron Paul Shimek, Individually

**APPROVED AS TO FORM:**

_____
Bailey Hartman, State Bar No. 24125916
Morgan Williamson LLP
701 S. Taylor, Suite 324
Amarillo, TX 79101
Telephone: 806-358-8116
Fax: 806-350-7485
bhartman@mw-law.com

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kenzi Nguyen on behalf of C Knight
Bar No. 794107
knguyen@mw-law.com
Envelope ID: 106124432
Filing Code Description: Proposed Order
Filing Description: Agreed Judgment
Status as of 9/29/2025 10:55 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bailey Hartman | | bhartman@mw-law.com | 9/26/2025 11:07:20 AM | SENT |

Copy from re:SearchTX



| | |
|---|---|
| **From:** | Morales, Ana |
| **To:** | Aaron Shimek |
| **Cc:** | Credit & Collections; accountspayable |
| **Subject:** | Re: Archrock Invoices - Past Due |
| **Date:** | Tuesday, August 19, 2025 1:58:27 PM |
| **Attachments:** | image001.png |
| | 84 Vendor ACH Enrollment.pdf |
| | image.png |

Hi Aaron,

Our Chase bank account is temporarily inactive due to some bogus checks. The bank is currently resolving the issue. Additionally, we're experiencing some cash flow challenges. Please make all further payments to our OpenBank account attached.

Could you kindly let us know when we can expect payment for the remaining overdue invoices? Your immediate response is highly appreciated.

We appreciate your assistance and understanding in this matter.

Thank you,

Ana Morales,

AR Analyst Specialist



PH: 281-836-8008

9807 Katy Frwy | Ste 100 | Houston, TX 77024

Ana.Morales@Archrock.com

On Fri, Aug 8, 2025 at 5:28 PM Aaron Shimek <aaron@84-energy.com> wrote:

> 1 ACH went out earlier today. Another will be following shortly as we are catching up months at a time.
>
> ---
>
> **From:** Morales, Ana <ana.morales@archrcok.com>
> **Sent:** Friday, August 8, 2025 12:15 PM
> **To:** Aaron Shimek <aaron@84-energy.com>
> **Cc:** Credit & Collections <Accounts.Receivables@archrcok.com>; accountspayable <accountspayable@84-energy.com>
> **Subject:** Re: Archrock Invoices - Past Due

Hi Aaron,

We have not yet received the ACH payment for the past due invoices listed attached. Please advise on the payment status.

Thank you,

Ana Morales,

AR Analyst Specialist

PH: 281-836-8008

9807 Katy Frwy | Ste 100 | Houston, TX 77024

Ana.Morales@Archrock.com

On Fri, Aug 1, 2025 at 3:17 PM Morales, Ana <ana.morales@archrcok.com> wrote:

As you promised that our payment would be processed this week, could you please confirm when we should expect to receive the ACH payment?

Thank you,

Ana Morales,

AR Analyst Specialist

PH: 281-836-8008

9807 Katy Frwy | Ste 100 | Houston, TX 77024

Ana.Morales@Archrock.com

On Tue, Jul 29, 2025 at 2:15 PM accountspayable <accountspayable@84-energy.com> wrote:

We would need the ACH form filled out as soon as possible.

I have attached it.

Copy from re:SearchTX

Thanks

MacKenzie

---

**From:** Morales, Ana <ana.morales@archrcok.com>
**Sent:** Tuesday, July 29, 2025 8:38 AM
**To:** Aaron Shimek <aaron@84-energy.com>
**Cc:** Credit & Collections <Accounts.Receivables@archrcok.com>; accountspayable
<accountspayable@84-energy.com>
**Subject:** Archrock Invoices - Past Due

Hi Aaron,

Before issuing the check for this payment, could you please confirm if an ACH transfer
can be processed instead ?

I will forward our banking information once I hear back from you. We appreciate your
assistance regarding this matter.

Thank you,

Ana Morales,

AR Analyst Specialist



PH: 281-836-8008

9807 Katy Frwy | Ste 100 | Houston, TX 77024

Ana.Morales@Archrock.com



# EXHIBIT N



**From:** Nathan Merchant <nmerchant@eastexcrude.com>
**Date:** September 15, 2025 at 3:49:52 pm GMT-4
**To:** Andrew Kollaer <akollaer@blackfininterests.com>, Aaron Shimek <aaron@84-energy.com>, Tom Hanks <tom.hanks@eastexcrude.com>, JJ Oshins <joshins@jhdjr.com>
**Subject: Re: Open Items**

I appreciate everyone taking the time this morning.  Please see the updated list.  I updated the due dates and added a column for you to put any notes regarding BWT responsibility.

Let me know if you have any questions.

Thanks,

Nate

On Wed, Sep 10, 2025 at 7:11 PM Nathan Merchant <nmerchant@eastexcrude.com> wrote:

Good evening,

Please see the attached updated list of open items.  Please let me know if you have any questions, and if the assigned due date will not be met.

Thanks,

Nate

On Mon, Sep 8, 2025 at 9:15 AM Nathan Merchant <nmerchant@eastexcrude.com> wrote:

Good morning,

I wanted to create a listing of open items in an email chain so we can work together to complete them. All of these items have been communicated at some point during the past few months.  Please let me know if you have any questions or if you are unable to meet the expected completion dates.

| | Description | Status | Expected Completion Date | Notes |
|---|---|---|---|---|
| 1 | Invoices repository - Current and past. This includes all invoices since the acquisition and any current invoices that have been received but not paid | Open | 9/15/2025 | If this can not be done by 9/15/2025, please document why and explain why this is not considered a control weakness |
| 2 | Truck Listing by VIN number, assigned driver, company they work for, are miles or routes are tracked | Open | 9/15/2025 | |
| 3 | 84 Energy Service Invoices - please add truck VIN to all past invoices | Open | 9/15/2025 | Are any of the trucks being charged to RH part of the BASA acquisition?  If so, please process a credit for all of those charges. |
| 4 | Employee listing for 84 RH | Open | 9/30/2025 | |
| 5 | Payroll support 2024-2025 | Open | 9/30/2025 | |
| 6 | Attorney update on New Horizon acquisition | Open | 9/15/2025 | Please provide as soon as possible so we can keep this process moving |
| 7 | Equity Buyout amount | Open | 9/15/2025 | Please provide as soon as possible so we can keep this process moving |
| 8 | Support for all employee reimbursables over $1,000 | Open | 9/15/2025 | |
| 9 | BWT invoices - I believe most of these costs are G&A and relate to the operator, 84 Energy LLC (invoice approval and processing JIB).  I don't believe these costs are supposed to be paid by the WI. I think the only expenses RH should pay for are the costs directly associated with RH books and reconciling the one bank account.  If RH is responsible for GA costs related to the operator's invoice and JIB process, please provide support for that agreement. | Open | 9/15/2025 | If this is accurate, please process a credit to 84 RH for the necessary amount for next month's JIB |
| 10 | Bank Transactions for Aug and Sep. | Open | 9/15/2025 | |
| 11 | Sulfer River question regarding why services were shut down and how much this is costing RH in sales | Open | 9/15/2025 | |
| 12 | Listing of all invoices currently over 30 days past due | Open | 9/15/2025 | |
| 13 | Updated Production volumes forecast for 2025 with Work Over analysis - | Open | 9/15/2025 | need more forward-looking analysis to be able to track performance and evaluate the use of RH capital/investment |
| 14 | Suspense Details - | Open | 9/15/2025 | need to see the monthly activity and understand the liability.  This also needs to be considered a direct deduction from current cash (preferably kept in a separate account) |
| 15 | Separate Accounting records - | Open | 11/30/2025 | need to separate all accounting records based on the legal ownership.  There should be no consolidation between the Operator and associated entities that RH.  BWT not able to start until Oct. 16 |

Copy from re:SearchTX



**EXHIBIT**

**O**

84 Resources Management, LLC                                    October 1, 2025
675 Bering, Suite 140
Houston, Texas 77057

*Sent via email and delivered by hand*

Dear 84 Resources Management LLC,

The Major Investors in 84 Resources Holdings, LLC ("RH") hereby propose an amendment to the 84 RH Company Agreement (the "Amendment") attached hereto.

The objective of the Amendment is to ensure accountability and transparency relative to Manager and Operator under the company agreement.

The Major Investors have repeatedly requested information from the Manager and the Operator regarding the management of RH. These requests have gone unanswered.

Your unresponsiveness to our ongoing evaluation has made it impossible to determine the extent of the harm to the investment caused by what we deem severe mismanagement.

Concerns and information requests communicated to date include but are not limited to:

1.  Royalty payments and suspense funds – information requests have gone unanswered and concerns are further heightened by our receipt of claims of unpaid royalties from mineral owners, which were never disclosed.

2.  Multiple lawsuits have been filed against Operator by Lenders such as Prosperity Bank and Skyinance. None of these were disclosed. We hereby request information on these lawsuits and any impact (liens, first purchasers withholding revenue to RH) on the RH assets.

3.  Failure to timely pay vendors (such as Sulfur River), leading to a discontinuation of services and directly resulting in a loss of production / revenue.

4. The Major Investors have submitted written questions to the Operator and Manager regarding growing concerns about potential conflicts of interest and self-dealing. Information has been requested regarding areas such as engaging family members as employees (payroll information has been requested), and material related party transactions.

5. We have learned of numerous regulatory delinquencies (Railroad Commission) such as failure to perform necessary well tests, which jeopardize standing of the Operator and thus pose a substantial risk to the RH assets. A recent adverse ruling against the Operator by the Railroad Commission (in the Paul Bethany matter) raises further questions about regulatory standing and operational competence.

6. Severe underperformance of the underlying assets relative to the business plan: Oil production from the larger of the two asset packages RH acquired ("Basa") has **declined by approximately 56%** in the 18 months since inception, from ~660 barrels of oil per day to ~290 today, as compared to your business plan that projected volumes would **increase** over this period.

   In the absence of accountability and transparency, the investors are unable to delve deeper into the root causes of this severe underperformance and take steps to protect the investment. We are prepared to engage a third party to help us assess why production has dropped so dramatically relative to your business plan.

We also note that the growing list of concerns has prompted the investors to consider whether we will need to take steps to protect our investment in 84 Energy Resources I as well.

The attached Amendment will ensure accountability by allowing members in 84 RH to protect their collective investment and in so doing, also protect the economic interests of 84 Resources Management.

If the Members of RH are not allowed to control major decisions such as those outlined in this Amendment, and there is no accountability in the agreement, the interests of all stakeholders will be at increasing risk. The Major Investors will not continue to fund capital expenditures,

Copy from re:SearchTX

management/operator fees, and operating shortfalls without the ability to affect change provided for in the Amendment.

We request that 84 Resources Management, LLC execute and return the attached Amendment within 5 business days so that we can take the steps necessary to allow RH to function properly and protect the interests of all stakeholders.

This letter does not intend to state our entire position. Our investigation remains ongoing pending critical information requested to date or which may be requested in the future.

JJN2 DC, LLC

By: _____

Name: J.J. Oshins

Title: Manager

84 Basa 0224, LLC

By: _____

Name: Tom O. Hanks

Title: Manager

**SECOND AMENDMENT TO**
**THE COMPANY AGREEMENT OF**
**84 RESOURCES HOLDINGS, LLC**

This SECOND AMENDMENT TO THE COMPANY AGREEMENT (this "*Amendment*") of 84 Resources Holdings, LLC, a Texas limited liability company (the "*Company*"), dated as of the 1st day of October, 2025 (the "*Effective Date*"), is entered into by the undersigned Manager and the undersigned Members constituting a majority-in-interest.

**RECITALS**:

**WHEREAS**, reference is hereby made to that certain Company Agreement of the Company, dated March 15, 2024, as amended by that certain First Amendment to Company Agreement of the Company, dated December 31, 2024 (as amended, the "*Company Agreement*"). Capitalized terms used but not defined herein have the meanings assigned to them in the Company Agreement;

**WHEREAS**, pursuant to Section 12.3(a) of the Company Agreement, the Company Agreement may be amended by the Manager with the consent of a majority-in-interest of the Members;

**WHEREAS,** the undersigned Manager and Members desire to amend certain provision in the Company Agreement as set forth herein.

**AGREEMENT:**

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned agree as follows:

1.    Recitals.  The background recitals are incorporated in and made a part of this Amendment by this reference.

2.    Amendment to certain definitions in the Company Agreement.  As of date of the Company Agreement: March 14, 2024 (the "**LLCA Date**"), the definitions of "Manager Membership Interests" and "Expert" are hereby deleted in their entirety from Article I of the Company Agreement and the definition of a "Cause Event" in Article I of the Company Agreement is hereby deleted in its entirety and replaced with the following:

"**Cause Event**" means any of the following, as determined by the affirmative vote of Members holding at 66 2/3% of the Membership Percentages in their reasonable judgment:

(i)    The repeated failure by the Manager or any owner of the Manager (each, an "**Owner**") to substantially perform its or his duties as a Manager or other associate of the Company or any of the Company Affiliates which failure, whether committed willfully or negligently, has continued unremedied for more than thirty (30) days after the Company has provided written notice thereof;

(ii)    fraud or embezzlement by the Manager or any of its owners, employees, or officers (together with the Manager, the "**Manager Parties**");

(iii)    material dishonesty or breach of fiduciary duty by any of the Manager Parties against the Company or any of the Company Affiliates;

Copy from re:SearchTX

(iv)    willful misconduct or gross negligence by any of the Manager Parties which is injurious to the Company or any of the Company Affiliates, including the material breach of, or inability to meet the standards of operation customary in the field, or material failure or inability to perform its obligations under this Agreement as it pertains to the Annual Business Plan;

(v)    any conviction of, or the entering of a plea of guilty or *nolo contendere* by any of the Manager Parties to, a crime that constitutes a felony (or any state-law equivalent) or that involves moral turpitude, or any willful or material violation of any federal, state, or foreign securities laws;

(vi)    any conviction of any other criminal act or act of material dishonesty, disloyalty, or misconduct by any of the Manager Parties that has a material adverse effect on the property, operations, business, or reputation of the Company or any of the Company Affiliates;

(vii)    the unlawful use (including being under the influence) or possession of illegal drugs by any of the Manager Parties on the premises of the Company or any of the Company Affiliates while performing any duties or responsibilities with the Company or any of the Company Affiliates;

(viii)    the material breach by any of the Manager Parties of any covenant undertaken herein, any effective employment agreement, or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Affiliates;

(ix)    the failure by any of the Manager Parties to comply with any material policy generally applicable to employees of the Company or any of the Company Affiliates following written notice and a period of not less than thirty (30) days to cure, if such failure to comply is curable; or

(x)    the violation of an employment discrimination or harassment law by any of the Manager Parties."

3.    <u>Amendment to Section 7.14(b) of the Company Agreement</u>.  As of the Effective Date, Section 7.14(b) of the Company Agreement is hereby deleted in its entirety and replaced with the following:

(b)    Anything contained in any other Section of this Agreement notwithstanding, Members holding at least 66 2/3% of the Membership Percentages shall have the sole and exclusive right and power and authority to cause the Company to initiate, perform and carry out any of the following acts (each, a "<u>Major Decision</u>", collectively, the "<u>Major Decisions</u>") and take all actions and execute all documents on behalf of the Company relating to such Major Decision, all without the necessity of the consent, approval, or joinder of any Manager or other Member of the Company:

(1)    Causing a Liquidation Event;

(2)    Change the purpose of the Company;

(3)    Adopting a plan or proposal for a complete or partial bankruptcy of the Company;

(4)    Adopting any voluntary change in the tax classification

Copy from re:SearchTX

for U.S. federal income tax purposes of the Company;

(5)        Commencing or settling any litigation, investigation, proceeding or governmental or regulatory action for an aggregate amount over $10,000;

(6)        Incur any indebtedness, pledge or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person;

(7)        Enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange, or other acquisition (including by merger, consolidation, acquisition of stock, or acquisition of assets) by the Company of any assets and/or equity interests of any Person;

(8)        Enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange, or other disposition (including by merger, consolidation, sale of Interests, or sale of assets) by the Company of any assets;

(9)        Removing and/or replacing Operator

(10)      Changing the total number of, or voting power of, the Managers; and

(11)      Making any material amendments or modifications, or waivers of restatements of, the organizational documents of the Company (subject to consent requirements under Section 12.3(a)(i)).”

4.        Amendment to Section 10.1 of the Company Agreement.  As of the LLCA Date, Section 10.1 of the Company Agreement is hereby deleted in its entirety and replaced with the following:

“**10.1 Resignation and Removal of Manager**.  A Manager may resign at any time by giving written notice to the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  A Manager may be removed at any time by the affirmative vote of Members holding at least 66 2/3% of the Membership Percentages upon the occurrence of a Cause Event.  A vacancy in the position of a Manager may be filled by the affirmative vote of Members holding at least 66 2/3% of the Membership Percentages.”

5.        The undersigned hereby ratify and confirm the Company Agreement and agree that, except as amended by this Amendment, the Company Agreement will continue in full force and effect in accordance with its original terms.  All references in the Company Agreement to the “Agreement” mean the Company Agreement, as amended by this Amendment.

6.        This Amendment may be executed by reliable electronic means (i.e. DocuSign, ShareFile), or delivery by email of a scanned/PDF signed copy of this Amendment, which will be legally enforceable in the same manner as an original.

[SIGNATURE PAGE FOLLOWS]

Copy from re:SearchTX

IN WITNESS WHEREOF, the undersigned have executed this Amendment to the Company Agreement to be effective as of the Effective Date.

**MANAGER**:

84 Resources Management, LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**MEMBERS**:

84 Basa 0224, LLC

By: _____
Name: _Tom O Hanks_____
Title: __Manager_____

JJN2 DC, LLC

By: _____
Name: _J.J. Oshins_____
Title: _Manager_____

*Signature Page to Second Amendment to Company Agreement of 84 Resources Holdings, LLC*

Copy from re:SearchTX

EXHIBIT

P

84 Energy LLC                                                                    October 9, 2025
1902 Winners Circle
Richmond, TX 77406

*Re: response to 84 Energy letter to Major Investors of October 7, 2025*

Aaron,

Your letter of October 7 threatened to shut in production on the assets owned by 84 ER and 84 RH. You further threatened Bankruptcy.  We were very surprised by your threats and do not approve either course of action.  Your threats are consistent with our prior expressed concerns regarding your solvency and willingness to act reasonably and in good faith.

We suspect your threats could be motivated by a misunderstanding on your end about Major Investors' intentions as expressed in my October 1 letter.  We spoke on the morning of October 8 and I made clear (as I have numerous times previously) that the working interest owners have no intention to leave you on the hook for operating expenses incurred during your tenure as Operator.  We recognize there needs to be a true-up and this letter reflects another effort to engage you on this topic.   I also reiterated a willingness to discuss an amicable transition of operatorship, which you again rejected.

Following our conversation on Oct. 8 you abandoned the operatorship by withdrawing personnel from the field and shutting in production – with no notice. Your unilateral decision to shut in the fields and abandon your duties as Operator further jeopardizes the investment and the interests of all stakeholders - in blatant contradiction to your claim to be "preserv[ing] the value of the assets." You continue to put your Operatorship ahead of the interests of the investors (and frankly your own interests as a Manager and Profit Share owner).

At no time have we expressed an interest in "conclusion of operations." That assertion is unreasonable and based on an absurd interpretation of our prior communication. Our interest is in transparency into haphazard accounting and accountability for dramatic underperformance.  Your proposed course of action exposes the operation to waste of the oil and gas assets and possible environmental liabilities.

In order to protect our interests (and the interests of the Managers) and to minimize our damages, and in light of your unwillingness to engage constructively, the investors plan to cause the working interest owners to step in to pick up the assets and operate them.

As part of this transition, the appropriate entities will reimburse you within 10 business days for any normal and customary third-party operating expenses for which you submit appropriate documentation and which were incurred during your tenure as Operator.

Please forward all unpaid (as of this date) and future invoices you receive in connection with these assets to Andrew Kollaer at akollaer@blackfininterests.com so that we can protect against further damages and liens.

We reserve all rights.

JJN2 DC, LLC (Major Investor in 84 Resources Holdings and 84 Energy Resources I)

By: _J.J. Oshins_

Name: J.J. Oshins

Title:  Manager

84 Basa 0224, LLC (Major Investor in 84 Resources Holdings)

By: _Brad Hanks_

Name: _Brad. Hanks_

Title: _Manager_

167 Oil & Gas Rep. 94

**EXHIBIT Q**

101 S.W.3d 583
Court of Appeals of Texas,
El Paso.

TRI–STAR PETROLEUM COMPANY, Appellant,

v.

TIPPERARY CORPORATION, Tipperary
Oil & Gas Corporation, and Tipperary Oil
& Gas (Australia), Pty Ltd., Appellees.

No. 08–02–00107–CV.
|
Jan. 31, 2003.

**Synopsis**

Non-operating interest in joint operating agreement (JOA) of natural gas project sued operator for mismanagement and sought injunction to remove operator from project. The 238th District Court, Midland County, John G. Hyde, J., granted injunction. Operator appealed. The Court of Appeals, David Wellington Chew, J., held that: (1) status quo was owners' right to remove operator from project; (2) determination that owners had probable right of recovery was not abuse of discretion; (3) evidence of probably injury was sufficient to support issuance of temporary injunction; (4) temporary injunction was prohibitive; and (5) arbitration clause in JOA did not require court to deny temporary injunction.

Affirmed.

West Headnotes (22)

**[1]     Injunction**
          🗝 Discretionary Nature of Remedy

The decision to grant or deny the temporary injunction lies within the sound discretion of the trial court.

2 Cases that cite this headnote

**[2]     Appeal and Error**
          🗝 Extent of Review Dependent on Nature of Decision Appealed from

In an appeal from an order granting a temporary injunction, review is confined to the validity of that order.

1 Cases that cite this headnote

**[3]     Appeal and Error**
          🗝 Abuse of discretion

Abuse of discretion arises when the trial court misapplies the law to the established facts of the case or when it concludes that the movant has demonstrated a probable injury or a probable right to recovery and the conclusion is not reasonably supported by the evidence.

5 Cases that cite this headnote

**[4]     Appeal and Error**
          🗝 Injunction

On review of grant of temporary injunction, reviewing court may neither substitute its judgment for that of the trial court nor resolve the merits of the underlying case; rather, it views the evidence in light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determines whether the order is so arbitrary as to exceed the bounds of reasonable discretion.

5 Cases that cite this headnote

**[5]     Appeal and Error**
          🗝 Necessity of finding facts

In reviewing injunction issued by trial court, where there are no findings of fact or conclusions of law, reviewing court will uphold the trial court's judgment on any legal theory supported by the record.

Cases that cite this headnote

**[6]     Appeal and Error**
          🗝 Findings supported by evidence

Appellate court cannot reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision.

Copy from re:SearchTX

**Tri-Star Petroleum Co. v. Tipperary Corp., 101 S.W.3d 583 (2003)**

167 Oil & Gas Rep. 94

Cases that cite this headnote

**[7]** **Injunction**
   ⚷ Preservation of status quo

At a temporary injunction hearing, the only issue before the trial court is whether the applicant is entitled to preservation of the status quo pending a trial on the merits.

Cases that cite this headnote

**[8]** **Injunction**
   ⚷ Entitlement to Relief

**Injunction**
   ⚷ Likelihood of success on merits

**Injunction**
   ⚷ Injury, Hardship, Harm, or Effect

In order to prevail in application for temporary injunction, applicant need only show a probable right to recovery and a probable injury if temporary equitable relief is denied; the applicant is not required to establish that he will finally prevail in the litigation.

1 Cases that cite this headnote

**[9]** **Injunction**
   ⚷ Preservation of status quo

In deciding whether to grant a temporary injunction, the trial court must ascertain whether the applicant is entitled to preservation of the status quo, which is defined as the last, actual, peaceable, non-contested status that preceded the controversy.

1 Cases that cite this headnote

**[10]** **Mines and Minerals**
   ⚷ Injunction and receivers

Finding that status quo between non-operating interest owners of natural gas project and operator was owners' right to remove operator from project under joint operating agreement was not abuse of

discretion, and satisfied element of successor operator's request for temporary injunction to remove original operator from project; vote to remove operator was last peaceable, non-contested status between parties.

1 Cases that cite this headnote

**[11]** **Injunction**
   ⚷ Likelihood of success on merits

While an applicant for a temporary injunction is not required to establish that he will finally prevail in the litigation, there must be probative evidence of a probable right of recovery.

Cases that cite this headnote

**[12]** **Mines and Minerals**
   ⚷ Injunction and receivers

Trial court did not abuse its discretion in determining that successor operator of natural gas project had probable right of recovery in underlying breach of contract action as necessary element to issue temporary injunction removing operator from project, where non-operating owners voted to remove operator under terms of joint operating agreement (JOA), non-operating owners elected successor operator, and owners alleged operator violated JOA as basis for removal of operator.

1 Cases that cite this headnote

**[13]** **Mines and Minerals**
   ⚷ Injunction and receivers

Evidence of probable injury to non-operating owners of natural gas project if original operator of project was not removed pending resolution of underlying breach of joint operating agreement (JOA) suit was sufficient to satisfy that element in issuing temporary injunction that removed original operator from project, where successor operator introduced evidence that original operator could not meet necessary pace of gas well development, and that project would lose

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Copy from re:SearchTX

**Tri-Star Petroleum Co. v. Tipperary Corp., 101 S.W.3d 583 (2003)**

167 Oil & Gas Rep. 94

acreage and exploration rights if current pace of development continued. V.T.C.A., Civil Practice & Remedies Code § 65.011(5).

Cases that cite this headnote

**[14]    Injunction**
☞ Grounds in general;multiple factors

**Injunction**
☞ Irreparable injury

**Injunction**
☞ Adequacy of remedy at law

Probable injury, as requirement to issue injunction, includes the elements of imminent harm, irreparable harm, and lack of adequate remedy at law for damages.

2 Cases that cite this headnote

**[15]    Injunction**
☞ Irreparable injury

**Injunction**
☞ Adequacy of remedy at law

**Injunction**
☞ Recovery of damages

An irreparable injury, as element necessary to issue injunction, is defined as an injury for which compensation cannot be made, or for which compensation cannot be measured by any certain pecuniary standard.

2 Cases that cite this headnote

**[16]    Injunction**
☞ Adequacy of remedy at law

An adequate remedy at law, as necessary element to issue injunction, is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.

1 Cases that cite this headnote

**[17]    Mines and Minerals**
☞ Injunction and receivers

Temporary injunction that removed operator from natural gas project was prohibitive,

rather than mandatory, and thus, trial court was not required to find clear and compelling presentation of extreme necessity or hardship, even though injunction required operator to take some affirmative action, where affirmative action was incidental to requirement that operator not interfere with assumption of operations by successor.

3 Cases that cite this headnote

**[18]    Injunction**
☞ Prohibitory nature;preservation of status quo

**Injunction**
☞ Mandatory injunctions;restoration of status quo

A prohibitive injunction forbids conduct, whereas a mandatory injunction requires it.

2 Cases that cite this headnote

**[19]    Injunction**
☞ Irreparable injury

The issuing of a temporary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship.

2 Cases that cite this headnote

**[20]    Injunction**
☞ Mandatory injunctions;restoration of status quo

While granting a mandatory injunction is within the sound discretion of the trial court, the grant should be denied absent a clear and compelling presentation of extreme necessity or hardship.

3 Cases that cite this headnote

**[21]    Injunction**
☞ Effect of granting full relief on merits

A ruling on temporary injunctive relief may not be used to obtain an advance ruling on the merits.

Copy from re:SearchTX

Cases that cite this headnote

**[22]   Mines and Minerals**

   🔑 Injunction and receivers

Trial court was not required to deny request for temporary injunction to remove original operator of natural gas project and permit successor to take over operations on grounds that billing dispute in underlying suit was subject to arbitration; successor operator introduced other evidence not subject to arbitration that was sufficient to establish probable right of recovery and irreparable harm required for issuance of injunction. V.T.C.A., Civil Practice & Remedies Code § 171.025.

3 Cases that cite this headnote

**Attorneys and Law Firms**

***586** Steven C. Kiser, Lynch, Chappell & Alsup, Midland, for Appellant.

Charles Tighe, Cotton, Bledsoe, Tighe & Dawson, Midland, for Appellees.

Leslie G. McLaughlin, for Butlers.

Before Panel No. 3 BARAJAS, C.J., LARSEN, and CHEW, JJ.

*OPINION*

DAVID WELLINGTON CHEW, Justice

This is an accelerated, interlocutory appeal from a temporary injunction order that requires Appellant, Tri–Star Petroleum Company ("Tri–Star"), to relinquish operations and cease acting as Operator of the Comet Ridge Project and prohibits Tri–Star from interfering with Appellees' assumption of control and operation of the Project. A party may appeal from a trial court's interlocutory order granting a temporary injunction or overruling a motion to dissolve a temporary injunction.

*See* TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(4)(Vernon Supp.2003).

In nine issues for review, Tri–Star argues that the trial court erred and abused its discretion by: (1) Signing and entering the temporary injunction; and by granting a temporary injunction that; (2) alters the status quo; (3) does not make a judicial determination that Tri–Star failed or refused to carry out its duties; (4) is an advanced ruling on the merits; (5) relies on evidence which is subject to binding arbitration and was outside the court's purview; (6) fails to apply the proper standards for removal; (7) is effectively a mandatory injunction where there is no extreme hardship or special circumstances; (8) is without evidence or no factually sufficient evidence that Appellees will suffer irreparable injury in the interim or that there is no adequate remedy at law; and (9) does not make a judicial determination that Tipperary would be a better operator than Tri–Star. We affirm.

**PROCEDURAL BACKGROUND**

Appellant Tri–Star and Appellees Tipperary Corp., Tipperary Oil & Gas Corp., Tipperary Oil & Gas (Australia) Pty Ltd. (collectively "Tipperary") are parties to a Joint Operating Agreement ("JOA") which governs the development of a large natural gas project, the Comet Ridge Project, located in Queensland, Australia. The JOA dated May 15, 1992, designated Tri–Star as the Operator of the Project and Tipperary as one of the non-operating working interest owners. On August 6, 1998, Tipperary filed the underlying suit against Tri–Star seeking money damages for alleged mismanagement of the Project by Tri–Star and a declaration that Tri–Star has breached the JOA, has failed to operate in a good and workmanlike manner, and that cause exists to remove Tri–Star as Operator. In January 1999, a majority of non-operators affirmatively voted to remove Tri–Star as Operator and selected Tipperary as successor Operator. In November 2000, the non-operating working interest owners again affirmatively voted to remove Tri–Star as Operator and to replace Tri–Star with Tipperary. On May 1, 2000, Tipperary filed an amended original petition which alleges that Tri–Star breached its contractual obligations under the JOA by refusing to step down as Operator ***587** after the affirmative vote for removal and the selection of Tipperary as successor. On November 27, 2000, Appellees filed an application for a temporary injunction seeking

Copy from re:SearchTX

removal of Tri–Star as Operator. On November 13, 2001, Tipperary filed an amended verified application for a temporary injunction regarding removal of Tri–Star Petroleum Company as Operator.

After a seven-day hearing, the trial court granted a temporary injunction in favor of Tipperary, finding that Tipperary had established a probable right of recovery, probable injury in the interim, and no adequate remedy at law. Specifically, the temporary injunction order in pertinent part finds that Tipperary is the current lawful operator by vote of the majority in interest under the terms of the JOA, that Tri–Star is prohibited from interfering with Tipperary's assumption of control and operation of the Project, and that Tri–Star shall relinquish operations, and cease acting as Operator of the Project. Tri–Star now brings this accelerated interlocutory appeal, challenging the trial court's temporary injunction order.

## DISCUSSION

### Standard of Review

**[1] [2] [3] [4] [5] [6]** The decision to grant or deny the temporary injunction lies within the sound discretion of the trial court. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). In an appeal from an order granting a temporary injunction, our review is confined to the validity of that order. *Id.; Universal Health Services, Inc. v. Thompson,* 24 S.W.3d 570, 576 (Tex.App.-Austin 2000, no pet.). Abuse of discretion arises when the trial court misapplies the law to the established facts of the case or when it concludes that the movant has demonstrated a probable injury or a probable right to recovery and the conclusion is not reasonably supported by the evidence. *See State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.1975); *Davis v. Huey,* 571 S.W.2d 859, 861–62 (Tex.1978); *Universal Health Servs., Inc.,* 24 S.W.3d at 576. We may neither substitute our judgment for that of the trial court nor resolve the merits of the underlying case. *See Davis,* 571 S.W.2d at 861–62; *Universal Health Servs., Inc.,* 24 S.W.3d at 576. Rather, we view the evidence in light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order is so arbitrary as to exceed the bounds of reasonable discretion. *See Universal Health Servs., Inc.,* 24 S.W.3d at 576. Where there are no findings of fact or conclusions of law, as here, we will uphold the trial court's

judgment on any legal theory supported by the record. *Davis,* 571 S.W.2d at 862. We cannot reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision. *Id.* Consequently, a decision based on conflicting evidence does not constitute an abuse of discretion. *Id.*

### The Injunctive Relief Inquiry

**[7] [8]** At a temporary injunction hearing, the only issue before the trial court is whether the applicant is entitled to preservation of the status quo pending a trial on the merits. *Walling,* 863 S.W.2d at 58. The applicant need only show a probable right to recovery and a probable injury if temporary equitable relief is denied; the applicant is not required to establish that he will finally prevail in the litigation. *See Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex.1968).

### Preservation of the Status Quo

**[9]** In deciding whether to grant a temporary injunction, the trial court must ascertain whether the applicant is entitled **\*588** to preservation of the status quo. *Walling,* 863 S.W.2d at 58. The status quo is defined as the last, actual, peaceable, non-contested status that preceded the controversy. *Southwestern Bell Tel. Co.,* 526 S.W.2d at 528.

**[10]** In its Issue Two, Tri–Star contends that the trial court abused its discretion because the order allegedly alters the status quo between the parties pending a trial on the merits. Tri–Star asserts that the controversy did not begin with Tri-Star's refusal to comply with the vote to remove it as Operator. Rather, the last peaceable non-contested status is Tri–Star as Operator, the position it held prior to August 6, 1998 when Tipperary filed its lawsuit. In its original petition, Tipperary included a request for the trial court to declare that cause exists to remove Tri–Star as operator of the Comet Ridge Project. Tri–Star argues that the vote to remove Tri–Star as Operator occurred after the 1998 filing of this suit and thus, cannot establish the status quo.

It is undisputed that Tri–Star was the Operator under the JOA when this lawsuit was originally filed. However,

Copy from re:SearchTX

Tri–Star's argument regarding the status quo relies on a broad interpretation of "the controversy" between the parties. In its original petition, Tipperary complained that Tri–Star had breached several provisions of the JOA, including allegations that Tri–Star had failed to conduct operations in a good and workmanlike manner, committed several breaches of contract, and had failed and refused to carry out its duties under the JOA. In January 1999 and again in November 2000, non-operator working interest owners exercised their right to vote under the JOA for removal of the Operator and selection of a successor. After the January 1999 vote, Tipperary filed an amended original petition on May 1, 2000, which included subsequent allegations against Tri–Star *inter alia* a request for injunctive relief to require Tri–Star to comply with the majority vote of non-operators for its removal and replacement by successor.

Given the standard of review we must employ, we find that the trial court could have rationally determined that the last peaceable, non-contested status between the parties during this lengthy litigation was the status of the parties prior to Tipperary's filing of the amended original petition, i.e., prior to the new controversy as to whether Tri–Star must comply with the affirmative vote for its removal as Operator. The trial court found that upon the effective date of the removal vote, Tipperary became the duly elected successor operator of the Comet Ridge Project. It was within the trial court's discretion to find that the status quo between the parties consisted in non-operator working interest owners having the contractual ability under the JOA to follow the provision for removal and selection of successor as written, which Tri–Star now challenges as invalid and requiring judicial determination of cause for removal. We overrule Issue Two.

### Probable Right of Recovery

 **[11]**   In Issues Three and Six, Tri–Star challenges the trial court's finding of a probable right to recovery. While an applicant for a temporary injunction is not required to establish that he will finally prevail in the litigation, there must be probative evidence of a probable right of recovery. *See Walling,* 863 S.W.2d at 58; *Southwestern Savings & Loan Assoc. v. Mullaney Construction Co., Inc.,* 771 S.W.2d 205, 206 (Tex.App.-El Paso 1989, no writ). To establish a probable right of recovery, Tipperary and Intervenors must have a cause of action for which they

may be granted relief. *See* **\*589** *Walling,* 863 S.W.2d at 58; *Universal Health Servs., Inc.,* 24 S.W.3d at 577.

 **[12]**   With respect to Tipperary's claim that Tri–Star has violated Tipperary's and Intervenors' contractual rights to remove it as the Operator and select a successor, the relevant JOA provisions are found in Article V:

*B. Resignation or Removal of Operator and Selection of Successor:*

1. **Resignation or Removal of Operator**: Operator may resign at any time by giving written notice thereof to Non–Operators. If Operator terminates its legal existence or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non–Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes solvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non–Operators owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non–Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non–Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. **Selection of Successor Operator**: Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a

Copy from re:SearchTX

majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

In its order, the trial court in part based its finding that Tipperary and Intervenors had shown a probable right of recovery on the following evidence presented at the hearing: (1) There was an affirmative vote by two or more non-operators owning a majority working interest under the Joint Operating Agreement (JOA) to remove Tri-Star as operator and to select Tipperary as operator; (2) those non-operators voting to remove Tri–Star as operator made the determination under Article V.B. [of the JOA] that Tri–Star had failed and refused to carry out its duties under the JOA; and (3) upon the effective date of the removal vote, Tipperary became the duly elected successor operator of the Comet Ridge Project but Tri–Star failed and refused to yield operations to Tipperary.

The trial court also found the following non-exclusive evidence supported the non-operators' determination that Tri-Star had failed or refused to carry out its duties: (1) By improperly assessing charges against **590** the Joint Account; (2) failing to supply reasonable information requested by the non-operators; (3) commingling TIPLAW (legal fees incurred by and billed by Tri-Star in connection with this suit) funds with other funds in the Joint Account; (4) unexplained classification and reclassification of amounts billed to the Joint Account; (5) failing to provide timely and proper adjustments to the Joint Account for surpluses in the foreign exchange account; (6) double-charging Tipperary and Intervenors on cash calls and subsequent billings; (7) allowing the premature loss of acreage relinquished to the Queensland government; and (8) its inability to sustain deliverable quantities of gas under existing contracts.

Tri-Star argues that the trial court erred and abused its discretion by granting the temporary injunction without making a judicial determination that Tri–Star had failed or refused to perform its duties as Operator under the JOA. According to Tri-Star, this judicial determination is a condition precedent to a valid vote for removal of Tri–Star as Operator. Further, Tri–Star contends that the trial court did not consider any standard or considered an improper standard in its order to remove Tri–Star as the Operator. Tri-Star argues that the trial court should have applied a gross negligence standard, or at the very least, there must be a showing of complete abdication of all

activity and responsibility by abandonment or by allowing another party to conduct operations on the contract area. Alternatively, Tri–Star argues that the evidence in the record fails to support Tri-Star's removal as operator for allegedly "failing or refusing to carry out its duties."

Reviewing the evidence in the light most favorable to the trial court's order, we cannot conclude the trial court abused its discretion in finding a probable right of recovery. By Tipperary's amended original petition, it alleged that it had a right, based on a majority vote of the non-operators to be the successor Operator. Mr. David Bradshaw, CEO and Director of Tipperary, testified that Tipperary and Intervenors voted their interests to remove in January 1999. According to Mr. Bradshaw, Tri–Star was furnished with copies of the vote ballots and has not resigned operations. Mr. Bradshaw also testified as to the same result in the November 2000 ballot vote. Further, Mr. Bradshaw testified that it was Tipperary's position that Tri–Star has failed or refused to carry out or perform duties under the JOA.

In examining the JOA provisions to determine whether Tipperary has a probable right of recovery, the trial court could conclude that the JOA provisions were unambiguous and thus its terms should be given their plain, ordinary, and generally accepted meaning. *See Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). The trial court could conclude from the evidence that the non-operators determined that they had cause to remove Tri–Star as Operator. The trial court in a temporary injunction hearing is only required to find that Tipperary and Intervenors have a probable right of recovery with respect to their claim of non-compliance with the removal vote, not that they will ultimately prevail in the litigation.

Tri–Star also asserts in its Issue Nine that the temporary injunction is an abuse of discretion because it does not make a judicial determination that Tipperary would be a better operator than Tri–Star. Tri–Star's argument as presented goes to the merits of the case, and we do not reach the merits of the underlying case in an appeal from the granting of a temporary injunction. *See* **591** *Texas Indus. Gas v. Phoenix Metallurgical Corp.,* 828 S.W.2d 529, 533 (Tex.App.-Houston [1st Dist.] 1992, no writ). We overrule Issues Three, Six, and Nine.

Copy from re:SearchTX

Tri-Star Petroleum Co. v. Tipperary Corp., 101 S.W.3d 583 (2003)

167 Oil & Gas Rep. 94

*Probable Injury*

[13]   [14]   [15]   [16]   In Issue Eight, Tri–Star contends that Tipperary and Intervenors presented no or insufficient evidence to show probable injury. Tri–Star also argues that Tipperary and Intervenors have an adequate remedy at law for money damages. Probable injury includes the elements of imminent harm, irreparable harm, and lack of adequate remedy at law for damages. *See Surko Enter., Inc. v. Borg Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no writ). An irreparable injury is defined as an injury for which compensation cannot be made, or for which compensation cannot be measured by any certain pecuniary standard. *Texas Indus. Gas,* 828 S.W.2d at 533. An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *See Universal Health Servs., Inc.,* 24 S.W.3d at 577; *Texas Indus. Gas,* 828 S.W.2d at 533.

In summary, the trial court's order states that its finding that Plaintiffs and/or Intervenors will suffer injury for which there was no adequate remedy at law was based in part on the following evidence: (1) The applicants are suffering ongoing and continuing harm because of Tri–Star's refusal to relinquish control over the day-to-day operations of the Comet Ridge Project; (2) Tri–Star's pace of project development demonstrates that it cannot, or will not develop the Contract Area in a manner that is sufficient for Tipperary and Intervenors to deliver the required minimum quantities of gas called for under existing contract; (3) Tipperary and Intervenors have lost acreage and will continue to lose acreage through relinquishment of the Queensland government due to Tri–Star's pace of development; and (4) the evidence established, at least, a threat of irreparable injury to real or personal property and thus, an injunction is appropriate under Section 65.011(5) of the Texas Civil Practice and Remedies Code irrespective of any remedy at law. As to each of the above findings, the trial court determined that it was impossible to measure by definite, certain, or useable pecuniary standard the damages caused and that such harm is imminent, irreparable, and lacks an adequate legal remedy.

To show probable injury in the interim, Tipperary introduced sufficient evidence as to Tri-Star's inability to produce the required minimum amounts of gas under Tipperary's long-term contracts, Energex 1, Energex 2, and QFAL, given Tri-Star's historic pace of development. Mr. Ken Ancell, a Tipperary executive, testified that Energex has the right to cancel its contract if Tipperary fails to deliver its minimum requirement. In Mr. Ancell's opinion, he did not think Tipperary could supply the maximum amount of gas to which Energex is entitled to under the two contracts. Mr. Ancell based his opinion on the amount of gas the Project was producing under Tri-Star's operation. According to Mr. Ancell, he did not see any way that Tri–Star as operator would be able to deliver the maximum daily quantity of gas under Energex 2 given the historical pace of the project to date. Mr. Ancell testified that he believes Energex 2 is at risk of cancellation if Tri–Star continues as operator. Mr. Ancell further testified that Tipperary will not be able to fulfill its obligations under the QFAL contract at Tri–Star's pace of development.

Tipperary also presented sufficient evidence to show that Tipperary and Intervenors will suffer irreparable harm by the loss of acreage and exploration rights to **\*592** the Comet Ridge Project. Mr. Ancell testified that under the Project's Authority to Prospect ("ATP") [1] the Queensland government requires eight new wells to be drilled, in addition to the Project's twenty-well program of which thirteen wells remain to be completed. The ATP also requires an additional twelve wells to be completed. In addition, Mr. Ancell estimated that the QFAL contract would require a minimum of eighty wells, thus ninety-two new wells would need to be drilled beginning November 1, 2002 to October 31, 2004. Mr. Ancell did not believe Tri–Star was capable of drilling and completing this number of wells in the twenty-four-month period. In addition to the possible loss of Energex 2 and QFAL contracts, Mr. Ancell testified that if the required wells are not drilled, the Project would have to relinquish acreage under the ATP. In Mr. Ancell's opinion, if Tipperary takes over operations now, there was a substantial likelihood that Tipperary could prevent some of these injuries and losses from occurring.

[1]   An Authority to Prospect is an exploration license which gives the holder the right to explore and develop the subject acreage, but not the right to sell hydrocarbons. An ATP holder must apply for and obtain a petroleum lease from the Australian government in order to sell the produced product.

Copy from re:SearchTX

Tri-Star Petroleum Co. v. Tipperary Corp., 101 S.W.3d 583 (2003)

167 Oil & Gas Rep. 94

Tipperary and Intervenors presented sufficient evidence to show probable injury in the interim. It was within the trial court's discretion to determine that there was no adequate remedy for the loss of unexplored acreage in the Project or for the loss of long-term contracts. Moreover, the evidence of probable injury presented was sufficient to support the trial court's finding to grant a temporary injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code given the threat of irreparable injury to real or personal property irrespective of any remedy at law. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 65.011(5)(Vernon 1997). We overrule Issue Eight.

### Mandatory or Prohibitive Injunction

**[17]** **[18]** **[19]** **[20]** In Issue Seven, Tri–Star argues that the injunction is mandatory, rather than prohibitive. There are two types of temporary injunctions: prohibitive and mandatory. A prohibitive injunction forbids conduct, whereas a mandatory injunction requires it. *Universal Health Servs., Inc.,* 24 S.W.3d at 576; *See LeFaucheur v. Williams,* 807 S.W.2d 20, 22 (Tex.App.-Austin 1991, no writ). The issuing of a temporary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *See LeFaucheur,* 807 S.W.2d at 22. While granting a mandatory injunction is within the sound discretion of the trial court, the grant should be denied absent a clear and compelling presentation of extreme necessity or hardship. *See Rhodia, Inc. v. Harris County,* 470 S.W.2d 415, 419 (Tex.Civ.App.-Houston [1st Dist.] 1971, no writ).

Tri–Star contends that the trial court in effect granted a mandatory injunction, which altered the status quo without a showing of extreme hardship or other special circumstance to justify this remedy. The temporary injunction order prohibits Tri–Star from interfering with Tipperary's assumption of control and operation of the Project as the successor Operator. The order also requires Tri–Star to relinquish operations and cease acting as Operator of the Project. We find that the trial court's injunction is prohibitive in nature. While the order requires Tri–Star to take some affirmative action in allowing Tipperary to assume operation of the Project, the action **\*593** required on Tri-Star's part is incidental to its non-interference with the successor Operator's assumption of control in the interim. We overrule Issue Seven.

### Advanced Ruling on the Merits

**[21]** A ruling on temporary injunctive relief may not be used to obtain an advance ruling on the merits. *See Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981). In Issue Four, Tri–Star contends that the temporary injunction order constitutes an advanced ruling on the merits on the issue of whether Tri–Star should be removed as operator.

In the underlying suit, Tipperary has asserted several claims against Tri–Star. Tipperary alleges that Tri–Star breached its contractual obligations under the JOA *inter alia:* by failing to provide full access to all its books and records and information regarding the Project and by failing to conduct operations in a good and workmanlike manner, which has resulted in damages in amounts in excess of one million dollars. Tipperary alleges that Tri–Star has breached the mediation and settlement agreements between the parties, that Tri–Star has committed civil conspiracy to defraud and to misapply fiduciary property by overcharging for goods and services and by failure to properly account for the non-operators' money and property. Tipperary also alleges fraud, breach of fiduciary duties, aiding and abetting a fiduciary in breach of its duties, negligence per se, gross negligence, and willful misconduct by violating Texas Penal statutes relating to misapplication of fiduciary property. Further, Tipperary seeks a full accounting and a constructive trust on all proceeds or profits arising out of the use of funds in dispute and injunctive relief to enforce the removal vote of the non-operator working interest owners.

The record does not reflect that the trial court ruled on the merits regarding Tipperary and Intervenors' probable right to recovery. Further, the injunctive relief granted does not fully grant the relief sought in their lawsuit. We overrule Issue Four.

### Arbitration Evidence

**[22]** In Issues One and Five, Tri–Star attacks the trial court's granting of the temporary injunction and contends that the trial court erroneously relied on evidence that is subject to binding arbitration to justify removing Tri–Star as operator. At the hearing, Tipperary presented evidence

Copy from re:SearchTX

related to joint billing disputes some of which were allegedly subject to an arbitration agreement. Tipperary introduced this evidence to establish a probable right of recover and irreparable harm. The trial court considered evidence of joint billing disputes, reasoning that this evidence was relevant to understanding the whole context of the request for injunctive relief.

Tri–Star relies on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCollum,* 666 S.W.2d 604 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 811, 83 L.Ed.2d 804 (1985), in support of its position that the trial court should have denied the temporary injunction with respect to issues subject to arbitration prior to an evidentiary hearing. The *McCollum* case involved breach of contract action against a former employee of a stock brokerage firm. *McCollum,* 666 S.W.2d at 606. Appellant Merrill Lynch challenged the denial of a temporary injunction to enjoin a former employee from further use of confidential information and further solicitation of Merrill Lynch clients. *Id.* at 606. The trial court denied the application based on a finding that all matters pled were subject to arbitration. *Id.* The *McCollum* Court  **\*594**  held that the trial judge

did not abuse his discretion in determining that each count pled by Merrill Lynch was subject to arbitration. *Id.* at 607–08. Tri–Star asserts that while *McCollum* involved the Federal Arbitration Act, the Texas Arbitration Act also requires that the trial court stay a proceeding that involves an issue subject to arbitration. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 171.025 (Vernon Supp.2003).

In the present case, the trial court considered other evidence in addition to the evidence of joint billing disputes, which we find support its finding of probable recovery and probable injury. Even if we assume, without deciding, that the trial court erred in considering evidence that is allegedly outside its purview, Tipperary and Intervenors presented other evidence, discussed above, which was sufficient to support of their application for a temporary injunction. We overrule Issues One and Five.

Having overruled all of Tri–Star's issues for review, we affirm the trial court's judgment.

**All Citations**

101 S.W.3d 583, 167 Oil & Gas Rep. 94

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Copy from re:SearchTX

<div style="border: 1px solid black; text-align: center;">

**EXHIBIT R**

</div>

October 20, 2025

84 Energy, LLC                                                    ***Via Certified Mail, Return Receipt Requested***
84 Energy Holdings, LLC
Aaron Shimek
1902 Winner's Cir.
Richmond, Texas 77406

  Dear Aaron:

  We are writing in our various capacities as investors, managers, and/or members of 84 Energy Resources I, LLC ("Energy Resources"), 84 Resources Holdings, LLC ("Resources Holdings"), and 84 Resources Management, LLC ("Resources Management").

  We reference communications with you over the past few months, including but not limited to phone calls, in-person meetings, correspondence from the Major Investors dated October 1, 2025 and October 9, 2025, and a default letter from Bonnie View South, LLC dated October 16, 2025.  By and through these communications, we and those aligned with us have objected to the manner in which you have unilaterally and recklessly been doing business on behalf of Energy Resources, Resources Holdings, and Resources Management.  Your actions have caused incalculable and ongoing financial losses.  Against this backdrop, and given your refusal to change your ways, you have given us no option but to notify you that the following actions have been taken, effective immediately:

1. **84 Energy, LLC has been removed for cause as manager of Energy Resources;**
2. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Energy Resources;**
3. **Aaron Shimek has been removed for cause as manager of Resources Management;**
4. **Resources Management has been removed as manager of Resources Holdings; and,**
5. **84 Energy, LLC has been terminated for cause as the contract operator of all wells owned by Resources Holdings.**

  Because you have previously expressed your unwillingness to cooperate on these matters, a lawsuit will be filed against you in order to confirm the effect of this letter.  In so doing, we are seeking a complete separation from you along with the formal removal of 84 Energy, LLC as the P-4 operator of record with the Railroad Commission of Texas.

  This notice does not intend to present a complete recitation of all facts and we reserve all rights. This notice constitutes a presentment of claims under Texas Civil Practice and Remedies Code § 38.001. We intend to recover our attorney's fees and costs from you.

  Regards,


*/s/ Andrew Kollaer*              */s/ J.J Oshins*              */s/ Tom Hanks*
Andrew Kollaer                  J.J Oshins                  Tom Hanks

Copy from re:SearchTX



**EXHIBIT S**

**DAVID LEONARD**
D: 713.986.7198
Dleonard@grayreed.com

October 22, 2025

Blakely & Weeks-Thome, PLLC                    *Via E-mail at hthome@bwtcpas.com*
5555 San Felipe, Suite 500
Houston, Texas 77056
Attn. Legal Department

Ladies and Gentlemen:

This law firm has been retained by Andrew Kollaer to address your wrongful refusal to turn over accounting books and records of 84 Resources Holdings, LLC and 84 Energy Resources I, LLC (the "**Companies**").

While my investigation is ongoing, it is my understanding that Mr. Kollaer originally requested this material months ago in May. You contend you are excused from granting his request because the material has been consolidated with a separate company, 84 Energy, LLC. The decision to consolidate this material was made by you (as a matter of your convenience) and never requested by Mr. Kollaer. Mr. Kollaer would have never agreed to this arrangement if you had disclosed to him it would result in him not being able to access accounting material belonging to the Companies. Nonetheless, in the spirit of good faith, Mr. Kollaer offered to pay you to separate the Companies from 84 Energy, LLC. To date, you have failed and refused to do so, and you have otherwise failed and refused to respond to Mr. Kollaer's information request.

Your refusal to turn over this information is unlawful under Texas law, including 22 Tex. Admin. Code § 501.76. Demand is hereby made for you to respond to Mr. Kollaer's information request on or before October 31, 2025. Demand is further made for you to immediately send me any engagement agreement between your firm and the Companies.

This notice does not intend to present a complete recitation of all facts and Mr. Kollaer reserves all rights. This notice constitutes a presentment of claims under Texas Civil Practice and Remedies Code § 38.001. Mr. Kollaer intends to recover his attorney's fees and costs from you.

Regards,

/s/ *David Leonard*

David Leonard

Copy from re:SearchTX



**Bryon L. Romine**
bromine@kesslercollins.com

October 24, 2025

**Via Email:  dleonard@grayreed.com**

David Leonard
Gray Reed
1300 Post Oak Boulevard
Suite 2000
Houston, Texas 77056

Re:  Demand letter to Blakely & Weeks-Thome

Dear Mr. Leonard:

This firm represents Blakely & Weeks-Thome, PLLC ("BWT") with respect to the above-referenced matter.  Please direct all future correspondence to us.

We have received and reviewed your correspondence of October 22, 2025.  Your client, Andrew Kollaer, has requested a variety of documents from BWT.  The firm has provided the requested records relating to 84 Resources Holdings, LLC and 84 Energy Resources, LLC.  If additional documents are desired, you will have to be more specific.

BWT has provided your client with settlement statements for each joint interest billing ("JIB") cycle and corresponding lease operating statements.  Your client has also been provided with access to invoices associated with wells in which your client's companies own a working interest.  BWT has also prepared financial statements for the companies, reconciled their bank statement, and provided monthly copies of the cash transactions as posted to the general ledger.  From an "accounting records" standpoint, we do not understand what else your client desires.

Your comments concerning the "consolidation" of the books of your client's entities and 84 Energy, LLC is incorrect.  It is common practice in oil and gas accounting to enter transactions in the books at the operator level.

BWT has set up its accounting software for 84 Energy, LLC to automatically post the investor share of costs/revenue to the books of each working interest holder.  Accordingly, when the JIB cycle is completed each month on 84 Energy, LLC's books, your clients' share of costs and

Copy from re:SearchTX

David Leonard
October 24, 2025
Page 2

revenue are posted to the companies' books.  This occurs every JIB cycle. Attached to this letter are copies of general ledgers for your client's companies that were created through this process.

Your letter references 22 Texas Admin. Code § 22.  We believe your reliance on this regulation is misplaced.  BWT has not refused to return any of your client's companies' "original records." Rather, the firm has refused, and will continue to refuse, to provide your client records of other clients, including records of 84 Energy, LLC without the client's authorization.  BWT is expressly prohibited from providing this information under Texas Occ. Code § 901.457.

It is unfortunate that your client and 84 Energy, LLC appear to be involved in a dispute.  However, if you wish to obtain records concerning 84 Energy, LLC, it would be best to request them directly from the company or obtain the company's consent to allow BWT to release documents to you and your client.

I would be happy to discuss this further if you like.


Sincerely,

Bryon L. Romine


KESSLER
COLLINS



**EXHIBIT U**

**D**AVID **L**EONARD
D: 713.986.7198
DLEONARD@GRAYREED.COM

October 27, 2025

Aaron Shimek                                           ***Via E-mail at rlfuqua@fuqualegal.com***
c/o Dick Fuqua
Fuqua & Associates, PC
8558 Katy Freeway, Suite 119
Houston, Texas 77024

Dear Mr. Fuqua,

I am writing on behalf of Andrew Kollaer in his capacity as the sole manager of 84 Resources Management, LLC ("***Resources Management***"), the manager of 84 Resources Holdings, LLC ("***Resources Holdings***"). I am writing with regards to the enclosed letter that Resources Holdings received from Bonnie View South, LLC ("***Bonnie View***") on October 16, 2025, a copy of which has been previously furnished to you.

Despite demand, Mr. Shimek still has not responded to the issues raised by Bonnie View in its letter. It is otherwise likely impossible for Mr. Kollaer, acting as manager of Resources Holdings, to oppose Bonnie View's default allegation in good faith because, for example, Mr. Shimek exclusively controls 84 Energy, LLC and the preparation and maintenance of its operational records are within his exclusive possession and control. Moreover, Mr. Shimek is the only person authorized to act on behalf of the operator relative to the Railroad Commission of Texas. And, adding insult to injury, Shimek has unlawfully instructed Blakely & Weeks-Thome, PLLC to block Mr. Kollaer's access to Resource Holdings' accounting books and records. Simply put, Mr. Kollaer's hands are tied relative to defending Resources Holdings against the claims from Bonnie View—all due to Mr. Shimek.

Please be advised that, if Bonnie View files suit against Resources Holdings, it will likely be impossible for Mr. Kollaer to assist in defending Resources Holdings due to the actions of Mr. Shimek. Because defending Resources Holdings will probably be futile, Mr. Kollaer may not incur the expense of retaining defense counsel for Resources Holdings, in which case all of its assets will likely be foreclosed upon. Such an adverse consequence will come as the direct result of Mr. Shimek's ongoing reckless behavior. This is yet another example of why Mr. Shimek was removed as manager of Resources Management and is no longer affiliated with Resources Holdings.

This notice does not intend to present a complete recitation of all facts and Mr. Kollaer reserves all rights. This notice constitutes a presentment of claims under Texas Civil Practice and Remedies Code § 38.001.

Copy from re:SearchTX

October 27, 2025
Page 2

Regards,

/s/ *David Leonard*

David Leonard

Copy from re:SearchTX



EXHIBIT
V

Doliver Income Fund I, LLC
6363 Woodway Drive #763
Houston, TX 77057

November 5, 2025

VIA CERTIFIED MAIL AND EMAIL

To:

84 Energy Resources I, LLC
2000 Bering
Suite 6000
Houston, TX 77057

Aaron Shimek
1902 Winner's Cir.
Richmond, TX 77406

With copies to:
MPC Conventional Management, LLC, Co-Manager
84 Energy LLC, Co-Manager
1902 Winners Circle
Richmond, TX 77406

NOTICE OF DEFAULT AND DEMAND FOR CURE, NOTICE OF INTENT TO ACCELERATE, NOTICE OF
ACCELERATION, and FORMAL DEMAND

Borrower: 84 Energy Resources I, LLC ("Borrower")
Lenders: JJN2 DC, LLC and Doliver Income Fund I, LLC (together, the "Lenders")

Lenders hereby provide formal notice that Borrower is in default under those certain Secured
Promissory Notes (together, the "Notes") executed in favor of each of the Lenders. Specifically,
Borrower has failed to timely make required interest payments when due under the Notes (the
"Default"). Such failure constitutes an Event of Default under the Notes and related loan
documents. Pursuant to the terms of the Notes, Borrower is hereby provided forty-five (45) days
from the date of this Notice (the "Cure Period") to fully cure the Default by remitting all past-
due interest, together with any additional interest, fees, and charges accruing thereon. If
Borrower fails to cure the Default within the Cure Period, the Lenders intend to exercise all



Doliver Income Fund I, LLC
6363 Woodway Drive #763
Houston, TX 77057

rights and remedies available under the Notes, the related security instruments, and applicable law, including without limitation:

(a) Acceleration of all amounts outstanding under the Notes noticed herein;
(b) Foreclosure on all collateral securing the indebtedness; and
(c) Any and all other legal and equitable remedies available to the Lenders.

Nothing in this Notice shall be construed as a waiver of any existing or future default, nor shall it limit any rights, remedies, or powers of the Lenders under the Notes, the related security agreements, or Texas law.

Payment to cure the Default must be received in immediately available funds. Lenders expect full compliance within the Cure Period. Failure to do so will immediately result in the initiation of foreclosure and all other enforcement actions available at law and in equity. In addition to all principal and accrued interest on this Note, Borrower agrees to pay

(a) all reasonable costs and expenses incurred by all owners and holders of this Note in collecting this Note through probate, reorganization, bankruptcy or any other proceeding,
(b) the reasonable attorneys' fees when and if this Note is placed in the hands of an attorney for collection after default, and
(c) the reasonable attorneys' fees, costs and expenses incurred by Lender in connection with the preparation and filing of the agreements and documents contemplated herein.

Very Truly Yours,

Doliver Income Fund I, LLC
By: _____
Name: _____Ralph McBride_____
Title: _____Manager_____

JJN2 DC, LLC
By: _____
Name: _____J.J. Oshins_____
Title: _____Manager_____



EXHIBIT
W

1902 Winners Circle, Richmond, TX 77406 | Phone: (361) 655-4761

November 19, 2025

To: Investors and Working Interest Owners

Re: Change of Operator – Clarksville Cotton Valley Unit, Red River County, Texas

Dear 84 Resources Management and 84 Resources Holdings,

This notice is to formally inform you that the operator for the above-referenced oil and gas leases and associated operations has changed effective November 19, 2025. This change is required based on provisions in the Joint Operating Agreement for the subject field.

Former Operator:

84 Energy, LLC

New Operator:

SND Operating, LLC

The new operator will assume responsibility for all operational, regulatory, and reporting obligations. This includes, but is not limited to:

• Daily field operations

• Regulatory filings and compliance

• Revenue distribution and accounting

• Production reporting

• Lease maintenance and contractor management

Copy from re:SearchTX



1902 Winners Circle, Richmond, TX 77406 | Phone: (361) 655-4761

No action is required by you at this time. All ownership interests, revenue decimal interests, and existing agreements remain unchanged. You will begin receiving all future revenue checks, statements, and communications from the new operator.

We appreciate your cooperation during this transition and look forward to continuing to operate efficiently and transparently on your behalf.

Sincerely,

Aaron Shimek
President
84 Energy, LLC

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Celeste Reyes on behalf of David Leonard
Bar No. 24078847
creyes@grayreed.com
Envelope ID: 108393686
Filing Code Description: Amended Filing
Filing Description: Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC's First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief
Status as of 11/24/2025 1:48 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Leonard | | dleonard@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Hendershot Cowart P.C. Eservice | | eService@hchlawyers.com | 11/24/2025 11:42:32 AM | SENT |
| Lacey LynnSpears | | lspears@hchlawyers.com | 11/24/2025 11:42:32 AM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Division 11B | | BCDivision11B@txcourts.gov | 11/24/2025 11:42:32 AM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
11/24/2025 11:42 AM
Accepted by: Beverly Crumley
Case Number: 25-BC11B-0074

**THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION**

| | | |
|---|---|---|
| **ANDREW KOLLAER, MPC 84 I, LLC, AND KOLCAP, LLC,** | § § § | |
| *Plaintiffs,* | § § | **EXHIBIT 15** |
| **v.** | § § | |
| **84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK,** | § § § § | **CAUSE NO. 25-BC11B-0074** |
| *Defendants.* | § § | |

**ORDER GRANTING PLAINTIFFS'
VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER**

This matter came before the Court on Plaintiffs' Verified Application for Temporary Restraining Order (the "Application"). The Court finds that Plaintiffs complied with the notice requirements of Tex. R. Civ. P. 680 and has provided adequate notice to Defendants with respect to the Application and the hearing on the Application pursuant to those rules.

For the reasons set forth herein, the Court finds that the issuance of a temporary restraining order on the date of this order is necessary due to the urgency of the requested relief, the additional harm that might be incurred by Plaintiffs, and the additional harm that Defendants might cause to Plaintiffs including the ongoing negative consequences of Plaintiffs' wells being shut in.

The Court finds that Plaintiffs have shown a probable right of success on the merits and the likelihood and probability of imminent, irreparable injury if this Temporary Restraining Order is not granted. Plaintiffs have demonstrated a probable right to relief based on the terms of the Company Agreements of 84 Resources Holdings, LLC, 84 Resources Management, LLC, and 84 Energy Resources I, LLC, along with Defendant 84 Energy, LLC's prior material breach of the same.

4938-6625-9836.1

Copy from re:SearchTX

The Court further finds that injunctive relief is required to preserve the status quo of Plaintiffs' wells being operated by a solvent and willing operator, and to prevent further irreparable harm to the environment and Plaintiffs' property rights and contractual interests pending a hearing on the application for temporary injunction.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that a Temporary Restraining Order be, and the same is hereby **GRANTED** and issued and Defendant 84 Energy, LLC, its agents, officers, servants, employees, representatives, and any other person acting in concert or participation with it or on its behalf (including but not limited to Defendant Aaron Shimek), is hereby enjoined and ordered to:

1. Immediately execute dual-signature P-4s with HD Operating, LLC, in the forms furnished to Defendant 84 Energy, LLC by Plaintiffs, for all leasehold interests owned by 84 Resources Holdings, LLC and 84 Energy Resources I, LLC where 84 Energy, LLC currently serves as operator of record,

2. Authorize HD Operating, LLC to immediately resume all oilfield operations, including turning the oil wells back on and resuming production of hydrocarbons, for all leasehold interests owned by 84 Resources Holdings, LLC and 84 Energy Resources I, LLC where 84 Energy, LLC currently serves as operator of record,

3. Immediately furnish to Plaintiffs the well files, records, data, and all other documentation relating to the previous operation of the leases necessary to continue the operation of the leases, and

4. All such incidental affirmative acts that may be required for completion of items 1, 2, and 3.

This temporary restraining order shall expire upon the issuance or denial or a temporary injunction but in no event more than fourteen (14) days from its issuance, unless extended by mutual agreement or the Court orders otherwise.

It is **ORDERED** that a bond or cash in lieu of bond be submitted on behalf of Defendants in the amount of _____.

2

4938-6625-9836.1

Copy from re:SearchTX

**IT IS FURTHER ORDERED** that upon the filing of such Bond or Cash in Lieu of Bond by Plaintiffs, the Clerk of this Court shall issue the order, citation and notice to Defendants of the Temporary Restraining Order and notice to appear to show cause, if any, it has as to why the Temporary Restraining Order shall not be made into a Temporary Injunction, said hearing being set by the Court for the ____ day of _____, 2025, at _____ __.m. in the Business Court of Texas, 11th Division.

Date and Hour of Issuance:_____

_____
HON. MARIALYN BARNARD

3

Copy from re:SearchTX

### Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Celeste Reyes on behalf of David Leonard
Bar No. 24078847
creyes@grayreed.com
Envelope ID: 108393686
Filing Code Description: Amended Filing
Filing Description: Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC's First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief
Status as of 11/24/2025 1:48 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Leonard | | dleonard@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Hendershot Cowart P.C. Eservice | | eService@hchlawyers.com | 11/24/2025 11:42:32 AM | SENT |
| Lacey LynnSpears | | lspears@hchlawyers.com | 11/24/2025 11:42:32 AM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 11/24/2025 11:42:32 AM | SENT |
| Division 11B | | BCDivision11B@txcourts.gov | 11/24/2025 11:42:32 AM | SENT |

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
11/24/2025



**EXHIBIT**

**16**

The Business Court of Texas,
Eleventh Division

| | | |
|---|---|---|
| ANDREW KOLLAER, MPC 84 I, LLC, AND KOLCAP, LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Cause No. 25-BC11B-0074 |
| | § | |
| 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

**NOTICE OF HEARING**

Before the court is Plaintiffs' First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief, filed on November 24, 2025. The court will conduct a hearing only on Plaintiffs' request for a temporary restraining order on November 25, 2025 at 3:00 p.m.

The hearing will be held via Zoom. The court will provide the participants with the meeting link and instructions for joining the proceeding electronically prior to the hearing. Only participants directly involved in the case will be able to participate. The public may

Copy from re:SearchTX

observe    the    proceeding    by    accessing    the    court's    YouTube    channel
at https://www.youtube.com/@4thbusinesscourttexas.


      SO ORDERED.


MARIALYN BARNARD
Judge of the Texas Business Court


SIGNED ON: November 24, 2025

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108412203
Filing Code Description: No Fee Documents
Filing Description: Notice of TRO Hearing
Status as of 11/24/2025 3:24 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Leonard | | dleonard@grayreed.com | 11/24/2025 3:18:14 PM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 11/24/2025 3:18:14 PM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 11/24/2025 3:18:14 PM | SENT |
| Hendershot Cowart P.C. Eservice | | eService@hchlawyers.com | 11/24/2025 3:18:14 PM | SENT |
| Lacey LynnSpears | | lspears@hchlawyers.com | 11/24/2025 3:18:14 PM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 11/24/2025 3:18:14 PM | SENT |
| Division 11B | | BCDivision11B@txcourts.gov | 11/24/2025 3:18:14 PM | SENT |

Copy from re:SearchTX

E-filed in the Office of the Clerk
for the Business Court of Texas
11/25/2025 2:27 PM
Accepted by: Alexis Jennings
Case Number: 25-BC11B-0074

## THE BUSINESS COURT OF TEXAS
## ELEVENTH DIVISION

|  |  |  |
|---|---|---|
| **ANDREW KOLLAER** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 25-BC11B-0074** |
| | § | |
| **84 ENERGY, LLC, 84 ENERGY** | § | |
| **HOLDINGS, LLC, AND AARON** | § | |
| **SHIMEK** | § | |
| **Defendant.** | § | |

> **EXHIBIT**
> **17**

### SUGGESTION OF BANKRUPTCY

Defendants 84 Energy, LLC ("84 Energy"), 84 Energy Holdings, LLC ("Energy Holdings"), and Aaron Shimek ("Shimek") (collectively "Defendants"), file this Suggestion of Bankruptcy and would respectfully show unto the Court as follows:

1.     On November 22, 2025, Defendant 84 Energy, LLC filed a petition for relief under Title 11 of the United States Code, in the United States Bankruptcy Court for the Southern District of Texas, which bears the case number 25-37093. The bankruptcy case is still pending.

2.     Attached as Exhibit A is a copy of the petition and notice of bankruptcy filing as evidence of this bankruptcy case by Defendant 84 Energy, LLC.

3.     The filing of the bankruptcy case by Defendant 84 Energy, LLC triggered the automatic stay under 11 U.S.C. § 362, which prohibits, among other things, any act to obtain possession of property of the estate or of property from the estate, or to exercise control over property of the estate.

4.     This pending district court civil action seeks to remove 84 Energy, LLC as the designated operator of the oil-and-gas leases, which constitutes an act to obtain possession of, or

to exercise control over, property of the bankruptcy estate. Such actions are stayed by operation of 11 U.S.C. § 362.

5.      Although the automatic stay applies directly to Defendant 84 Energy, LLC, the stay should also extend to the closely related co-defendants—84 Energy Holdings, LLC and Mr. Shimek—because there exists such a unity of interest and identity between them that a judgment entered against the non-debtor defendants would, in effect, operate as a judgment or finding against the debtor.

6.      Courts have recognized that "unusual circumstances" warrant extending the automatic stay to non-debtors where, as here, (1) indemnification and contribution obligations or overlapping management roles create an identity of interest between the debtor and non-debtor defendants; (2) continuation of the action would impose substantial discovery or litigation burdens on the debtor; or (3) the proceeding would have a preclusive or practical effect that forces the debtor to participate as if it were a party. *See*, e.g., *In re Jefferson County, Ala.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013).

7.      Because the operator-removal claims asserted in this action are directed at 84 Energy's operatorship rights and necessarily implicate the conduct, rights, and obligations of all Defendants collectively, allowing this litigation to proceed against the non-debtor defendants would undermine the protections afforded by § 362 and would effectively circumvent the stay.

WHEREFORE, PREMISES CONSIDERED, Defendants 84 Energy, LLC, 84 Energy Holdings, LLC, and Aaron Shimek, suggests that this action against them is stayed by the operation of 11 U.S.C. § 362.

Respectfully submitted,

**HENDERSHOT COWART, PC**

/s/ *Simon W. Hendershot, III*
SIMON W. HENDERSHOT, III
SBN: 09417200
trey@hchlawyers.com
LACEY L. SPEARS
SBN: 24111392
lspears@hchlawyers.com
1800 Bering Drive, Suite 600
Houston, Texas 77057
Telephone:  (713) 783-3110
Facsimile:  (713) 783-2809

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Hendershot Cowart P.C. Eservice on behalf of Lacey Spears
Bar No. 24111392
eService@hchlawyers.com
Envelope ID: 108460780
Filing Code Description: Notice
Filing Description: Suggestion of Bankruptcy
Status as of 11/25/2025 2:39 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Leonard | | dleonard@grayreed.com | 11/25/2025 2:27:51 PM | SENT |
| Jeremy Walter | | jwalter@grayreed.com | 11/25/2025 2:27:51 PM | SENT |
| Celeste Reyes | | creyes@grayreed.com | 11/25/2025 2:27:51 PM | SENT |
| Hendershot Cowart P.C. Eservice | | eService@hchlawyers.com | 11/25/2025 2:27:51 PM | SENT |
| Lacey LynnSpears | | lspears@hchlawyers.com | 11/25/2025 2:27:51 PM | SENT |
| Daniel B.Howry | | dhowry@grayreed.com | 11/25/2025 2:27:51 PM | SENT |
| Division 11B | | BCDivision11B@txcourts.gov | 11/25/2025 2:27:51 PM | SENT |

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Southern District of Texas**

Case number (if known): _____   Chapter ___**11**___



EXHIBIT A

☐ Check if this is an amended filing

## Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy                04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| **1. Debtor's name** | **84 Energy LLC** |
| **2. All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | |
| **3. Debtor's federal Employer Identification Number (EIN)** | 8 3 – 2 6 7 9 4 3 0 |

**4. Debtor's address**

**Principal place of business**

_____
Number        Street

**1902 Winners Cir**
Number        Street

**Richmond, TX 77406**
City                    State   ZIP Code

**Fort Bend**
County

**Mailing address, if different from principal place of business**

_____
Number        Street

**225 Matlage Way Unit 1387**
Number        Street

**Sugar Land, TX 77487-0950**
City                    State   ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number        Street

_____
City                    State   ZIP Code

| | |
|---|---|
| **5. Debtor's website (URL)** | |
| **6. Type of debtor** | ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |