**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re:<br><br>84 ENERGY, LLC,<br><br>*Debtor.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 25-37093 |
| ANDREW KOLLAER, MPC 84 I, LLC, AND KOLCAP, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. No. 25-03836 |

**OPPOSED MOTION FOR EMERGENCY HEARING ON**
**PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs Andrew Kollaer, Kolcap, LLC, and MPC 84 I, LLC (collectively, the "Plaintiffs"), file this Opposed *Motion for Emergency Hearing on Plaintiffs' Request for a Temporary Restraining Order*, and respectfully shows the Court as follows:

1. Plaintiffs filed their *First Amended Petition for Declaratory Relief and Verified Application for Injunctive Relief* on November 24, 2025 in the Business Court of Texas, Eleventh Division, Cause No. 25-BC11B-0074 (the "State Court Action") against 84 Energy, LLC (the "Debtor") and the other named defendants.

2. The Debtor filed its voluntary chapter 11 bankruptcy petition in this Court on November 25, 2025 and remains a debtor in possession at this time. Plaintiffs removed the State Court Action to this Court on November 26, 2025.

3. The declaration of Andrew Kollaer is attached hereto as **Exhibit A** in support of the emergency relief requested herein.

4. The Debtor was previously the contract operator for certain oil and gas properties in the State of Texas owned by nondebtors 84 Resources Holdings, LLC ("RH") and 84 Energy Resources I, LLC ("ER"). The Debtor (apparently in his purported capacity as contract operator) unilaterally shut-in over 100 wells owned by RH and ER on October 8, 2025 that were generating approximately $40,000 in revenue per day without the consent or approval of any of the owners of such wells. Plaintiffs assert that the Debtor was removed as the contract operator of the wells owned by ER and RH by correspondence dated October 20, 2025. Notwithstanding such removal, the Debtor has refused to acknowledge such removal, and has effectively shutdown the subject oil and gas properties. Debtor will not transition operatorship to a willing and able operator, and he is apparently holding the oil and gas wells hostage for a ransom.

5. Debtor's reckless behavior is far more extreme than other leading cases under Texas law where Courts have granted injunctions requiring an operator to step down from the operatorship and transfer the operatorship to someone else—the exact relief Plaintiffs seek. *See U.S. Energy Dev. Corp. v. WBH Energy Partners, et al.*, No. 15-01006-HCM (W.D. Tex. Bank. 2015); *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 587 (Tex. App.—El Paso 2003, pet. denied). In these cases, the operator was actually willing and able to operate the oil and gas wells. The issue was that the operator had been removed but refused to step down. Here, the operator—Debtor—was removed from its position before filing for bankruptcy. Despite this removal, the Debtor proceeded to shut in the wells, abandon the oilfield, and refused to transfer operatorship to another qualified operator. The Debtor's actions caused the whole

oilfield operation, which is currently unsupervised and ground to a halt, even though there are operational issues that must be addressed, including environmental issues.

6. Plaintiffs are filing a *Supplemental Brief* contemporaneously with this Motion to detail the *WBH* case and explain why it justifies an emergency hearing and issuance of a temporary restraining order.

7. The Debtor's unilateral shutting down of the subject wells appears to be either (a) out of spite to harm parties that have invested in excess of $25,000,000 in the wells, (b) a strategy to leverage his purported position as contract operator into a payday "to get rid of him," or (c) some other bad-faith motive. If the wells do not commence production immediately, many of the subject oil and gas leases may be terminated due to certain cessation of production clauses in the underlining leases. Specifically, if some of the wells do not return to production on or before **December 7, 2025**, the oil and gas leases owned by ER and RH may be lost to the detriment of everyone including the Debtor, Debtor's bankruptcy estate, creditors of the bankruptcy estate and the investors in those properties that have invested millions of dollars.

8. Further, there are ongoing environmental issues that must be addressed, as reflected in the following recent photographs showing oil on the ground:

9.      It is the understanding of the Plaintiffs that the subject investors are agreeable to paying legitimate and allowable third-party vendor claims relating to the subject properties to get workers back to the various well sites to get the wells immediately operational once again.  The investors have previously expressed this intent to Debtor, but Debtor refused to respond.  Unless certain other wells are brought back to production prior to January 6, 2026 and other wells by February 5, 2026, those other leases may also be subject to termination for cessation of production (pursuant other 90- and 120-day cessation of production clauses) to the determent of all of the parties.

10.      The Plaintiffs request an emergency hearing on their request for a temporary restraining order on or before Tuesday, December 2, 2025.  The Plaintiffs understand that it will take a couple of days after entry of an order granting the requested relief before workers can actually get back into the field to commence production from the subject wells.   Thus, an emergency hearing is needed on or before December 2, 2025.  Relief was not previously requested because the Debtor did not file its bankruptcy petition until November 25, 2025.  The Debtor filed its bankruptcy petition apparently to stop a hearing in state court on Plaintiffs' request for a temporary restraining order scheduled for hearing on November 25,  2025.  The Plaintiffs have been diligent asserting their rights subsequent to the bankruptcy filing.

11.      Bonnie View South, LLC and 84 BASA 0224, LLC (collectively, "Bonnie View") removed certain litigation to this Court on November 25, 2025 in the adversary proceeding styled *Bonnie View South. LLC and 84 BASA 0224, LLC v. 84 Resources Holdings, LLC, et al.* which was assigned Adversary Proceeding No. 25-03834 (the "Bonnie View Adversary").  In the Bonnie View Adversary, the plaintiffs are seeking injunctive relief against the Debtor and the other named defendants.  The Bonnie View parties have filed in the Bonnie

4919-7762-1628

View Adversary a motion seeking an emergency hearing on its request for a temporary restraining order requesting a hearing on or prior to Tuesday, December 2, 2025. The facts and circumstances respecting the relief requested in the Bonnie View Adversary overlap in many respects with the relief requested by the Plaintiffs in this adversary proceeding. A key difference is that the Plaintiffs in this case include the manager of RH and ER (Andrew Kollaer) along with a member of ER (MPC 84 I, LLC).

12. In the interest of preservation of Court resources, and to save cost and expense to the litigants, the Plaintiffs request that the Court set its request for a temporary restraining order in this adversary proceeding at the same date and time as the hearing on the Bonnie View request for a temporary restraining order.

13. Based upon the facts set forth in this Motion, the Plaintiffs believe that good cause exists to set an emergency hearing on the injunctive relief requested because of the immediate and irreparable injury, loss or damage that will result to the Plaintiffs if the requested relief is not granted on or before Tuesday, December 2, 2025. The Plaintiffs and other investors in the subject oil and gas wells potentially could lose millions of dollars in investments if the relief requested is not granted as requested. There are environmental contamination issues that will likely arise as well.

WHEREFORE, Plaintiffs request that the Court set a hearing on its request for a temporary restraining order on or before December 2, 2025, and at the same time as the hearing on the request for injunctive relief in the Bonnie View Adversary. The Plaintiffs request such other and further relief to which they may show themselves justly entitled.

Respectfully submitted this 28th day of November, 2025.

**GRAY REED**

By: */s/ Micheal W. Bishop*
Micheal W. Bishop
Texas Bar No. 02354860
Emily F. Shanks
Texas Bar No. 24110350
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: mbishop@grayreed.com
eshanks@grayreed.com

-and-

**GRAY REED**

David Leonard
Texas Bar No. 24078847
Jeremy Walter
Texas Bar No. 24098572
Daniel B. Howry
Texas Bar No. 24130877
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7198
Email: dleonard@grayreed.com
jwalter@grayreed.com
dhowry@grayreed.com

*Counsel for Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC*

**CERTIFICATE OF CONFERENCE**

I, the undersigned, hereby certifies that I had a telephone discussion with Dick Fuqua, bankruptcy counsel for the Debtor, on November 28, 2025 to discuss the relief requested herein. Mr. Fuqua referred me to litigation counsel for the Debtor, Hendershot Cowart, PC. I then called both Mr. Hendershot and Ms. Spears, but neither answered, and I left them each a message with their assistant/answering service. I also emailed both of them. Ms. Spears responded via email and stated Debtor is opposed to the relief requested herein.

*/s/ David Leonard*
David Leonard

**CERTIFICATE OF SERVICE**

The undersigned certifies that on November 28, 2025, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties who are deemed to have consented to ECF electronic service. Service has also been made by U.S. mail, first class- postage prepaid, and by electronic transmission on the parties listed below.

Simon W. Hendershot, III
Lacey L. Spears
HENDERSHOT COWART, P.C.
1800 Bering Drive, Suite 600
Houston, Texas 77057
Email: rtey@hchlawyers.com
lspears@hchlawyers.com

*Counsel for Defendants*

Richard L. Fuqua, II
FUQUA & ASSOCIATES, PC
8558 Katy Freeway, Suite 119
Houston, TX 77024
Email: fuqua@fuqualegal.com

*Counsel for the Debtor*

*/s/ Micheal W. Bishop*
Micheal W. Bishop

# EXHIBIT A

## Kollaer Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| 84 ENERGY, LLC, | § | Case No. 25-37093 |
| *Debtor.* | § | |
| ANDREW KOLLAER, MPC 84 I, LLC, AND KOLCAP, LLC, | § | |
| *Plaintiffs,* | § | Adv. No. 25- 03836 |
| v. | § | |
| 84 ENERGY, LLC, 84 ENERGY HOLDINGS, LLC, AND AARON SHIMEK, | § | |
| *Defendants.* | § | |

**DECLARATION OF ANDREW KOLLAER**

1. "I, Andrew Kollaer, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief.

2. My name is Andrew Kollaer. I am over the age of twenty-one and am fully competent to provide sworn testimony. I have personal knowledge of the factual matters set forth in this declaration, all of which are true and correct. All opinions stated herein are to a reasonable degree of professional certainty, based on my professional judgment, my personal knowledge of the facts giving rise to this dispute, my background and experience, and other factors as detailed herein.

3. I graduated with a BBA in Finance from Texas A&M University. I earned an MBA from the McCombs School of Business at the University of Texas at Austin. I have 20 years of experience sourcing, evaluating, and managing oil and gas investments. My experience covers operated, non-operated, and royalties/minerals. I gained this experience through roles at Buckhorn Resources, Intrepid Financial Partners, OMERS Strategic Investments, and Guggenheim Partners. In these roles, I routinely evaluated the operational performance of oil and gas operating companies. For example, at Guggenheim, I was part of a six-person investment team that managed over $600mm of invested debt and equity capital in private oil and gas companies. Further, in my roles at Intrepid and Buckhorn Resources, I valued oil and gas assets based on well performance, operational efficiencies, and rock quality. In all of these roles, I managed the investments that were executed on behalf of the investors. Such work included daily investment management to ensure that the companies were being prudent operators in the field and maintaining prudent financial controls, land, accounting, tax, and risk management. Because of my experience and education, I am familiar with oilfield industry standards and practices, particularly private investments in traditional oil and gas projects.

4. I hold a number of different roles with respect to 84 Resources Holdings, LLC ("***RH***"), 84 Energy Resources I, LLC ("***ER***"), and 84 Resources Management, LLC (collectively, the "***Production Companies***"):

| |
|---|
| • RH is Managed by 84 Resources Management, LLC<br>• I manage 84 Resources Management, LLC |
| • ER is Managed by MPC Conventional Manager, LLC<br>• MPC Conventional Manager, LLC is managed by Magnolia Texas Management, LLC<br>• I manage Magnolia Texas Management, LLC |
| • ER's Sole Member is MPC 84 I, LLC<br>• MPC 84 I, LLC is managed by MPC Conventional Manager, LLC<br>• MPC Conventional Manager, LLC is managed by Magnolia Texas Management, LLC |

| |
|---|
| • I manage Magnolia Texas Management, LLC<br>• I am a Member of MPC 84 I, LLC |
| • Kolcap, LLC is a member of RH<br>• I am the Member of Kolcap, LLC |

5. I have been personally involved with RH, RM, and ER on a daily basis since their inception. My duties and responsibilities include the management of all operations including accounting, budgeting, finance, land work, regulatory compliance, investor relations, business development, and field operations. These duties and responsibilities overlap with my prior experience at Buckhorn Resources, Intrepid Financial Partners, OMERS Strategic Investments, and Guggenheim Partners.

6. Among my duties and responsibilities, I administer oil and gas leases for RH and ER. In this role, I review the terms of the lease and monitor performance thereunder. In so doing, I occasionally employ third-party professionals such as landmen and attorneys.

7. ER and RH are lessees under hundreds of oil and gas leases across the State of Texas. I maintain a list of these leases and have been working to obtain actual copies of all of them.

8. On or about October 8, 2025, debtor, 84 Energy, LLC (the "Debtor") shut in all oil and gas wells owned by RH and ER. On that date, the Debtor was the contract operator of the oil and gas wells owned by RH and ER. This made me concerned about RH and ER losing the leases pursuant to cessation of production clauses. It is generally known in the oil and gas business that cessation of production clauses state that the lease terminates if production ceases for a certain period of time, typically anywhere from 60 to 120 days.

9. By correspondence dated October 20, 2025, the Debtor was removed as contract operator of the oil and gas wells owned by RH and ER.

10. My work is ongoing and, so far, I have physical possession of at least four leases with 60-day cessation of production clauses, attached hereto as Exhibit "A-1," and described as follows:

i. Oil, Gas and Mineral Lease dated December 11, 1970, recorded in Volume 779, Page 53 of the Deed Records of Anderson County, Texas, from Strong Memorial Cemetery, acting through its duly constituted and elected Trustees, Henry Melver, Harry Denson and Lester Denson, as Lessor, to R&M Drilling Company, as Lessee.

ii. Oil, Gas and Mineral Lease dated February 6, 1952, recorded in Volume 353, Page 171 of the Deed Records of Kaufman County, Texas, from Mrs. Robert Reed Humphrey, as Lessor, to Thos. D. Humphrey, as Lessee.

iii. Oil, Gas and Mineral Lease dated April 14, 1987, recorded in Volume 893, Page 938 of the Deed Records of Kaufman County, Texas, from John E. Douglas, as Lessor, to Al Rowan, as Lessee

iv. Oil, Gas and Mineral Lease dated June 1, 1950, recorded in Volume 331, Page 215 of the Deed Records of Kaufman County, Texas, from Roy S. Blowers and wife, Mary B. Blowers, as Lessor, to Thos. D. Humphrey, as Lessee.

11. I have identified many other leases with 60-day cessation of production clauses and am withholding any identification for confidentiality purposes, though I would be willing to submit a list to the Court under seal.

12. The leases as identified in Exhibit 1, and all others with a 60-day cessation of production clause, are subject to termination on December 7, 2025 (60 days after October 8, 2025). Any and all of RH and ER's leases with 90-day cessation of production clauses are subject to termination on January 6, 2026. Any and all of RH and ER's leases with 120-day cessation of production clauses are subject to termination on February 5, 2026.

13. The cessation of production issue would be cured if the wells were brought back online and production restored. The only entity with authority to take this action is the Debtor because the Debtor is still the named operator of the wells with the Texas Railroad Commission. But the Debtor has refused for several weeks to bring the wells back online or otherwise resume

production.  The Debtor also refuses to transition the operatorship to a willing and able operator. I am likely not authorized to turn the wells back online.

14.     I believe that RH, ER and the investors in the related oil and gas wells will incur immediate and irreparable harm if any of their leases are lost due to the cessation of production clauses in the leases.  The investors in RH and ER did not consent to the Debtor unilaterally shutting-in the subject wells.

15.     In my experience, we would need at least two days after entry of an order by this Court to get workers back to the field to resume production at the wells.  Thus, I request a hearing before this Court on the subject issues on or prior to December 2, 2025.

16.     With regards to the two photos shown in the *Emergency Motion for Hearing*, both photos were taken in the Pittsburg Field the week of October 17, 2025 by field personnel of the Debtor.

17.     I am familiar with HD Operating Co., LLC and believe it is a qualified operator because it is solvent, experienced, and—most importantly—ready, willing, and able to assume the operatorship.  It is my understanding that HD Operating Co., LLC is affiliated with Tom Hanks and Johnny Duncan, two individuals who are heavily invested in the Production Companies and are very motivated to see it succeed.  I have worked with them relative to the Production Companies and know they are familiar with these oilfields and the personnel required to properly operate them.  HD Operating Co., LLC is solvent based on the prior cash investments made by their owners into the Production Companies.

18.     Aaron Shimek has told me directly and indirectly through counsel that he has been trying to raise capital for the Debtor, particularly after it became clear that the members of RH and ER would discontinue funding.  He made these comments to me as early as August 2025

and as recently as October 21, 2025 (through counsel). To my knowledge, his fundraising efforts have not been successful.

19. I signed a Declaration that is attached to the *Plaintiff's First Amended Petition and Application for Injunctive Relief* filed in the state court lawsuit that was removed to this Court. That Declaration contains additional background information respecting the disputes before the Court. My Declaration is incorporated by reference as if fully set forth herein.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief."

Executed in Harris County, State of Texas, on November 28, 2025.

Signed by:

By: */s/* ______________________

1CD812CD0AF147B...

ANDREW KOLLAER

**EXHIBIT A-1**

EXHIBIT
J

VOL 0893 PAGE 938
Producers 88 (4-76) Revised Paid Up
with 640 Acres Pooling Provision

5232

POUND PRINTING & STATIONERY COMPANY
2325 FANNIN, HOUSTON, TEXAS 77002, (713) 659-3159

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this 14th day of April 19 87, between John E. Douglas

Lessor (whether one or more), whose address is: ______________________

and Al Rowan; P. O. Box 216; Van, Texas 75790, Lessee, WITNESSETH:

1. Lessor in consideration of Ten Dollars ($ 10.00), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Kaufman County, Texas, to-wit:

Being 96-3/4 acres of land, being all of block No. 4 of the subdivision of the N/2 of the Edward Fitzgerald Survey, A-150, Kaufman County, Texas and beginning at the southwest corner of 200 acres conveyed by Bell Ragunt and husband, to J. F. Tharp:

THENCE West 657 Varas;
THENCE North 833-3/10 Varas;
THENCE East 657 Varas;
THENCE South 833-3/10 to the place of beginning.

~~This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described above.~~

2. This is a paid up lease and subject to the other provisions herein contained, this lease shall be for a term of 3 years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled thereunder.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) to pay lessor for gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, one-eighth of the amount realized from the sale of gasoline or other products extracted therefrom and one-eighth of the amount realized from the sale of residue gas after deducting the amount used for plant fuel and/or compression; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee convenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the First National Bank at Kemp, Texas, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owners of this lease, severally as to acreage owned by each.

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of ten percent (10%) thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, for the drilling or operation of a well at a regular location or for obtaining maximum allowable from any well to be drilled, drilling or already drilled, units thereafter created may conform substantially in size with those prescribed or permitted by governmental regulations. Lessee under the provisions hereof may pool or combine acreage covered by this lease or any portion thereof as above provided as to oil in any one or more strata and as to gas in any one or more strata. The units formed by pooling as to any stratum or strata need not conform in size or area with the unit or units into which the lease is pooled or combined as to any other stratum or strata, and oil units need not conform as to area with gas units. The pooling in one or more instances shall not exhaust the rights of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit. Lessee may at its election exercise its pooling option before or after commencing operations for or completing an oil or gas well on the leased premises, and the pooled unit may include, but it is not required to include, land or leases upon which a well capable of producing oil or gas in paying quantities has theretofore been completed or upon which operations for the drilling of a well for oil or gas have theretofore been commenced. In the event of operations for drilling on or production of oil or gas from any part of a pooled unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this instrument or the instrument designating the pooled unit, such operations shall be considered as operations for drilling on or production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease and in such event operations for drilling shall be deemed to have been commenced on said land within the meaning of paragraph 5 of this lease; and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated for all purposes, except the payment of royalities on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease (or in each such separate tract) and included in the pooled unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. The production from an oil well will be considered as production from the lease or oil pooled unit from which it is producing and not as production from a gas pooled unit; and production from a gas well will be considered as production from the lease or gas pooled unit from which it is producing and not from an oil pooled unit. The formation of any unit hereunder shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interest as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool as provided above with consequent allocation of production as above provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. If at the expiration of the primary term, oil, gas, or other mineral is not being produced on said land, or from land pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than 60 consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas, or other mineral is produced from said land, or from land pooled therewith. If, after the expiration of the primary term of this lease and after oil, gas, or other mineral is produced from said land, or from land pooled therewith, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within 60 days after the cessation of such production, but shall remain in force and effect so long as such operations are prosecuted with no cessation of more than 60 consecutive days, and if they result in the production of oil, gas, or other mineral, so long thereafter as oil, gas, or other mineral is produced from said land, or from land pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof, may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of and draining the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances. Lessee may at any time execute and deliver to Lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U.S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. No obligation reasonably to develop the leased premises shall arise during the primary term. Should oil, gas or other mineral in paying quantities be discovered on said premises, then after the expiration of the primary term, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator, but in discharging this obligation it shall in no event be required to drill more than one well per forty (40) acres of the area retained hereunder and capable of producing oil in paying quantities and one well per 640 acres plus an acreage tolerance not to exceed 10% of 640 acres of the area retained hereunder and capable of producing gas or other mineral in paying quantities. If after the expiration of the primary term, Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties, and other monies accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

10. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, and Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the lease premises; and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

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
Tax ID (Soc. Sec.) No.

John E. Douglas (signature)
John E. Douglas

STATE OF Texas
COUNTY OF Dallas

**INDIVIDUAL ACKNOWLEDGMENT**

Before me, the undersigned authority, on this day personally appeared John E. Douglas known to me to be the person ____ whose name ____ is (are) subscribed to the foregoing instrument, and acknowledged to me that executed the same as ____ free act and deed for the purposes and consideration therein expressed.

Given under my hand and seal of office this 22nd day of April, 19 87.

A.H. Lindquist (signature)
Notary Public in and for the State of Texas

My Commission Expires 1/23/88

Notary's Printed Name: A.H. Lindquist

STATE OF ____
COUNTY OF ____

**HUSBAND AND WIFE ACKNOWLEDGMENT**

Before me, the undersigned authority, on this day personally appeared ____ and ____ husband and wife, known to me to be the persons whose names are subscribed to the forgoing instrument, and acknowledged to me that they executed the same as their free act and deed for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of ____, 19 ___.

Notary Public in and for the State of Texas

My Commission Expires ____

Notary's Printed Name: ____

FILED FOR RECORD AT 3:20 O'CLOCK P M. 6-2- 1987 JAMES K. GRAHAM CLERK COUNTY COURT, KAUFMAN COUNTY TEXAS, BY May Howard DEPUTY

171

IN TESTIMONY WHEREOF, witness my hand this 21st day of May, A. D. 19 51.

Jeff Still

THE STATE OF TEXAS,
County of KAUFMAN

Before me, the undersigned authority, on this day personally appeared Jeff Still, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the 21st day of May, A. D. 19 51.

(Brownie Henry)
Notary Public in and for Kaufman County, Texas.

FILED FOR RECORD THE 19 DAY OF FEBRUARY, A. D. 1952 AT 8:30 O'CLOCK A. M.
RECORDED THE 26 DAY OF FEBRUARY, A. D. 1952
VANCE THREALKELD, COUNTY CLERK,
KAUFMAN COUNTY, TEXAS
BY Martha Anne Paul DEPUTY

Producers 88 Revised 5-42—Texas | Texas Standard Form

# OIL, GAS AND MINERAL LEASE

611

THIS AGREEMENT made this 6th day of February 19 52 between Mrs. Robert Reed Humphrey, of 4600 Lawther Drive, Dallas, Texas

Lessor (whether one or more), and Thos. D. Humphrey Lessee, WITNESSETH:

1. Lessor in consideration of Ten and no/100 - - - - - - - - - - - - - - - - - - - - - - - Dollars ($10.00) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees, the following described land in Kaufman County, Texas, to-wit:

An undivided three-eighths (3/8) interest in and to 50 acres of land, more or less, out of the Ed Fitzgerald Survey, in Kaufman County, Texas, and out of the Southwest corner of R. S. Blowers 200 acre tract, and being described as follows:

BEGINNING at the Southwest corner of the said R. S. Blowers 200 acre tract, and the Southeast corner of the E. B. Tuggle 96.7 acre tract, and the Northwest corner of the Tuggle 184.5 acre tract; THENCE North with the West line of the said R. S. Blowers 200 acre tract 2178 feet to a point for corner; THENCE East 1000 feet to point for corner; THENCE South 2178 feet to a point in the South line of the said R. S. Blowers 200 acre tract and the North line of the said Tuggle 184.5 acre tract to a point for corner; THENCE West with the South line of the said R. S. Blowers 200 acre tract 1000 feet to the place of beginning, containing 50 acres of land, more or less,

and containing 50 acres, more or less. In the event a resurvey of said lands shall reveal the existence of excess and/or vacant lands lying adjacent to the lands above described and the lessor, his heirs, or assigns, shall, by virtue of his ownership of the lands above described, have preference right to acquire said excess and/or vacant lands, then in that event this lease shall cover and include all such excess and/or vacant lands which the lessor, his heirs, or assigns, shall have the preference right to acquire by virtue of his ownership of the lands above described as and when acquired by the lessor; and the lessee shall pay the lessor for such excess and/or vacant lands at the same rate per acre as the cash consideration paid for the acreage hereinabove mentioned.

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

3. The Royalties to be paid Lessor are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be fifty cents (50c) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

4. If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Republic National Bank at Dallas, Texas (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Eighteen and 75/100 - - - - - - - - - - - - - - - - - - - - - - - - Dollars

172

($ 18.75 ), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases. In this connection the above described premises shall be treated as comprising 50 acres, whether there be more or less.

5. If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas or other mineral is produced from said land. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, successors and assigns, but no change or divisions in ownership of the land, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding on Lessee until Lessee shall be furnished with a certified copy of recorded instruments evidencing same. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part save as herein expressedly provided. If the obligation for reasonable development should require the drilling of a well or wells, Lessee shall have ninety (90) days after ultimate judicial ascertainment of the existence of such obligation within which to begin the drilling of a well, and the only penalty for failure to do so shall be the termination of this lease save as to ten (10) acres for each well being worked on and/or being drilled and/or producing oil or gas to be selected by Lessee so that each 10-acre tract will embrace one such well.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land and in event Lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty, in event of failure of title, it is agreed that if Lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid Lessor shall be reduced proportionately.

10. If any operation permitted or required hereunder, or the performance by Lessee of any covenant, agreement or requirement hereof is delayed or interrupted directly or indirectly by any past or future acts, orders, regulations or requirements of the Government of the United States or of any state or other governmental body, or any agency, officer, representative or authority of any of them, or because of delay or inability to get materials, labor, equipment or supplies, or on account of any other similar or dissimilar cause beyond the control of Lessee, the period of such delay or interruption shall not be counted against the Lessee, and the primary term of this lease shall automatically be extended after the expiration of the primary term set forth in Section 2 above, so long as the cause or causes for such delays or interruptions continue and for a period of six (6) months thereafter; and such extended term shall constitute and shall be considered for the purposes of this lease as a part of the primary term hereof. The provisions of Section 4 hereof, relating to the payment of delay rentals shall in all things be applicable to the primary term as extended hereby just as if such extended term were a part of the original primary term fixed in Section 2 hereof. The Lessee shall not be liable to Lessor in damages for failure to perform any operation permitted or required hereunder or to comply with any covenant, agreement or requirement hereof during the time Lessee is relieved from the obligations to comply with such covenants, agreements or requirements.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

Mrs. Robert Reed Humphrey

WITNESSES:

L. D. Humphrey Jr.

WIFE'S SEPARATE ACKNOWLEDGMENT

THE STATE OF TEXAS, }
COUNTY OF DALLAS }

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Robert Reed Humphrey, wife of Thos. D. Humphrey, known to me to be the person whose name is subscribed to the foregoing instrument, and having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Robert Reed Humphrey, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 18 day of February A. D. 19 52

(L. S.)

Mildred Adams
Notary Public in and for Dallas County, Texas

FILED FOR RECORD THE 19 DAY OF FEBRUARY, A. D. 1952 AT 8:15 O'CLOCK A. M.

RECORDED THE 26 DAY OF FEBRUARY, A. D. 1952.

BY Martha Ann Paul DEPUTY

VANCE THREALKELD, COUNTY CLERK
KAUFMAN COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Producers 88 (Revised) Rev.-Texas 1704 Texas Standard Form

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this 1st day of June, 1950, between Roy S. Blowers and wife, Mary B. Blowers, of Westfield, Chautauqua County, New York,

Lessor (whether one or more), and Thos. D. Humphrey

Lessee, WITNESSETH:

1. Lessor in consideration of Ten and No/100 Dollars ($10.00) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees, the following described land in Kaufman County, Texas, to-wit:

50 acres of land, more or less, out of the Ed Fitzgerald Survey, in Kaufman County, Texas, and out of the southwest corner of R. S. Blowers 200 acre tract, and being described as follows:

BEGINNING at the southwest corner of the said R. S. Blowers 200 acre tract, and the southeast corner of the E. B. Tuggle 96.7 acre tract, and the northwest corner of the Tuggle 184.5 acre tract; THENCE North with the west line of the said R. S. Blowers 200 acre tract 2178 feet to a point for corner; THENCE East 1000 feet to point for corner; THENCE South 2178 feet to a point in the south line of the said R. S. Blowers 200 acre tract and the north line of the said Tuggle 184.5 acre tract to a point for corner; THENCE West with the south line of the said R.S. Blowers 200 acre tract 1000 feet to the place of beginning, containing 50 acres of land, more or less

and containing 50 acres, more or less. In the event a resurvey of said lands shall reveal the existence of excess and/or vacant lands lying adjacent to the lands above described and the lessor, his heirs, or assigns, shall, by virtue of his ownership of the lands above described, have preference right to acquire said excess and/or vacant lands, then in that event this lease shall cover and include all such excess and/or vacant lands which the lessor, his heirs, or assigns, shall have the preference right to acquire by virtue of his ownership of the lands above described as and when acquired by the lessor; and the lessee shall pay the lessor for such excess and/or vacant lands at the same rate per acre as the cash consideration paid for the acreage hereinabove mentioned.

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

3. The Royalties to be paid Lessor are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be fifty cents (50c) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

4. If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Union Trust Company Bank at Westfield, New York (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Fifty & No/100 Dollars ($50.00), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases. In this connection the above described premises shall be treated as comprising 50 acres, whether there be more or less.

5. If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or reworking operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas or other mineral is produced from said land. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding on Lessee until Lessee shall be furnished with a certified copy of recorded instrument evidencing same. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part save as herein expressly provided. If the obligation for reasonable development should require the drilling of a well or wells, Lessee shall have ninety (90) days after ultimate judicial ascertainment of the existence of such obligation within which to begin the drilling of a well, and the only penalty for failure to do so shall be the termination of this lease save as to ten (10) acres for each well being worked on and/or being drilled and/or producing oil or gas to be selected by Lessee so that each 10-acre tract will embrace one such well.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land and in event Lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid Lessor shall be reduced proportionately.

10. If any operation permitted or required hereunder, or the performance by Lessee of any covenant, agreement or requirement hereof is delayed or interrupted directly or indirectly by any past or future acts, orders, regulations or requirements of the Government of the United States or of any state or other governmental body, or any agency, officer, representative or authority of any of them, or because of delay or inability to get materials, labor, equipment or supplies, or on account of any other similar or dissimilar cause beyond the control of Lessee, the period of such delay or interruption shall not be counted against the Lessee, and the primary term of this lease shall automatically be extended after the expiration of the primary term set forth in Section 2 above, so long as the cause or causes for such delays or interruptions continue and for a period of six (6) months thereafter; and such extended term shall constitute and shall be considered for the purposes of this lease as a part of the primary term hereof. The provisions of Section 4 hereof, relating to the payment of delay rentals shall in all things be applicable to the primary term as extended hereby just as if such extended term were a part of the original primary term fixed in Section 2 hereof. The Lessee shall not be liable to Lessor in damages for failure to perform any operation permitted or required hereunder or to comply with any covenant, agreement or requirement hereof during the time Lessee is relieved from the obligations to comply with such covenants, agreements or requirements.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

R. S. Blowers

Mary B. Blowers

WITNESSES:

Clara B Bristol

JOINT ACKNOWLEDGMENT

THE STATE OF ~~TEXAS,~~ New York }
COUNTY OF Chautauqua }

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Roy S. Blowers and Mary B. Blowers, , his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Mary B. Blowers , wife of the said Roy S. Blowers, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mary B. Blowers, acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 12th day of June, A.D. 1950.

(L. S.)

Clara B. Bristol
Notary Public in and for Chautauqua County, ~~Texas~~ New York.

FILED FOR RECORD THE 16 DAY OF June, A.D. 1950, AT 1:30 O'CLOCK P.M.

RECORDED THIS 19 DAY OF June, A.D. 1950.

FLOYD SHUMPERT, CLERK, COUNTY COURT
KAUFMAN COUNTY, TEXAS

BY Betty Clymer DEPUTY

1697

E-1136—ASSIGNMENT OF LIEN, CONTRACT, ETC.—Class 4. Clarke & Courts, Houston-Dallas-Galveston

Assignment of John Mc Coy Note to Perry Blythe

# ASSIGNMENT

THE STATE OF TEXAS, }
COUNTY OF Kaufman } KNOW ALL MEN BY THESE PRESENTS:

That I We, Clark Pevehouse and wife, Carrie Pevehouse of Dallas, County, Texas, for and in consideration of the sum of One Thousand Dollars ($1000.00), to ~~me~~ us in hand paid by Perry Blythe the receipt of which is hereby acknowledged, have bargained, sold and assigned, and by these presents do grant, bargain, sell, assign and transfer unto the said Perry Blythe his executors, administrators and assigns, a certain Vendor's Lien Note in the principal sum of $1000.00 payable in six installments, the first five being in the amount of $100.00 each and due on or before the first day of January 1951, 1952, 1953, 1954, 1955 and $500.00 due on or befoore January 1st, 1956. Said Note executed by John Mc Coy and wife, Varree Mc Coy, and being in part payment for 64.8 acres of land out of the William A. Thompson Survey situated in Kaufman County, Texas.

A—1-66
PRODUCERS 88 REV.
WITH POOLING PROVISION

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this 11th day of December 1970, between Strong Memorial Cemetery, acting through its duly constituted and elected Trustees, Henry McIver, Harry Denson and Lester Denson,

Lessor (whether one or more), whose address is: Slocum, Texas

and R & M Drilling Company, P.O. Box 399, Elkhart, Texas, Lessee, WITNESSETH:

1. Lessor in consideration of TEN AND NO/100 DOLLARS & Other Valuable Consideration xxx ($10.00 OVC), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Anderson County, Texas, to-wit:

All that certain tract or parcel of land situated in the W. R. Wilson Survey, Abstract #66, known as the Strong Memorial Cemetery, located aboutonne(1) mile West of the Village of Slocum, and being the same tract or parcel of land described in a Deed recorded in Vol. 199, Page 518, Deed Records of Anderson County, Texas, described by metes and bounds as follows, to-wit:

Starting at a stone in the center of the Slocum-Denson Springs Highway which is 174 yards from a stone culvert, place of beginning, THENCE S. 10 W. 210 yards, rock for corner; THENCE W. 10 N. 174 yards to center of Highway for corner; THENCE E. with said Highway to the place of beginning, containing 3 acres of land, more or less.

This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described above. For the purpose of calculating the rental payments hereinafter provided for, said land is estimated to comprise 3 acres, whether it actually comprises more or less.

2. Subject to the other provisions herein contained, this lease shall be for a term of 5 years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; while there is a gas well on this lease or on acreage pooled therewith, but gas is not being sold or used, Lessee may pay or tender as royalty on or before ninety (90) days after the date on which (1) said well is shut in, or (2) the land covered hereby, or any portion thereof, is included in a pooled unit on which a well is located, or (3) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter at monthly intervals, a sum equal to one-twelfth (1/12) of the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payment is made, and if such payment is made or tendered, this lease shall not terminate and it will be considered that gas is being produced from this lease in paying quantities; and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed, the royalty shall be fifty cents (50c) per long ton. Lessee shall have free use of oil, gas, coal, and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used.

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises. The size and shape of any such unit or units shall be determined by lessee. The units formed by pooling as to any stratum or strata need not conform in size or area with the unit or units into which the lease is pooled or combined as to any other stratum or strata, and oil units need not conform as to area with gas units. The pooling in one or more instances shall not exhaust the right of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit. Lessee may at its election exercise its pooling option before or after commencing operations for or completing an oil or gas well on the leased premises, and the pooled unit may include, but it is not required to include, land or leases upon which a well capable of producing oil or gas in paying quantities has theretofore been completed or upon which operations for the drilling of a well for oil or gas have theretofore been commenced. Operations for drilling on or production of oil or gas from any part of the pooled unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this instrument or the instrument designating the pooled unit, shall be considered as operations for drilling on or production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease, and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease and included in the pooled unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. The production from an oil well will be considered production from the lease or oil pooled unit from which it is producing and not as production from a gas pooled unit; and production from a gas well will be considered as production from the lease or gas pooled unit from which it is producing and not from an oil pooled unit. At any time and from time to time Lessee may revise, enlarge or diminish any pooled unit established hereunder, and in the absence of production therefrom may abolish and dissolve same, by filing for record in the appropriate records of the county in which the leased premises are situated an instrument so declaring in each such instance. Any such revision, enlargement, diminution or dissolution shall become effective as of the date of such filing for record, without any retroactive adjustment of royalties.

5. If operations for drilling are not commenced on said land or on acreage pooled therewith as above provided on or before one year from this date, the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender (or shall make a bona fide attempt to pay or tender, as hereinafter stated) to Lessor or to the credit of Lessor in Elkhart State Bank Bank at Elkhart, Texas, (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Three and No/100 Dollars ($3.00), (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental under this paragraph and of royalty under paragraph 3 on any gas well from which gas is not being sold or used may be made by the check or draft of Lessee mailed or delivered to the parties entitled thereto or to said bank on or before the date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instument naming another bank as agent to receive such payments or tenders. If Lessee shall, on or before any anniversary date, make a bona fide attempt to pay or deposit rental to a Lessor entitled thereto according to Lessee's records or to a Lessor, who, prior to such attempted payment or deposit, has given Lessee notice, in accordance with subsequent provisions of this lease, of his right to receive rental, and if such payment or deposits shall be ineffective or erroneous in any regard, Lessee shall be unconditionally obligated to pay to such Lessor the rental properly payable for the rental period involved, and this lease shall not terminate but shall be maintained in the same manner as if such erroneous or ineffective rental payment or deposit had been properly made, provided that the erroneous or ineffective rental payment or deposit be corrected within 30 days after receipt by Lessee of written notice from such Lessor of such error accompanied by such instruments as are necessary to enable Lessee to make proper payment. The down cash payment is consideration for this lease according to its terms and shall not be allocated as a mere rental for a period. Lessee may at any time or times execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases.

6. If prior to discovery and production of oil, gas or other mineral on said land, or on acreage pooled therewith, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other mineral the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment or tender of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty (60) days from date of completion of dry hole or cessation of production. If at any time subsequent to sixty (60) days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other mineral on said land, or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force for so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within three hundred thirty (330) feet of and draining the leased premises, or acreage pooled therewith, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

7. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U.S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. In the event of the death of any person entitled to rentals hereunder, Lessee may pay or tender such rentals to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence satisfactory to it as to the heirs or devisees of the deceased and that all debts of the estate have been paid. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rentals to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository; and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

9. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. After the discovery of oil, gas or other mineral in paying quantities on said premises, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator but in discharging this obligation it shall in no event be required to: (a) drill more than one well per 40 acres of the area retained hereunder and capable of producing oil in paying quantities from any formation, stratum or strata situated between the surface and the top of the Glen Rose Formation thereunder; (b) drill more than one well per 160 acres of the area retained hereunder and capable of producing oil in paying quantities from any formation, stratum or strata situated beneath the top of the Glen Rose Formation thereunder; and (c) drill more than one well per 640 acres plus an acreage tolerance not to exceed 10% of 640 acres in the area retained hereunder and capable of producing gas or other mineral in paying quantities.

10. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in the oil, gas or other minerals on, in or under said land less than the entire fee simple estate, whether or not this lease purports to cover the whole or a fractional interest, then the royalties and rentals to be paid Lessor shall be reduced in the proportion that his interest bears to the whole and undivided fee and in accordance with the nature of the estate of which Lessor is seized. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same. Failure of Lessee to reduce rental paid hereunder shall not impair the right of Lessee to reduce royalties.

11. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or on land pooled therewith or from producing oil or gas therefrom or from land pooled therewith by reason of scarcity of or inability to obtain or use equipment or material, or by operation of force majeure, any Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises or land pooled therewith, and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

12. As an additional consideration for the execution of this Oil, Gas and Mineral Lease, it is mutually agreed and understood that Lessee, its successors and assigns, shall not ever locate a well, or place the drilling equipment, slush pits, roads, tank batteries, or anything necessary in connection with the drilling, producing and marketing oil from the above described lands on the premises described herein, and that the Lessee will continue operations at the same location as the well which has been previously drilled on or off-setting said premises, and that any additional wells shall be directionally drilled so that the same may be bottomed on the above described lands, but the surface shall not be used by Lessee, its successors or assigns.

13. It is understood and agreed by and between the parties hereto that the Lessee herein, its successors and assigns shall pay to Lessor herein by depositing the same to the account of the Lessor at Elkhart State Bank at Elkhart, Texas, a minimum monthly royalty payment of Thirty Dollars ($30.00) per month beginning on the 15th day of January 1971, and thereafter on or before the 15th day of each succeeding month, it being understood that the royalties to be paid to Lessor from production of oil and/or gas from said lease shall be 1/8th of such production as is provided in Paragraph 3; however, at such time as 1/8th of the production totals less than $30.00 per month, the Lessee shall pay the minimum monthly royalty payment provided hereinabove.

**IN WITNESS WHEREOF, this instrument is executed on the date first above written.**

STRONG MEMORIAL CEMETERY

By Henry McIver
Henry McIver

Harry Denson
Harry Denson

Lester Denson
Lester Denson

TRUSTEES

THE STATE OF TEXAS X

COUNTY OF ANDERSON X

BEFORE me the undersigned, a Notary Public in and for said County and State on this day personally appeared Henry McIver, Harry Denson, and Lester Denson, known to me to be the persons and officers whose names are subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Strong Memorial Cemetery and that they executed the same as the act of such Strong Memorial Cemetery for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN under my hand and seal of office this the 11th day of December 1970.

NOTARY PUBLIC COUNTY OF ANDERSON, TEXAS

Dorothy Parker DOROTHY PARKER
Notary Public in and for
Anderson County, Texas.

FILED FOR RECORD AT 2:15 O'CLOCK P. M 12-11 19 70 STANLEY WALTON
CLERK COUNTY COURT, ANDERSON CO., TEXAS By Mary Watson Deputy