## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| 84 ENERGY, LLC, | § | Case No. 25-37093 |
| | § | |
| *Debtor.* | § | |
| | § | |
| | § | |
| ANDREW KOLLAER, MPC 84 I, LLC, | § | |
| AND KOLCAP, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | Adv. No. 25-03836 |
| | § | |
| v. | § | |
| | § | |
| 84 ENERGY, LLC, 84 ENERGY HOLDINGS, | § | |
| LLC, AND AARON SHIMEK, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS REQUEST
## FOR A TEMPORARY RESTRAINING ORDER AND AN EMERGENCY HEARING

Plaintiffs Andrew Kollaer, Kolcap, LLC, and MPC 84 I, LLC (collectively, the "Plaintiffs") file this *Supplemental Brief in Support of Its Request for A Temporary Restraining Order and an Emergency Hearing*, and respectfully shows the Court as follows:

### Introduction

1.     Plaintiffs wish to bring to the Court's attention an injunction issued in 2015 by Judge H. Christopher Mott of the United States Bankruptcy Court, Western District of Texas, Austin Division.[1] The injunction was issued under very similar circumstances and may be helpful to the Court.

---

[1]     *See* Adversary Case No. 15-01006-HCM; Lead Case No. 15-0003.   The injunction was read into the record in the Transcript filed under Document No. 44 (the "***Injunction Order***").   True and correct copies of the Injunction Order and the court's oral ruling are attached hereto as **Exhibits A and B**, respectively.

2. In *U.S. Energy Development Corp. v. WBH Energy Partners, LLC, et al.*, the Bankruptcy Court issued an injunction granting the exact same relief requested by Plaintiffs, namely, an order transitioning operatorship from an unlawful holdover operator to a new one. **The Bankruptcy Court issued the injunction in order to avoid the "absolute crisis" that is present in this case**—a situation where oil and gas operations are halted due to operator's insolvency, thereby leading to ongoing destruction of value. *See* Injunction at p. 39.

3. The facts of this case are far more extreme than *WBH* because Debtor 84 Energy, LLC (the "**Debtor**" or "**84 Energy**") is acting in a coercive manner—through retaliatory shut-ins, abandonment of the field while retaining operator-of-record status, and obstruction of records access—all designed to extract leverage, not to preserve assets.

<u>**Background**</u>

4. The *WBH* matter arises from the Chapter 11 cases of WBH Energy, LP; WBH Energy Partners, LLC; and WBH Energy GP, LLC. In an adversary proceeding, U.S. Energy Development Corporation ("***USED***") applied for a preliminary injunction against WBH Energy Partners, LLC (the "***Debtor LLC***"). USED's claims arose under a Joint Operating Agreement (the "***JOA***") under which USED was working interest owner and Debtor LLC was named operator. Millions of dollars had been invested under the JOA to develop and operate oil and gas properties subject to hundreds of oil and gas leases. *See* Injunction Order at p. 19.

5. Before Debtor LLC declared bankruptcy, USED exercised its rights under the JOA to remove Debtor LLC as operator and name itself as the successor operator. USED was qualified to serve as operator because it was capitalized, experienced, and familiar with the operations.

6. USED removed Debtor LLC as operator on two separate grounds under the JOA, namely, that Debtor LLC was insolvent and unable to serve as operator. USED demonstrated

Debtor LLC's inability to serve as operator through testimony regarding its failure to pay vendors along with alleged misappropriation of investor funds.[2]

7.      As a result of these facts, Debtor LLC's investors stopped funding its operations. *See* Injunction at p. 40.  Debtor LLC claimed its defaults under the JOA were excused, and that its removal was improper, because its insolvency was caused by the investor's decision to cut off funding.  *See* Injunction Order at p. 29.

8.      Following its removal as operator, Debtor LLC refused to transition the operatorship to the new operator.  Unlike 84 Energy, however, Debtor LLC continued to actively operate the wells, so the stakes were not as high as they are in this case.

## The Injunction

9.      After Debtor LLC declared bankruptcy, USED initiated an adversary proceeding and applied for a temporary injunction that:

i.   Restrained Debtor LLC from refusing to execute joint P-4s; interfering with RRC efforts; operating or preventing USED's operations; withholding access to well files and data; interfering with proceeds redirection; withdrawing escrowed funds; or damaging, destroying, moving, or concealing JOA-related property or records.

ii.  Required Debtor LLC to deliver all Exhibit A records by dates certain (generally by February 20, 2015; well data by March 1, 2015); provide additional records within five business days of request; notify payors within five business days to remit to USED; complete operator-change forms within three business days; take steps enabling payors to deliver proceeds; and turn over funds attributable to USED's working interest.

---

[2]      The investors alleged Debtor LLC used money earmarked for a specific purpose for a different purpose, without the investors' consent.  The investors therefore called for a forensic accountant to conduct an investigation.  *See* Injunction at p. 40.

10.     The Bankruptcy Court held an evidentiary hearing on *Plaintiffs' Application for Temporary Injunction* and determined that Plaintiffs were entitled to an injunction because they demonstrated likelihood of success, irreparable injury, no adequate legal remedy, favorable equities, and public-interest support to preserve the status quo.  In so ruling, the Court made the following findings:

## I.      Status Quo

11.     The Court determined the status quo to be that Debtor LLC had been removed as operator and USED had been selected as successor operator.  *See* Injunction at 24 (citing *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 587 (Tex. App.—El Paso 2003, pet. denied)).[3] In other words, the status quo is the rightful owners' removal decision and successor's installation—not the holdover operator's possession.  *See* Injunction Order at p. 24.

## II.     Likelihood of Success on the Merits

12.     The Court determined USED was likely to succeed on its claim that it removed Debtor LLC as operator under the JOA because Debtor LLC was insolvent and unable to pay lease expenses.  *See* Injunction at p. 46.  The Court determined it was not a defense to the issuance of an injunction that Debtor LLC argued its defaults were executed because the investors stopped funding its operations.  *See* Injunction Order at p. 29.

## III.    Irreparable Harm

13.     The Bankruptcy Court found five instances of irreparable harm.  First, USED was "being denied the right to operate oil and gas properties in which it has invested significant funds when it had the contractual right to be the operator."  *See* Injunction Order at p. 33.  Second,

---

[3]      *Tri-Star* stands for the proposition that Courts may grant operator-transition injunctions that ensure regulatory compliance, continuity of production, protection against waste, and safeguarding of records and proceeds while the merits are litigated.

"Debtor LLC's lack of funding and capital" rendered it unfit to be operator and otherwise resume operations. *See* Injunction Order at p. 34-35 (observing "operating wells is a capital intensive business," "Debtor LLC "has no ready capital," and "Debtor LLC has no alternative source of funding that is on the horizon or immediate prospect."). Third, USED's oil and gas leases were subject to termination for non-production. *See* Injunction Order at p. 35-36. Fourth, mineral lien claims were being asserted against the wells due to Debtor LLC's failure to pay suppliers and vendors. *See* Injunction at 36. Fifth, Debtor LLC was involved and did not have adequate monetary relief available. *See* Injunction Order at p. 37.

14. The finding of irreparable harm is noteworthy because, again, Debtor LLC was continuing to actively operate the oil and gas wells. Here, 84 Energy shut-in the wells and walked away from them—all while refusing to transition the operatorship to someone else.

## IV.      Balancing of the Equities

15. To balance the equities, the Court looked to the Creditors Committee and lender, and did not take into account arguments from Debtor LLC. The Court noted the equities favored an injunction because of the disastrous consequences associated with not granting an injunction:

> The Court is very concerned that even if the preliminary injunction were not granted, given all the fighting and accusations between the debtors and its lenders and the lacking of funding support for the Debtors, that Debtor LLC would end up at some point not having the funds to operate and lose the operatorship anyway. It is better to have an orderly operator transition now with USED instead of waiting until it is in ***absolute crisis mode*** and run the risk that Debtor LLC operations would have to be immediately shut down and harm all parties concerned that have interest in and claims against the wells and leases.

*See* Injunction Order at p. 39 (emphasis added).

16. The Court further noted the equities favored an injunction because Debtor LLC would be fully occupied defending itself in the adversary proceeding:

The Court is making no findings on whether or not Debtor LLC has engaged in any accounting irregularities, but the time and expense to Debtor LLC to defend these accusations, while at the same time trying to act as operator and trying to cooperate and complete the wells with little or no financial funding greatly reduces any possibility that Debtor LLC will be successful in operating and completing these wells, which would harm all stakeholders in these bankruptcy cases.  40-41.

17.     The Court concluded that it was in the best interest of Debtor LLC "to cooperate in the operator transition for several reasons, including to preserve the working interests."  *See* Injunction Order at p. 39.  In so holding, the Court noted "Debtor LLC will incur time and expense in transitioning operations to USED" and that "Debtor LLC and its management and employees must be paid for those transition services." *See* Injunction Order at p. 38.

18.     Finally, the Court noted the benefits associated with a new operator:

On the other hand, USED as a successor operator is a financially solvent and experienced operator that is willing and able to operate the wells. USED already has a vested financial interests and successfully operating and completing these wells. USED already has some knowledge about the wells and properties given its substantial working interest ownership and the properties at issue.

*See* Injunction Order at p. 39.

**V.     Public Interest**

19.     The Court concluded the public interest would benefit from an injunction:

Debtor LLC is on very shaky financial footing and the Court has little confidence at this point that the Debtor LLC will have the capital and funding to operate and complete the wells period to have an operator like Debtor LLC that might have to suddenly shut down due to lack of funds would disservice the interests of the public in the state of Texas.  A sudden shutdown of operating wells would be dangerous for the public. In the rest of the public can be lowered by having used as the operator.

*See* Injunction Order at p. 41.

4920-5090-3420.2

## VI.     Adequate Remedy at Law

20.     The Court found that loss of operational continuity, integrity of technical datasets and records, and misdirection of proceeds are not compensable by money damages. *See* Injunction Order at p. 33-34.

## VII.    Bond

21.     The Court ordered USED to post a $150,000 bond and an undertaking to perform operator obligations. *See* Injunction Order at p. 42.

## Application Of *WBH* To The Debtor and Plaintiffs

22.     The Court's decision in *WBH* justifies and supports *Plaintiffs' Application for Temporary Restraining Order* and hearing thereon.

## I.     Status Quo

23.     Similar to *WBH*, and relying upon *Tri-Star*, the status quo is where 84 Energy had been removed as operator of all wells owned by ER and RH, and that ER and RH had selected HD Operating, LLC as successor operator.  Additionally and in the alternative, the status quo is when all wells owned by ER and RH were being operated by a willing and solvent operator who performed its work in a transparent fashion and in accordance with industry standards.

## II.     Likelihood of Success on the Merits

24.     The relevant claim for purposes of this element is Plaintiffs' claim for declaratory relief that the October 20, 2025 removal notice was effective to remove 84 Energy as operator of all wells owned by ER and RH.  There are many other disputes between the parties, but this is the only claim that matters for purposes of an injunction.

25.     <u>As to wells owned by ER</u>, MPC, the manager, exercised its right to remove 84 Energy as manager "for cause" by written correspondence dated October 20, 2025.  *See* ER

Company Agreement at Section 5.11.  Because 84 Energy was removed as manager, it "shall no longer serve" as operator, *i.e.*, 84 Energy's removal as operator was automatic.  *See* ER Company Agreement at Section 5.14.  ER's managers and members—exclusive of 84 Energy—unanimously approved this decision along with the selection of HD Operating, LLC as successor operator.

26.     <u>As to wells owned by RH</u>, there is no written joint operating agreement or any other document fixing 84 Energy's term as operator.  As a result, 84 Energy's operatorship was terminable at will.  ER's managers and members—reflecting 99% of the membership interest, exclusive of those associated with 84 Energy—unanimously approved the removal of 84 Energy as operator and replacing it with HD Operating, LLC.  84 Energy was removed as operator by written correspondence dated October 20, 2025.

27.     As evident in *WBH* and *Tri-Star*, 84 Energy does not state a defense to an injunction by arguing it was wrongfully removed or rendered insolvent because the investors ceased funding operations.  For purposes of an injunction, Plaintiffs have demonstrated a likelihood of success on their removal claim, and this is where the injunction analysis ends.  The parties will litigate the merits in due course.

**III.    Irreparable Harm**

28.     The WBH Injunction Order recognized continuity of operations as critical.  This consideration is even more critical in this case because Debtor has already shut-in all wells.  It is therefore not surprising that all five instances of irreparable harm in *WBH* are very evident in this case.  Further, in this case, there is a sixth instance of irreparable harm through ongoing

environmental contamination that is being ignored because Debtor walked away from the oilfield, which is currently unsupervised.

i.   Debtor is denying ER and RH the right to operate their oil and gas properties.  The total investment in the wells owned by ER and RH is approximately $25 million.

ii.  Operating the wells owned by ER and RH is capital intensive and presents immediate funding needs.  Debtor has no funding or capital and will be very unlikely to resume operations.

iii. Multiple leases carry 60- and 120-day cessation clauses; several with 60-day terms are on a live clock following the October 20th shut-in.  **These leases may terminate on December 7, 2025** for non-production.  Loss of leases equals loss of the enterprise and is an injury that cannot be cured by money damages.

iv.  Debtor is insolvent and will not be able to compensate Plaintiffs with monetary relief.

## IV.    Balancing of the Equities

29.    The equities in this case balance much stronger in favor of issuance of injunction because Plaintiffs are already in the "absolute crisis mode" that the Bankruptcy Court feared in WBH.  *See* Injunction Order at p. 39.  Debtor does not have funds to operate and all wells have already been shut-in.

30.    Further, Debtor has demonstrated it is incapable of being operator.  While no party is advocating for Debtor to resume its role as operator, it is certain Debtor could not resume such a role while also defending itself in at least two adversary proceedings, whether from a financial and/or a time and attention standpoint.

31.     Plaintiffs have offered to compensate 84 Energy for its time and expense in transferring operations to HD Operating, LLC.  This offer stands, consistent with the Court's finding in *WBH.*

32.     Finally, similar to the replacement operator in *WBH*, HD Operating, LLC is experienced, solvent, and knowledgeable of the wells and properties at issue.  The owners of HD Operating, LLC already have a vested financial interest in these wells given their ownership of ER and RH.

## V.     Public Interest

33.     The public interest strongly favors issuance of an injunction.  The public interest has already been injured by the ongoing environmental pollution along with ongoing inattention to hundreds of oil and gas wells across multiple counties in Texas.

## VI.     Adequate Remedy at Law

34.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 65.011(5), Plaintiffs are not required to demonstrate an inadequate remedy at law because Defendants' unlawful action threatens irreparable injury to real or personal property, namely, the oil and gas interested owned by ER and RH.  *See Tri-Star Petroleum Co.*, 101 S.W.3d at 592.  Regardless, Plaintiffs are experiencing the same loss of operational continuity, integrity of technical datasets and records, and misdirection of proceeds as in *WBH*, none of which are compensable by money damages.

## VII.     Bond

35.     Plaintiffs contend no bond is necessary because 84 Energy and its affiliates will actually benefit from an injunction because it will protect their alleged economic interest in ER and RH—thus, an injunction will protect property of the Debtor's estate.  Defendants will otherwise suffer no harm if an injunction is granted because 84 Energy is sitting on its hands.

10

Defendants will suffer no harm if the operatorship is resumed by someone else. 84 Energy is apparently willing to transfer the operatorship to someone else as evident through its purported assignment of the Clarksville Cotton Valley Unit to SND Operating, LLC. Conversely, if an injunction is not granted, any economic interest in ER and RH—including anything allegedly owned by Defendants—will be completely wiped out, harming property of the estate.

36. Nonetheless, should the Court so require, Plaintiffs stand ready to post an appropriate bond in the suggested amount of $150,000 consistent with the *WBH* Injunction Order.

## VIII. Property of the Estate

37. Additionally, the operatorship did not become property of the Debtor's estate upon the bankruptcy filing because the operatorship was properly terminated prepetition. Section 541(a) of the Bankruptcy Code broadly defines property of the estate to include all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy case, wherever located. *See* 11 U.S.C. § 541. The scope of property interests under section 541 is determined by federal law, but the nature and extent of those interests are governed by applicable nonbankruptcy law, including state law. *See In re Amaravathi Ltd. P'ship*, 416 B.R. 618, 622 (Bankr. S.D. Tex. 2009) (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979)). Property that the debtor no longer has an interest in as of the petition date is generally excluded from the estate. *See In re Great Gulfcan Energy Texas, Inc.*, 488 B.R. 898, 910 (Bankr. S.D. Tex. 2013) (explaining that "[t]he estate does not receive more rights than those that the debtor has in property as of the commencement of the case. Thus, if a debtor's interest in property is limited at the time of filing, the estate's right in the property is also so limited").

38. Contractual rights held by the debtor as of the petition date constitute estate property, but a prepetition termination or relinquishment of a contract interest ordinarily precludes

inclusion of that interest in the estate. *In re Quade*, 482 B.R. 217, 225 (Bankr. N.D. Ill. 2012), *aff'd in part*, 498 B.R. 852 (N.D. Ill. 2013) (stating that "[t]o the extent that a debtor once had an interest in property but, as of the commencement of the bankruptcy case, no longer does, that interest does not become property of the estate"). In *In re Redman Oil Co.*, which related to a debtor's request that a receiver turnover operations of certain oil and gas wells, the court held that a debtor's contractual right to operate oil and gas wells terminated prepetition. *In re Redman Oil Co., Inc.*, 95 B.R. 516, 524 (Bankr. S.D. Ohio 1988). The court stated that the debtor bears the burden of proving it had "the contractual right to operate the Wells as of the petition date" and held that "the evidence clearly establishes that [debtor's] operating rights were effectively extinguished by lawful invocation of the Replacement Provision [in the operating agreement] well in advance of the commencement of this case." *Id.* at 524-25. Again, in *In re WBH Energy*, the court granted a preliminary injunction recognizing that the debtor operator "had been properly removed as operator under the JOA prior to its bankruptcy filing," explaining that the debtor "had no 'property interest' in the JOA because its only interest (the operatorship) was terminated prior to Debtor LLC's bankruptcy filing." *In re WBH Energy, LP*, No. 15-10003-HCM, 2016 WL 3049666, at *5 (Bankr. W.D. Tex. May 20, 2016), *aff'd sub nom. In re: WBH Energy, LP U.S. Energy Dev. Corp. v. CL III Funding Holding Co., LLC*, No. 1: 16-CV-884-LY, 2017 WL 663561 (W.D. Tex. Feb. 17, 2017), *aff'd sub nom. In re WBH Energy, L.P.*, 708 F. App'x 210 (5th Cir. 2018).

39.     Here, the Debtor was a mere contract operator, and the operatorship was not subject to any joint operating agreement. Any right to operatorship that the Debtor maintained was a contractual right that was terminated prepetition, and therefore the operatorship is not property of the estate.

## Conclusion

40.     The Court's reasoning and analysis in *WBH* should be helpful to enable the Court to issue a ruling on Plaintiffs' *Application for Temporary Restraining Order*.  The damage and destruction in this case is far worse than *WBH* since the wells have already been shut in, but thankfully it is not too late to act.  With Court intervention, the wells owned by ER and RH can be promptly turned back on in order to avoid further destruction of value and assets.

Respectfully submitted this 28th day of November, 2025.

**GRAY REED**

By: _/s/ David Leonard_

    Micheal W. Bishop
    Texas Bar No. 02354860
    Emily F. Shanks
    Texas Bar No. 24110350
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     mbishop@grayreed.com
            eshanks@grayreed.com

-and-

**GRAY REED**

    David Leonard
    Texas Bar No. 24078847
    Jeremy Walter
    Texas Bar No. 24098572
    Daniel B. Howry
    Texas Bar No. 24130877
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7198
Email:     dleonard@grayreed.com
            jwalter@grayreed.com
            dhowry@grayreed.com

*Counsel for Plaintiffs Andrew Kollaer, MPC 84 I, LLC, and Kolcap, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on November 28, 2025, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties who are deemed to have consented to ECF electronic service. Service has also been made by U.S. mail, first class- postage prepaid, and by electronic transmission on the parties listed below.

Simon W. Hendershot, III
Lacey L. Spears
HENDERSHOT COWART, P.C.
1800 Bering Drive, Suite 600
Houston, Texas 77057
Email: rtey@hchlawyers.com
      lspears@hchlawyers.com

*Counsel for Defendants*

Richard L. Fuqua, II
FUQUA & ASSOCIATES, PC
8558 Katy Freeway, Suite 119
Houston, TX 77024
Email: fuqua@fuqualegal.com

*Counsel for the Debtor*

 

*/s/ Micheal W. Bishop*
Micheal W. Bishop

**<u>EXHIBIT A</u>**

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: February 17, 2015.**

*H Mott*

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| WBH Energy, LP, | § | Case No. 15-10003 |
| WBH Energy Partners LLC, | § | Case No. 15-10004 |
| WBH Energy GP, LLC, | § | Case No. 15-10005 |
|     Debtors. | § | |
| | § | |
| U.S. ENERGY DEVELOPMENT | § | |
| CORPORATION, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 15-1006-HCM |
| | § | |
| WBH ENERGY PARTNERS, LLC, WBH | § | |
| ENERGY, LP AND WBH ENERGY | § | |
| GP, LLC, | § | |
|     Defendants. | § | |

**ORDER GRANTING PLAINTIFF'S APPLICATION FOR A PRELIMINARY
INJUNCTION AGAINST DEFENDANT WBH ENERGY PARTNERS, LLC**

      On February 6, 9 and 13, 2015 the Court considered Plaintiff's application for a

preliminary injunction against Defendant WBH Energy Partners, LLC ("Debtor LLC"). After

examining the verified pleadings, evidence presented and argument, and holding a hearing with

notice to Debtor LLC, the Court finds that the requirements for issuance of the requested preliminary injunction have been met. Pursuant to FRCP 52(a) and Bankruptcy Rule 7052 the Court incorporates its findings of fact and conclusions of law set forth on the record at the hearing conducted on February 9, 2015 in this adversary proceeding as if fully set forth herein. The Court finds that:

1. Plaintiff, U.S. Energy Development Corporation ("USED" or "Plaintiff") is entitled to the issuance of a preliminary injunction to protect and preserve the status quo pending a trial. Plaintiff has demonstrated a likelihood of success on the merits of its claims against Defendant, Debtor, and LLC. Further, the balance of equities between Plaintiff on the one hand and Debtor, LLC on the other favors the issuance of a preliminary injunction.

2. Irreparable injury, loss or damage would otherwise occur.

3. Plaintiff has demonstrated a probable injury and right to the relief it seeks on final hearing.

4. A preliminary injunction is necessary in this case to preserve the status quo between the parties pending trial.

5. Unless Debtor LLC is enjoined, Plaintiff will probably suffer irreparable injury and damage.

6. In addition, unless Debtor LLC is immediately enjoined, Plaintiff will have no adequate remedy at law, and good cause exists for the issuance of an injunction.

7. The harm that will be suffered by Plaintiff without injunctive relief outweighs the harm to Debtor LLC resulting from the injunction; and

8. The issuance of this injunction is in the public interest.

It is therefore ORDERED that an injunction shall issue, and Debtor LLC and its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are hereby immediately restrained and ordered to refrain from:

    a. refusing to join in the immediate execution and delivery of proper joint form P-4s designating Plaintiff as the operator under the Joint Operating

Agreement dated September 1, 2011, as it has been amended and modified (the "JOA");

b.    interfering with Plaintiff's efforts to file and obtain approval from the Texas Railroad Commission of joint form P-4s designating Plaintiff (for Commission purposes) as the operator under the JOA;

c.    further operating or performing operations under the JOA or preventing USED's activities as operator under the JOA;

d.    interfering with Plaintiff's operation of the Contract Area under the JOA;

e.    withholding or refusing to deliver to Plaintiff the well files, records, data, and all other documentation described on **Exhibit A** hereto necessary to continue operations under the JOA;

f.    withholding from Plaintiff, or denying Plaintiff access to, any property or records (including paper or tangible documents or files and electronic files) necessary to continue operations under the JOA;

g.    interfering with Plaintiff's efforts to have all payors of production proceeds from the Contract Area deliver such proceeds to Plaintiff;

h.    giving Horizon Bank or any other escrow agent notice or taking any other action to withdraw any funds from any of Plaintiff's escrow accounts related to the JOA; and

i.    damaging, destroying, tampering with, transferring or moving (except as required in the Court's order), hiding or secreting any property or records (including paper or tangible documents or files and electronic files), any text messages, computer files, faxes or other paper or electronic documents that relate to the JOA or operations thereunder;

and requiring that Debtor LLC do the following:

j.    deliver to Plaintiff, in their current form, all records and data listed on **Exhibit A** in Debtor LLC's possession and/or subject to its control no later than February 20, 2015 (or with respect to well data files, by March 1, 2015) and provide such additional records or access to information in Debtor LLC's possession or subject to its control reasonably necessary to continue operations under the JOA as may be requested by USED in writing no later than 5 business days after request;

k.    advise all parties paying production proceeds for the JOA Contract Area, no later than five (5) business days after this order becomes effective, to pay all such proceeds to USED.

l.   complete the forms to be filed with the Texas Railroad Commission changing the operator to Plaintiff and deliver them to Plaintiff no later than three (3) business days after this order becomes effective; and

m.   take such action as might be necessary to allow all payors of production proceeds for the Contract Area deliver all such proceeds to Plaintiff.

It is further ordered that upon (i) the filing of a bond by Plaintiff in the amount of $150,000.00 (or a cash deposit in lieu thereof), and (ii) filing by Plaintiff of a written undertaking by which it (a) agrees to perform the obligations of the Operator under the JOA and (b) agrees that damages, if any, from any determination that Debtor LLC has been wrongfully enjoined is not limited by the amount of the bond provided herein, (collectively, the "Security") this injunction shall become effective and this Order shall be served by Plaintiff.

It is further ordered that this order shall become effective and Plaintiff shall be deemed the operator under the JOA upon the later of March 1, 2015 or the date the Security is posted in accordance with this order.  However, Debtor, LLC's responsibility to provide the information by February 20, 2015 (or as applicable, March 1, 2015) as reflected above shall be effective upon the later to occur of February 20, 2015 or the date that the Security is completed.

It is further ordered that not later than five (5) business days after this order becomes effective, Debtor LLC shall turnover to Plaintiff any funds it is holding attributable to Plaintiff's working interest.

It is further ordered that once this order becomes effective, it shall remain in effect until a trial on the merits, further order of this Court (or another court of competent jurisdiction) or agreement of the parties;

It is ordered that nothing in this order shall prohibit or enjoin any of the Defendants (or any other person or party in interest; including the Official Committee of Creditors or Plaintiff) from (i) seeking relief or appeal from this order; (ii) defending against any claims, causes of

action, or pleadings filed by or against Plaintiff in this adversary proceeding or otherwise; or (iii)

asserting any claims or causes of action against Plaintiff or its property or defending any such

claims.

# # #

Entry Requested By:

Eric J. Taube
Mark C. Taylor
Hohmann, Taube & Summers, LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone:  512/472-5997
Telecopier:  512/472-5248

APPROVED AS TO FORM ONLY:

BRACEWELL & GIULIANI LLP

By: _By permission Eric Taube_       196793150

    William A. (Trey) Wood III
    Texas Bar No. 21916050
    Trey.wood@bgllp.com
    711 Louisiana, Suite 2300
    Houston, TX 77002
    Telephone:  (713) 223-2300
    Facsimile:  (713) 221-1212

COUNSEL FOR DEBTORS

## EXHIBIT A

- Royalty Owners:  Updated Division Orders, including names, addresses and federal ID #s (SS, EIN)
- All financial information necessary to account for well costs to date (including any AFE to actual cost comparisons)
- Oil and gas purchasers and contact information (as per order, but critical)
- Vendor information
  - Updated listing – including Name and Addresses, Federal ID #'s
  - Service Contracts – MSAs,
  - Current insurance information for Vendors and WBH
  - Current outstanding balances owed by vendor and date
  - Post-Petition Outstanding Balances
    - Aged listing of all outstanding balances
  - Chemical treatment description (along with schedule and what treating for)
    - Wells
    - Pipeline/flowlines
  - Electrical supplier
  - Agreements made for any current or future work with any vendor, service company or supplier.
- Information on all field staff personnel (some may be offered to be retained by USEDC)
- Gain access to field office and facilities and files
- Access to well sites
- Information for all landowners including land records
  - Copies of all leases
  - Contact details and relationship information
  - Ongoing negotiations – explanation and status
  - Title Attorney(s) information and status
- Clear description and understanding of what is done on a daily basis by:
  - Pumpers
    - gauging, reporting
    - well checks
    - maintenance
      - Well treatment programs (schedule, volumes, by whom)
      - Well integrity and monitoring programs (pressures, testing, etc)
  - Other field staff
  - Office staff
    - reporting (what, to who, why, when)
      - TRRC reports made and required

In addition, we request the following general information as well as wellbore and geological information:

General:

- Inventory of facilities and equipment
- HSSE Information of any spills or other incidents that have taken place, any concerns, etc

- Location plats of wells, locations, facilities, pipelines, metering, valving, water supply ponds, water supply sources, etc
- Mapping of right of ways and associated records
- Inventory of any stock on hand
- Inventory of and access to all seismic data and interpretations
- Any work performed & prepared by SPRI including but not limited to log or production analysis, any interpretations, reports or recommendations
- Any other geologic, geophysical or petrophysical consulting analyses or reports;
- Marble Falls cuttings analysis.

Well Data For Each Well:
- Files and History of
  - All well work activity
    - Drilling and Completion
    - Stimulation
    - Flowback
    - Artificial lift
    - Well intervention (repairs, changes, etc)
- Wellbore Diagrams
- Frac design for each well completed by WBH in Cooke/Montague Counties
- Actual pumped reports for each stimulation (3rd party reports)
- Open Hole logs
- Cased Hole logs
- Mud Logs
- Results & interpretations of any microseismic data
- List of all necessary regulatory filings & required timing.

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| U.S. ENERGY DEVELOPMENT | ) | CASE NO:  15-01006-HCM |
| CORPORATION, | ) | ADVERSARY |
| | ) | |
| Plaintiff, | ) | |
| | ) | Austin, Texas |
| vs. | ) | |
| | ) | Monday, February 9, 2015 |
| WBH ENERGY PARTNERS, LLC, | ) | (1:04 p.m. to 2:20 p.m.) |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

LEAD CASE:  15-10003    WBH ENERGY, LP; WBH ENERGY GP, LLC and
WBH ENERGY PARTNERS, LLC


#1 - ADVERSARY COMPLAINT;

#70 - MOTION TO APPROVE ENTERPRISE STIPULATION
AND AGREED ORDER CONCERNING FUNDS HELD IN SUSPENSE;

#71 - MOTION TO APPROVE COPANO STIPULATION
AND AGREED ORDER CONCERNING FUNDS HELD IN SUSPENSE

#16 - EMERGENCY MOTION TO USE CASH COLLATERAL


BEFORE THE HONORABLE H. CHRISTOPHER MOTT,
UNITED STATES BANKRUPTCY JUDGE


Appearances:          See next page

Court Recorder:       Sherri Miiller

Deputy Clerk:         Ronda Farrar

Transcribed by:       Exceptional Reporting Services, Inc.
                      P.O. Box 18668
                      Corpus Christi, TX 78480-8668
                      361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>COURTROOM APPEARANCES FOR:</u>

Debtors:                          WILLIAM A. (TREY) WOOD, ESQ.
                                  Bracewell & Giuliani, LLP
                                  711 Louisiana, Suite 2300
                                  Houston, TX 77002

U.S. Energy Development:          ERIC J. TAUBE, ESQ.
                                  Hohmann Taube & Summers, LLP
                                  100 Congress Avenue, Suite 1800
                                  Austin, TX 78701

Copano Field Services/           PATRICIA PREWITT, ESQ.
 North Texas, LLC:               Law Office of Patricia Williams
                                   Prewitt
                                  10953 Vista Lake Court
                                  Navasota, TX 77868

CL III Funding Holding           KENNETH P. GREEN, ESQ.
 Company, LLC:                   Snow Spence Green, LLP
                                  2929 Allen Pkwy, Suite 2800
                                  Houston, TX 77019

Official Creditors               BERRY D. SPEARS, ESQ.
 Committee:                      TODD L. DISHER, ESQ.
                                  Locke Lord, LLP
                                  600 Congress Avenue
                                  Suite 2200
                                  Austin, TX 78701


<u>TELEPHONIC APPEARANCES FOR:</u>

Debtors:                          JASON G. COHEN, ESQ.
                                  Bracewell & Giuliani, LLP

Official Creditors Committee:     PHILIP EISENBERG, ESQ.
                                  Locke Lord, LLP

Basic Energy Services:            JERROD L. ALLEN, ESQ.
                                  West Allen Law Firm, PC

U.S. Energy Development:          ALAN LAURITA, ESQ.

U.S. Energy Development:          RON HOLBROOK, ESQ.

3

**TELEPHONIC APPEARANCES FOR (Cont'd):**

| | |
|---|---|
| CL III Funding Holding<br> Company, LLC: | PHIL F. SNOW, ESQ.<br>ROSS SPENCE, ESQ.<br>Snow Spence Green, LLP |
| PLPS, Inc: | MICHAEL W. BISHOP, ESQ.<br>Gray Reed & McGraw, PC |
| Enterprise Crude Oil: | JOSEPH P. ROVIRA, ESQ.<br>Andrews Kurth, LLP |

4

1          **Austin, Texas; Monday, February 9, 2015; 1:04 p.m.**

2                        **(Call to order)**

3          **THE COURT:**  Good afternoon, everyone.

4      **(Attorneys respond in unison)**

5          **THE COURT:**  Okay, I'm going to call the case of WBH

6   Energy, LP, WBH Energy Partners, LLC, and WBH Energy GP, LLC,

7   which is jointly administered Chapter 11 Case Number 15-1003

8   (sic), and in particular the adversary proceeding, Number 15-

9   1006, styled U. S. Energy Development Corporation versus the

10  three WBH Debtor entities as Defendants.  So why don't we start

11  by getting appearances of counsel in the courtroom, please?

12         **MR. WOOD:**  Good afternoon, your Honor.  Trey Wood on

13  behalf of the Debtors.

14         **MR. TAUBE:**  Good afternoon, your Honor.  Eric Taube

15  on behalf of U. S. Energy Development, Corp.

16         **MS. PREWITT:**  Good afternoon, your Honor.  Patricia

17  Prewitt, P-R-E-W-I-T-T, representing Copano Field Services.

18  And, again, I'm here just for the stipulation.

19         **MR. SPEARS:**  Good afternoon, your Honor.  Berry

20  Spears and Todd Disher from Locke Lord on behalf of the

21  Official Creditors' Committee.  Mr. Eisenberg is also in

22  attendance by telephone.

23         **THE COURT:**  Thank you.

24         **MR. GREEN:**  Good afternoon.  Ken Green for CL Three

25  Funding Holding Company, LLC, also referred to as Castlelake.

5

1          **THE COURT:**  Thank you.  Very good, so the parties on

2   the phone that want to make an appearance, if you do so, spell

3   your last name after you state your name, please.

4          **MR. ROVIRA:**  Good afternoon, your Honor.  Joseph

5   Rovira, R-O-V-I-R-A, on behalf of Enterprise Crude Oil, LLC.

6          **MR. LAURITA:**  Good afternoon, your Honor.  Allen

7   Laurita, L-A-U-R-I-T-A, on behalf of U. S. Energy Development

8   Corporation.

9          **MR. ALLEN:**  Jerrod Allen, A-L-L-E-N, on behalf of

10  Basic Energy Services, LP.

11         **MR. BISHOP:**  Mike Bishop, B-I-S-H-O-P, on behalf of

12  P.L.P.S., Inc.

13         **MR. EISENBERG:**  Philip Eisenberg, E-I-S-E-N-B-E-R-G,

14  on behalf of the Official Creditors Committee.

15         **MR. HOLBROOK:**  Ron Holbrook on behalf of U. S. Energy

16  Development Corporation, H-O-L-B-R-O-O-K.

17         **MR. SNOW:**  Phil Snow on behalf of Castlelake,

18  S-N-O-W, and Ross Spence, S-P-E-N-C-E.

19         **MR. COHEN:**  Jason Cohen, C-O-H-E-N, for the Debtors.

20         **THE COURT:**  Very good.  So we're going to start with

21  the Court announcing its ruling on USED's application for

22  preliminary injunction.  That's going to take a little while so

23  if you're on the phone, please put your speakerphone on mute.

24  And if you're in the courtroom, just for your information, the

25  -- an audio recording of this oral ruling will be made; and due

6

1    to some I guess relatively new technology, that audio file will

2    be posted on the docket in the adversary proceeding.  So after

3    the hearing, counsel can access to and listen again, if they

4    want to, to this oral ruling through PACER by clicking on that

5    audio file.  And hopefully that will be on the docket, Rhonda,

6    by tomorrow.  Is that realistic?  Yes.  So with that I'll go

7    ahead and start.

8              This is going to be the Court's ruling in adversary

9    proceeding Number 15-1006 (sic) that's styled *U. S. Energy*

10   *Development Corporation, Plaintiff, versus WBH Energy Partners,*

11   *LLC, et al., as Defendants*, with respect to the application for

12   preliminary injunction filed by U. S. Energy Development

13   Corporation that's located at Docket Number 4 in that adversary

14   proceeding.

15             On this past Friday, February 6, 2015, the Court

16   conducted a hearing on the application for preliminary

17   injunction.  At the conclusion of the hearing, the Court took

18   its ruling under advisement.  The Court has carefully reviewed

19   the evidence and worked on its decision over the weekend.  This

20   has been a very difficult decision for the Court.  In short,

21   the Court has decided to grant the application for preliminary

22   injunction.  The following will constitute the Court's finding

23   of fact and conclusions of law with respect to the application

24   for preliminary injunction in accordance with Rule 7052, 7065,

25   and 9014 of the Federal Rules of Bankruptcy Procedure which

7

1   incorporate by reference Rules 52 and 65 of the Federal Rules

2   of Civil Procedure.  In reaching its determinations, the Court

3   has considered the demeanor and credibility of all witnesses,

4   all admitted exhibits, and the pleadings and arguments of the

5   parties regardless of whether they are specifically referred to

6   in this ruling.  The Court has also considered the arguments

7   and statements of counsel, the pleadings of the parties, as

8   well as its own independent legal research when necessary.

9   Without changing its order, the Court reserves the right to

10  add, alter, or delete any language, grammar, or punctuation in

11  this oral ruling to correctly reflect the Court's intention in

12  determining the application.

13        First, jurisdiction and authority will be briefly

14  addressed by the Court.  The Court has jurisdiction over this

15  adversary proceeding and the application for preliminary

16  injunction under 28 USC Sections 1334 and 157.  This adversary

17  proceeding and application for preliminary injunction were

18  filed in bankruptcy cases referred to this Court by the

19  standing order of reference entered in this district.  This

20  adversary proceeding and related application for preliminary

21  injunction are core proceedings pursuant to 28 USC Section

22  157(b) and as admitted by the parties in their pleadings.  The

23  Court is authorized to enter an order on the application for

24  preliminary injunction.

25        Next, the procedural background will be briefly

8

1    addressed by the Court.   The Plaintiff in this adversary

2    proceeding and the Movant is U. S. Energy Development

3    Corporation, which the Court will refer to as "USED"  The three

4    Defendants in this adversary proceeding are, one, WBH Energy,

5    LP, a Debtor in these bankruptcy cases, which the Court will

6    refer to as "Debtor LP;" two, WBH Energy Partners, LLC, another

7    Debtor in these bankruptcy cases, which the Court will refer to

8    as "Debtor LLC;" and three, WBH Energy GP, LLC, another Debtor

9    in these bankruptcy cases, which the Court will refer to as

10   "Debtor GP."  The Court notes and appreciates the efforts of

11   counsel and the parties to use these names for the Debtors

12   during the hearing and testimony.  The Court will refer to

13   "Debtor LP," "Debtor LLC," and "Debtor GP" collectively as "the

14   Debtors."  Although not a party to the adversary proceeding,

15   the Official Committee of Creditors in the Debtors' bankruptcy

16   cases appeared and was heard, which the Court will refer to as

17   "the Creditors Committee."  Also, although not a party to the

18   adversary proceeding, C Three Funding Holding Company, also

19   known as Castlelake, a secured creditor in the Debtors'

20   bankruptcy cases, appeared and was heard, which the Court will

21   refer to as "Castlelake."

22          The Court makes the following findings of fact and

23   conclusions of law.  To the extent any finding of fact is

24   construed to be a conclusion of law, it is hereby adopted as

25   such and vice versa.  Next, the Court will set forth its

9

```
 1    findings of fact with factual background.

 2           On January 4, 2015, the Debtors filed voluntary

 3    petitions for relief under Chapter 11 of the Bankruptcy Code in

 4    this Court.  The Debtors' Chapter 11 cases are being jointly

 5    administered under Bankruptcy Case Number 15-10003.

 6           On January 15, 2015, USED initiated this adversary

 7    proceeding, Number 15-1006, by filing its original complaint

 8    with application for injunctive relief which is located at

 9    Docket Number 4, and the Court will refer to this as "the

10    application."  The application seeks a temporary injunction

11    which the Court refers to as "a preliminary injunction."

12    Following a status conference held on January 23, 2015, with

13    the parties, the Court set a hearing on the application for

14    February 6, 2015.  That order is at Docket 10.  The Court finds

15    that notice and hearing on the application has been proper in

16    all respects.

17           On January 30, 2015, the Debtors filed an answer, a

18    response to the application, and counterclaim which is located

19    at Docket 14.  In sum, through the application, USED seeks a

20    preliminary injunction prohibiting the Debtor LLC from acting

21    as operator under a joint operating agreement and requiring

22    Debtor LLC to turn over operations to USED  The Debtors contest

23    the application on various grounds.

24           On February 6, 2015, the Court conducted an

25    evidentiary hearing on the application for preliminary
```

10

1   injunction.  Numerous exhibits were admitted into evidence at

2   the hearing by Plaintiff USED, which the Court will call "USED

3   exhibits," as well as by the Defendant Debtors, which the Court

4   will call the "Debtors exhibits."  At the hearing, two primary

5   witnesses testified.  First, Mr. Douglas Walch, President of

6   USED, testified.  Second, Mr. Joseph Warnock, Vice President of

7   the Debtors, testified.  The Court finds the testimony of

8   Mr. Walch of USED to be credible in most respects.  The Court

9   finds that the testimony and demeanor of Mr. Warnock of the

10   Debtors lacked credibility in some respects as his testimony

11   was summary, vague, and lacked specifics and not consistent on

12   several key points.  Having said that, the Court recognizes

13   that Mr. Warnock is an oil man and not a professional witness.

14   The Debtors were formed in the year 2010 as effectively startup

15   companies to engage in the exploration and development of oil

16   and gas properties.  The Debtors have common ownership and

17   management, and Debtor LLC and Debtor LLP are controlled by the

18   same persons.

19         Effective September 1, 2001, Debtor LLC as operator,

20   USED as non-operator, and VW Ventures, LLC as non-operator,

21   entered into a joint operating agreement which the Court will

22   refer to as "the JOA."  The JOA was admitted into evidence as

23   USED's Exhibit 1 and Debtors' Exhibit 1.  The JOA deals with

24   the exploration, development, and operation of oil and gas

25   properties by the parties located in various counties in Texas

1   known as the "Barnett Combo Play" in the Fort Worth Basin.

2   Under the JOA, Debtor LLC was named as the operator.  Debtor

3   LLC owned a five percent working interest according to the JOA.

4   USED is named as a non-operator, owning a 50 percent working

5   interest according to the JOA.  VW Ventures is named as a non-

6   operator, owning a 45 percent working interest according to the

7   JOA.  Later, after execution of the JOA, VW Ventures assigned

8   its 45 percent working interest and Debtor LLC assigned its

9   five percent working interest in various percentages to Debtor

10  LP and to USED  As a result of these assignments, Debtor LP

11  currently owns about 50 percent working interest in many of the

12  wells, and USED owns at least 50 percent working interest in

13  many of the wells.  However, on certain of these wells, USED

14  owns more than 50 percent working interest and up to about 95

15  percent on certain wells.  Hundreds of leases are covered by

16  the JOA.

17          Since 2011, under the JOA Debtor LLC as operator has

18  developed and drilled about 36 wells, most of which are

19  producing.  About six wells, known as certain Lewis-Stewart

20  wells, have been drilled and cased but have not been brought to

21  completion or production by Debtor LLC.

22          The chain of events that led to the Debtors'

23  bankruptcy filing and the dispute over the operator began in

24  mid-2014, amid declining oil prices.  The lender to Debtor LLP,

25  Castlelake, apparently stopped funding to Debtor LP.  As a

12

1  result, Debtor LP was unable to pay its share of working

2  interest expense to Debtor LLC.  In turn, Debtor LLC was unable

3  to pay its suppliers and vendors that had worked on the wells

4  and leases.  By early November, 2014, Debtor LP owed Debtor LLC

5  about 11.1 million in lease operating expenses owing to vendors

6  and suppliers attributable to Debtor LP's working interest.

7  The unpaid expenses were incurred beginning around April, 2014.

8  See USED Exhibit 47.  Meanwhile, the total accounts payable

9  owed by Debtor LLC to vendors and suppliers by November, 2014,

10 had grown to about 11.9 million.  See USED Exhibit 46.

11         In late October, 2014, management of the Debtors went

12 and met with USED management in New York.  The Debtors

13 explained the situation to USED, which was basically that

14 Debtor LP was unable to fund its share of working interest

15 expense due to lack of Castlelake funding, and Debtor LLC owed

16 suppliers and vendors over 11 million.  This meeting was

17 followed by emails sent by Debtor LLC to USED on November 10,

18 2014.  See USED Exhibits 46 and 47.

19         The Court does not believe the Debtors' testimony

20 that at the meeting with USED or thereafter, that Debtor LLC

21 made a request to USED to pay the unpaid lease operating

22 expenses owned by Debtor LP within the meaning section -- or,

23 excuse me, Article 7B of the JOA.  Nothing in the written

24 documents provided at the hearing could be construed as a

25 request by Debtor LLC to USED to pay Debtor LP's share of

13

1   expenses.  The two key exhibits in this regard, USED Exhibits

2   46 and 47, which are emails with attachments sent from Debtor

3   LLC to USED, do not mention any request for payment by USED.

4   And Mr. Warnock's testimony regarding the alleged request to

5   USED was summary and vague.  Instead, the Court believes

6   Mr. Walch's testimony that the Debtors presented this as a

7   possible opportunity for USED, that if USED paid Debtor LP's

8   expenses, then USED could perhaps get a first lien under the

9   JOA.  The Debtor LLC did not make a definitive request to USED

10  to pay Debtor LP's share of expenses within Article 7B of the

11  JOA; and it would make sense that Debtor LLC was being cautious

12  and non-demanding with USED in late October and early November,

13  2014, as Debtor LLC was in a very tight spot.  Debtor LLC's own

14  affiliate, that is, Debtor LP, the other working interest

15  owner, could not pay what Debtor LP owed.  The Court's

16  conclusion is also buttressed by the fact that Debtor LLC never

17  took any action to withhold or set off any production revenues

18  owed to USED until after the bankruptcy filing by Debtor LLC in

19  January, 2015.  Debtor LLC also admitted at the hearing that it

20  never made written demand on USED for payment of Debtor LP's

21  share of expenses.

22          Shortly after the late October meeting starting on

23  November 7, 2014, USED started receiving an avalanche of

24  statutory lien claim notices from unpaid suppliers and vendors

25  on the wells and leases.  See USED Exhibits 10 through 21.

14

1   These notices were sent by vendors and suppliers that Debtor

2   LLC owed money to.  The vendors and suppliers had performed

3   services and provided materials to the wells for Debtor LLC and

4   totaled at that time over $4 million.  Shortly thereafter, on

5   November 20, 2014, USED sent a letter to Debtor LLC.  The Court

6   will refer to this as "the November 20 letter."  It is located

7   at USED Exhibit 9.  In the November 20 letter, USED notified

8   Debtor LLC that under Article 5B3 of the JOA, Debtor LLC was

9   deemed to have resigned as operator due to Debtor LLC's

10  insolvency; and additionally because Debtor LLC was no longer

11  capable of serving as operator under article 5A1 of the JOA.

12  The November 20 letter also notified Debtor LLC that USED was

13  exercising its rights under Article 16D of the JOA to select

14  itself, USED, as successor operator.  It must be emphasized

15  this letter was sent on November 20, 2014, prior to the

16  bankruptcy filing by Debtor LLC.

17          On November 9, 2014 -- excuse me, on December 9,

18  2014, USED also sent letters to Debtor LLC and to Debtor LP

19  notifying the Debtors of defaults under the JOA, including the

20  failure to pay vendors, failure to pay share of expenses, and

21  due to lien filings by vendors and suppliers.  The Court finds

22  that Debtor LLC was insolvent within the meaning of the JOA on

23  November 20, 2014, the date of the November 20 letter from USED

24  to Debtor LLC.  The term "insolvent" is not defined in the JOA.

25  Insolvent can be defined under either of two tests.  It is

15

1   either the failure to pay debts as they become due, or balance

2   sheet insolvent where the value of assets exceed the amount of

3   liabilities.  Under either of these insolvency tests the Court

4   finds that Debtor LLC was insolvent on November 20, 2014.  The

5   evidence at the hearing clearly demonstrated that Debtor LLC

6   was unable to pay its debts as they became due on November 20,

7   2014, and was thus insolvent.  The evidence showed that Debtor

8   LLC had over $11 million in past due invoices owed to vendors

9   and suppliers.  See USED Exhibit 46.  Debtor LLC was unable to

10  pay such debts; and, as a result, many unpaid vendors and

11  suppliers filed lien notices.

12          From a balance sheet perspective, the Court also

13  finds that Debtor LLC was insolvent on November 20, 2014.  By

14  its own admission, Debtor LLC was a pass-through-type entity.

15  Its primary assets were accounts receivable owed to Debtor LLC

16  by its affiliate working interest owner LP and working interest

17  owner USED.  Debtor LP owed a huge accounts receivable, over

18  $11 million, to Debtor LLC in November, 2014, that Debtor LP

19  was unable to pay.  USED also allegedly owed some amounts of

20  accounts receivable to Debtor LLC in November, 2014.  The exact

21  amount was unclear from the evidence provided at the hearing.

22  The Debtor LLC suggested it was about 2.5 million.  But the

23  Court cannot conclude based on the limited evidence provided at

24  the hearing that USED also owed Debtor LLC the $11 million that

25  was unpaid by Debtor LP, as Debtor LLC had never made a request

16

1   for payment of such amount to USED as required under Article 7B

2   of the JOA.  The determination that Debtor LLC was balance

3   sheet insolvent is also buttressed by the sworn bankruptcy

4   schedules filed by Debtor LLC just a few weeks later showing

5   its financial condition as of its January 5, 2015, bankruptcy

6   filing.  See USED Exhibit 52.  Debtor LLC's representative

7   testified at the hearing that Debtor LLC's financial condition

8   on November 20, 2014, was roughly equivalent to that set forth

9   in the bankruptcy schedules.  These bankruptcy schedules show

10  that Debtor LLC was -- has about 43 million in liabilities and

11  about 15 million in assets.  The 15 million in assets does not

12  include the value of oil and gas leases which is listed in the

13  bankruptcy schedules as "unknown."  But when asked about the

14  value of the oil and gas properties at the hearing, Debtor

15  LLC's representative, Mr. Warnock, testified that he did not

16  have any idea as to the value.  For these reasons, the Court

17  finds that Debtor LLC was insolvent on November 20, 2014, and

18  thus had deemed to resign as operator under Article 5B3 of the

19  JOA, which is also the date of USED's November 20 letter to

20  USED (sic) replacing Debtor LLC as operator.

21          The Court also finds that under Article 16D of the

22  JOA, USED had the right and authority to select a successor

23  operator on November 20, 2014, and selected itself.  The

24  evidence at the hearing clearly demonstrated that USED owned

25  working interest in the leases as of November 20, 2014 that

17

1   were not less than the interest in the leases owned by USED on

2   September 1, 2011, the date of the JOA.  And in testimony at

3   the hearing, Debtor LLC's representative effectively agreed

4   that USED was the party that had the right to select a

5   successor operator under the JOA.

6           The Court also finds that in November, 2014, Debtor

7   LLC was in default under the JOA for several reasons.  Debtor

8   LLC had failed to pay expenses incurred in the development and

9   operation of the contract area under Article 5D2 of the JOA.

10  Debtor LLC also failed to pay when due all accounts of

11  contractors and suppliers under Article 5D3 of the JOA.  Debtor

12  LLC also failed to keep the leases and wells free of liens

13  under Article 5D3 of the JOA.

14          On December 29, 2014, USED filed suit against the

15  Debtors in state court and sought emergency injunctive relief.

16  See USED Exhibit 2.  On December 29, 2014, USED obtained an ex

17  parte temporary restraining order from the state court.  See

18  USED Exhibit 3.  In essence, the temporary restraining order

19  prohibited the Debtor LLC from interfering with USED's rights

20  as operator under the JOA.  The Court recognizes that the

21  temporary restraining order was entered by the state court ex

22  parte and without notice to or participation by Debtor LLC and,

23  thus, the Court gives it limited probative value.  But now this

24  Court has had a preliminary injunction hearing on notice to and

25  with the participation of Debtor LLC and finds that Debtor LLC

18

1   should be restrained.

2          The Court also finds that Debtor LLC misled USED with

3   respect to draws from the escrow account for expenses funded by

4   USED for its working interest.  Mr. Walch of USED testified

5   that an escrow agreement was used to ensure that money was

6   properly applied by Debtor LLC as operator.  Debtor LLC and

7   USED entered into a series of escrow agreements with Horizon

8   Bank.  See for example USED Exhibit 33.

9          Debtor LLC sent lease requests to USED which

10  identified specific vendors to be paid and then would request a

11  disbursement from the USED escrow account for about 50 percent

12  of such amount.  See USED Exhibits 34 through 45.  The evidence

13  at the hearing demonstrated that Debtor LLC did not use the

14  USED funds to pay the specific vendors identified in the list

15  accompanying the release requests.  For example, vendors Nabors

16  Drilling and Halliburton Energy were not paid by Debtor LLC for

17  invoices accompanying the release request sent to USED  See

18  USED Exhibits 43, 45, and 46.  The Court finds that Debtor

19  LLC's explanation, that the list of specific vendors to be paid

20  was sent to USED as just a courtesy, was not credible.  At some

21  point -- the exact date was unclear from the testimony -- but

22  sometime after September, 2014, USED stopped paying its share

23  of working interest expense to the Debtor LLC.  Debtor LLC

24  contends that USED currently owes about 2.5 million for its

25  share of expenses.  USED has very recently filed an

1   interpleader with the Court effectively admitting that it owes

2   about $1.9 million for some period of time.  See Debtors'

3   Exhibit 6.  Mr. Walch for USED testified that as of November

4   10, 2014, USED was current on payment of its share of working

5   interest expenses.  But more importantly, USED provided a

6   sufficient explanation to the Court as to why it stopped paying

7   its lease operating expenses to Debtor LLC.  USED started

8   receiving statutory lien notices under the Texas Property Code

9   in early November from unpaid suppliers and vendors of Debtor

10  LLC and did not want to have to pay the same amounts twice.

11        USED demonstrated at the hearing that it has

12  significant experience and resources to be the successor

13  operator under the JOA.  According to Mr. Walch, USED has been

14  an operator of oil and gas wells for over 30 years, has drilled

15  over 1,600 wells, is involved in over 200 wells in the State of

16  Texas, is an operator in Texas in addition to other states, and

17  is an operator of one well in the Barnett Shale area.  USED has

18  over 500 employees.  Debtor LLC has about seven employees, and

19  many of the operations are conducted by contractors.

20        According to Debtor LLC, USED funded about $28

21  million to Debtor LLC from December, 2013, through December,

22  2014, under the JOA.  USED has invested significant funds,

23  millions of dollars, in the six Lewis-Stewart wells under the

24  JOA which have not been completed to date by Debtor LLC.

25  Mr. Warnock testified that Debtor LLC does not currently have

20

1    the money to fund completion of these six Lewis-Stewart wells.

2    There was some indication that lease extensions on the wells

3    had been signed until April, but no specifics were provided.

4    Mr. Warnock vaguely testified that Debtor LLC and Debtor LP

5    were in negotiations with unnamed third parties to get

6    financing to complete these six wells, but no details of the

7    status of negotiation or the identity of a potential lender was

8    provided to the Court.  There was some mention that Castlelake

9    might possibly be a debtor in possession, or DIP, lender to

10   finish these wells, but that possibility was quickly dashed by

11   Castlelake's counsel who advised the Court that it would not be

12   supporting the Debtor's use of cash collateral after the end of

13   this month, February, 2015.  Given the current state of

14   affairs, the Court has no confidence that Debtors will be able

15   to obtain funding to complete these six wells.

16          The Debtors have admitted in previous pleadings filed

17   with the Court that the operation of the wells is capital-

18   intensive, and the Court believes that to be true.  Yet the

19   Debtors have no unencumbered cash and have been living week-to-

20   week on interim cash collateral budgets showing mostly negative

21   cash flow.  The Debtors have shown no realistic prospects for

22   outside financing to fund completion and operation of the wells

23   under the JOA.

24          Very little probative evidence on the value of the

25   oil and gas properties was provided to the Court.  Mr. Walch of

21

1    USED testified that based on current pricing, he believed the

2    total current value of a hundred percent of the oil and gas

3    properties was about $25 million.  Mr. Warnock of the Debtors

4    testified that he had no idea as to the value of the oil and

5    gas properties.  The Court notes that there are at least $30

6    million in liens are asserted by Castlelake on just the

7    Debtors' 50 percent working interest in the properties in

8    addition to possible lien claims under the JOA, as well as

9    unpaid mineral lien suppliers.

10           Next, the Court will set forth its conclusions of law

11   with legal analysis.  First, the Court will address the general

12   legal standards for granting a preliminary injunction under

13   Rule 65 of the Federal Rules of Civil Procedure which are

14   incorporated into Bankruptcy Rule 7065.

15           According to the Fifth Circuit, to obtain a

16   preliminary injunction, the movant must prove the following

17   four factors:  one, a substantial likelihood that the movant

18   will prevail on the merits; two, a substantial threat that the

19   movant will suffer irreparable injury if the preliminary

20   injunction is not granted; three, the threatened injury to

21   movant outweighs the threatened harm to the parties sought to

22   be enjoined; and four, granting the injunction will not

23   disserve the public interest.  See for example the case of *Lake*

24   *Charles Diesel, Inc. versus General Motors*, 328 F.3rd 192 at

25   pages 195 through 196, a Fifth Circuit decision from 2003.

22

1          A preliminary injunction is an extraordinary remedy

2   that should not be issued unless a movant clearly carries the

3   burden of persuasion on all four of these factors.  See for

4   example the cases of *Lake Charles Diesel*, 328 F.3d at 195

5   through 196, as well as the Fifth Circuit decision in

6   *Mississippi Power and Light versus United Gas*, 760 F.2d 618 at

7   page 622.

8          The decision whether to grant a preliminary

9   injunction is within the discretion of the trial court.  See

10  for example the case of *Allied Marketing Group versus CDL*

11  *Marketing*, a Fifth Circuit decision at 878 F.2d at page 809.

12         The primary purpose of a preliminary injunction is to

13  preserve the status quo and prevent irreparable harm until the

14  respective rights of the parties can be determined during a

15  trial on the merits.  For that proposition, you can see the

16  cases of *Petro Franchise Systems versus All American*

17  *Properties*, 607 F. Supp.2d 781, a district court decision from

18  the Western District of Texas in 2009, as well as the Fifth

19  Circuit decision of *Winner versus Texas Lottery*, 123 F.3d at

20  page 326.  The status quo has been defined as the last

21  uncontested status which preceded the pending controversy.  See

22  for example the case of *Auode*, that's A-U-O-D-E, *versus Mobile*

23  *Oil*, 862 F.2d 890 at page 893 from the First Circuit, 1988.

24         Courts have recognized the distinction between

25  injunctions that are prohibitory and those that are mandatory

23

1   in nature.  In general, a prohibitory injunction maintains the

2   status quo and prohibits a party from taking action.  See for

3   example the case of *Winner versus Texas Lottery*, a Fifth

4   Circuit decision, 123 F.3d at 326.  On the other hand, a

5   mandatory injunction commands a party to promptly and

6   affirmatively act in a specific and extremely extensive manner.

7   See for example the cases of *United States versus Texas*, 601

8   F.3d 354 at page 362, a Fifth Circuit decision from 2010, as

9   well as the *Braintree Laboratories versus Citigroup* case, 622

10  F.3d at page 41, First Circuit, 2010.

11       A mandatory preliminary injunction, which goes beyond

12  maintaining the status quo, should be granted only if the facts

13  and law clearly favor the movant.  See for example the case of

14  *Martinez versus Mathews*, a Fifth Circuit decision, 544 F.2d at

15  page 1243.

16       Here in our situation the Court concludes that the

17  injunctive relief sought by USED against Debtor LLC is

18  primarily a prohibitory injunction.  This is because the status

19  quo, the last uncontested status that preceded the instant

20  controversy, was that USED had properly been selected as

21  successor operator under the contractual terms to the JOA on

22  November 20, 2014.  In this regard, the following case is

23  instructive, the case of *Tri-Star Petroleum Company versus

24  Tipperary Corp.*, 101 S.W.3d 583, a Texas Court of Appeals

25  decision from El Paso, 2003.  There a dispute existed between

24

1    Tri-Star, the operator of wells, and Tipperary, the non-

2    operator.

3            There a dispute existed between Tri-Star, the

4    operator of wells, and Tipperary, the non-operator.  Tipperary

5    sued Tri-Star for mismanagement as operator and a determination

6    that cause existed to remove Tri-Star as operator.

7            Then after the suit was filed the non-operators voted

8    to remove Tri-Star's operator and elected Tipperary as the

9    operator, as permitted under the contractual terms of the Joint

10   Operating Agreement.  Tipperary then filed an amended petition

11   alleging that Tri-Star breached its contractual obligations

12   under the Joint Operating Agreement by refusing to step down as

13   operator after it had been replaced as the operator under the

14   terms of the Joint Operating Agreement.

15           Tipperary then sought and obtained a temporary

16   injunction determining that it was the current lawful operator

17   by virtue of the vote of non-operators under the Joint

18   Operating Agreement and prohibiting Tri-Star from interfering

19   with Tipperary's assumption of control and requiring Tri-Star

20   to relinquish operations and cease acting as operator.

21           On appeal, the Appellate Court in *Tri-Star* upheld the

22   temporary injunction and found that the status quo was that the

23   non-operators had the contractual right under the Joint

24   Operating Agreement to remove Tri-Star and elect a new

25   operator.  See the *Tri-Star* decision.  It's at 101 S.W.3d at

25

1   588.

2          Further, the Appellate Court in *Tri-Star* found that

3   even though the temporary injunction required some affirmative

4   action by the removed operator, it was incidental to the non-

5   interference with the assumption of control by the successor

6   operator; and, thus, the injunction was prohibitive, not

7   mandatory in nature.  See the case of *Tri-Star*, 101 S.W.3d at

8   Pages 592 through 593.

9          Similarly, in our case the preliminary injunction

10  sought by USED is based on a contractual right under the JOA to

11  remove Debtor LLC as operator and elect a successor operator.

12  This contractual right of USED was exercised and occurred prior

13  to the filing of this adversary proceeding in the bankruptcy

14  case.  Similar to the Tri-Star case, the fact that the

15  preliminary injunction may require Debtor LLC to take some

16  affirmative actions in connection with its non-interference

17  with USED as successor operator does not make it a mandatory

18  injunction, and even if the preliminary injunction sought by

19  USED is considered a mandatory injunction, the Court concludes

20  that the facts and the law clearly support -- or clearly favor

21  the Movant USED that would support a mandatory injunction.

22          Next, with these legal standards in mind, the Court

23  will address the specific requirements for a preliminary

24  injunction as applied to the facts of this case.

25          The first factor that must be established by Movant

26

1    USED to grant a preliminary injunction is that there must be a

2    substantial likelihood that the Movant will prevail on the

3    merits at trial.  To determine the likelihood of success on the

4    merits the Court should look to the standards provided by

5    substantive law.  See, for example, the case of *Valley versus*

6    *Rapides Parish School Board*, 118 F.3d at Page 1051, a Fifth

7    Circuit decision.

8           A movant, however, is not required to prove his case.

9    To satisfy this factor the likelihood of success need not be

10   absolutely certain.  See, for example, the cases of *Casarez*

11   *versus Val Verde County,* 957 F.Supp. 847, a District Court

12   decision from the Western District of Texas in 1997, as well as

13   the Fifth Circuit decision in *Lake Dreams versus Taylor*,

14   932 F.2d at 1009, Note 11.

15          Here the Court concludes that USED has a very

16   substantial likelihood that it will prevail on the merits at

17   trial on the removal of Debtor LLC as operator and the

18   selection of USED as successor operator.  This is because

19   Debtor LLC was insolvent on November 20, 2014, the date of its

20   deemed resignation and the election of USED as successor

21   operator.  In this regard, Article 5B(3) of the JOA provides:

22   "If operator, that is, Debtor LLC, becomes insolvent, it shall

23   be deemed to have resigned without any action by non-operators

24   other than selection of a successor."

25          As already extensively set forth by the Court in its

**EXCEPTIONAL REPORTING SERVICES, INC**

1   findings of fact, Debtor LLC, the operator, was clearly

2   insolvent on November 20, 2014.  Debtor LLC was insolvent

3   because it could not pay its debts when they became due to the

4   tune of over $11 million in unpaid past due invoices from

5   vendors.  Debtor LLC was also insolvent under a balance sheet

6   test, as its liabilities exceeded its assets.

7           Insolvent is commonly defined under one of two

8   different tests as either the failure to pay debts as they

9   become due or balance sheet insolvency where the value of

10  assets exceed the amount of liabilities.  See, for example,

11  Section 1.20123 of the Texas Business and Commerce Code,

12  Section 101(32) of the Bankruptcy Code, as well as Black's Law

13  Dictionary.  Under either of these tests Debtor LLC was

14  insolvent on November 20, 2014.

15          Article 5B of the JOA provides that if an operator

16  has resigned, a successor operator shall be selected by the

17  parties.  However, these parties signed in connection with the

18  JOA a special Article 16, which trumps Article 5B.  Article 16D

19  of the JOA provides, in pertinent part:

20  "Notwithstanding anything to the contrary contained herein,

21  including Article 5B, if at the time WBH, that is, the Debtor

22  LLC, first ceases to be operator, USED and its affiliates

23  collectively own an undivided working interest in the subject

24  leases that is not less than the interest in the subject leases

25  as of the date hereof that USED owns as of the date hereof;

28

1   that is, September 1, 2011, USED shall have the sole and

2   exclusive authority to select a successor operator."

3        There was no dispute that USED owned an undivided

4   working interest in the leases as of November 20, 2014 that was

5   not less than the undivided working interest owned by USED as

6   of the September 1, 2011 date of the JOA.  So the Court

7   concludes that the JOA gave USED the sole right to select a

8   successor operator, which USED did on November 20, 2014 when it

9   selected itself as successor operator.  The Court must

10  emphasize that this insolvency clause of the JOA was exercised

11  by USED before the bankruptcy case filing by Debtor LLC.

12       Various provisions of the Bankruptcy Code invalidate

13  insolvency clauses, sometimes called ipso facto clauses, if

14  they are attempted to be exercised after the filing of the

15  bankruptcy case.  See, for example, Section 365(e)(1)(A) of the

16  Bankruptcy Code dealing with executory contracts, which

17  basically invalidates insolvency clauses if they are used

18  "after the commencement of the bankruptcy case."

19       Here in our situation USED's rights based on the

20  insolvency clause in the JOA were exercised and completed on

21  November 20, 2014 prior to the commencement of Debtor LLC's

22  bankruptcy case, so the invalidation of the ipso facto clauses

23  in the Bankruptcy Code do not apply.  See, for example, the

24  cases of In Re Comp III, 136 B.R. at 636, a Bankruptcy Court

25  decision out of the Southern District of New York, as well as

29

1   *In Re LJP, Inc.,* 22 B.R. 556, a Bankruptcy Court decision out

2   of Florida.  Further, Debtor LLC in this case did not argue or

3   suggest that the insolvency clause in the JOA was invalid based

4   on the Bankruptcy Code.

5           At the hearing the Debtors appeared to argue that

6   Article 16D of the JOA, which gives USED the sole right to

7   appoint a successor operator, does not apply.  This argument

8   seemed to be based on the notion that USED's rights could only

9   be triggered if WBH, that is Debtor LLC, failed to maintain a

10  5 percent working interest in the leases.  The Court does not

11  read this Article 16D that way and neither did Debtor LLC's

12  representative of the hearing who effectively conceded that

13  USED was given the right to appoint a successor operator.

14          Further, the evidence at the hearing established that

15  WBH, that is, Debtor LLC, did not maintain a 5 percent working

16  interest in the leases as of November 20, 2014.  Further, the

17  evidence showed that USED owned a majority interest in many

18  wells up to as much as 95 percent in certain wells as of

19  November 2014, which would give USED the right to select a

20  successor operator under Article 5B(2) of the JOA, in any

21  event.

22          The Debtor LLC also argues that Article 16G(1) of the

23  JOA effectively excuses their defaults, insolvency and lack of

24  performance under the JOA because USED had not paid Debtor LP's

25  share of lease operating expenses.  In this regard, Article

1   16G(1) of the JOA provides:

2   "Notwithstanding anything hereunder to the contrary, operator,

3   that is, Debtor LLC, shall not be obligated to perform nor

4   liable for its failure to perform or to continue any work or

5   incur any expenditure or indebtedness hereunder for the joint

6   account until all funds requested of non-operators pursuant to

7   cash calls given in accordance with the applicable provisions

8   hereof have been received by the operator."

9         As already set forth by the Court in its finding of

10  fact, Debtor LLC never made a demand, request or cash call to

11  the USED to pay Debtor LP's share of lease operating expenses

12  prior to November 20, 2014.  No writing or written notice of

13  any cash calls upon USED for Debtor LP's share of expenses was

14  provided at the hearing, and Debtor LLC cannot rely on this

15  Article 16G(1) when it lists its very own affiliate Debtor LP

16  that failed to pay over $11 million of its own expenses to

17  Debtor LLC.

18        In a similar vein, Debtor LLC argues that USED was in

19  default under the JOA because USED did not pay Debtor LP's

20  share of lease operating expenses under Article 7B of the JOA.

21  In this regard, Article 7B of the JOA provides, in pertinent

22  part:

23  "If any party fails to pay its share of costs within 120 days

24  after rendition of a statement thereof by operator, the non-

25  defaulting parties, including operator, shall upon request of

31

1   operator pay the unpaid amount in the proportion that the

2   interest of such party bears to the interest of all parties."

3          Under this article, Debtor LLC argues that since its

4   affiliate Debtor LP failed to pay its share of the costs, then

5   USED as a non-defaulting party must pay Debtor LP's share.  But

6   this Article 7B does not apply to the state of affairs as they

7   existed on November 20, 2014.  As of that time, Debtor LLC had

8   never made a request to USED to pay Debtor LP's share of costs

9   prior to November 20, 2014.

10         As set forth in detail in the Court's findings of

11   fact, Debtor LLC did not make a request to USED to pay Debtor

12   LP's share of costs within the meaning of 7B of the JOA prior

13   to November 20, 2014 and nothing in the written documents

14   provided at the hearing could be construed as a request by

15   Debtor LLC to USED to pay Debtor LP's share of expenses.

16         Finally, Debtor LLC argues that USED is attempting to

17   impermissibly enforce an unassumed executory contract, that

18   being the JOA, against the debtor in bankruptcy.  For this

19   proposition Debtor LLC cites case law for the proposition that

20   until an executory contract is assumed or rejected by a debtor

21   in bankruptcy it remains unenforceable against the debtor party

22   but is enforceable against the non-debtor party.  This argument

23   lacks merit because Debtor LLC had already resigned and been

24   replaced as the operator under the JOA prior to the bankruptcy

25   filing by Debtor LLC.

32

1           Further, the Court is very troubled by this argument

2    by Debtor LLC.  How could Debtor LLC be an operator of numerous

3    wells and leases if there is not an agreement in place the

4    Debtor LLC will abide by, that being the JOA, that will govern

5    the parties' relationship?

6           For any and all of these reasons the Court concludes

7    that USED has a very substantial likelihood that it will aver

8    on the merits at trial on the removal of Debtor LLC as operator

9    and that the selection of USED as successor operator.  Thus,

10   the first factor for preliminary injunction has been satisfied.

11          The second factor that must be satisfied by Movant

12   USED to grant a preliminary injunction is that there is a

13   substantial threat that the movant will suffer irreparable

14   injury or harm if the preliminary injunction is not granted.

15   The consideration of irreparable harm is an essential

16   prerequisite for equitable injunctive relief.  See, for

17   example, *Braintree Laboratories versus Citigroup*, 622 F.3d at

18   Page 41, a First Circuit decision in 2010.

19          An injury is irreparable if monetary relief cannot

20   remedy it.  See, for example, the cases of *Watchguard Tech*

21   *versus Valentine,* a District Court decision from the Northern

22   District of Texas located at 433 F.Supp., Page 792.

23          With regard to the extent that irreparable injury

24   must be demonstrated, some courts apply a sliding scale.  See,

25   for example, the case of *Braintree Lab,* 622 F.3d at Pages 42

33

1   and 43.  Basically, under the sliding scale the strength of the

2   showing necessary on irreparable harm depends, in part, on the

3   degree of likelihood of success shown.  The greater the

4   likelihood that a moving party will succeed on the merits of a

5   case means there is less of a need to demonstrate irreparable

6   injury.  However, courts cannot dispense with the irreparable

7   harm and injury requirement in affording injunctive relief.

8   See, for example, the case of *Gately versus Commonwealth,*

9   2 F.3d at 1221, a First Circuit decision.

10          Here the Court concludes that there is a high degree

11  that USED will succeed on the merits at trial regarding

12  replacement of Debtor LLC as operator for the reasons already

13  set forth by the Court, and regardless of the sliding scale

14  USED met its burden on this second factor.

15          The Court concludes that there is a substantial

16  threat that USED will suffer irreparable injury and harm if a

17  preliminary injunction is not granted, for several reasons.

18          First, USED will suffer irreparable injury and harm

19  because it is being denied the right to operate oil and gas

20  properties in which it has invested significant funds when it

21  had the contractual right to be the operator.  When interests

22  involving real property are at stake, a preliminary injunction

23  can sometimes be particularly appropriate because of the unique

24  nature of real estate.  When a movant is being denied the right

25  to participate in operation of its income producing oil and gas

34

1   properties for which a movant has paid a substantial amount of

2   funds, courts have found irreparable injury and lack of

3   adequate monetary relief.  See, for example, the case of *RoDa*

4   *Drilling versus Siegal,* 552 F.3d 1203, a Tenth Circuit decision

5   in 2009.

6          Here the working interest owned by USED in the oil

7   and gas leases are considered real estate under Texas law.

8   See, for example, the cases of *In Re Cornerstone Energy,*

9   436 B.R. 865 at Page 869, a Bankruptcy Court decision from the

10  Northern District of Texas in 2010, as well as *Long Trusts*

11  *versus Griffin,* a Texas Supreme Court case in 2006 located at

12  222 S.W.3d 412 at Page 416.

13         USED's working interests are income producing and

14  USED has spent millions of dollars investing in these oil and

15  gas interests.  USED is being denied the right to operate the

16  oil and gas properties that it owns and spent significant funds

17  by virtue of Debtor LLC's refusal to relinquish the

18  operatorship of such properties under the JOA.

19         Second, irreparable injury will be suffered by USED

20  if the Debtor LLC does not relinquish operatorship under the

21  JOA due to Debtor LLC's lack of funding and capital.  Debtor

22  LLC admits that operating wells is a capital intensive

23  business, and Debtor LLC has no ready capital.  All of Debtor

24  LLC's cash is encumbered by millions of dollars in liens and

25  claims.

35

```
 1              Its pre-bankruptcy lender, Castle Lake, has advised

 2     that it will not support Debtor LLC's use of cash collateral

 3     after the end of this month.  The Debtor LLC has no alternative

 4     source of financing that is on the horizon or immediate

 5     prospect.  At least one unpaid vendor testified that it would

 6     not continue to provide services to the oil and gas properties

 7     unless Debtor LLC prepays for future services in cash, which

 8     typifies the position of many unpaid vendors in Chapter 11

 9     cases.

10              Third, there's a substantial likelihood that

11     irreparable injury will be suffered by USED with respect to the

12     six Lewis Stuart wells that Debtor LLC has been unable to

13     complete.  According to Debtor LLC, USED has paid over

14     $28 million to Debtor LLC over the last year for the oil and

15     gas properties under the JOA, which is a very significant sum

16     of money.  USED has invested significant funds, millions of

17     dollars, in the six Lewis Stuart wells under the JOA, which

18     have not been completed to date by Debtor LLC.  Debtor LLC

19     currently does not have the money to fund completion of the six

20     Lewis Stuart wells.  There was some indication, but no

21     specifics, that lease extensions on these six wells had been

22     signed until April.

23              Mr. Warren Vagley (phonetic) testified the Debtor LLC

24     and Debtor LP were in negotiations with unnamed third parties

25     to get financing to complete these six wells, but no details of
```

**EXCEPTIONAL REPORTING SERVICES, INC**

36

1   the status of the negotiation, the identify of a potential

2   lender or the timing of any financing was provided to the

3   Court.  There was some mention that Castle Lake might possibly

4   be a DIP lender to finish these wells, but that possibility

5   seemed highly unlikely as Castle Lake's counsel advised the

6   Court that it would not be supporting the Debtor's use of cash

7   collateral after the end of this month, February 2015, and

8   wants a forensic accountant.

9          Given the current state of affairs, which include a

10  steep decline in oil prices, it seems unlikely the Debtors will

11  be able to obtain funding to complete these six wells.  If the

12  Debtors are unable to fund completion of these six wells, USED

13  will suffer irreparable injury and loss of their significant

14  investment in the wells.

15         Fourth, USED will suffer irreparable injury due to

16  the mounting statutory lien mineral claims against it that is a

17  result of Debtor LLC and Debtor LP not paying suppliers and

18  vendors.  Statutory mineral lien claims continue to be asserted

19  against USED's working interests in these oil and gas

20  properties for suppliers the Debtor LLC did not pay.  See, for

21  example, USED Exhibit 16 and 21.  Under Section 56.021 of the

22  Texas Property Code, more mineral lien notices are likely

23  forthcoming, as claimants have six months after the date that

24  labor and materials are last furnished to file liens.

25         Fifth, USED will likely suffer irreparable injury, as

37

1   USED does not appear to have adequate monetary relief available

2   for several reasons:

3          For one, the Debtors are insolvent and already owe

4   millions of dollars in lender and vendor debt and appear unable

5   to pay any damage claim that USED might assert for the loss of

6   the operatorship rights and its interest in oil and gas

7   properties.

8          Second, attempting to quantify the money damages for

9   USED's loss of operating rights under the JOA would be

10  difficult, if not impossible.

11         Third, the lien rights granted to USED in the JOA are

12  of questionable and unknown value given the numerous liens on

13  the oil and gas properties and declining oil prices.

14         For any and all of these reasons the Court concludes

15  that USED has proven that there is substantial threat that USED

16  will suffer irreparable injury or harm if the preliminary

17  injunction is not granted; and, thus, the second factor has

18  been proven.

19         The third factor that must be satisfied by Movant

20  USED to grant a preliminary injunction is that the threatened

21  injury to Movant USED outweighs the threat and harm to the

22  party, here Debtor LLC, sought to be enjoined.  This balance of

23  harm is not presumed in a movant's favor merely by showing a

24  substantial likelihood on the merits.  See, for example, the

25  case of *Casarez versus Val Verde County,* 957 F.Supp. at

38

1    Page 865, a District Court decision from the Western District

2    of Texas.

3           With respect to Movant USED, the Court has already

4    set forth the substantial injury and harm to Movant USED if a

5    preliminary injunction is not granted.  So now the Court must

6    balance the threat and injury to Debtor LLC, the party sought

7    to be enjoined by USED.  In this regard, the Court believes it

8    is appropriate to consider not only what the Debtors have to

9    say but also what the Creditors' Committee and Castle Lake, the

10   primary lender, has to say since we are dealing with bankruptcy

11   estates and the Creditors' Committee and Castle Lake are

12   substantial stakeholders.

13          Strictly from the Debtor LLC's standpoint it does not

14   appear that the harm of a preliminary injunction would be

15   substantial.  Debtor LLC and its estate would have to

16   relinquish operating rights under the JOA, but the lost revenue

17   from not collecting operator's fees does not appear

18   significant.  Debtor LLC would incur time and expense in

19   transitioning operations to USED, which the Court realizes is

20   no small undertaking.  The only time estimate of operator

21   transition time was provided by USED, who estimated that it

22   would take about two weeks, and the Debtor LLC and its

23   management and employees must be paid for those transition

24   services.  The Court does not expect them to perform those

25   services for free, and it is in the best interest of Debtor LLC

39

1    to cooperate in the operator transition for several reasons,

2    including to preserve the working interests and interest in the

3    oil and gas leases owned by the Debtors.

4           The Court is very concerned that even if a

5    preliminary injunction were not granted, given all the fighting

6    and accusations between the Debtors and its lenders and the

7    lack of funding support for the Debtors, that Debtor LLC would

8    end up at some point not having the funds to operate and lose

9    the operatorship anyway.  It is better to have an orderly

10   operator transition now with USED instead of waiting until it

11   is in absolute crisis mode and run the risk that Debtor LLC

12   operations would have to be immediately shut down and harm all

13   parties concerned that have interest in and claims against the

14   wells and leases.

15          On the other hand, USED as successor operator is a

16   financially solvent and experienced operator that is willing

17   and able to operate the wells.  USED already has a vested

18   financial interest in successfully operating and completing

19   these wells.  USED already has some knowledge about the wells

20   and properties given its substantial working interest ownership

21   in the properties at issue.

22          The Creditors' Committee raised several good points

23   at the hearing regarding the balancing of the harms to the

24   Debtor's estates.  Chief amongst them is what will USED do if

25   it is operator, will USED sue itself for Debtor LP's unpaid

40

1  costs under the JOA and will USED pay the mineral lien

2  claimants?  At the hearing USED did not definitively answer

3  these questions.  The Court does not have a crystal ball that

4  can answer all of these questions.

5       What is clear to the Court is that even if USED is

6  operator, the automatic stay will continue to protect the

7  working interest of the Debtors and the Debtors' interest in

8  the oil and gas leases and mineral lien claimants will still

9  have their statutory rights against USED if it is operator.

10 And for USED this could turn out to be a classic example of be

11 careful what you ask for because you might get it, here the

12 right to be the operator.  Only time will tell, and at this

13 point it would be speculation for the Court to try and answer

14 these questions.

15       Castle Lake's position on the Debtor LLC operatorship

16 and the harm to the Debtors of losing operating rights was

17 somewhat baffling to the Court.  Castle Lake stated that it is

18 unwilling to fund the Debtors past the end of this month,

19 accused the Debtors of financial irregularities and has called

20 for a forensic accountant.  This does not bode well for Debtor

21 LLC when its primary lender, Castle Lake, as well as the

22 majority working interest owner USED, has accused Debtor LLC of

23 misapplying funds and accounting irregularities.

24       The Court is making no findings on whether or not

25 Debtor LLC has engaged in any accounting irregularities, but

41

1   the time and expense to Debtor LLC to defend these accusations,

2   while at the same time trying to act as operator and trying to

3   operate and complete the wells with little or no financial

4   funding greatly reduces any possibility that Debtor LLC will be

5   successful in operating and completing these wells, which would

6   harm all stakeholders in these bankruptcy cases.

7          For any and all of these reasons the Court concludes

8   that USED has proven that the threat and injury to Movant USED

9   outweighs the threat and harm to the parties that are to be

10  enjoined; and, thus, the third factor has been satisfied.

11         The fourth and final factor that must be satisfied by

12  Movant USED to grant a preliminary injunction is that granting

13  the preliminary injunction will not disserve the public

14  interest.  Here the public interest would not be disserved by

15  having USED be the operator.  USED has the financial ability

16  and experience to operate the wells and develop the leases and

17  is already an operator in the state of Texas.

18         In contrast, Debtor LLC is on very shaky financial

19  footing and the Court has little confidence at this point that

20  the Debtor LLC will have the capital and funding to operate and

21  complete the wells.  To have an operator like Debtor LLC that

22  might have to suddenly shut down due to lack of funds would

23  disserve the interest of the public and the state of Texas.  A

24  sudden shutdown of operating wells would be dangerous for the

25  public.  Any risk to the public can be lowered by having USED

42

1    as the operator.

2         For these reasons the Court concludes that USED has

3    proven that the granting of a preliminary injunction will not

4    disserve the public interest; and, thus, the fourth and final

5    factor has been satisfied.

6         In conclusion, the Court finds that the application

7    for preliminary injunction filed by USED should be granted

8    subject to the posting of an appropriate bond by USED.  This

9    decision has not been made lightly by the Court, and the Court

10   realizes the seriousness of the situation.

11        The Court also realizes that this ruling on the

12   preliminary injunction and its impact is a lot for the parties

13   and counsel to immediately digest.  For that reason in a moment

14   we're going to take about a 30-minute recess and provide the

15   parties with the opportunity to discuss and evaluate the

16   situation given the Court's ruling that it just announced on

17   the preliminary injunction.  When we come back after recess, to

18   the extent possible the Court wants the parties to try to

19   address the following issues:

20        One, the amount of bond that USED should post for the

21   preliminary injunction.  We did not reach that issue at

22   Friday's hearing and I want to hear what the parties have to

23   say before setting the bond.  The preliminary injunction is not

24   effective under the rules until an order has been entered and a

25   bond has been posted.

43

1          Second, preparation of an order granting a

2    preliminary injunction, we have not gotten to that yet.

3    There's several issues there in the order for the parties to

4    consider.  One is the timing and logistics of transition to the

5    USED as an operator -- or as the operator.  Another is the

6    effective date of USED becoming operator.  It would seem like

7    to have the appointment effective November 20, 2014 on the date

8    of the deemed resignation would create additional problems and

9    concerns, as the Debtor LLC has been acting as the operator

10   since November 20 and during the bankruptcy case.

11         I'm hopeful that the parties could agree on an

12   effective date on the change in operatorship to minimize those

13   issues, and I think it's in all parties' best interest to do

14   so.

15         USED has submitted and filed with the application a

16   proposed form of Order granting a preliminary injunction, which

17   is a starting place, but it definitely would need revision.

18   Although I do not expect the Debtors to agree to a preliminary

19   injunction, I do expect the Debtors to work with USED to come

20   up with a form of Order that's realistic from a logistics and

21   timing standpoint on the transition of operatorship.  You

22   really don't want me trying to craft that kind of logistical

23   part of the order, though I think the parties would understand

24   the logistics much better than I would.

25         I realize we also have set today cash collateral,

1   another interim cash collateral hearing, and I realize that the

2   Court's ruling may well impact that.  I do expect that the

3   employees and management of Debtor LLC to be paid for their

4   services in transition of operatorship and I don't want to hear

5   a lot of quibbling about that from lenders and lien holders.

6        I also realize today we had set for status hearing

7   stipulations on suspense funds with Enterprise and Copano, and

8   I realize that the Court's ruling today may impact that.

9        So that's a lot to try to get accomplished today in

10  light of the Court's ruling on the preliminary injunction,

11  which I know will take some time to digest the impact of.  But

12  let's see what we can do to move forward.

13        For the parties' information this is the Court's

14  schedule and availability in the short term:  One, we have

15  until 5:00 o'clock today -- that's Monday.  I will be leaving

16  early tomorrow morning for El Paso for court and not returning

17  to Austin until very late Thursday night.  Unfortunately, this

18  is not my only bankruptcy case.  This Friday, February 13, I

19  should be back in Austin.  I could give you some time on

20  Friday.  Be aware that I'm coming back really late the night

21  before and I have other hearings, so I wouldn't be inclined to

22  make Friday a day for lots of argument and decision making, but

23  I could give you some time.

24        The following week, February 16, Monday,

25  unfortunately that happens to be a federal holiday the way the

45

1  calendar works out so the courthouse won't be open.  And

2  Tuesday, February 17, is my consumer docket day in Austin and

3  you don't want to be part of that.

4          So the next slot after that would be Wednesday,

5  February 18, which is already set aside as an omnibus hearing

6  date in these bankruptcy cases, and I have been and will hold

7  that open for this case.

8          So I'm going to take a recess for about 30 minutes

9  and then we'll come back out and we'll see how far we can get

10  on some of these issues.  We'll be in recess.

11          **THE CLERK:**  All rise.

12      **(Requested transcription concluded at 2:20 p.m.;**

13  **proceeding continued and is transcribed under separate cover)**

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          <u>March 11, 2015</u>

TONI HUDSON, TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC